## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES H. ROANE, JR.                         :
Inmate Number 32923-083                     :
U.S. Penitentiary Terre Haute               :
Terre Haute, IN 47802                       :
                                            :
            and                             :
                                            :
RICHARD TIPTON                              :
Inmate Number 32922-083                     :
U.S. Penitentiary Terre Haute               :
Terre Haute, IN 47802                       :
                                            :
            and                             :
                                            :
CORY JOHNSON                                :
Inmate Number 27832-054                     :
U.S. Penitentiary Terre Haute               :
Terre Haute, IN 47802                       :
                                            :
        Plaintiffs,                         :
                                            :
v.                                          :          Case Number:  1:05-cv-2337
                                            :
ALBERTO GONZALES                            :
Attorney General                            :
U.S. Department of Justice                  :
950 Pennsylvania Avenue, NW                 :
Washington, DC 20530                        :
                                            :
            and                             :
                                            :
KAREN TANDY, Administrator                  :
Drug Enforcement Administration             :
2401 Jefferson Davis Highway                :
Alexandria, VA 22301                        :
                                            :
            and                             :
                                            :

**HARLEY G. LAPPIN, Director**       :
**Federal Bureau of Prisons**        :
**U.S. Department of Justice**       :
**320 First St., NW**                :
**Washington, DC 20534**             :
                                     :
            **and**                  :
                                     :
**NEWTON E. KENDIG, II., M.D.**      :
**Medical Director**                 :
**Health Services Division**         :
**Federal Bureau of Prisons**        :
**320 First St., NW**                :
**Washington, DC 20534**             :
                                     :
            **and**                  :
                                     :
**MARK BEZY, Warden**                :
**U.S. Penitentiary Terre Haute**    :
**4700 Bureau Road South**           :
**Terre Haute, IN 47802**            :
                                     :
                                     :
            **and**                  :
                                     :
**THOMAS WEBSTER, M.D.**             :
**Clinical Director**                :
**U.S. Penitentiary Terre Haute**    :
**4700 Bureau Road South**           :
**Terre Haute, IN 47802**            :
                                     :
            **and**                  :
                                     :
**JOHN DOES I-X,**                   :
                                     :
**Individually and in their**        :
  **official capacities,**           :
                                     :
**Defendants.**                      :

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, ATTORNEY'S FEES, AND COSTS OF SUIT, PURSUANT TO *BIVENS v. SIX UNKNOWN AGENTS*, 403 U.S. 388, 390-97 (1971), AND THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 551 *et seq*.**

## I.
## Nature of Action

1.      This action is brought pursuant to (a) <u>Bivens v. Six Unknown Agents</u>, 403 U.S. 388, 390-97 (1971), for (a) violations and threatened violations of the plaintiffs' rights to Due Process under the Fifth Amendment to the United States Constitution; and (b) violations and threatened violations of the plaintiffs' rights to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution; and (b) violations and threatened violations of the plaintiffs' rights pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. ("APA").

2.      The Plaintiffs have been sentenced to death under federal law and, unless their capital conviction(s) and/or death sentence(s) are overturned in another judicial proceeding or via executive clemency, they will be killed by the defendants pursuant to an execution procedure that violates (a) the Fifth and Eighth Amendments; and (b) the APA.   The plaintiffs seek a preliminary and permanent injunction preventing the defendants from doing so, an Order declaring that the defendants' proposed execution procedure violates the Fifth and Eighth Amendments, and violates the APA, and such other equitable relief as the Court deems just and proper.

3.      The Fifth Amendment's Due Process clause requires notice and the opportunity to be heard before the deprivation of life, liberty, or property.   The defendants, however, have failed to disclose the procedures that will be utilized in carrying out plaintiffs' executions, preventing the plaintiffs from determining whether any aspect of those procedures may constitute cruel and unusual punishment, and to

consult medical experts concerning that possibility, in violation of the Due Process Clause.

4.     Moreover, it is a violation of the Eighth Amendment to use an arbitrary, cruel, and/or unreliable method of execution, which risks inflicting unnecessary pain, particularly when the risk of such unnecessary pain is foreseeable.  Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463 (1947) (opinion of Reed, J.); Furman v. Georgia, 408 U.S. 238, 273 (1972), citing Resweber).  On information and belief, the means by which the defendants plan to kill the plaintiffs are arbitrary, cruel and/or unreliable, and risk causing unnecessary and gratuitous suffering.

5.     Furthermore, the plaintiffs were sentenced to death pursuant to 21 U.S.C. § 848(l) of the Controlled Substances Act, 21 U.S.C. § 801 et seq. ("CSA"), which authorizes a sentence of death in certain circumstances.  The defendants have promulgated regulations which purport to authorize that a sentence of death be carried out by the injection of lethal chemicals.  However, those regulations were promulgated without public notice and comment, and in violation of the APA's procedural requirements, and are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

6.     In addition, in the CSA, Congress established a federal scheme that comprehensively regulates the manufacture, distribution, possession and dispensing of "controlled substances."  The CSA makes it unlawful to "dispense" any controlled substance except pursuant to the prescription of a practitioner possessing a registration issued pursuant to the CSA.  21 U.S.C. §§ 822, 829 (2000).  To be effective, such a prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. §

1306.04(a) (2005).  The defendants intend to execute the plaintiffs by administering a controlled substance – sodium thiopental – in violation of the CSA; *i.e.*, by dispensing that controlled substance not pursuant to a prescription issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice and possessing a valid registration issued pursuant to the CSA.  In doing so, the defendants have arbitrarily and capriciously failed to exercise their authority to enforce the CSA.

7.      The claims in this complaint are cognizable under <u>Bivens</u> and the Fifth and Eighth Amendments, as well as the APA.  This lawsuit is not, and should not be treated as, a successor habeas corpus petition.  <u>See</u> <u>Hill v. McDonough</u>, 126 S.Ct. 2096 (2006); <u>Nelson v. Campbell</u>, 541 U.S. 637 (2004).  In this action, the plaintiffs do not challenge the validity of their convictions or death sentences.  Rather, they claim that the means by which the defendants plan to kill them violate the Fifth and Eighth Amendments, and the APA.

