IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES H. ROANE, JR., et al.,** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| v. : | Case Number: 1:05-cv-2337 |
| : | |
| **ALBERTO GONZALES, et al.,** : | |
| : | |
| **Defendants.** : | |

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR PROTECTIVE ORDER**

The information the defendants seek to shield from discovery—*i.e.*, information concerning the identities of individuals involved in drafting Execution Protocols and in executing inmates ("Execution Personnel")[1]—goes to the heart of the plaintiffs' claims. The defendants have not yet provided the plaintiffs with specific information concerning the Execution Protocol by which they propose to execute the plaintiffs, but it appears they plan to use serial injections of sodium thiopental, pancuronium bromide and potassium chloride. There is little, if any, dispute that, if administered properly, these drugs can end an individual's life in a manner consistent

---

[1] In their Memorandum in Support of their Motion For Protective Order ("Def. Mem."), the defendants allude to concerns regarding "security procedures instituted by Defendants." Def. Mem. at 2. However, the defendants offer no evidence or even argument that good cause exists to excuse them from producing such materials, subject to the protective order proposed by the plaintiffs. The protective order proposed by the plaintiffs would permit the defendants to identify all such materials as "Highly Confidential" materials, in which case access to those materials would be limited to plaintiffs' counsel (including employees working under counsel's direct supervision, and any copy service, court reporter, or vendor retained by a party or counsel, who agrees to be bound by the terms of the protective order), experts and the Court. See Exh. A ¶ 9. Such materials would not be available to the public, or even to the plaintiffs themselves. The defendants do not even attempt to argue that producing materials concerning "security procedures" pursuant to such a protective order would cause them any harm.

with the Eighth Amendment. However, in case after case and jurisdiction after jurisdiction, these drugs have been administered by persons lacking necessary qualifications to deliver them appropriately, and in ways that cause severe pain and suffering to condemned inmates. Thus, the training and qualifications of the persons who have devised the Execution Protocols, and who carry them out, are critical to plaintiffs' case. See Morales v. Tilton, 465 F. Supp. 2d 972, 978 (N.D. Cal. 2006) (because there was no dispute that administration of lethal drugs to insufficiently-anesthetized inmate would be unconstitutional, or that administration of lethal drugs to properly-anesthetized inmate would be constitutional, case "turn[ed] on a single factual question: whether [California's execution protocol], as implemented, provides constitutionally adequate assurance that condemned inmates will be unconscious" when lethal drugs are administered). Given the importance of this information to the plaintiffs, the defendants bear a heavy burden in showing "good cause" for the protective order they seek. However, they proffer no specific evidence of any need for the sweeping protection they seek, but only broad and unsubstantiated suggestions that some unspecified harm *could* result from the discovery they seek to forestall. The defendants have thus failed to establish the "good cause" required under Rule 26(c), and their Motion should be denied. Rather than defendants' proposed protective order, the Court should adopt the protective order proposed by the plaintiffs, which would allow the plaintiffs to obtain critical information without causing the harms hypothesized by the defendants.

## ARGUMENT

Defendants' Motion requires the Court to balance the plaintiffs' need for the information defendants seek to shield from discovery against "the harm which disclosure would cause." AMFAC Resorts, LLC v. U.S. Dep't of Interior, 143 F. Supp. 2d 7, 14 (D.D.C. 2001). Under

Rule 26(c), a protective order may be granted only upon a showing of "good cause," and before a party may be relieved of the obligation to produce otherwise-discoverable information, "it must be shown that disclosure will work a *clearly defined and serious injury* . . . and that the party resisting disclosure 'will indeed be harmed by disclosure.'" Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 529 F. Supp. 866, 891 (E.D. Pa. 1981) (citations omitted) (emphasis added). "The moving party must present a factual showing of *a particular and specific need for the protective order. . . . 'Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test.'"* Welsh v. City of San Francisco, 887 F. Supp. 1293, 1297 (N.D. Cal. 1995) (citations omitted) (emphasis added).

