Westlaw.                                                                NewsRoom

7/29/06 STLSPD (No Page)                                                Page 1


7/29/06 St. Louis Post-Dispatch (Pg. Unavail. Online)
2006 WLNR 13143815

St. Louis Post-Dispatch (KRT)
Copyright 2006 St. Louis Post-Dispatch

**July 29, 2006**

Doctor overseeing executions had history of lawsuits, reprimands
By Jeremy Kohler
St. Louis Post-Dispatch

ST. LOUIS  ST. LOUIS _ Missouri officials fought to keep the moment from happening.

From behind a screen in a Kansas City court June 5, the doctor who devised and supervised the state's lethal injection procedure described it in terms so troubling to a federal judge that he ordered it halted.

The doctor testified anonymously that he is dyslexic. That he sometimes confused names of drugs. That he sometimes gave inconsistent testimony. That the injection protocol was not written down, and that he made changes on his "independent authority."

And that turns out not to be all.

The St. Louis Post-Dispatch has confirmed the man behind the screen was Dr. Alan R. Doerhoff, 62, of Jefferson City. Two Missouri hospitals won't allow him to practice within their walls. He has been sued for malpractice more than 20 times, by his own estimate, and was publicly reprimanded in 2003 by the state Board of Healing Arts for failing to disclose malpractice suits to a hospital where he was treating patients.

It is unclear how much U.S. District Judge Fernando Gaitan Jr. was told before he strongly questioned the doctor's qualifications _ and whether Missouri was delivering unconstitutionally cruel punishment in its death chamber.

Doerhoff's reprimand was no secret to Attorney General Jay Nixon's office. Nixon's office, which fought to keep Doerhoff's identity a secret in death penalty appeals, signed off on the discipline.

Over five years, the board has doled out the same or worse discipline to only 2 percent of the state's practicing physicians.

A public reprimand can have bad consequences, veteran physicians say. It may be a red flag that causes a hospital to investigate further before conveying privileges.

Typically, if a doctor is cited for concealing malpractice complaints, it could

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/29/06 STLSPD (No Page)                                                                Page 2

signal to an insurer that "maybe his skills are not what they're looking for," said Dr. Robert Gibbons, president of the Metropolitan Medical Society of Greater Kansas City.

"Doctors don't take it lightly," he said.

But the rebuke from one arm of Missouri government did not affect **Doerhoff's** status with another arm, the Department of Corrections.

Even after the reprimand, **Doerhoff**, who had supervised 48 executions, continued to supervise six more. And he had prepared injections for a seventh _ Michael A. Taylor, who raped and murdered a teenager in Kansas City in 1989. It was Taylor's appeal that led to Gaitan's landmark order.

A deeper dive into court records shows that **Doerhoff** made false statements in at least two different court cases about his history of mistakes.

In one case, he was to be the expert witness for a woman suing a Tennessee surgeon in Nashville for allegedly botching a bladder repair. But lawyers dropped the suit just before the trial when the judge ruled that he would allow evidence that **Doerhoff** had misrepresented a disciplinary action taken against him.

Gary B. Kempker, who served as director of the Missouri Department of Corrections under Gov. Bob Holden from 2001 to 2005, said he spoke with **Doerhoff** before each of the 16 executions over that time.

He said he never knew **Doerhoff** had a disability or had been reprimanded by the Board of Healing Arts.

**Doerhoff** had been involved with executions long before Kempker took over as director, he said, and Kempker said he saw no reason to question or replace the doctor.

**Doerhoff's** role was to supervise the injections but he did not push the plunger.

Kempker, a former police chief in Jefferson City, said he had known **Doerhoff** from living in the same small city. He also knew other members of **Doerhoff's** family, prominent professionals who included **Doerhoff's** wife, Adelia, an anesthesiologist, brother Carl, a general surgeon, and brother Dale, former president of the Missouri State Bar Association.

Alan **Doerhoff** was the only one of them involved in executions, Kempker said.

"He had been trusted by the Department of Corrections for a long time," Kempker said.

"I would say it was very humane and it was a process that I ... know all the staff took extremely seriously about our legal mandate," he said.

