**NewsRoom**

7/30/06 STLSPD A1                                                                 Page 1


7/30/06 St. Louis Post-Dispatch A1
2006 WLNR 13165651

St. Louis Post-Dispatch (MO)
Copyright 2006 St. Louis Post-Dispatch

July 30, 2006

Section: News

**Behind    the    mask** of the    **execution    doctor**

Jeremy Kohler ST. LOUIS POST-DISPATCH

A PUBLIC REPRIMAND - One state agency disciplined him; another kept him employed.

PRIVILEGES DENIED AT 2 HOSPITALS - They say he misrepresented his history.

FALSE STATEMENTS - His role as expert witness torpedoed plaintiff's case.

MALPRACTICE SUITS - He admits to being sued more than 20 times.

---

Missouri officials fought to keep the moment from happening.

From behind a screen in a Kansas City court June 5, the doctor who devised and supervised the state's lethal injection procedure described it in terms so troubling to a federal judge that he ordered it halted.

The doctor testified anonymously that he is dyslexic. That he sometimes confused names of drugs. That he sometimes gave inconsistent testimony. That the injection protocol was not written down, and that he made changes on his "independent authority."

And that turns out not to be all.

The Post-Dispatch has confirmed the man behind the screen was Dr. Alan R. Doerhoff, 62, of Jefferson City. Two Missouri hospitals won't allow him to practice within their walls. He has been sued for malpractice more than 20 times, by his own estimate, and was publicly reprimanded in 2003 by the state Board of Healing Arts for failing to disclose malpractice suits to a hospital where he was treating patients.

It is unclear how much U.S. District Judge Fernando Gaitan Jr. was told before he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

strongly questioned the doctor's qualifications -- and whether Missouri was delivering unconstitutionally cruel punishment in its death chamber.

Doerhoff's reprimand was no secret to Attorney General Jay Nixon's office. Nixon's office, which fought to keep Doerhoff's identity a secret in death penalty appeals, signed off on the discipline.

From 2000 to 2004, the board doled out the same or worse discipline to only 2 percent of the state's practicing physicians.

A public reprimand can have bad consequences, veteran physicians say. It may be a red flag that causes a hospital to investigate further before conveying privileges.

Typically, if a doctor is cited for concealing malpractice complaints, it could signal to an insurer that "maybe his skills are not what they're looking for," said Dr. Robert Gibbons, president of the Metropolitan Medical Society of Greater Kansas City.

"Doctors don't take it lightly," he said.

But the rebuke from one arm of Missouri government did not affect Doerhoff's status with another arm, the Department of Corrections.

Even after the reprimand, Doerhoff, who had supervised 48 executions, continued to supervise six more. And he had prepared injections for a seventh -- Michael A. Taylor, who raped and murdered a teenager in Kansas City in 1989. It was Taylor's appeal that led to Gaitan's landmark order.

A deeper dive into court records shows that Doerhoff made false statements in at least two different court cases about his history of mistakes.

In one case, he was to be the expert witness for a woman suing a Tennessee surgeon in Nashville for allegedly botching a bladder repair. But lawyers dropped the suit just before the trial when the judge ruled that he would allow evidence that Doerhoff had misrepresented a disciplinary action taken against him.

No problem for ex-director

Gary B. Kempker, who served as director of the Missouri Department of Corrections under Gov. Bob Holden from 2001 to 2005, said he spoke with Doerhoff before each of the 16 executions over that time.

He said he never knew Doerhoff had a disability or had been reprimanded by the Board of Healing Arts.

Doerhoff had been involved with executions long before Kempker took over as director, he said, and Kempker said he saw no reason to question or replace the doctor.

Doerhoff's role was to supervise the injections, but he did not push the plunger.

Kempker, a former police chief in Jefferson City, said he had known Doerhoff from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/30/06 STLSPD A1                                                                    Page 3

living in the same small city. He also knew other members of Doerhoff's family, prominent professionals who included Doerhoff's wife, Adelia, an anesthesiologist, brother Carl, a general surgeon, and brother Dale, former president of the Missouri State Bar Association.

Alan Doerhoff was the only one of them involved in executions, Kempker said.

"He had been trusted by the Department of Corrections for a long time," Kempker said.

"I would say it was very humane and it was a process that I . . . know all the staff took extremely seriously about our legal mandate," he said.

'I don't do them'

When a reporter approached Doerhoff at his home Thursday and asked about his role in executions, he said, "Read my lips: I don't do them." Then he shut the door.

The Post-Dispatch asked Friday to speak with Attorney General Jay Nixon about his office's defense of Missouri's lethal-injection process, its efforts to conceal Doerhoff's identity in court and whether he knew about the reprimand.

