Westlaw.

Slip Copy                                                                                                   Page 1

Slip Copy, 2006 WL 1779035 (W.D.Mo.)
**(Cite as: Slip Copy)**

▷
Briefs and Other Related Documents
Taylor v. CrawfordW.D.Mo.,2006.Only the Westlaw citation is currently available.
United States District Court,W.D. Missouri,Central Division.
Michael Anthony TAYLOR, Plaintiff,
v.
Larry CRAWFORD, et al., Defendants.
No. 05-4173-CV-C-FJG.

June 26, 2006.

Eric Berger, Ginger Anders, Jenner & Block LLP, Matthew S. Hellman, Jenner & Block, LLC, Donald B. Verrilli, Washington, DC, John William Simon, John William Simon, J.D., Ph.D., St. Louis, MO, for Plaintiff.
Michael Pritchett, Missouri Attorney General, Jefferson City, MO, for Defendants.

**ORDER**
FERNANDO J. GAITAN, JR., District Judge.

**I. BACKGROUND**

*1 Plaintiff filed his Complaint on June 3, 2005, and an amended complaint on September 12, 2005 (Doc. # 36) [FN1]. In his First Amended Complaint plaintiff sought a declaratory judgment that Missouri's method of execution by lethal injection violates the Eighth, Thirteenth and Fourteenth Amendments because it would inflict on him cruel and unusual punishment, would deprive him of life, liberty or property without due process of law and would inflict upon him a badge of slavery, in that the three drug sequence using a procedure whereby the drugs are administered through the femoral artery creates a foreseeable risk of the infliction of gratuitous pain. Plaintiff also argued that the physician's role in the execution violated medical ethics. On December 28, 2005, the Court issued an Order denying defendant's Motion to Dismiss and ruling that the case presented factual issues which would likely be resolved by either a motion for summary judgment or through a hearing (Doc. # 54). On January 3, 2006, the defendants notified the Court that the Supreme Court of Missouri had set plaintiff's execution date for February 1, 2006. On January 18, 2006, plaintiff filed an Application for a Court Order requesting that the Court issue an Order directing that Taylor not be executed until further order of the Court to be issued within a reasonable time after a hearing on the merits which was scheduled for February 21, 2006. On January 19, 2006, Judge Scott Wright issued an Order staying the execution until the Court could conduct the hearing (Doc. # 62). The same day, defendants appealed Judge Wright's ruling to the Eighth Circuit. On January 29, 2006, the Eighth Circuit entered an Order reversing and vacating Judge Wright's January 19, 2006 Order. The Eighth Circuit remanded the case to the Western District and directed that the Court reassign the case to another judge for an immediate hearing. The Eighth Circuit directed that an Order be issued no later than 12:00 Noon on Wednesday, February 1, 2006. This case was assigned to this Court on Monday, January 30, 2006.

> FN1. Richard Clay was previously granted leave to intervene in this action. On January 30, 2006, the Court orally granted Mr. Clay's Motion to Dismiss this action as to him without prejudice. Reginald Clemons also had a pending Motion for Leave to Intervene in this action. He has now also moved to withdraw from this action.

*1 On January 30-31, 2006, this Court conducted a telephonic hearing regarding plaintiff's Complaint. During the telephonic hearing, the Court heard the testimony of the following individuals: Dr. Mark Dershwitz, Dr. Jonathan I. Groner, Dr. Mark Heath and Terry W. Moore, the Director of Adult

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                       Page 2
Slip Copy, 2006 WL 1779035 (W.D.Mo.)
(Cite as: Slip Copy)

Institutions for the Missouri Department of Corrections. Plaintiff requested that the State produce John Doe Numbers One and Two (the doctor and the nurse who participated in the most recent execution), but this request was denied. Plaintiff also sought to present the testimony of Dr. Sri Melethil, a pharmacokineticist, but he was out of town and unable to appear until the morning of February 1, 2006. After considering the evidence and the testimony of these individuals, the Court determined that neither the chemicals used by the State for lethal injection nor the procedure employed to administer these injections constituted cruel or unusual punishment. The Court noted that while the plaintiff suggested a different approach to lethal injection, he had not shown that the current method used by Missouri violated the Eighth Amendment. Further the Court was not persuaded that the use of the femoral vein for the administration of the lethal injection violated applicable standards of the Eighth Amendment. The Court also did not find that Missouri physicians who are involved in administering lethal injections were violating their ethical obligations or that the procedure was violative of the Thirteenth Amendment.

