# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

JAMES ROANE, JR., et al.,

      Plaintiffs,

BRUCE WEBSTER,

      Intervenor-Plaintiff,

      v.

ALBERTO GONZALEZ, et al.,

      Defendants.

_____

Civil Action No. 05-2337 (RWR/DAR)

## DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER

Defendants respectfully submit this reply in support of their Motion for Protective Order. The only issue as between the parties concerns the disclosure of the identities of persons performing sensitive tasks in connection with the execution of condemned prisoners, or creating the Execution Protocol, and the prohibition on the ability of Plaintiffs' counsel to conduct background investigations on those persons, which is set forth in Defendants' proposed order at ¶ 13. See Plaintiffs' Opposition to Defendants' Motion for Protective Order ("Pl. Opp."), Document No. 32, at 1. The identities of those persons participating in executions and in drafting the executions protocols are protected by, inter alia, the Privacy Act of 1974, 5 U.S.C. § 552a and the discovery limitations of the Federal Rules of Civil Procedure.

The exhibits to Plaintiffs' Opposition demonstrate that the Court should enter on a permanent basis in this case the government's proposed protective order. Plaintiffs' counsel scoured the internet and other sources for the identities of persons participating in State and

Federal executions and found a Wikipedia entry[1] and a 67-year-old Time magazine article (dated

1939) identifying certain persons who participated in State executions.  Pl. Opp. at 8-9.  For the

reasons explained below, the government has significant interests in maintaining the anonymity

of those involved in executions and the development of the execution protocols.

A.    The Government's Legal and Policy Interests in Non-Disclosure of Identifying
       Information for Those Individuals Involved in the Execution Protocol.

Plaintiffs claim that the training and qualifications of the persons "who have devised the

Execution Protocols, and who carry them out, are critical" to their case.  Pl. Opp. at 2.  As

explained in more detail below, the government's protective order will allow Plaintiffs' counsel

to have access to information about the training and qualifications of those involved, without any

of the significant risks that the government identified in its initial motion.  In addition, the

government's proposed protective order states that witnesses will testify anonymously at

depositions, for example.  The government's proposed protective order does not otherwise

prevent Plaintiffs' counsel from pursuing discovery from witnesses concerning their training,

qualifications, disciplinary record and actual roles in past executions.

As both parties point out, the Federal Rules of Civil Procedure empower the Court to

enter, for "good cause shown" and when "justice [so] requires," protective orders designed to

prevent "a party or person from annoyance, embarrassment, oppression, or undue burden or

expense."  Fed. R. Civ. P. 26(c).  Plaintiffs argue that the government has offered only "broad

and unsubstantiated suggestions" in support of its motion.  Pl. Opp. at 2.  That is far from the

---

[1] We note that *Wikipedia*, "the free encyclopedia that anyone can edit," is hardly a reliable source for factual information.  See http://en.wikipedia.org/wiki/Main_Page.  *Wikipedia* itself explicitly states that because it is created and updated by the public at large, "newer articles may still contain significant misinformation . . . ."  http://en.wikipedia.org/wikipedia:About.

2

case.  In numerous other jurisdictions, courts have entered very restrictive protective orders in

cases where plaintiffs have brought constitutional challenges to various States' lethal injection

protocols.  District courts expressly have recognized the sensitivity of the issues and the

important security and privacy concerns of the governmental defendants in those cases.  See, e.g.,

Def. Memo. at 10-11 (listing cases).  Those courts clearly have weighed the risks the government

addressed in its initial motion and found that they do constitute "good cause" for entry of a

protective order pursuant to the Fed. R. Civ. P 26.

　　　As Defendants' initial motion explained, many of those who have participated in, or will

be participating in, Federal executions are Federal Bureau of Prisons correctional officers or

employees who could be exposed to danger if their roles in the conduct of Federal executions

were revealed.  Moreover, were their names revealed, those involved in executions, or in creating

the Execution Protocol, could experience harassment, embarrassment or retaliation against them.

These and associated risks stem from the Plaintiffs, some of whom operated large-scale drug

enterprises, and their families and friends, other inmates, and members of the public opposed to

the death penalty.  The government also expressed concerns regarding retaliation against health

care practitioners involved in executions or creating the Execution Protocol by the relevant

licensing authorities, professional associations or the medical community in general.  Finally, the

government explained that disclosure of identities could result in unwillingness on the part of

BOP staff and contractors to volunteer as participants in Federal executions.

　　　Far from unsubstantiated suggestions, there is strong evidence of the specific harms that

can and do result from disclosure of the names and identifying information at issue.  Defendants

have attached as Exhibit 1 a transcript of a PBS broadcast describing the example of a person

who was identified as having been involved in executions receiving harassing phone calls and

notes.  See  http://www.pbs.org/now/transcript/228.html at 2 ("the execution team members have

experienced outright harassment" including complaints to state licensing organizations, phone

calls, and notes left at offices).  The reporter notes that the "AMA [American Medical

Association] and most medical associations have said that they oppose doctors and other medical

personnel helping to carry out executions."  Id. at 1.  A physician who was identified during a

challenge to Georgia's lethal injection protocol had a complaint filed against him with his state

licensing authority.  Id. at 2.  Similarly, a 2006 article in the *New England Journal of Medicine*

dealing with Physician participation and anonymity, explains that States "commonly . . . promise

anonymity . . . . [n]onetheless, several physicians have faced [licensing] challenges, though none

have lost their licenses as yet." Atul Gawande, "When Law and Ethics Collide–Why Physicians

Participate in Executions," *N. ENGL. J. MED*. 354:12 (March 23, 2006) at 1223 (attached as Ex.