## II.

### Parties

8.      Plaintiff James H. Roane, Jr. ["Roane"] is a United States citizen and a resident of the Commonwealth of Virginia.  He is a death-sentenced inmate in the custody of the defendants, and under the control and supervision of the Federal Bureau of Prisons, a department of the United States Department of Justice ["BOP"].  He is incarcerated at the U.S. Penitentiary in Terre Haute, Indiana.  If his capital conviction and/or death sentence are not overturned in another judicial proceeding or through executive clemency, the defendants will kill him in the "death house" located on the

grounds of the U.S. Penitentiary Terre Haute, which is operated and controlled by the defendants.

9.     Plaintiff Richard Tipton ["Tipton"] is a United States citizen and a resident of the State of New York.  He is a death-sentenced inmate in the custody of the defendants, and under the control and supervision of the BOP.  He is incarcerated at the U.S. Penitentiary in Terre Haute, Indiana.  If his capital conviction and/or death sentence are not overturned in another judicial proceeding or through executive clemency, the defendants will kill him in the "death house" located on the grounds of the U.S. Penitentiary Terre Haute, which is operated and controlled by the defendants.

10.     Plaintiff Cory Johnson ["Johnson"] is a United States citizen and a resident of the State of New York.  He is a death-sentenced inmate in the custody of the defendants, and under the control and supervision of the BOP.  He is incarcerated at the U.S. Penitentiary in Terre Haute, Indiana.  If his capital conviction and/or death sentence are not overturned in another judicial proceeding or through executive clemency, the defendants will kill him in the "death house" located on the grounds of the U.S. Penitentiary Terre Haute, which is operated and controlled by the defendants.

11.     Defendant Alberto Gonzales is the Attorney General of the United States. The plaintiffs were remanded into his custody upon their conviction and the imposition of their death sentences, and he is the final executive authority responsible for carrying out sentences of death against federal prisoners.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

12.     Defendant Karen Tandy is the Administrator of the United States Drug Enforcement Agency ["DEA"].  In that role, she is responsible for exercising the authority delegated to her by the Attorney General to enforce the CSA.  She is sued here

in her individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

13.    Defendant Harley G. Lappin is the Director of BOP.  As such, he is charged with prescribing and directing, and is authorized to prescribe and direct, the promulgation of rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations and execution procedures.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

14.    Defendant Newton E. Kendig, II., M.D. is the Medical Director of BOP.  In that position he is responsible for overseeing the provision of medical care to inmates at all BOP facilities, and for promulgating and implementing BOP policy with respect to medical care provided by BOP.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

15.    Defendant Mark Bezy is the Warden of the United States Penitentiary at Terre Haute, Indiana, which is the BOP facility at which sentences of death are executed in the federal system.  In that position, he is charged with management of the U.S. Penitentiary Terre Haute and the oversight and conduct of operations there, including the oversight and conduct of executions carried out there.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

16.    Defendant Thomas Webster, M.D. is the Clinical Director at the United States Penitentiary Terre Haute.  In that position he is responsible for overseeing the provision of medical care to inmates at that facility.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

17.    Defendants John Does I - X are employed by BOP to prepare for and carry out the plaintiffs' executions.  The plaintiffs do not know, and the defendants have not revealed, their identities.   They are sued here in their individual and official capacities for the purpose of obtaining declaratory and injunctive relief.

18.    The defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law. Upon information and belief, unless preliminarily and permanently enjoined, the defendants, and each of them, intend to act in their respective official capacities and under the authority of federal law in executing the plaintiffs, in violation of the plaintiffs' constitutional and statutory rights.

### III.
### Jurisdiction and Venue

19.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that it arises under the Constitution and laws of the United States; Bivens, 403 U.S. at 390-97, in that it seeks to secure prospective, equitable relief directly under the Constitution, specifically the Fifth and Eighth Amendments; under 28 U.S.C. § 2201(a), in that one purpose of this action is to secure declaratory relief; and under 28 U.S.C. § 2202, in that one purpose of this action is to secure preliminary and permanent injunctive relief.  Judicial review of the agency action at issue is authorized by the APA, 5 U.S.C. §§ 702, 704 and 706.

20.    This Court has venue under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events giving rise to the claims made herein – *i.e.*, the formulation of the Bureau of Prison's procedures governing the execution of condemned inmates – took

place in this District.  Alternatively, this Court has venue under 28 U.S.C. § 1391(b)(3) because defendants Gonzalez, Lappin and Kendig reside here.

## IV.
### Facts

21.    The plaintiffs incorporate by reference all facts and allegations contained in paragraphs 1 - 20.

22.    The plaintiffs were convicted of murder and sentenced to death in 1993 in the United States District Court for the Eastern District of Virginia.  In 1996, their convictions were affirmed on direct appeal.  In 2003, the United States District Court for the Eastern District of Virginia granted plaintiff Roane's petition for habeas corpus relief under 28 U.S.C. § 2255 and vacated his death sentence, finding that he had received ineffective assistance of counsel at trial.  That court denied all of Roane's other grounds for relief under 28 U.S.C. § 2255, and all grounds for relief raised by plaintiffs Tipton and Johnson under 28 U.S.C. § 2255.  In 2004, the United States Court of Appeals for the Fourth Circuit reversed the District Court's grant of relief to Roane, and affirmed that court in all other respects.  The United States Supreme Court denied *certiorari* on October 3, 2005, and on November 17, 2005, acting on motion of the United States, the United States District Court for the Eastern District lifted the stay of the plaintiffs' executions, which it had imposed February 21, 1997.  On December 19, 2005, after this action was filed, the defendants scheduled the plaintiffs' executions to take place in May 2006.  However, on February 24, 2006, this Court entered an Order staying this litigation, and enjoining the plaintiffs' executions, until further order of the Court.  On June 30, 2006, this Court entered an Order lifting the stay of litigation, but continuing its February 24, 2006, Order in all other respects.  Thus, while no date has

been set for their executions, and while their executions have been enjoined, each of the plaintiffs currently faces a death sentence, and if their capital convictions and/or death sentences are not overturned in another judicial proceeding or through executive clemency, the defendants will execute the plaintiffs on a date or dates yet to be fixed.