The defendants have failed to make a "particular and specific" showing of any "clearly defined and serious injury" that would result from disclosure, and the "[b]road allegations of harm" made in their Motion are "unsubstantiated by specific examples or articulated reasoning." Thus, they have failed to establish "good cause," and their Motion should be denied. The Court should adopt the plaintiffs' proposed protective order instead, requiring the defendants to identify Execution Personnel (but authorizing them to designate their identities as "Highly Confidential" material under that protective order), and authorizing the plaintiffs to conduct background investigations into their training, qualifications, and disciplinary records.

1. **No Good Cause Exists To Bar All Discovery Of The Identities Of Execution Personnel.**

As an initial matter, even if the Court were to accept the defendants' argument that background investigations might identify Execution Personnel to persons not involved in this litigation, and not subject to a protective order entered in it, this does not provide "good cause" to excuse the defendants from identifying such personnel to plaintiffs' counsel as "Highly Confidential" material pursuant to plaintiffs' proposed protective order. Such identification may

provide plaintiffs' counsel with highly relevant information that is publicly available even without any background investigation that could result in public identification of such personnel.

For example, after a doctor involved in executions in Missouri testified anonymously in litigation over that state's method of lethal injection, the *St. Louis Post-Dispatch* identified him—through independent investigation—as Alan Doerhoff, whom the paper said "sometimes confused names of drugs" because of dyslexia, who had been sued for malpractice more than 20 times, who lost privileges at two Missouri hospitals, and who was publicly reprimanded by Missouri's Board of Healing Arts. J. Kohler, "Doctor Overseeing Executions Had History of Lawsuits, Reprimands," *S. Louis Post-Dispatch* (July 29, 2006) (attached as Exh. B hereto).

Of course, were Dr. Doerhoff identified as a participant in the federal execution process, all this obviously-relevant information would be available to the plaintiffs without any background investigation that might cause the hypothetical harms that defendants suggest support their Motion.[2] Were the defendants' proposal adopted, on the other hand, all this information would be concealed from the plaintiffs. The government offers to provide "information about the training, credentials, qualifications, and experience" of Execution Personnel, Def. Mem. at 9, but significantly absent from that proposal is any offer to provide the plaintiffs with information concerning potentially relevant physical infirmities or disciplinary actions initiated against any of the Execution Personnel. And because all this information may be publicly available already, it would be withheld from the plaintiffs without a corresponding increase in the protection of the defendants' "security" or "privacy" interests.

---

[2] The possibility that a participant in state executions might also be involved in federal executions is very real, as evidenced by the recent testimony of a witness before the commission convened by the Governor of Florida to study that state's lethal injection procedures after the botched execution of Angel Diaz in December 2006. That witness testified that he had been involved in executions in several states and for the federal government. See Exh. C.

Similar information concerning other physicians—*i.e.*, information about training and qualifications, malpractice suits, revocation of hospital privileges, and reprimands by state licensing boards—may also be publicly available without any risk that an inquiry would result in public disclosure of the identities of Execution Personnel. For example, the Maryland Board of Physicians' website includes a search feature that permits the public to determine the training and qualifications of particular physicians, as well as disciplinary actions such as revocation of hospital privileges and malpractice actions. See https://www.mbp.state.md.us/bpqapp/ and Exh. D. Again, defendants' proposal would bar the plaintiffs from obtaining any of this clearly relevant information, even though if plaintiffs had the names of Execution Personnel, they could perform necessary inquiries without risking public identification of these persons.

Thus, at a minimum, the Court should adopt the plaintiffs' proposed protective order, and require the defendants to identify Execution Personnel, while allowing them to designate the identities of Execution Personnel as Highly Confidential information. Because those identities would provide the plaintiffs with highly relevant information, without implicating any of the "security" or "privacy" concerns relied upon by the defendants, no good cause exists for the blanket bar sought by defendants.