When a reporter approached **Doerhoff** at his home Thursday and asked about his role in executions, he said, "Read my lips: I don't do them." Then he shut the door.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/29/06 STLSPD (No Page)                                                    Page 3

The Post-Dispatch asked Friday to speak with Attorney General Nixon about his office's defense of Missouri's lethal-injection process, its efforts to conceal **Doerhoff's** identity in court, and whether he knew about the reprimand.

The department said Nixon was unavailable, but issued this statement:

"The doctor who administers this procedure was hired and retained by the Department of Corrections. We will continue to defend this method of execution against constitutional challenges. All questions about the qualifications of this doctor would be better addressed by those who hired and retained him."

Larry Crawford, the director of the Department of Corrections appointed by Gov. Matt Blunt in January 2005, did not respond last week to a request to be interviewed.

(EDITORS: BEGIN OPTIONAL TRIM)

The Post-Dispatch asked the department July 17 for records of the state's payments to the physician who supervises the lethal injections. The Missouri Sunshine Law requires public bodies to respond to requests for records within three days and that the cause of any delay beyond that must be explained in detail.

The department, through its spokesman Brian Hauswirth, responded three days later that it was gathering records and needed seven working days to review them. It has not responded to the newspaper's requests to explain the delay.

In a previous interview, Crawford said that he was concerned that revealing the execution doctor's identity would expose him to harassment, even put him in physical danger.

Crawford said he was grateful to have a doctor participate in something that most physicians avoid as a matter of medical ethics.

Kent Gipson, of the Public Interest Litigation Clinic in Kansas City, questioned exactly what the state sought to protect with its secrecy. He suggested, "It was to hide the embarrassment of hiring somebody with that many problems."

Said Gipson, who has represented Missouri inmates appealing death sentences, "It sounds to me that if that's the best they can do, that's sort of a sad commentary on how the department does business."

(END OPTIONAL TRIM)

According to statements **Doerhoff** made in regard to Taylor's appeal, corrections officials first consulted with him in 1989, when George Mercer became the first Missouri inmate to be executed in 24 years. The state had purchased a lethal injection machine. **Doerhoff** said he suggested changes to the injections planned for Mercer.

In his deposition, **Doerhoff** said he overhauled Missouri's lethal-injection protocol at the request of corrections officials after a debacle on May 3, 1995, when it took more than 30 minutes for the state to execute Emmitt Foster.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/29/06 STLSPD (No Page) Page 4

Foster "was a drug addict and they could not get an IV line in," **Doerhoff** explained in the deposition. "They finally put the needle in his thumb ... so it was a prolonged execution which caused a lot of embarrassment and it should not have happened."

He then stayed on as a long-term contractor. In court filings, he described his role as preparing the injections, inserting the intravenous line, ensuring proper functioning of medical equipment and providing medical support for the offender and witnesses. Other staffers actually injected the drugs, he wrote.

**Doerhoff** spoke in a malpractice suit filed against him about what else was happening in his life during 1995: He had a heart attack, he was $4 million in debt and was depressed.

On top of that, a woman sued **Doerhoff** in St. Louis Circuit Court that May, alleging that he was having sex with her while she was under his care, that he performed an operation to restore her virginity and other sex-related procedures, and that he gave her an abortion in a Jefferson City hotel room.

The case was settled with the woman being paid $100,000 in an agreement in which **Doerhoff** admitted no wrong, according to court records. She suggested in a recent interview that her lawyer fabricated some of the claims.

In a 1998 deposition, **Doerhoff** said he had been sued about 20 times after as many as 35,000 surgeries. He mentioned a settlement paid in one, and other records show at least four more settlements plus a judgment for $262,000 that he appealed and lost.

**Doerhoff's** work for the Department of Corrections goes back to at least the mid-1970s. He and his brother, Carl **Doerhoff**, had a contract to perform surgeries on Missouri prisoners. Each also has served as medical examiner in Cole County, a title Carl **Doerhoff** now holds.

Contacted by phone, Carl **Doerhoff** said he had no knowledge about who may have been involved with executions, and otherwise declined to comment.

Alan **Doerhoff** participated in more than half of Missouri's executions _ 54 out of 105 _ since the Department of Corrections took over the responsibility from counties in 1938.