The department said Nixon was unavailable, but issued this statement:

"The doctor who administers this procedure was hired and retained by the Department of Corrections. We will continue to defend this method of execution against constitutional challenges. All questions about the qualifications of this doctor would be better addressed by those who hired and retained him."

Larry Crawford, the director of the Department of Corrections appointed by Gov. Matt Blunt in January 2005, did not respond last week to a request to be interviewed.

The Post-Dispatch asked the department July 17 for records of the state's payments to the physician who supervises the lethal injections. The Missouri Sunshine Law requires public bodies to respond to requests for records within three days; the cause of any delay beyond that must be explained in detail.

The department, through its spokesman Brian Hauswirth, responded three days later that it was gathering records and needed seven working days to review them. It has not responded to the newspaper's requests to explain the delay.

In a previous interview, Crawford said that he was concerned that revealing the execution doctor's identity would expose him to harassment, even put him in physical danger.

Crawford said he was grateful to have a doctor participate in something that most physicians avoid as a matter of medical ethics.

Kent Gipson, of the Public Interest Litigation Clinic in Kansas City, questioned exactly what the state sought to protect with its secrecy. He suggested, "It was to hide the embarrassment of hiring somebody with that many problems."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Said Gipson, who has represented Missouri inmates appealing death sentences, "It sounds to me that if that's the best they can do, that's sort of a sad commentary on how the department does business."

Lawsuits and settlements

According to statements Doerhoff made in regard to Taylor's appeal, corrections officials first consulted with him in 1989, when George Mercer became the first Missouri inmate to be executed in 24 years. The state had purchased a lethal injection machine. Doerhoff said he suggested changes to the injections planned for Mercer.

In his deposition, Doerhoff said he overhauled Missouri's lethal-injection protocol at the request of corrections officials after a debacle on May 3, 1995, when it took more than 30 minutes for the state to execute Emmitt Foster.

Foster "was a drug addict and they could not get an IV line in," Doerhoff explained in the deposition. "They finally put the needle in his thumb . . . so it was a prolonged execution which caused a lot of embarrassment and it should not have happened."

He then stayed on as a long-term contractor. In court filings, he described his role as preparing the injections, inserting the intravenous line, ensuring proper functioning of medical equipment and providing medical support for the offender and witnesses. Other staffers actually injected the drugs, he wrote.

Doerhoff spoke in a malpractice suit filed against him about what else was happening in his life during 1995: He had a heart attack, he was $4 million in debt and was depressed.

On top of that, a woman sued Doerhoff in St. Louis Circuit Court that May, alleging that he was having sex with her while she was under his care, that he performed an operation to restore her virginity and other sex-related procedures, and that he gave her an abortion in a Jefferson City hotel room.

The case was settled with the woman being paid $100,000 in an agreement in which Doerhoff admitted no wrong, according to court records. She suggested in a recent interview that her lawyer fabricated some of the claims.

In a 1998 deposition, Doerhoff said he had been sued about 20 times after as many as 35,000 surgeries. He mentioned a settlement paid in one, and other records show at least four more settlements plus a judgment for $262,000 that he appealed and lost.

Operated on inmates

Doerhoff's work for the Department of Corrections goes back to at least the mid-1970s. He and his brother, Carl Doerhoff, had a contract to perform surgeries on Missouri prisoners. Each also has served as medical examiner in Cole County, a title Carl Doerhoff now holds.

Contacted by phone, Carl Doerhoff said he had no knowledge about who may have been

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

involved with executions, and otherwise declined to comment.

Alan Doerhoff participated in more than half of Missouri's executions -- 54 out of 105 -- since the Department of Corrections took over the responsibility from counties in 1938.

Records indicate the Department of Corrections paid him $33,020 since mid-2001, typically in checks of $2,000 that were issued a few weeks to a few months after each of the past 17 executions. Earlier pay records were not available.

Doerhoff has testified that he brought special knowledge to the death chamber. "I was the only physician available anywhere to ask about how and what," he said in a deposition in Taylor's appeal. "No one has any experience (with the execution drugs) so I have to be the authority, I guess."

It was that deposition in June that led to a moratorium on Missouri executions. A U.S. Supreme Court decision made it easier for death-row inmates to file suits challenging lethal injection as unconstitutionally cruel and unusual punishment.

Lawyers for Missouri's condemned inmates have seized upon that issue in the past year, claiming that Missouri inmates were not being sufficiently numbed before the final two injections in the three-drug cycle. The reasoning is that if the condemned is not properly numbed by the first drug, paralysis from the second could make it impossible to communicate pain from the third.

The argument gained traction with Gaitan after the state acknowledged during Taylor's appeal that its own logs of the chemicals given to prisoners were incorrect. Over Nixon's objection, Gaitan allowed Taylor's legal team to depose Doerhoff.