*2 Plaintiff appealed this Court's January 31, 2006 Order, arguing that he did not have sufficient time to present his arguments to the Court during the two day telephonic hearing. Plaintiff argued that this Court had abused its discretion in not allowing him to call John Doe I and II or Dr. Melethil and also erred in denying his claims. On April 27, 2006, the Eighth Circuit remanded the case to this Court to reconvene the hearing. The Eighth Circuit gave the parties thirty days to engage in some limited additional discovery and then an additional thirty days within which the hearing was to be held and for this Court to issue its Order, amending, modifying or restating the previous judgment and certifying the same to the Eighth Circuit.

*2 The Court allowed plaintiff to conduct the following discovery: a Rule 34 inspection and videotaped tour of Missouri's execution chamber, a deposition of Larry Crawford, Director of the Missouri Department of Corrections and document requests which pertained to the last six executions carried out by the State of Missouri. The document requests included any execution logs, records, autopsy reports, test results and analyses of post-mortem/toxicology reports. The State also provided information regarding what specialized training the physicians and nurses undergo who participate in administration of the drugs and all documents pertaining to any fall back procedures regarding vein access and the three drug sequence. The Court also allowed plaintiff to submit interrogatories to John Doe Defendants I-V. After John Doe I submitted his interrogatory responses, plaintiff again asked the Court for permission to depose him. The Court allowed plaintiff to conduct a limited anonymous deposition of John Doe I. This deposition was conducted at the Courthouse, with only the Court and counsel present. On June 12 -13, 2006 this Court continued the hearing which was begun in January 2006. During the hearing, plaintiff presented the testimony of Dr. Mark Heath, an anesthesiologist, Dr. Stephen Johnson, an expert in central line placement and femoral line placement and Dr. Thomas Henthorn, an expert in pharmokinetics. The State presented the testimony of Dr. Mark Dershwitz, an anesthesiologist, Terry Moore, Director of Adult Institutions for Department of Corrections and Larry Crawford, Director of the Department of Corrections.

## II. DISCUSSION

### A. Standard

*2 The Eighth Amendment provides that "cruel and unusual punishment" shall not be inflicted. It prohibits punishments that are "incompatible with the 'evolving standards of decency that mark the progress of a maturing society.' " *Estelle v. Gamble* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)). As to executions, it prohibits "the unnecessary and wanton infliction of pain" as well as methods involving torture or a lingering death. *See Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). "The cruelty against which the Constitution protects a convicted man is cruelty

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 3

Slip Copy, 2006 WL 1779035 (W.D.Mo.)
(Cite as: Slip Copy)

*inherent in the method of punishment,* not the necessary suffering involved in any method employed to extinguish life humanely." *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947)(emphasis added). Additionally, as the Court noted in *Campbell v. Wood,* 18 F.3d 662, 687 (9th Cir.1994), "[t]he risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review."

### B. Missouri's Execution Procedure

*3 During the January 30-31, 2006 hearing, Terry Moore, Director of Adult Institutions for the Missouri Department of Corrections, described what he believed was the execution procedure used in Missouri. Mr. Moore testified that three drugs are administered by a board certified physician. The physician first administers five grams of sodium pentothal, also known as thiopental, which is a substance that produces anesthesia. Thereafter, the physician administers a syringe of saline to flush the IV line. Next, the physician administers pancuronium bromide, also referred to as pancuronium. This drug is a paralytic agent which prevents any involuntary movement of the body. The physician then again administers the saline solution. Finally, the third drug which is administered is potassium chloride, which is a drug which stops the electrical activity of the heart. There was no dispute that if an inmate is not sufficiently anesthetized when the potassium chloride is administered, it will cause excruciating pain as it is administered through the inmate's veins. The inmate, however, would be unable to show that he was experiencing discomfort due to the paralyzing effects of the pancuronium bromide.

*3 After the Eighth Circuit remanded this case, the Court allowed plaintiff to conduct additional limited discovery. In a letter sent to the Court on May 17, 2006, plaintiff's counsel informed the Court that new evidence in the form of chemical dispensary logs, which had recently been produced by the State, contradicted the State's previous representations regarding the amount of thiopental that is used during executions.