2).

That article also recounts the story of an inmate who had killed four people "even while

in prison," by arranging "for an accomplice to blow up the home of a county attorney he was

angry with while the attorney, his wife, and their child were inside."  Id. at 1227.  The article

continues that when the accomplice cooperated with the government, "the inmate arranged for

him to be tortured and killed at a roadside rest stop."  Id.  The undersigned counsel of record also

is aware of at least one anecdotal account of attempted contacts with the relatives and

professional contacts of contractors who have participated in executions, for which there is no

documentary record.

B.    "Good Cause" Exists for Entry of Defendants' Proposed Order.

Plaintiffs repeatedly argue that the government has not provided "evidence" to support its proposed protective order. Pl. Opp. at 5-6 (arguing not provided evidence), 8 (no evidence of harassment or violence).[2] While we disagree that the Court must have "evidence" of the sort Plaintiffs claim is required in order to enter a protective order on a showing of "good cause," we specifically respond to Plaintiffs' arguments as follows.

First, the cases cited by Plaintiffs do not bind this Court, nor do they require any particular form or quantity of "evidence." See Pl. Opp. at 3 (citing, inter alia, Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 529 F.Supp. 866, 891 (E.D. Pa. 1981).[3] Rather, the cited cases discuss the Court's duty to balance competing interests. As explained above, even though not required for the entry of a protective order, there is evidence of the sort Plaintiffs argue is necessary.

Second, the Federal government cannot have evidence of something that has not yet happened, insofar as the release of the identities of Federal employees and contractors participating in executions has never occurred. No BOP employee other than Director Lappin

_____

[2] Plaintiffs go so far as to state that the government has cited no "evidence that [the person named in the 1939 *Time Magazine* article] was ever subjected to harassment, embarrassment, retaliation or 'danger.'" Pl. Opp. at 9. Plaintiffs rely on an article that is almost 70 years old. Social views and the ability to disseminate information have changed significantly in that period of time. Moreover, since Defendants did not rely on the 1939 example of the release of the name of a person who participated in executions, they would have no reason to "cite . . . evidence" concerning that example.

[3] The cited portion of the opinion appears to be referring to standards for protective orders concerning claims of competitive disadvantage, which is not at issue in this case. 529 F.Supp. at 891. Regardless, the court goes onto to state that "hard and fast rules in this area are inappropriate" and that the "Court's common sense is a helpful guide." Id.

has been identified as participating in an execution.  If the information has not been disclosed,

then it is no risk of injury to the person involved.  Director Lappin's role is more akin to the role

of a judge or prosecutor in that he did not personally start an IV or administer lethal substances.

Director Lappin has not had a permanent duty station involving contact with inmates since June,

2001.  Similarly, Plaintiffs argue that there is no evidence that the Missouri physician identified

by the *St. Louis Post-Dispatch* "suffered any harassment, embarrassment, retaliation or danger."

Pl. Opp. at 9.  While it is correct that the government did not offer evidence concerning that

person in its motion, the fact is that he has faced embarrassment and harassment.  The *St. Louis

Post-Dispatch* articles cited by Plaintiffs are but one example.

Third, Plaintiffs' additional exhibits support Defendants' argument.  Pl. Opp. at note 2

(citing Ex. C, witness testimony).  The Florida Commission transcript, Pl. Ex. C, demonstrates

that confidentiality was a central concern to the Commission and that the witness in Ex. C

testified anonymously with his or her voice altered.[4]  Plaintiffs also claim that the Florida

Commission membership is public and thus that there is precedent for releasing the sort of

information at issue.  But Plaintiffs' own opposition defeats their argument because the

Commission's role is limited to oversight.  The Commission itself is not conducting any

executions.  Pl. Opp. at 10 (citing Exec. Order No. 06-260 at 2 (Dec. 15, 2006) concerning

findings and recommendations about revising Florida's execution procedures).  Again, Plaintiffs'

own exhibit demonstrates that while the panel membership is public, certain witnesses, including

---

[4] Florida statutes protect the identities of those involved in the execution process.  <u>See</u> West's F.S.A. § 945.10 (g), which mandates confidentiality for: "Information which identifies an executioner, or any person prescribing, preparing, compounding, dispensing, or administering a lethal injection."

those directly responsible for carrying out executions, testified anonymously.

Fourth, as explained in Defendants' initial motion, the sending of a subpoena with the case name, designating the information sought, creates a real risk that, as in the example of the *St. Louis Post-Dispatch*, the public will glean the names the government is seeking to protect. There can be no question that capital punishment is socially controversial and generates public attention.  Gawande, <u>supra</u> at 1229 (comparing ethical issues in executions to, <u>inter alia</u>, "abortion").