23.    On information and belief, the defendants intend to execute the plaintiffs by injecting three chemicals, administered intravenously in sequence, separated by injections of saline solution.    The chemicals include sodium thiopental or sodium pentothal (an ultra short-acting barbiturate); pancuronium bromide or pavulon (a curare-derived agent that paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or sensation), and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the inmate's veins and which interferes with the rhythmic contractions of the heart, causing cardiac arrest.)   This combination of drugs causes death by suffocation and heart attack, which cause extraordinary and excruciating suffering.    While this combination of drugs supposedly will render the plaintiffs insensible to the pain of their deaths, it in fact can cast a "chemical veil" over this excruciating suffering, leaving plaintiffs conscious but trapped in a paralyzed body wracked by suffocation and a heart attack.    At the same time, it will be impossible for those observing the execution – including witnesses to it, as well as John Does I-X, who are charged with actually carrying out the execution – to recognize and prevent the gratuitous pain and suffering being inflicted upon the plaintiffs.

A.     **The Lethal Injection Regulations**

24.    The plaintiffs were sentenced to death pursuant to § 848(l) of the CSA, which authorizes the imposition of a death sentence in certain circumstances.  The CSA

does not, however, specify the means by which an individual sentenced to death under the statute is to be executed.

25.    On November 30, 1992, the DOJ published a proposed rule purporting to "establish[] procedures" for carrying out a death sentence imposed under 21 U.S.C. § 848(l).  57 Fed. Reg. 56536 (1992).  In response, DOJ received twenty-three comments concerning the proposed rule from medical associations and physicians, criminal defense attorneys, advocates for prisoners' rights and the media, and from private citizens.

26.    The comments received by DOJ included those of United States Congressman Don Edwards, Chairman of the Subcommittee on Civil and Constitutional Rights of the U.S. House of Representatives, who stated that only Congress could establish such procedures, and that the proposed rule was therefore beyond the scope of DOJ's powers.  DOJ rejected this comment, stating that it "does not need explicit authority to issue regulations establishing death penalty procedures."  58 Fed. Reg. 4898 (1993).

27.    Another commenter urged that lethal injection is an unnecessarily painful method.  DOJ rejected this comment without further inquiry or analysis, stating simply that it "disagree[d], and regard[ed] lethal injection as less problematic than the alternatives."  Id.

28.    DOJ also received comments "from medical associations and physicians objecting to the provisions that a physician be present at the execution, §  26.4(c)(1), and that a physician or other qualified personnel determine that the prisoner has died, § 26.4(g)."  Id.  The American Medical Association (AMA) and the American College of Physicians "agreed with most other physicians and medical associations commenting on

the rule that medical ethics prohibit physicians from pronouncing the death of a prisoner." The two associations and other commenters also stated that medical ethics prohibit physicians from even attending an execution in a professional capacity. In response, DOJ stated:

> [I]t cannot be said at this point that the statements of medical ethics offered by the associations and physicians who commented on the proposed rule necessarily conflict with orderly, professional executions. Perhaps, when it has developed detailed procedures for lethal injection, or has experience administering the injections, the Department will conclude that a physician need not be present. The proposed rule contemplated that the Bureau of Prisons might wish to select someone other than a doctor – a coroner, for instance – to pronounce death; here, too, there is no reason to insist in the rule itself that death might be pronounced by a physician.
>
> The rule has therefore been revised to eliminate the requirement of a physician's presence, and to eliminate the reference to a physician determining death. Because the Department may conclude that a physician's presence is necessary to a responsible execution, physician participation will not be barred.

Id. DOJ did not address the question whether a physician's presence was required for any reason other than to pronounce death.

29. The defendants rejected these comments and issued a Final Rule that purportedly took effect February 18, 1993. 58 Fed. Reg. 4898 (1993) (the "Final Rule"). The Final Rule stated merely that "a sentence of death shall be executed . . . by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal." 28 C.F.R. § 26.3(a)(4). The regulations adopted by the defendants do not specify what lethal substances shall be used to kill condemned inmates, what amount of such substances shall be used, how they shall be

administered (including the order in which such substances shall be administered), or by whom they shall be administered.

30.    On information and belief, however, on one or more occasions since February 18, 1993, the defendants have adopted further regulations specifying in detail the means and method by which executions by lethal injection are to be carried out (the "Lethal Injection Protocol").

31.    The defendants have not disclosed the Lethal Injection Protocol to the plaintiffs, nor have they made public all material and relevant details surrounding the process by which the defendants adopted the Lethal Injection Protocol.

32.    On information and belief, the defendants and/or their agents simply adopted lethal injection protocols used by one or more states, without providing public notice and opportunity for comment, and without investing meaningful and independent efforts designed to ensure that the Lethal Injection Protocol complies with contemporary medical standards and long-standing constitutional standards that forbid the infliction of excruciating, cruel, and unusual pain and punishment.

**B.    Lethal Injection**

**1.    The Chemicals Used in the Lethal Injection Protocol**

33.    The defendants have repeatedly refused to divulge the specifics of the Lethal Injection Protocol, but have informed the plaintiffs that they intend to execute the plaintiffs using sodium thiopental, pancuronium bromide, and potassium chloride. This combination of drugs causes death by suffocation and heart attack, each of which causes extraordinary and excruciating suffering.  While the administration of sodium thiopental supposedly will render the plaintiffs insensible to the pain of their deaths, on information and belief, the Lethal Injection Protocol creates a substantial risk that it will

not do so, and that the administration of pancuronium bromide will merely cast a "chemical veil" over the excruciating pain experienced by the plaintiffs, leaving them conscious but trapped in paralyzed bodies wracked by conscious suffocation and/or heart attack, while making it impossible for those observing the execution – including witnesses as well as John Does I-X,  who are charged with actually carrying out the execution – to recognize and prevent the gratuitous pain and suffering being inflicted upon the plaintiffs.

35.    Sodium thiopental is an ultra short-acting barbiturate with a very short shelf life in liquid form.  It is distributed in powder form to increase its shelf life, and must be mixed into a liquid solution by trained personal before it can be injected.  When anesthesiologists use sodium thiopental, they do so for the purpose of temporarily anesthetizing patients in order to permit sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration.   Once this has been achieved, additional drugs are administered to maintain a "surgical depth" or "surgical plane" of anesthesia (i.e., a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious for the duration of the surgical procedure).  The medical utility of sodium thiopental derives from its ultra short-acting properties:  if unanticipated obstacles hinder or prevent successful intubation, patients will quickly regain consciousness and will resume ventilation and respiration on their own.