2.   **The Defendants Have Failed To Establish "Good Cause" To Preclude Defendants From Conducting Background Investigations of Execution Personnel.**

As discussed above, the plaintiffs may be able to obtain highly relevant information concerning Execution Personnel without conducting any background investigation that might result in disclosure of Execution Personnel identities to persons not associated with this litigation, and not bound by a protective order entered in it. However, such discover is likely to be highly incomplete. As noted, Maryland's Board of Physicians' website allows the public to search for certain information concerning particular physicians, but there is no reason to believe

that all Execution Personnel are physicians licensed in Maryland, or that other states have similar search facilities, either for physicians or for other occupations likely to be included among Execution Personnel (such as nurses, emergency medical technicians, correctional officers, etc.). Nor is there any guarantee that the information contained in such databases is complete. See, e.g., Exh. D (noting that "[h]ospitals have not reported privilege [sic] information" for a particular physician). Therefore, because the defendants cannot establish "good cause" to prohibit it, the plaintiffs should be permitted to conduct background investigations of Execution Personnel.

      A.     **Defendants "Legal and Policy Interests" Do Not Establish Good Cause.**

Defendants identify several "Legal and Policy Interests" which, they claim, support their request. However, none of these "Legal and Policy Interests" provides any support for the defendants' request to forbid background investigations absent the assumption that such investigations will result in public disclosure of the identities of Execution Personnel. That assumption relies on several other assumptions: (i) that a request by the defendants for information concerning Execution Personnel would lead the party to whom the request is made to believe that such persons are involved in executions; (ii) that the fact that a request for information has been made would (or could) become public; and (iii) that members of the public learning of the request for information would connect the subject(s) of such a request to executions. The defendants offer no evidence whatsoever to support these assumptions.

The defendants have not provided *any* information about Execution Personnel, so it is impossible, at this point, to determine what schools, licensing boards or other bodies might have relevant information about Execution Personnel, or in what jurisdictions those bodies might be. Thus, it is impossible to determine, at this point, whether any of those bodies operate under

statutes, regulations or other rules making requests for background information confidential, in which case the hypothetical danger posited by the defendants would be nonexistent. See, e.g., Rules of the Georgia Composite State Board of Medical Examiners §360-28-09 ("[t]he identity of the person or entity requesting a physician's profile and the request shall be confidential").

Nor is it possible, at this point, to say whether a request for information would cause the personnel of such a regulatory body to connect the subject of the inquiry to executions. As discussed above, at least one state makes information about training, qualifications, disciplinary proceedings and malpractice actions publicly available for the asking, and members of the public may obtain such information anonymously. Furthermore, there is no basis to believe that any states where such information is publicly available, but where the requester must identify him- or herself (assuming that any such state exists and is relevant) would require the requester to provide an explanation for the request.

The unsupported assumptions underlying the "Legal and Policy Interests" cited by the defendants renders them incapable of supporting "good cause." But even if the government's assumptions were credited, those interests still would not provide "good cause."

As "Legal and Policy Interests in Non-Disclosure," the defendants identify the following:

1) identification of Execution personnel "could lead to harassment, embarrassment or retaliation . . . by Plaintiffs and their family and friends, by other inmates, or by members of the public opposed to the death penalty;"

2) Execution Personnel "could be exposed to danger" if their identities are revealed;

3) "licensing authorities, professional associations or the medical community" might "retaliat[e]" against Execution Personnel;[3]

---

[3] In some states, health care professionals are forbidden by either statute or regulations of licensing authorities from participating in executions. See, e.g., 725 Ill. Comp. Stat. 5/119-5(d-
(Continued ...)

    4)    disclosure of the identities of execution personnel "could result in unwillingness on the part of BOP staff and contractors to volunteer as participants in Federal executions;" and

    5)    Execution Personnel "were assured that their identities w[ould] not be disclosed."

These considerations—singly or in combination—do not provide the "good cause" necessary to support defendants' Motion.