Records indicate the Department of Corrections paid him $33,020 since mid-2001, typically in checks of $2,000 that were issued a few weeks to a few months after each of the past 17 executions. Earlier pay records were not available.

**Doerhoff** has testified that he brought special knowledge to the death chamber. "I was the only physician available anywhere to ask about how and what," he said in a deposition in Taylor's appeal. "No one has any experience (with the execution drugs) so I have to be the authority, I guess."

It was that deposition in June that led to a moratorium on Missouri executions. A U.S. Supreme Court decision made it easier for death row inmates to file suits challenging lethal injection as unconstitutionally cruel and unusual punishment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Lawyers for Missouri's condemned inmates have seized upon that issue in the past year, claiming that Missouri inmates were not being sufficiently numbed before the final two injections in the three-drug cycle. The reasoning is that if the condemned is not properly numbed by the first drug, paralysis from the second could make it impossible to communicate pain from the third.

The argument gained traction with Gaitan after the state acknowledged during Taylor's appeal that its own logs of the chemicals given to prisoners were incorrect. Over Nixon's objection, Gaitan allowed Taylor's legal team to depose **Doerhoff**.

To comply with an earlier protective order that sealed **Doerhoff's** identity, Gaitan allowed **Doerhoff** to testify from behind a screen, and arranged for identifying references to be blacked out of public records.

Though court records have cloaked his name, they left enough clues to identify **Doerhoff**. Interviews with three men who had official roles at executions, including Kempker, confirmed **Doerhoff's** name.

(EDITORS: STORY CAN END HERE)

Some of **Doerhoff's** problems are a matter of public record.

In August 1997, a letter from Lake of the Ozarks General Hospital informed **Doerhoff** that his request for active staff status was denied and that his privileges were revoked. The letter accused **Doerhoff** of failing to disclose malpractice claims against him, misrepresenting how many cases were brought against him, and of having an "extensive" history of cases he did disclose.

The letter, signed by Michael E. Henze, the hospital's chief executive officer, said the hospital had found a history of poor record-keeping at another hospital and that there were "continuity of care concerns" at more than one hospital.

Henze sent a second letter, to the Board of Healing Arts, saying the hospital's decision was based on "Dr. **Doerhoff's** material misrepresentations, misstatements, and omissions from his applications for medical staff membership and corresponding clinical privileges."

A year later, **Doerhoff** was contacted by Stephen Doughty, a lawyer in Nashville representing a woman in a malpractice claim against a surgeon and a hospital. **Doerhoff** agreed to be paid in exchange for his testimony as an expert that the surgeon had not used the standard of care required in a bladder repair. The plaintiff, Katrinka Stalsworth, claimed that she was in constant pain from severed nerve endings.

In a deposition on Nov. 23, 1998, the defense lawyer, Phillip North, asked **Doerhoff** where he practiced.

"Well, I've always had staff privileges at (Hermann) Hospital and Lake Ozark Hospital," he said. "They are hospitals I helped organize."

Later, North revisited the issue. "These ... are full privileges, no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/29/06 STLSPD (No Page)                                                                Page 6

qualifications, no restrictions or anything like that?"

**Doerhoff**: "Lake Ozark, I no longer have staff privileges there. There's too much to do. ... I helped build the Lake hospital, but I had not admitted a patient there for about 10 years and after a heart attack, my wife and I decided that we were going to retire and move to the lake, so I informed the Lake hospital I would be moving there, and they took away my staff privileges."

**Doerhoff** said the hospital gave no reason for taking his privileges. "The surgeon that was on the credentials committee saw me as a threat, and he wanted the hospital to hire him as a partner, so he terminated my privileges."

The defendant secured a copy of the letter revoking **Doerhoff's** privileges. Just before the trial was to begin, the judge ruled that he would admit it as evidence, which Doughty said he saw as a crucial blow to **Doerhoff's** credibility.

"He was our expert witness and ... now there was some question about the truthfulness of his answers," said Doughty. "It was not the kind of thing you want to find out about on the eve of the trial."

Doughty withdrew the case.

(EDITORS: STORY CAN END HERE)

A year later, **Doerhoff** was the defendant in a malpractice case. John Kerr, a minister in Jefferson City, accused **Doerhoff** of damaging his stomach during an appendectomy.