To comply with an earlier protective order that sealed Doerhoff's identity, Gaitan allowed Doerhoff to testify from behind a screen and arranged for identifying references to be blacked out of public records.

Though court records have cloaked his name, they left enough clues to identify Doerhoff. Interviews with three men who had official roles at executions, including Kempker, confirmed Doerhoff's name.

Misrepresentations

Some of Doerhoff's problems are a matter of public record.

In August 1997, a letter from Lake of the Ozarks General Hospital informed Doerhoff that his request for active staff status was denied and that his privileges were revoked. The letter accused Doerhoff of failing to disclose malpractice claims against him, misrepresenting how many cases were brought against him, and of having an "extensive" history of cases he did disclose.

The letter, signed by Michael E. Henze, the hospital's chief executive, said the hospital had found a history of poor record keeping by Doerhoff at another hospital and that there were "continuity of care concerns" at more than one hospital.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Henze sent a second letter, to the Board of Healing Arts, saying the hospital's decision was based on "Dr. Doerhoff's material misrepresentations, misstatements, and omissions from his applications for medical staff membership and corresponding clinical privileges."

A year later, Doerhoff was contacted by Stephen Doughty, a lawyer in Nashville representing a woman in a malpractice claim against a surgeon and a hospital. Doerhoff agreed to be paid in exchange for his testimony as an expert that the surgeon had not used the standard of care required in a bladder repair. The plaintiff, Katrinka Stalsworth, claimed that she was in constant pain from severed nerve endings.

In a deposition on Nov. 23, 1998, the defense lawyer, Phillip North, asked Doerhoff where he practiced.

"Well, I've always had staff privileges at (Hermann) Hospital and Lake Ozark Hospital," he said. "They are hospitals I helped organize."

Later, North revisited the issue. "These . . . are full privileges, no qualifications, no restrictions or anything like that?"

Doerhoff: "Lake Ozark, I no longer have staff privileges there. There's too much to do. . . . I helped build the Lake hospital, but I had not admitted a patient there for about 10 years and after a heart attack, my wife and I decided that we were going to retire and move to the lake, so I informed the Lake hospital I would be moving there, and they took away my staff privileges."

Doerhoff said the hospital gave no reason for taking away his privileges. "The surgeon that was on the credentials committee saw me as a threat, and he wanted the hospital to hire him as a partner, so he terminated my privileges."

The defendant secured a copy of the letter revoking Doerhoff's privileges. Just before the trial was to begin, the judge ruled that he would admit it as evidence, which Doughty said he saw as a crucial blow to Doerhoff's credibility.

"He was our expert witness and . . . now there was some question about the truthfulness of his answers," said Doughty. "It was not the kind of thing you want to find out about on the eve of the trial."

Doughty withdrew the case.

Accused of malpractice

A year later, Doerhoff was the defendant in a malpractice case. John Kerr, a minister in Jefferson City, accused Doerhoff of damaging his stomach during an appendectomy.

Kerr's lawyer, John Beger of Rolla, issued written questions to Doerhoff to clarify matters of evidence. He asked Doerhoff, "Have you now or at any time in your career had your license or staff privileges revoked, terminated, suspended, or limited in any way?"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/30/06 STLSPD A1                                                                Page 7

Doerhoff's reply: "No."

Beger said he obtained the Lake of the Ozarks letter -- as well as a transcript from Doerhoff's deposition in the Tennessee case -- and knew that the answer was false.

Beger filed a motion to compel Doerhoff to turn over records pertaining to his hospital privileges, writing that he believed Doerhoff's written answer was "incorrect." Within days, the suit was settled for an undisclosed sum.

In May 2000, Doerhoff's request for privileges was denied at St. Mary's Health Center in Jefferson City. The hospital alleged that he had failed to fully disclose malpractice cases filed against him. Doerhoff then withdrew his application from St. Mary's and did not appeal.

The matter was reported to the Board of Healing Arts, which opened a discipline case against Doerhoff. The two sides settled in 2003 with Doerhoff agreeing to his penalty -- a public reprimand.

Doerhoff is now on staff at a hair-removal business in Jefferson City and has made trips with groups of physicians to treat the Third World poor.

In a deposition in Kerr's suit in 1999, Doerhoff said he was looking forward to the new challenge of working overseas.

"It's really difficult to find surgeons that can operate under difficult circumstances," he said. The mission group "needs people that are able to go into a very primitive area and function without a lot of support. So I'm the type of person they're looking for."

"So it's a lot more interesting than sitting around in Jeff City waiting to die."