*3 In response, counsel for the State confirmed in a letter sent to the Court on May 17, 2006 that 5 grams of sodium pentothal are used:
*3 As plaintiff correctly points out, defendants have stated consistently that 5 grams of sodium pentothal are used in executions in Missouri. Five grams are in fact used. The reference to the 2.5 grams noted in the drug log is not correct. The doctor and the nurse who have prepared the drugs for the last six executions and for plaintiff's stayed execution confirm that 5 grams has been used in the last six executions and was prepared for plaintiff's stayed execution. (Defendants are attempting to run down the source of the error in the record, and continue to do so.)

*3 However, the next day on May 18, 2006, counsel for the State sent the Court another letter in which they acknowledge that a mistake had in fact been made regarding the representations as to the amount of thiopental administered. The letter stated in part:
*3 Upon further review, defendants have just determined this afternoon, contrary to previous representations, that 2.5 grams of sodium pentothal was prepared and used at the last execution (not 5 grams) and that 2.5 grams was prepared for use at the execution of plaintiff (which was stayed before the femoral IV was inserted). Defendants and their counsel apologize to the Court and the parties for providing incorrect information.

*4 (Doc. # 121).

*4 Upon learning of this information, the Court submitted a set of interrogatories to John Doe I [FN2] to answer. The Court inquired whether the lethal injection protocol was codified in any publication, policy statement or state regulation. John Doe I responded that he was not aware of the protocol being written down in any form. He stated that it was his understanding at the time of Mr. Gray's execution that he had the independent authority to change the dose based on his medical judgment. He stated that this understanding was based on past contacts with predecessors of the current Director of the Department of Corrections. When the Court asked how many times the protocol has been modified since it was put into place, John Doe I responded:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 4
Slip Copy, 2006 WL 1779035 (W.D.Mo.)
(Cite as: Slip Copy)

> FN2. Defendants have disclosed that John Doe I is the physician that mixes the drugs used during the executions.

*4 John Doe I can recall one instance when three syringes of potassium chloride were used based on the obesity of the offender. John Doe I can recall one instance when the IV was inserted in the offender's neck instead of his femoral vein based on the damage to both of his femoral veins from drug abuse. John Doe I is aware of one instance when a peripheral IV was used because John Doe I was unable to attend the execution. For the execution of Mr. Gray and the preparation for the execution of Mr. Taylor, John Doe I determined to use 2.5 grams of sodium pentothal. This determination occurred because of difficulty in dissolving powder, obtained from a new supplier, containing more than 2.5 grams in the liquid that could be accommodated in a syringe. The rate of infusion and the concentration of the dose ensured that 2.5 grams was more than sufficient to make the offender unconscious before administering the remaining drugs. Further, with regard to Mr. Taylor, John Doe I was aware that the dosage used in the execution of Mr. Gray was adequate.
*4 (Response to Interrogatory No. 5, Doc. # 152).

*4 When asked who was consulted before the dosage of thiopental was decreased, he responded that no one was consulted because he thought it was within the acceptable parameters to accomplish the goal. When questioned about his medical background, John Doe stated that although he was a board certified surgeon, he is not an anesthesiologist. The Court also allowed plaintiff to conduct an anonymous deposition of John Doe I on June 5, 2006.

*4 When he was asked whether any part of the execution procedure was written down, John Doe I responded as follows:
*4 A. I have never seen it. If it was, it would have been written on my recommendation.
*4 Q. I see. Do you have any idea why it might not be written down?
*4 A. I'm sure it's written down somewhere. If they're checking the logs of all the drugs every time we use them and recording expiration dates and number of sheets and needles that we use, I'm certain they have it written down somewhere.
*4 Q. But in terms of the aspects of the procedure that you're responsible for, that you perform, those aren't written down, to your knowledge?
*4 A. It might be written in there, but it would be written on by somebody observing what I was doing and using their interpretation. So if there was a written procedure that they had done I would-you know, I'm curious to see what they think I'm doing, but I don't know that they write down the individual details of how I insert an 18-gauge rather than a 22-gauge or a 14-gauge needle.
*5 Q. I see. So people might write things down as you're doing them, but there's no guide that you follow as you're doing it?
*5 A. Absolutely not.
*5 Q. So you just rely on your memory?
*5 A. Yes.
*5 Q. And your judgment?
*5 A. Yes.