Fifth, Plaintiffs argue there is no evidence that, were the names released as per Plaintiffs' proposed protective order, that the government would have difficulty obtaining volunteers to participate in the drafting of execution protocols or executions themselves.  Pl. Opp. at 9 (no evidence regarding participation, citing the example of Director Lappin).  However, both of the attached exhibits provide examples of, or state that, without the guarantee of complete anonymity, former  participants in executions have refused to participate in future executions. Other district courts have recognized the government's concerns as constituting "good cause" and entered restrictive protective orders whereby the names at issue here were not released.  <u>See</u>, <u>e.g.,</u> <u>Taylor v. Crawford</u>, No. 05-4173 (W.D. Mo.) (providing that the "names of persons involved in executions will not be ordered produced by defendants in response to plaintiffs' discovery requests" and limiting to plaintiffs' counsel and experts retained by counsel "confidential information" "regarding the training, credentials, and qualifications of corrections personnel involved in executions" and defining "corrections personnel" as including employees, contractors or agents of the State's Department of Corrections).

Finally, Plaintiffs argue that names were released to counsel in <u>Morales v. Woodford</u>,

7

Case Nos. 06-0219 and 06-0926 (N.D. Cal.). Pl. Opp. at 11. The weight of authority is against the Morales decision. See cases cited in Defs. initial motion at 10-11. Furthermore, even the Morales order offered more protections than Plaintiffs' proposed order, a fact which Plaintiffs do not address in their opposition. In the Morales protective order, the district court recognized "legitimate concerns about the safety of prison personnel," and stated that "Plaintiff's attorneys, expert, and investigator shall not disclose protected information to anyone without first obtaining express authorization to do so from the Court," a level of protection that is absent from Plaintiffs' proposed order.

Plaintiffs also attempt to distinguish Evans v. Saar, in which the court specifically prohibited background checks. However, Plaintiffs' attempt to distinguish Evans falls flat and stretches their credibility. Plaintiffs claim that unlike their broader challenge, the "[m]ost important" aspect of Evans' claim concerned the State's plan to access Evans' veins for the lethal injection. Pl. Opp. at 12 (citing Evans v. Saar, 412 F.Supp.2d 519, 521 (D. Md. 2006)). The cited decision, however, states that, similar to Plaintiffs' challenge, Evans' "suit attacks [Maryland's] Lethal Injection Protocol." 412 F.Supp.2d at 521. Just as here, Evans argued that "flaws in the protocol" create an unconstitutional risk of pain during Evans' execution. Id. Underscoring the similarity of the two cases, we understand that Plaintiffs intend to offer expert testimony from the same witness Evans used: Dr. Mark Heath.

The court in Evans correctly recognized that the mere act of conducting such an investigation raises the serious security and privacy concerns expressed in the government's papers. See Evans v. Saar, Civil No. 06-0149 (D. Md.). See Ex. 1 at ¶ 14 (protective order governing information relating to security procedures of defendants or of persons performing

sensitive tasks relating to the execution of condemned prisoners and prohibiting background checks).

C.    Exchanging Personally-Identifying Information for Personnel involved in Executions and in the Federal Government's Execution Protocol is Unnecessary in this Litigation.

Plaintiffs have not explained precisely why the information sought could not be obtained without the disclosure of identities, for example by way of anonymous interrogatory or deposition. That is how the Florida Commission is gathering information and was the method by which other plaintiffs have gone forward. Plaintiffs suggest that some of the information they are seeking is publicly available, were they to know the names of those involved, see Pl. Opp. at 4, from media reporting, licensing authorities or medical organizations. Without conceding the relevance of this information, the government could do the search for plaintiffs and redact the names. Similarly, the government can make any disciplinary history available to Plaintiffs.

Plaintiffs' argument also demonstrates why such care is in order. There was so much interest in the challenge to Missouri's lethal injection protocol that even when a physician testified anonymously, he later was identified during the course of a *St. Louis Post-Dispatch* investigation. As we have represented previously, the government will provide sufficient information about the participants in executions and the development of the Execution Protocol to permit the Court and the parties to evaluate the training, qualifications, experience and competency of those persons, including any disciplinary history. Revealing their identities and other personally-identifying information to Plaintiffs' counsel is both unnecessary for this purpose and highly detrimental to important governmental and privacy interests. In addition, the Court should bear in mind when balancing the parties' interests with respect to the competing

versions of the protective order that Plaintiffs do not even allege that any of the purported

problems identified in their Amended Complaint occurred in the three Federal executions using

lethal injection.

Respectfully submitted,

_____s/Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
Interim United States Attorney

_____s/Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

_____
_____s/Peter S. Smith_____
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

_____s/ Robert J. Erickson_____
ROBERT J. ERICKSON, D.C. Bar # 220731
Principal Deputy Chief
Criminal Appellate Section
U. S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Room 1515
Washington, DC 20530
(202) 514-2841

Counsel for Defendants