35.    These benefits of sodium thiopental in the operating room engender serious risks in the execution chamber.  The dose of sodium thiopental used in the execution procedure is, on information and belief, administered in a single injection from a single syringe.  By contrast, on information and belief,  the original design of the Lethal Injection Protocol called for the continuous intravenous administration of an

ultra short-acting barbiturate.  The use of a continuous administration of the ultra short-acting barbiturate may be required to ensure continued and sustained unconsciousness during the administration of pancuronium bromide and potassium chloride.  The failure to administer a continuous infusion of thiopental creates a significant, but completely avoidable and therefore unnecessary, risk that the condemned inmate will consciously experience muscular paralysis, without loss of consciousness or sensation, during the excruciating pain of both suffocation and the intravenous injection of potassium chloride.  This unnecessary risk is also present in the Lethal Injection Protocol because, if the two mix in a syringe or IV line, pancuronium bromide can cause sodium thiopental to precipitate, lessening its sedative effect.

38.    Sensitivity to sodium thiopental varies greatly among individuals.  Unless a superclinical dose is administered, the necessary dosage needed for effective use of sodium thiopental is susceptible to a number of factors, including body weight, body fat, prior drug usage, the presence in the body of other sedating agents (which may be provided to condemned inmates in the period immediately before their execution), and the level of anxiety or stress. The variable sensitivity and the range of known and unknown factors that influence the effectiveness of sodium thiopental make it imperative that the drug be administered by qualified individuals, in order to ensure that it brings about a deep, lengthy anesthetized state in a condemned individual, and prevents the infliction of unnecessary pain.  Unless it is administered by a qualified individual, the condemned person may lose consciousness for only a brief period, leaving him sensible to the horrific pain resulting from the administration of potassium chloride, but unable to communicate that pain to those administering the lethal injection because of the paralyzing effect of pancuronium bromide.  On information and

belief, the Lethal Injection Protocol does not call for sodium thiopental to be administered by a person qualified to administer it.

39.    Sedating chemicals other than sodium thiopental are available that are potent, long-lasting, stable in solution and inexpensive.    Compared to sodium thiopental, these alternative sedating chemicals pose substantially less risk that the prisoner will regain consciousness before the end of the execution process.

40.    Sodium thiopental is a Schedule III controlled substance under the CSA.

41.    The second chemical involved in the lethal injection process, pancuronium bromide, or pavulon, is a derivative of curare that acts as a neuromuscular blocking agent.  Pancuronium bromide paralyzes all skeletal muscles, including the diaphragm, causing the inmate to be unable to move or breathe.

42.    While pancuronium bromide causes muscular paralysis (including the diaphragm, stopping respiration), it does not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation.  If sodium thiopental and potassium chloride are given in doses sufficient to cause death, then there is no rational or medically justifiable place in the Lethal Injection Protocol for pancuronium bromide.  It is not necessary to cause death, and its function in the Lethal Injection Protocol is solely cosmetic or aesthetic.  By preventing the prisoner's muscles from moving and indicating pain, suffering or emotion, it makes the prisoner appear serene.  However, pancuronium bromide can lessen the sedating effect of sodium thiopental, and to the extent it does, or to the extent insufficient sodium thiopental is administered, pancuronium bromide masks the excruciating pain suffered by the inmate as he suffocates and endures cardiac arrest.

43. If an unconscious condemned person is paralyzed after being administered pancuronium bromide and then regains consciousness, it is almost a certainty that the execution staff would be completely unaware that he had become conscious. In such a scenario, the execution staff and witnesses would be completely unaware that the condemned person was experiencing excruciating pain from suffocation (because the diaphragm muscles would be paralyzed), burning in the veins from the injection of the potassium chloride, and finally a massive heart attack induced by the potassium chloride. The signs and symptoms that indicate how deeply a patient is anesthetized are subtle. On information and belief, the Lethal Injection Protocol does not provide for the presence in the execution chamber of staff with the training, experience, or expertise to assess these signs and symptoms, or for the presence in the execution chamber of any equipment capable of determining whether a prisoner to whom pancuronium bromide has been administered is, in fact, unconscious.

44. The third and final chemical administered in the Lethal Injection Protocol is potassium chloride. This chemical induces cardiac arrest in the inmate by activating the nerve fibers lining the inmate's veins and interfering with the rhythmic contractions of the heart. The administration of potassium chloride to a patient who is not properly anesthetized is inhumanly painful. The American Veterinary Medical Association is so confident that death by potassium chloride will cause unnecessary suffering that it states that "[i]t is of utmost importance that personnel performing [euthanasia by injection of potassium chloride] are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously." American Veterinary Medical Association, 2000 Report of the AVMA Panel on Euthanasia, JAVMA No. 218, No. 5

(March 1, 2001) 669, 681. On information and belief, the defendants have chosen potassium chloride to induce cardiac arrest despite the availability of other chemicals which accomplish the same purpose while inflicting substantially less, or no, pain.

45.    The absence of appropriately qualified personnel and proper procedures have caused botched executions in the past. On at least 11 occasions since 1977, inmates executed by means of lethal injection in the United States have suffered violent and painful reactions to the chemicals administered during the execution:

a.    On December 13, 1988, in Texas, Raymond Landry was pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms. Two minutes after the drugs were administered, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward witnesses. The curtain separating the witnesses from the inmate was then pulled, and not reopened for fourteen minutes while the execution team reinserted the catheter into the vein. Witnesses reported "at least one groan."

b.    On May 24, 1989, in Texas, Stephen McCoy had such a violent physical reaction to the drugs (heaving chest, gasping, choking, back arching off the gurney, etc.) that a male witness fainted, crashing into and knocking over another witness.

c.    On September 12, 1990, in Illinois, Charles Walker suffered excruciating pain during his execution because of equipment failure and human error. According to an engineer from the Missouri State Prison retained by the State of Illinois to assist with Walker's execution, a kink in the plastic tubing going into Walker's arm stopped the deadly chemicals from reaching Walker. In addition, the intravenous needle was inserted pointing at Walker's fingers instead of his heart, prolonging the execution.