Defendants have proffered no *evidence* that disclosure of the identities of Execution Personnel would lead to (1) "harassment, embarrassment or retaliation . . . by Plaintiffs and their family and friends, by other inmates, or by members of the public opposed to the death penalty;" (2) any "danger;" or (3) "retaliation . . . by the relevant licensing authorities, professional associations or the medical community." Participants in executions have been publicly identified in the past. See http://en.wikipedia.org/wiki/List_of_executioners (listing names of 6 persons

---

(... Continued)
5); Ky. Rev. Stat. Ann. § 431.220(3); North Carolina Medical Board Position Statement on Capital Punishment, available at http://www.ncmedboard.org/Clients/NCBOM/Public/Public Media/capitalpunishment.htm (last visited March 5, 2007). Likewise, it is the policy of the American Medical Association (AMA), the American Nursing Association (ANA), and the American Society of Anesthesiologists (ASA) that medical professionals should not participate in executions. See American Medical Association, Code of Ethics, E-2.06 ("A physician, as a member of a profession dedicated to preserving life when there is hope of doing so, should not be a participant in a legally authorized execution."); American Nursing Association, Position Statement on Nurses' Participation in Capital Punishment, available at http://nursingworld.org/readroom/position/ethics/etcptl.htm (last visited March 5, 2007). ("The [ANA] is strongly opposed to nurse participation in capital punishment."); American Society of Anesthesiologists, Message from the President: Observations Regarding Lethal Injection (June 30, 2006), available at http://www.asahq.org/news/asanews063006.htm (last visited March 5, 2007) ("ASA does not have a detailed position on anesthesiologist participation in lethal injection but the 2001 House of Delegates '[a]pproved a recommendation that ASA support the American Medical Association's position regarding physician nonparticipation in executions.'"). Thus, it appears that in speaking of "retaliation . . . by the relevant licensing authorities, professional associations or the medical community," Def. Mem. at 3, defendants refer to the enforcement of state law and/or medical ethics. Defendants cite no authority for the proposition that an individual should be protected from discovery in order to enable that individual to avoid the operation of state law or professional ethics.

who have served as executioners in the United States). In 1939, *Time* magazine identified Joseph Francel as "official executioner for New York, New Jersey, Pennsylvania, Connecticut, Vermont [and] Massachusetts." Exh. E. Mr. Francel held that position until 1953, but the defendants cite no evidence that he was ever subjected to harassment, embarrassment, retaliation or "danger." Last year, the *St. Louis Post-Dispatch* reported that Dr. Doerhoff—discussed above—"participated in more than 1/2 of Missouri's executions (54 out of 105) since the Department of Corrections took over the responsibility from counties in 1938," "Behind The Mask Of The Missouri Execution Doctor," *St. Louis Post-Dispatch* (July 29, 2006) (attached as Exh. F hereto), but the defendants cite no evidence that he has suffered any harassment, embarrassment, retaliation or danger. Absent evidence that public disclosure of an executioner's identity has ever led to any of the negative consequences about which the defendants speculate, defendants' "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." Welsh, 887 F. Supp. at 1297.[4]

Nor have defendants offered any evidence that disclosure of the names of Execution Personnel would result in the inability in the future to locate persons willing to carry out executions. Even if some persons *might* be disinclined to participate absent anonymity, it is clear that others *are* willing to participate even if their participation is disclosed. For example, defendant Harley Lappin participated in several executions as warden of USP Terre Haute, where federal executions are carried out, even though his participation was a matter of public

---

[4] The government states that "inmate assaults on Federal correctional officials are not uncommon," Def. Mem. at 4, but provides no evidence in this regard. Most critically, the government provides no evidence that any officer identified as a participant in an execution has been assaulted for that reason. The government also states that two correctional officers have been killed recently (in 1994 and 1997) by inmates, id., but does not suggest that either killing was related in any way to participation in federal executions. Indeed, no federal execution was carried out between 1963 and 2001.

record. See Exhs. G & H. Mr. Lappin is now a member of a commission appointed last December by then-Florida Governor Jeb Bush to study Florida's lethal injection procedure after the botched execution of Angel Diaz. That panel is charged with "mak[ing] findings and recommendations as to how administration of the protocols and procedures can be revised . . . to ensure that [the state's] administration of death by lethal injection comports with the United States and Florida Constitutions," Exec. Order No. 06-260, at 2 (Dec. 15, 2006), available at http://sun6.dms.state.fl.us/eog_new/eog/orders/2006/December/06-260-lethalinjection.pdf—i.e., it is charged with developing an execution protocol for the state. Nevertheless, its membership is public, see www.aclunc.org/news/press_releases/asset_upload_file804_4402.pdf, and it conducts its deliberations in public, and there is no evidence that the state had any difficulty finding persons willing to serve on it.