Kerr's lawyer, John Beger of Rolla, issued written questions to **Doerhoff** to clarify matters of evidence. He asked **Doerhoff**, "Have you now or at any time in your career had your license or staff privileges revoked, terminated, suspended, or limited in any way?"

**Doerhoff's** reply: "No."

Beger said he obtained the Lake of the Ozarks letter _ as well as a transcript from **Doerhoff's** deposition in the Tennessee case _ and knew that the answer was false.

Beger filed a motion to compel **Doerhoff** to turn over records pertaining to his hospital privileges, writing that he believed **Doerhoff's** written answer was "incorrect." Within days, the suit was settled for an undisclosed sum.

In May 2000, **Doerhoff's** request for privileges was denied at St. Mary's Health Center in Jefferson City. The hospital alleged that he had failed to fully disclose malpractice cases filed against him. **Doerhoff** then withdrew his application from St. Mary's and did not appeal.

The matter was reported to the Board of Healing Arts, which opened a discipline case against **Doerhoff**. The two sides settled in 2003 with **Doerhoff** agreeing to his penalty _ a public reprimand.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/29/06 STLSPD (No Page)                                                                                     Page 7

**Doerhoff** is now on staff at a hair-removal business in Jefferson City and has made trips with groups of physicians to treat the Third World poor.

In a deposition in Kerr's suit in 1999, **Doerhoff** said he was looking forward to the new challenge of working overseas.

"It's really difficult to find surgeons that can operate under difficult circumstances," he said. The mission group "needs people that are able to go into a very primitive area and function without a lot of support. So I'm the type of person they're looking for.

"So it's a lot more interesting than sitting around in Jeff City waiting to die."

---

(c) 2006, St. Louis Post-Dispatch.

Visit the Post-Dispatch on the World Wide Web at http://www.stltoday.com/

Distributed by McClatchy-Tribune Information Services.


For reprints, email tmsreprints@permissionsgroup.com, call 800-374-7985 or 847-635-6550, send a fax to 847-635-6968, or write to The Permissions Group Inc., 1247 Milwaukee Ave., Suite 303, Glenview, IL 60025, USA.

---- INDEX REFERENCES ----

NEWS SUBJECT:   (Judicial (1JU36); Legal (1LE33); Prisons (1PR87); Government (1GO80); Government Litigation (1GO18))

REGION:   (Kansas (1KA13); Missouri (1MI10); USA (1US73); Americas (1AM92); Tennessee (1TE37); North America (1NO39))

Language:   EN

OTHER INDEXING:   (BOARD OF HEALING; DALE; DEPARTMENT OF CORRECTIONS; GAITAN; HEALTH CENTER; IV; LAKE OZARK HOSPITAL; LOUIS; MCCLATCHY TRIBUNE INFORMATION SERVICES; METROPOLITAN MEDICAL SOCIETY; MILWAUKEE AVE; MISSOURI; MISSOURI DEPARTMENT OF CORRECTIONS; MISSOURI STATE BAR ASSOCIATION; MISSOURI SUNSHINE LAW; OZARKS; OZARKS GENERAL HOSPITAL; PERMISSIONS GROUP INC; PUBLIC INTEREST LITIGATION CLINIC; ST; TENNESSEE; US SUPREME COURT)   (Adelia; Alan Doerhoff; Alan R. Doerhoff; Beger; Bob Holden; Brian Hauswirth; Carl; Carl Doerhoff; Crawford; Doctors; Doerhoff; Doughty; Emmitt Foster; Fernando Gaitan Jr.; Foster; Gary B. Kempker; George Mercer; Gipson; Henze; Jay Nixon; John Beger; John Kerr; Katrinka Stalsworth; Kempker; Kent Gipson; Kerr; Lake; Larry Crawford; Matt Blunt; Mercer; Michael A. Taylor; Michael E. Henze; Nixon; North; Phillip North; Robert Gibbons; Stephen Doughty; Taylor; Visit)   (ST. LOUIS)

Word Count: 3176
7/29/06 STLSPD (No Page)

                           © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/29/06 STLSPD (No Page) Page 8

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.