---

DR. ALAN R. DOERHOFF TIMELINE

1969: Doerhoff graduates from medical school at University of Missouri with a specialty in general surgery

Mid-1970s to mid-'90s: He works as surgeon on contract for Department of Corrections

1989: Michael A. Taylor and second man admit kidnapping 15-year-old Ann Harrison from school bus stop in Kansas City, raping her and slitting her throat. Taylor is sentenced to death.

1989: Doerhoff advises corrections officials on lethal injections as state resumes executions after 24 years.

1995: He revises execution procedure after problem with condemned's veins leads to 30-minute execution. Becomes permanent contractor for corrections department.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/30/06 STLSPD A1                                                        Page 8

1997: Lake of the Ozarks General Hospital denies Doerhoff staff privileges.

1998: Doerhoff claims in a deposition that he's "always had staff privileges" at the Lake hospital, then, under questioning, says they were revoked by a surgeon who saw him as a threat. He is discredited as plaintiff's expert witness in Tennessee malpractice case, which then collapses.

1999: In written questions from a plaintiff alleging malpractice, Doerhoff is asked if he's ever had hospital privileges revoked. He answers "no." After the plaintiff moves to compel him to turn over records, the case is settled.

2000: St. Mary's Health Center in Jefferson City denies Doerhoff privileges, saying he failed to disclose malpractice cases from 1994-99.

2003: Doerhoff is reprimanded by Missouri Board of Healing Arts over claim that he failed to disclose past malpractice suits to St. Mary's.

Jan. 31, 2006: U.S. District Judge Fernano Gaitan Jr. rejects Taylor's appeal that lethal injection is cruel and unusual punishment.

April 26, 2006: U.S. Supreme Court agrees to hear lethal injection concerns in another case, opening door to further appeals by Taylor that end up back in Gaitan's court in Kansas City.

June 26, 2006: Gaitan orders Taylor's execution halted, citing concerns about problems with dyslexia and dealing with numbers that are admitted to in deposition by execution doctor "John Doe I," who in fact is Doerhoff. Gaitan demands execution procedure overhaul and use of board-certified anesthesiologist.

July 14, 2006: Corrections officials tell Gaitan they have made changes but cannot find an anesthesiologist to participate. Eleven days later, they appeal his order to the 8th Circuit Court of Appeals in St. Louis.

July 26, 2006: Gaitan says the state's proposal is an improvement, but that "there continue to be inadequacies with the personnel required to monitor and oversee" the death penalty.

---

STLtoday.com/links

Read earlier coverage of the halt in Missouri executions.

                        ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Judicial (1JU36); Legal (1LE33); Prisons (1PR87); Government (1GO80))

INDUSTRY:  (Healthcare (1HE06); Practice Management & Malpractice (1PR50))

REGION:  (Kansas (1KA13); Missouri (1MI10); USA (1US73); Americas (1AM92); Tennessee (1TE37); North America (1NO39))

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7/30/06 STLSPD A1                                                                    Page 9

Language: EN

OTHER INDEXING: (BOARD OF HEALING; CIRCUIT COURT OF APPEALS; CORRECTIONS; DALE; DEPARTMENT OF CORRECTIONS; GAITAN; HEALTH CENTER; IV; LAKE OZARK HOSPITAL; METROPOLITAN MEDICAL SOCIETY; MISSOURI; MISSOURI BOARD; MISSOURI DEPARTMENT OF CORRECTIONS; MISSOURI STATE BAR ASSOCIATION; MISSOURI SUNSHINE LAW; OZARKS; OZARKS GENERAL HOSPITAL; PRIVILEGES; PUBLIC INTEREST LITIGATION CLINIC; STLTODAY COM; TENNESSEE; US SUPREME COURT; UNIVERSITY OF MISSOURI) (1989; Adelia; Alan Doerhoff; Alan R. Doerhoff; Ann Harrison; Beger; Bob Holden; Brian Hauswirth; Carl; Carl Doerhoff; Crawford; Doctors; Doerhoff; Doughty; DR; Eleven; Emmitt Foster; Fernando Gaitan Jr.; Fernano Gaitan Jr.; Foster; Gary B. Kempker; George Mercer; Gipson; Henze; Jan; Jay Nixon; John; John Beger; John Kerr; Katrinka Stalsworth; Kempker; Kent Gipson; Kerr; Lake; Larry Crawford; Lawsuits; Matt Blunt; Mercer; Michael A. Taylor; Michael E. Henze; Nixon; North; Phillip North; Read; Robert Gibbons; Stephen Doughty; Taylor)

KEYWORDS: MISSOURI;CAPITAL PUNISHMENT;IDENTITY;ALAN DOERHOFF;PHYSICIAN

EDITION: Fourth Edition

Word Count: 3688
7/30/06 STLSPD A1
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.