*5 (John Doe Depo. pp. 69-70)

*5 During his deposition, John Doe I described how he has had to devise an improvised procedure with regard to mixing the correct dosage of thiopental:
*5 Q. And could you take me step-by-step through that, your improvised process?
*5 A. I'd have to see the containers because I cannot at the present time remember whether they have glass or-they are actually just two straight-walled glass bottles. One has powder in the bottom, one has liquid in the bottom, and they are designed to lock together and mix. So, I have to stick a needle through this plastic and inject my own diluents which I know will give me no more than 50 cc's for the final product, which is what I'm aiming for for the final injection.
*5 We have encountered problems trying to mix more than three or four grams using this method, mainly because of an inert substance possibly put in by the manufacturer to prevent mis-mixing, which I know several drug companies will do. So right now the last time I saw and talked to the Director on each of these occasions saying we either need to change what we say we're dosing or we will have to go back to the original five-gram bottle that was available when we instituted this procedure. So

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 5
Slip Copy, 2006 WL 1779035 (W.D.Mo.)
**(Cite as: Slip Copy)**

right now we're still improvising. And he's also having me researching an alternate drug if it comes to that.

**\*5** (John Doe Depo. pp. 9-10).

**\*5** When John Doe I was asked why he did not initially recall why he prepared a smaller dose of thiopental, he responded:
**\*5** A .... But I am dyslexic and so I can recall in the operating room specific facts and details of operation and function perfectly, but in terms of copying one line to another or trying to simply copy a phone number or account number I will sometimes transpose numbers even when I'm staring at the two numbers. *So, it's not unusual for me to make mistakes....* But I am dyslexic and that is the reason why there are inconsistencies in my testimony. *That's why there are inconsistencies in what I call drugs. I can make these mistakes, but it's not medically crucial in the type of work I do as a surgeon.*

**\*5** (John Doe Depo. pp. 24-25)(emphasis added).

**\*5** In describing how the drugs are administered, John Doe I stated that, "... the people who do the injections are nonmedical and they're in the dark so they have a small flashlight that they're able to quickly identify the syringes, make the appropriate connections and injections, disconnect, clamp the tube, and changing the number of syringes or the order of syringes was an unnecessary risk." (John Doe Depo. p. 31).

**\*5** When questioned about whether he monitors anesthetic depth, John Doe I testified as follows:
**\*5** Q. Did you monitor Mr. Gray's anesthetic depth during the execution?
**\*6** A. I monitor-the only thing that can be monitored is facial expression, and you can judge when the effect of the drug is accomplished, and that can be seen from across a room through a window. And when that effect occurs then I know the inmate is unconscious....
**\*6** Q. So you said that you can see that-an inmate's facial expression from where you stand?
**\*6** A. Yes. That's the only thing any anesthesiologist uses in the course of inducing a person when pentothal was still used, was you simply started injecting, look at the face, and again, it's difficult to describe, but I can tell instantly when the pentothal has taken effect. And in medical practice the instant the pentothal has taken effect they gave absolutely no more because then they move on to the actual anesthesia which has to be started before the pentothal wears off.

**\*6** (John Doe Depo. pp. 41-42).

**\*6** When he was asked whether he had any discussions with Director Crawford about the scope of his authority, John Doe I stated:
**\*6** A. Oh, yes. We talk-I talk in his office and at the time of the execution. In fact, he's the only director I have actually gone over to his office for other reasons and visited about this. And again, he has no background in corrections and he has no background in medicine, so the other corrections officers had long backgrounds in corrections so they were aware of what we were doing and why we were doing it. Since he has no background in either field, he reiterated that he's totally dependent on me advising him what could and should and will be done, and he will back up-if I think there's a change that needs to be made, he wants me to quickly inform him so he can make the appropriate changes.
**\*6** Q. I see. So, it's your understanding that if you thought a change to the execution procedure needed to be made you would-Director Crawford would defer to your opinion?
**\*6** A. Absolutely.