d.    On March 10, 1992, in Oklahoma, Robyn Lee Parks had a violent reaction to the drugs used in his execution. Two minutes after the drugs were dispensed, the muscles in his jaw, neck, and abdomen began to react spasmodically for approximately 45 seconds. Parks continued to gasp and violently gag until death came, eleven minutes after the

drugs were first administered. A *Tulsa World* reporter wrote that the execution looked "painful and ugly," and "scary."

e.   According to an Associated Press reporter, on May 7, 1992, in Texas, Justin Lee May "went into a coughing spasm, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing, his eyes and mouth remained open."

f.   On May 10, 1994, in Illinois, after the execution of John Wayne Gacy began, the lethal chemicals unexpectedly solidified, clogging the IV tube that lead into Gacy's arm, and prohibiting any further passage. Blinds covering the window through which witnesses observed the execution were drawn, and the execution team replaced the clogged tube with a new one. Ten minutes later, the blinds were reopened and the execution process resumed. It took 18 minutes to complete. Anesthesiologists blamed the problem on the inexperience of prison officials who were conducting the execution, saying that proper procedures taught in "IV 101" would have prevented the error.

g.   On May 3, 1995, in Missouri, seven minutes after the lethal chemicals began to flow into Emmitt Foster's arm, the execution was halted when the chemicals stopped circulating. With Foster gasping and convulsing, the blinds were drawn so that witnesses could not view the scene. Death was pronounced thirty minutes after the execution began, and three minutes *later* the blinds were reopened so the witnesses could view the corpse. According to the Washington County Coroner who pronounced death, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney; they were so tight that the flow of chemicals into the veins was restricted. Foster did not die until several minutes after a prison worker finally loosened the straps.

h.   On May 8, 1997, in Oklahoma, Scott Dawn Carpenter was pronounced dead 11 minutes after the lethal injection was administered. As the drugs took effect, Carpenter began to gasp and shake. This was followed by a guttural sound, multiple spasms and gasping for air, until his body stopped moving three minutes later.

i.  On April 23, 1998, in Texas, it took two attempts to complete the execution of Joseph Cannon. After Cannon made his final statement, the execution process began. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of the witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and the execution process resumed.

j.  On June 28, 2000, in Missouri, Bert Leroy Hunter repeatedly coughed and gasping for air after the lethal chemicals were injected and before he lapsed into unconsciousness. A witness reported that Hunter had "violent convulsions. His head and chest jerked rapidly upward as far as the gurney restraints would allow, and then he fell quickly down upon the gurney. His body convulsed back and forth . . . repeatedly. . . . He suffered a violent and agonizing death."

k.  On June 20, 2006 in Texas, Lamont Reese, who had to be carried into the execution chamber, said, "[t]his is some nasty," and gasped as the drugs began to be administered. He was pronounced dead eight minutes later.

See www.deathpenaltyinfo.org/article.php?scid=8&did=478; 'This is some nasty,' dying inmate says, CNN.com, June 21, 2006 (available at http://edition.cnn.com/2006/LAW/06/21/texas.execution.ap/index.html)

46.  In addition, on numerous occasions, delays in locating veins suitable for lethal injection have resulted in significant delays and other torment of condemned prisoners:

a.  March 13, 1985, Texas. Because of Stephen Peter Morin's history of drug abuse, the execution technicians were forced to probe both of Morin's arms and one of his legs with needles for nearly 45 minutes before they found a suitable vein.

b.  August 20, 1986, Texas. Randy Woolls, a drug addict, was required to help the execution technicians find a useable vein for the execution.

c.    June 24, 1987, Texas.  Because of collapsed veins, it took nearly an hour to complete the execution of Elliot Rod Johnson.

d.    January 24, 1992, Arkansas.  It took medical staff more than 50 minutes to find a suitable vein in Rickey Ray Rector's arm. Witnesses were kept behind a drawn curtain and not permitted to view this scene, but reported hearing Rector's eight loud moans throughout the process. During the ordeal Rector (who suffered from serious brain damage) helped the medical personnel find a vein.

e.    April 23, 1992, Texas.  Billy Wayne White was pronounced dead 47 minutes after being strapped to the execution gurney. The delay was caused by difficulty finding a vein.  White had a long history of heroin abuse. During the execution, White attempted to assist the authorities in finding a suitable vein.

f.    January 23, 1996, Virginia.  The execution of Richard Townes, Jr. was delayed for 22 minutes while medical personnel struggled to find a vein large enough for the needle. After unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes' right foot.

g.    July 18, 1996, Indiana.  Because of unusually small veins, it took one hour and nine minutes for Tommie J. Smith to be pronounced dead after the execution team began sticking needles into his body. For sixteen minutes, the execution team failed to find adequate veins, and then a physician was called.  Smith was given a local anesthetic and the physician twice attempted to insert the tube in Smith's neck. When that failed, an angio-catheter was inserted in Smith's foot. Only then were witnesses permitted to view the process. The lethal drugs were finally injected into Smith 49 minutes after the first attempts, and it took another 20 minutes before death was pronounced.

h.    June 13, 1997, South Carolina. Because Michael Eugene Elkins's body had become swollen from liver and spleen problems, it took nearly an hour to find a suitable vein for the insertion of the catheter. Elkins tried to assist the executioners, asking "Should I lean my head down a little bit?" as they probed for a vein. After numerous failures, a usable vein was finally found in Elkins's neck.

i.    August 26, 1998, Texas.  The execution of Genaro Ruiz Camacho was delayed approximately two hours due, in part, to problems finding suitable veins in Camacho's arms.

j.  October 5, 1998, Nevada. It took 25 minutes for the execution team to find a vein suitable for the lethal injection of Roderick Abeyta.

k.  May 3, 2000, Arkansas. Christina Marie Riggs' execution was delayed for 18 minutes when prison staff couldn't find a suitable vein in her elbows. Finally, Riggs agreed to the executioners' requests to have the needles in her wrists.

l.  June 8, 2000, Florida. It took execution technicians 33 minutes to find suitable veins for the execution of Bennie Demps. "They butchered me back there," said Demps in his final statement. "I was in a lot of pain. They cut me in the groin; they cut me in the leg. I was bleeding profusely. This is not an execution, it is murder." The executioners had no unusual problems finding one vein, but because Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures.