Finally, defendants offer no evidence that Execution Personnel "were assured that their identities w[ould] not be disclosed," Def. Mem. at 4, or, if that is indeed the case, the circumstances in which that assurance occurred. Nor have defendants offered evidence that any Execution Personnel conditioned their participation in executions on anonymity. Even if there were such evidence, a party may not unilaterally shield itself from discovery by making assurances to its agents. See Soobzokov v. CBS, Inc., 642 F.2d 28, 31 (2d Cir. 1981) (magistrate judge was not "required to accord appellant an evidentiary privilege arising out of appellant's promise to protect the identity of his benefactor"); U.S. Surgical Corp. v. Orris, Inc., 983 F.Supp. 963, 970 (D. Kan. 1997) (magistrate judge did not err in compelling disclosure of identities of participants in a survey, notwithstanding a promise that those identities would be kept confidential, because "confidential is not the equivalent of privileged").

B.  **Other Courts' Rulings On This Issue Demonstrate That There Is No "Good Cause" To Forbid Plaintiffs To Conduct Background Investigations.**

As the parties have previously noted, on April 3, 2006, the court in Morales v. Woodford, No. C 06 219 JF RS (N.D. Cal.), issued a protective order governing discovery in a case challenging California's lethal injection procedure. See Exh. I. That protective order *did not* forbid the plaintiff to conduct background investigations; in fact, it expressly allowed the identities of execution personnel to be provided to a licensed private investigator retained by the plaintiff.[5] Id. at 2. Although the Order itself does not explain the basis for the Morales court's conclusion that background investigations were appropriate, the court's decision on the merits of the constitutional challenge makes clear the rationale.

The Morales court noted that there was no dispute that it would be unconstitutional "to inject a conscious person with pancuronium bromide and potassium chloride in the amounts contemplated by" California's execution protocol, and that "assuming effective anesthesia," the use of these drugs would not violate the Eighth Amendment. Morales, 465 F. Supp. 2d at 978. Thus, the court concluded, "the resolution of this case thus turns on a single factual question: whether [California's execution protocol], *as implemented*, provides constitutionally adequate assurance that condemned inmates will be unconscious when they are injected with" these lethal drugs. Id. (emphasis added).

In determining whether California's execution protocol was constitutionally sufficient *as implemented*, the Morales court relied heavily on information concerning execution personnel obtained by the inmate through background investigations. It held that the record before it was "replete with evidence that in actual practice [California's execution protocol] does not function

---

[5] Notably, the defendants do not assert that the execution personnel identified in Morales have suffered any of the injuries they hypothesize in support of their Motion.

as intended," and found one "critical deficienc[y]" to be "[i]nconsistent and unreliable screening of execution team members," as shown by evidence—obtained through background investigations conducted by the plaintiff—that one member had been disciplined for smuggling illegal drugs into the prison, and that another had been diagnosed with post-traumatic stress disorder as a result of his "experiences in the prison system," including his service on the execution team, which he found to be "the most stressful responsibility a prison employee ever could have." Id. at 979. Thus, the evidence obtained by the plaintiff in Morales through background investigation proved to be crucial to the court's resolution of the merits of the case. The defendants here seek to keep this critical evidence out of the hands not only of the plaintiffs, but also of the Court.

Defendants point to the protective order entered in Evans v. Saar, 412 F. Supp. 2d 519 (D. Md. 2006), which expressly forbade background investigations.[6] As the basis for its decision, however, the Evans court wrote that the "[m]ost important[]" aspect of Evans' claim had nothing to do with the training or qualifications of the execution team, but rather concerned the state's plan to access Evans' veins. Id. at 521. To the very limited extent the Evans court did consider the qualifications and training of execution team members, it held that "[t]he qualifications of the team . . . appear adequate" because the injection would be administered by a certified nursing assistant, a doctor would be present, and non-medical personnel in the execution chamber could "determine whether there are any major problems such as a leak in the I.V. line." Id. at 524.