**\*6** (John Doe Depo. pp. 63-64).

### C. Is Missouri's Execution Procedure Constitutional?

**\*6** In *Morales v. Hickman,* 415 F.Supp.2d 1037 (N.D.Cal.2006), aff'd, 438 F.3d 926 (9th Cir.2006), *cert. denied,* 126 S.Ct.1314,163 L.Ed.2d 1148 (2006), the Court stated:
**\*6** The Eighth Amendment prohibits punishments that are incompatible with the evolving standards of decency that mark the progress of a maturing society .... Executions that involve the unnecessary and wanton infliction of pain ... or that involve torture

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 6
Slip Copy, 2006 WL 1779035 (W.D.Mo.)
**(Cite as: Slip Copy)**

or a lingering death ... are not permitted. When analyzing a particular method of execution or the implementation thereof, it is appropriate to focus on the objective evidence of the pain involved.... *In this case, the Court must determine whether Plaintiff is subject to an unnecessary risk of unconstitutional pain or suffering such that his execution by lethal injection under California's protocol must be restrained.*

*6 *Id.* at 1039 (internal citations and quotations omitted)(emphasis added). In that case the Court focused on the narrow issue of "whether or not there is a reasonable possibility that Plaintiff will be conscious when he is injected with pancuronium bromide or potassium chloride, and, if so, how the risk of such an occurrence may be avoided." *Id.* at 1040. This is precisely the same question which this Court must address.

*7 After learning more about how executions are carried out in Missouri, through the interrogatories submitted to the John Doe defendants, reviewing the chemical dispensary logs, reviewing the videotape of the execution chamber and listening to the testimony of John Doe I, and to the testimony of the other expert witnesses at the June 12-13, 2006 hearing, it is apparent that there are numerous problems. For example, there is no written protocol which describes which drugs will be administered, in what amounts and defines how they will be administered. John Doe I testified that he came up with the current protocol. John Doe I also testified that he felt that he had the authority to change or modify the formula as he saw fit. It is apparent that he has changed and modified the protocol on several occasions in the past. He has reduced the amount of thiopental given from 5.0 grams to 2.5 grams and has also changed the location on the inmate's body where the drugs were administered. It is obvious that the protocol as it currently exists is not carried out consistently and is subject to change at a moment's notice.

*7 The Court is also concerned that John Doe I possesses total discretion for the execution protocol. Currently, there are no checks and balances or oversight, either before, during or after the lethal injection occurs. No one monitors the changes or modifications that John Doe I makes. John Doe I even testified that the Director of the Department of Corrections, Mr. Crawford, has no medical or corrections background, and that he is "totally dependent on me advising him." (John Doe Depo. p. 64).

*7 In addition to the fact that there is no oversight and the responsibility for making changes or adjustments is completely vested in one individual, the Court also has concerns about John Doe I's qualifications. John Doe I readily admitted that he is dyslexic and that he has difficulty with numbers and oftentimes transposes numbers. John Doe I testified "it's not unusual for me to make mistakes.... But I am dyslexic and that is the reason why there are inconsistencies in my testimony. That's why there are inconsistencies in what I call drugs. I can make these mistakes, but it's not medically crucial in the type of work I do as a surgeon ." (John Doe Depo. p. 25). The Court disagrees and is **gravely concerned** that a physician who is solely responsible for correctly mixing the drugs which will be responsible for humanely ending the life of condemned inmates has a condition which causes him confusion with regard to numbers. As the Court has learned, the process of mixing the three different drugs and knowing the correct amount of the drugs to dissolve in the correct amount of solution involves precise measurements and the ability to use, decipher, and not confuse numbers. Although John Doe I does not feel this is crucial in the type of work he does as a surgeon, it is critical when one is mixing and dissolving chemicals for a lethal injection.

*8 In addition, John Doe I testified that although he is not an anesthesiologist, he monitors the anesthetic depth of an inmate by observing the inmate's facial expression. However, as can be seen from the videotape of the execution chamber, when the inmate is lying on the gurney in the execution room, the inmate is facing away from the Operations room where John Doe I is located. Additionally, it is dark in the Operations room and there are blinds on the window which are partially closed and obstruct the view. This would make it almost impossible for John Doe I to observe the inmate's facial expression. This leads the Court to conclude that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 7

Slip Copy, 2006 WL 1779035 (W.D.Mo.)
**(Cite as: Slip Copy)**

there is little or no monitoring of the inmate to ensure that he has received an adequate dose of anesthesia before the other two chemicals are administered.