m.  December 7, 2000, Texas. The execution of Claude Jones, a former intravenous drug abuser, was delayed 30 minutes while the executioners struggled to insert an IV into a vein. One member of the execution team commented, "They had to stick him about five times. They finally put it in his leg."

n.  November 7, 2001, Georgia. Jose High was pronounced dead more than one hour after his execution began. After attempting to find a useable vein for 39 minutes, the emergency medical technicians under contract to do the execution abandoned their efforts. Eventually, one needle was stuck in High's hand, and a physician was called in to insert a second needle between his shoulder and neck.

o.  On May 2, 2006 in Ohio, Joseph Clark shouted "it don't work" five times, and begged, "can you just give me something by mouth to end this?" as his executioners struggled to end his life. Witnesses reported that after the curtains were drawn to block their view, they heard sounds of a struggle, and Clark's repeated groans and guttural sounds. Clark finally died after ninety minutes in the execution chamber.

www.deathpenaltyinfo.org/article.php?scid=8&did=478; Paul E. Kostyu Copley, Execution runs into problems, Canton Repository (May 3, 2006); Andrew Welsh-Huggins, Botched Execution Leads To Ohio Review (May 12, 2006) (available at http://abcnews.go.com/US/wireStory?id=1952847&CMP=OTC-RSSFeeds0312).

## 2.    Lethal Injection Protocol, Personnel and Processes

47.    The preparation of drugs, particularly for intravenous use, is a technical task requiring significant training in pharmaceutical concepts and calculations. There are many risks associated with drug preparation that, if not properly addressed by properly credentialed and trained personnel, further elevate the risk that an inmate will consciously experience excruciating pain during lethal injection.

48.    The correct and safe management of intravenous drug and fluid administration requires a significant level of professional acumen, and can not be performed adequately by personnel lacking the requisite training and experience. The great majority of nurses are not trained in the use of ultra short-acting barbiturates; indeed, this class of drugs is normally used only by nurses who have significant experience in intensive care units and as nurse anesthetists. Very few paramedics are trained or experienced in the use of ultra short acting barbiturates.

49.    The risk of inflicting severe and unnecessary pain and suffering upon the plaintiffs in the Lethal Injection Protocol is particularly grave because, upon information and belief, the procedures and protocols designed by the defendants do not include safeguards regarding the manner in which the execution is to be carried out, do not establish the minimum qualifications and expertise required of the personnel performing critical tasks in the Lethal Injection Protocol, and do not establish appropriate criteria and standards that these personnel must meet in carrying out the Lethal Injection Protocol.

50.    On information and belief, the Lethal Injection Protocol does not call for available medical equipment which, if used by properly trained personnel, could alert defendants and their agents if the sodium thiopental has failed but the pancuronium

bromide has taken effect, leaving the condemned prisoner conscious but experiencing extreme pain. The Lethal Injection Protocol violates the plaintiffs' constitutional rights by reason of the absence of procedures for the use of medical monitoring equipment and other such necessary procedures and properly-trained execution personnel to respond appropriately to the information revealed by such medical equipment.

51.    Upon information and belief, the Lethal Injection Protocol fails to address additional factors necessary to ensure compliance with constitutional requirements, including but not limited to the following factors:

a.    the minimum qualifications, expertise, and training required for the different personnel performing the tasks involved in the Lethal Injection Protocol;

b.    the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will be determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

c.    the consideration of individualized factors, including body weight and individual sensitivity to or tolerance for the chemicals used in the Lethal Injection Protocol, that affect the appropriate dosage of each of the chemicals to be administered;

d.    the manner in which the IV tubing, three-way valve, saline solution or other apparatus shall be modified or repaired in the event it malfunctions during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

e.    the manner in which a monitoring system shall be installed and utilized to ensure that the plaintiffs deeply sedated while dying; and the qualifications and expertise required for the person who operates this equipment;

f.    the manner in which the IV catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required for the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned in favor of some other constitutionally-acceptable procedure; and the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next step of the Lethal Injection Protocol would not inflict severe and unnecessary pain and suffering on the plaintiffs;

g.    the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on the plaintiffs, and the criteria to be used in exercising this discretion; and

h.    the minimum qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to unanticipated problems or events arising during the Lethal Injection Protocol, and the criteria that shall be used in exercising this discretion.

52.    Although the Lethal Injection Protocol calls for the dispensing and administration of chemicals which are controlled substances under the CSA, on information and belief, it calls for those controlled substances to be dispensed and administered without the prescription of a practitioner issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice and possessing a registration under the CSA. 21 U.S.C. §§ 822, 829 (2000); 21 C.F.R. §§ 1301.11; 1306.04(a) (2005).

## C.    **Exhaustion of Remedies**

53.    Plaintiff Roane has exhausted his administrative remedies, filing a complaint with the U.S. Penitentiary Terre Haute, in compliance with the Administrative Remedy Procedure for Inmates, Bureau of Prisons Program Statement 1330.13, challenging the Lethal Injection Protocol on the grounds stated in this Amended Complaint. Plaintiff Roane's complaint was dismissed on the ground that no

court had ruled that the Lethal Injection Protocol constitutes cruel and unusual punishment and that this Procedure does not cause unnecessary pain and suffering, while providing no details regarding the specific procedures by which defendants intend to execute him. In accordance with the Administrative Remedy Procedure for Inmates, plaintiff Roane then appealed this denial first to defendant Bezy, the Warden, second to the Regional Director, of the Federal Bureau of Prisons, and third to the Office of General Counsel for the Federal Bureau of Prisons. At each stage, plaintiff Roane's appeal was denied on the same grounds: that no court had ruled that the Lethal Injection Protocol constitutes cruel and unusual punishment and that the Lethal Injection Protocol does not cause unnecessary pain and suffering, while providing no details regarding the specific procedures by which the defendants intend to execute him.