---

[6] Defendants also point to protective orders in Taylor v. Crawford, No. 05-4173 (W.D. Mo.), and Anderson v. Jones, Case No. 05-0825 (W.D. Okla.), Def. Mem. at 10, but neither order expressly forbade background investigations.

Here, however, as in Morales, there is no dispute that, if properly administered, the serial injection of sodium thiopental, pancuronium bromide and potassium chloride would not violate the Eighth Amendment. The pertinent issue in cases, such as this one, challenging lethal injection procedures is not what the relevant protocol specifies, but whether the protocol is constitutionally adequate *as implemented*. Morales, 465 F. Supp. 2d at 978. Even Evans purported to agree with this principle. 412 F. Supp. 2d at 521. But by simply relying on the fact that the state's protocol called for the presence of a physician and certified nurse specialist, without allowing discovery as to whether the persons who actually performed those tasks were trained adequately or were otherwise qualified, the Evans court effectively abdicated its duty in deciding the case. Because the Evans court denied discovery into the issue, there is no way to know what, in fact, the actual qualifications and training of the execution team were. For example, the Evans court relied on the fact that a doctor was present, but the same was true in Missouri, where the court in Taylor v. Crawford wrote that it was "gravely concerned that a physician who is solely responsible for correctly mixing the drugs which will be responsible for humanely ending the life of condemned inmates has a condition which causes him confusion with regard to numbers." Taylor v. Crawford, No. 05-4173, Slip Copy, 2006 WL 1779035 at *7 (W.D. Mo., June 26, 2006) (attached as Exh. J hereto).

## CONCLUSION

By this Motion, defendants seek to shield from discovery information that goes to the heart of the plaintiffs' claims. In support, they allege only broad, non-specific and hypothetical consequences of disclosure, which do not, singly or in combination, justify the sweeping ruling they seek. Plaintiffs' proposed protective order more properly balances the plaintiffs' need for this information against any potential harm to the defendants that may arise from its disclosure.

Therefore, the Court should enter plaintiffs' proposed order, (i) requiring the defendants to identify Execution Personnel, while allowing them to designate those identities as "Highly Confidential" information, and (ii) authorizing the plaintiffs to conduct background investigations regarding Execution Personnel.

Respectfully submitted,

/s/ Paul F. Enzinna
PAUL F. ENZINNA (D.C. Bar No. 421819)
TIMOTHY LOPER
RACHEL McKENZIE
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 639-7752
Fax: (202) 639-7980

*Counsel for Plaintiff James H. Roane, Jr.*

/s/ Charles A. Zdebski
CHARLES A. ZDEBSKI (D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, NW
Suite 1000
Washington, D.C. 20004-2134
(202) 274-2909

STEPHEN A. NORTHUP (D.C. Bar. No. 54587)
Troutman Sanders LLP
1001 Haxall Point
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1240

FREDERICK R. GERSON
Robinson & Gerson, P.C.
7102 Three Chopt Road
Richmond, Virginia 23226

*Counsel for Plaintiff Richard Tipton*


/s/ Charles A. Zdebski
CHARLES A. ZDEBSKI  (D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, NW
Suite 1000
Washington, D.C. 20004-2134
(202) 274-2909

BARBARA HARTUNG
700 E. Main Street
Suite 1600
Richmond, Virginia 23219

EDWARD E. SCHER
Thorsen & Scher, LLP
3810 Augusta Avenue
Richmond, VA  23230

*Counsel for Plaintiff Cory Johnson*


/s/ William E. Lawler III
WILLIAM E. LAWLER III (D.C. Bar No.398951)
GRAHAM E. EDDY (D.C. Bar No. 495794)
Vinson & Elkins LLP
1455 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004-1008
(202) 639-6676

*Counsel for Plaintiff Bruce Webster*