**\*8** All of these concerns lead the Court to conclude that Missouri's lethal injection procedure subjects condemned inmates to an unnecessary risk that they will be subject to unconstitutional pain and suffering when the lethal injection drugs are administered.

### D. Revisions to the Execution Protocol

**\*8** Having determined that Missouri's current method of administering lethal injections subjects condemned inmates to an unacceptable risk of suffering unconstitutional pain and suffering, the Court concludes that it is within its equitable powers to fashion a remedy that "preserves both the State's interest in proceeding with Plaintiff's execution and Plaintiff's constitutional right not to be subject to an undue risk of extreme pain." *Morales,* 415 F.Supp .2d at 1046. Director Crawford testified at the hearing that the Department of Corrections is in the process of developing a directive which would establish a protocol for administering lethal injections. However, from his testimony, it was apparent that the directive would not encompass all of the attributes which the Court finds are necessary to ensure that lethal injections are carried out humanely. Recently other courts have also faced this challenge and have modified execution procedures in those states. See *e.g. Brown v. Beck,* No. 5:06-CT-3018-H, (E.D.N.C. April 7, 2006)(Doc. No.32) and *Morales,* 415 F.Supp.2d at 1046.

**\*8** Accordingly, the Court hereby **AMENDS** its previous order of January 31, 2006 and **ORDERS** the Department of Corrections for the State of Missouri to prepare a written protocol for the implementation of lethal injections which incorporates the following provisions:

### 1. Personnel

**\*8** A board certified anesthesiologist shall be responsible for the mixing of all drugs which are used in the lethal injection process. If the anesthesiologist does not actually administer the drugs through the IV, he or she shall directly observe those individuals who do so. Additionally, the Operations Room shall be sufficiently lighted so that the corrections personnel can see which drugs are being administered.

### 2. Lethal Injection Drugs & Method of Administration

**\*9** The level of thiopental administered shall not be less than 5 grams. Pancuronium Bromide and Potassium Chloride will not be administered until the anesthesiologist certifies that the inmate has achieved sufficient anesthetic depth so that the inmate will not feel any undue pain when the Potassium Chloride is injected. The State in conjunction with the anesthesiologist will have discretion to determine the most appropriate location on the inmate's body to inject the drugs. The State shall specify in the protocol how the anesthesiologist will certify that the inmate has achieved the appropriate anesthetic depth.

### 3. Monitoring

**\*9** The State will put in place procedures which will allow the anesthesiologist to adequately monitor the anesthetic depth of the inmate. This may require the State to purchase additional equipment in order to adequately monitor anesthetic depth. The State should also consider repositioning the gurney so that the inmates's face will be visible to the anesthesiologist, using a mirror, or even allowing the anesthesiologist to be present in the room with the inmate when the drugs are injected.

### 4. Contingency Plan

**\*9** The State's protocol shall also contain a contingency plan in case problems develop during the execution procedure.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### 5. Auditing Process

*9 The Department of Corrections shall put in place an auditing process which will ensure that the individuals involved in the lethal injection process are correctly following the protocol, including administering the correct dosages of the medication, in the proper order. The Court contemplates that the State will consult with a board certified anesthesiologist in designing the auditing process.

### 6. Changes to the Lethal Injection Procedure

*9 After approval by the Court, no further changes shall be made to the lethal injection protocol without seeking the prior approval of this Court. This Order contemplates consultation with a board certified anesthesiologist in arriving at a proposed written protocol. The Court will retain jurisdiction over the State's implementation of the lethal injection protocol for the next six executions or until the Court is satisfied that the protocol is being administered in a consistent fashion. The Department of Corrections shall submit its revised lethal execution protocol to this Court for review and approval on or before **July 15, 2006.** All executions in the State of Missouri are hereby **STAYED** pending approval of the protocol.

### III. CONCLUSION

*9 For the reasons stated above, the Court hereby **AMENDS** its January 31, 2006 Order and in accordance with the April 27, 2006 Order of the Eighth Circuit, this Court hereby **CERTIFIES** this Order to the Eighth Circuit for its review and consideration.

W.D.Mo.,2006.
Taylor v. Crawford
Slip Copy, 2006 WL 1779035 (W.D.Mo.)

Briefs and Other Related Documents (Back to top)

• 2:05cv04173 (Docket) (Jul. 28, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.