54.    Plaintiff Tipton has exhausted his administrative remedies, filing a complaint with the U.S. Penitentiary Terre Haute, in compliance with the Administrative Remedy Procedure for Inmates, Bureau of Prisons Program Statement 1330.13, challenging the Lethal Injection Protocol on the grounds stated in this Amended Complaint. Plaintiff Tipton's complaint was dismissed on the ground that no court had ruled that the Lethal Injection Protocol constitutes cruel and unusual punishment and that this Procedure does not cause unnecessary pain and suffering, while providing no details regarding the specific procedures by which defendants intend to execute him. In accordance with the Administrative Remedy Procedure for Inmates, plaintiff Tipton then appealed this denial first to defendant Bezy, the Warden, second to the Regional Director, of the Federal Bureau of Prisons, and third to the Office of General Counsel for the Federal Bureau of Prisons. At each stage, plaintiff Tipton's appeal was denied on the same grounds: that no court had ruled that the Lethal

Injection Protocol constitutes cruel and unusual punishment and that the Lethal Injection Protocol does not cause unnecessary pain and suffering, while providing no details regarding the specific procedures by which the defendants intend to execute him.

55.    Plaintiff Johnson has exhausted his administrative remedies, filing a complaint with the U.S. Penitentiary Terre Haute, in compliance with the Administrative Remedy Procedure for Inmates, Bureau of Prisons Program Statement 1330.13, challenging the Lethal Injection Protocol on the grounds stated in this Amended Complaint. Plaintiff Johnson's complaint was dismissed on the ground that no court had ruled that the Lethal Injection Protocol constitutes cruel and unusual punishment and that this Procedure does not cause unnecessary pain and suffering, while providing no details regarding the specific procedures by which defendants intend to execute him. In accordance with the Administrative Remedy Procedure for Inmates, plaintiff Johnson then appealed this denial first to defendant Bezy, the Warden, second to the Regional Director, of the Federal Bureau of Prisons, and third to the Office of General Counsel for the Federal Bureau of Prisons. At each stage, plaintiff Johnson's appeal was denied on the same grounds: that no court had ruled that the Lethal Injection Protocol constitutes cruel and unusual punishment and that the Lethal Injection Protocol does not cause unnecessary pain and suffering, while providing no details regarding the specific procedures by which the defendants intend to execute him.

## V.

## <u>First Claim: Fifth Amendment Violation – Denial of Due Process</u>

56.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 55.

57.    The Due Process clause requires notice and the opportunity to be heard before the deprivation of life, liberty, or property.

58.    The defendants, acting under color of federal law, have refused to disclose the procedures that will be utilized in carrying out plaintiffs' executions, preventing the plaintiffs from determining whether any aspect of the Lethal Injection Protocol may constitute cruel and unusual punishment, and to consult medical experts concerning that possibility, in violation of the Due Process Clause.

## VI.
## <u>Second Claim:  Eighth Amendment Violation – Cruel and Unusual Punishment</u>

59.    Plaintiffs incorporate by reference the allegations of paragraphs 1 - 58.

60.    The Eighth Amendment forbids the government, in carrying out a death sentence, to inflict pain beyond that necessary to end the condemned prisoner's life.  <u>In re Kemmler</u>, 136 U.S. 436, 447 (1890).  "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." <u>Id</u>.

61.    Defendants, acting under color of federal law, intend to execute the Plaintiffs in a manner that is arbitrary, cruel, and/or unreliable, and which will inflict, or has a foreseeable and significant, but completely avoidable and therefore unnecessary, risk of causing the plaintiffs excruciating but unnecessary pain in the process of carrying

out their execution.  Because it is foreseeable that it will inflict unnecessary and savage pain upon the plaintiffs, it violates the plaintiffs' constitutional right to be free from arbitrary, capricious, cruel, and unusual punishment, which right is secured and guaranteed to them by the Eighth Amendment of the United States Constitution.

## VII.
## Third Claim: Eighth Amendment Violation – Deliberate Indifference

62.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 61.

63.    The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," Estelle v. Gamble, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to an inmate.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

64.    BOP undertakes to provide inmates with medical care that is "presently medically necessary," defined as  treatment "without which an inmate could not be maintained . . . without significant pain or discomfort." Federal Bureau of Prisons, U.S. Dep't of Justice, Program Statement, No. 6000.04 (Dec. 15, 1994) ("Health Services Manual"), Ch. 1, § 1.

65.    The choice of a course of medical treatment may violate the Eighth Amendment where it is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." Thomas v. Pate, 493 F.2d 151, 158 (7th Cir. 1974), *vacated and remanded on other grounds sub nom.* Cannon v. Thomas, 419 U.S. 813 (1974).

66.    The defendants are required to provide the plaintiffs with appropriate medical care until the moment of their deaths.   Thus, the Eighth Amendment's

proscription against "deliberate indifference" requires that they administer the death penalty without the "unnecessary and wanton infliction of pain." However, the means chosen by the defendants anesthetize the plaintiffs to prevent them from experiencing the excruciating pain associated with the lethal injection of potassium chloride are "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." Thus, the means by which the defendants have chosen to anesthetize the plaintiffs prior to their execution violates the plaintiffs' right, secured and guaranteed to them by the Eighth Amendment of the United States Constitution, to be free from deliberate indifference to serious medical needs.

**VIII.**
**Fourth Claim:  Violation of Administrative Procedure Act –**
**Agency Action That Is Arbitrary, Capricious, An Abuse Of**
**Discretion And Otherwise Not In Accordance With Law**
**In Promulgating The Lethal Injection Regulations.**

67.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 66.

68.    The APA imposes upon the defendants a number of non-discretionary duties regarding rulemaking procedures.  5 U.S.C. § 553 (2000).  The APA requires a federal agency to provide adequate notice to the public regarding the nature, scope and effects of any proposed or final agency action.  The APA also requires that the federal agency provide the public with a full and fair opportunity to comment regarding any proposed agency action.   The defendants failed to provide adequate notice, or opportunity for the public to comment on, the Lethal Injection Protocol prior to its promulgation.

70.    The APA also required the defendants to consider and respond to any public comments submitted, and where appropriate, revise the Final Rule accordingly.

The defendants failed to respond adequately – or at all – to numerous public comments. Defendants also failed to correct deficiencies in the Final Rule that the comments identified.

71.    The APA also requires a federal agency to fully articulate its basis and reasons regarding any final agency action.   The defendants have failed to explain adequately the basis and reason(s) for its decision to adopt lethal injection as the means of execution, or for the specific procedures adopted in the Lethal Injection Protocol.

72.    The defendants' failure to comply with the APA's procedural requirements was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.   Therefore, in issuing the Proposed Rule, promulgating the Final Rule, and promulgating the Lethal Injection Protocol, the defendants violated the APA, and their actions must be set aside.

## IX.
### Fifth Claim: Violation of Administrative Procedure Act – Arbitrary And Capricious Failure To Exercise Enforcement Authority Under The CSA.

73.    Plaintiffs incorporate by reference the allegations of paragraphs 1 - 72.

74.    The CSA makes it unlawful to "dispense" any "controlled substance" except pursuant to a prescription "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice" and who has obtained a registration pursuant to the statute.   21 U.S.C. §§ 822, 829; 841(a)(1) (2000).

75.    Sodium thiopental is a Schedule III controlled substance.

76.    Regulations promulgated by the Drug Enforcement Administration provide that every person who "dispenses" a "controlled substance" is required to obtain

a "registration."  21 C.F.R. § 1301.11 (2005).  The regulations also provide that the Administrator of the Drug Enforcement Administration "shall deny" an application for registration unless the issuance of a registration is "required" under the CSA.  21 C.F.R. § 1301.35 (2005).

77.    On information and belief, the Lethal Injection Protocol calls for the dispensing of sodium thiopental absent a valid prescription, by a person or persons who lack a valid registration.  Moreover, on information and belief, the defendants have arbitrarily and capriciously failed to exercise their authority to enforce the CSA, by not requiring the persons whom the defendants intend to dispense controlled substances to the plaintiffs to apply for a registration, and will continue to act arbitrarily and capriciously by permitting them to dispense a controlled substance without doing so. Such arbitrary and capricious action violates the APA.

## XI.
## Prayer for Relief

78.    In order to prevent the defendants from violating the plaintiffs' rights under the Fifth and Eighth Amendments to the United States Constitution and the Administrative Procedure Act, the plaintiffs request that this Court grant preliminary and permanent injunctive relief barring the defendants from executing the plaintiffs by means of the Lethal Injection Protocol.

79.    The plaintiffs are entitled to a preliminary injunction barring the defendants from executing them by the Lethal Injection Protocol because (a) there is a significant likelihood that the plaintiffs will prevail on the merits; (b) the plaintiffs will suffer irreparable harm if they are executed pursuant to the Lethal Injection Protocol; (c) there is a compelling public interest in ensuring that our government not behave like

nations we roundly condemn for utilizing execution methods violative of our nation's constitutional proscription against cruel and unusual punishment; and (d) there is a substantial possibility that others under a sentence of death will suffer unconstitutional executions unless this Court requires that defendants design and adopt constitutionally-acceptable execution procedures.

80.    The plaintiffs do not seek relief herein as a means of attacking their underlying conviction(s) or death sentence(s); rather than seeking to stop their executions *per se,* they seek to stop the defendants from executing them in a manner that violates their constitutional and statutory rights.   If the defendants implement execution procedures that do not violate the plaintiffs' constitutional rights, then the defendants will be entitled to execute the plaintiffs barring relief granted through some other judicial or clemency proceeding.

81.    The plaintiffs further request that this Court grant declaratory relief by issuing an Order declaring that the defendants' current means, methods, practices, procedures, and customs regarding execution violate the Fifth and Eighth Amendments to the United States Constitution, and the Administrative Procedure Act.

82.    The plaintiffs request that this Court grant them reasonable attorney fees pursuant to 42 U.S.C. § 1988 and the laws of the United States.

83.    The plaintiffs request that the Court grant such further relief as it deems just and proper.

Dated:  July 10, 2006                         Respectfully submitted,


                                               /s/ Paul F. Enzinna
                                              PAUL F. ENZINNA (D.C. Bar No. 421819)
                                              TIMOTHY LOPER
                                              Baker Botts LLP
                                              1299 Pennsylvania Avenue, NW
                                              Washington, DC  20004-2400
                                              (202) 639-7752
                                              Fax:  (202) 585-1086

                                              DENISE LEBOEUF
                                              700 Camp Street
                                              New Orleans LA 70130

                                              *Counsel for Plaintiff James H. Roane, Jr.*



                                               /s/ Charles A. Zdebski
                                              CHARLES A. ZDEBSKI
                                              (D.C. Bar No. 451075)
                                              Troutman Sanders LLP
                                              401 9th Street, N.W.
                                              Suite 1000
                                              Washington, D.C. 20004-2134
                                              (202) 274-2909

                                              STEPHEN A. NORTHUP (D.C. Bar No. 54587)
                                              Troutman Sanders LLP
                                              1001 Haxall Point
                                              P.O. Box 1122
                                              Richmond, Virginia 23218-1122
                                              (804) 697-1240

                                              FREDERICK R. GERSON
                                              Robinson & Gerson, P.C.
                                              7102 Three Chopt Road
                                              Richmond, Virginia  23226

                                              *Counsel for Plaintiff Richard Tipton*

  /s/ Charles A. Zdebski
CHARLES A. ZDEBSKI
(D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, N.W.
Suite 1000
Washington, D.C. 20004-2134
(202) 274-2909

BARBARA HARTUNG
700 E. Main Street
Suite 1600
Richmond, Virginia 23219

EDWARD E. SCHER
Thorsen & Scher, L.L.P.
3810 Augusta Avenue
Richmond, VA  23230

*Counsel for Plaintiff Cory Johnson*

## CERTIFICATE OF SERVICE

I certify that on this 10th day of July, 2006, I caused a copy of the foregoing Amended Complaint for Injunctive and Declaratory Relief, Attorney's Fees, and Costs of Suit, Pursuant to *Bivens v. Six Unknown Agents*, 403 U.S. 388, 390-97 (1971), and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, to be served by first class mail on:

G. Wingate Grant
Assistant United States Attorney
Eastern District of Virginia
600 E. Main Street, Suite 800
Richmond, VA  23219

Robert J. Erickson
Principal Deputy Chief
Criminal Appellate Section
U.S. Department of Justice
Robert F. Kennedy Bldg., Rm. 1515
950 Pennsylvania Ave., N.W.
Washington, DC 20530
Tel: (202) 514.2841
Fax: (202) 301.2121
Robert.Erickson@USDOJ.gov


        /s/ Paul F. Enzinna