**Transcript - July 14, 2006**

**BRANCACCIO:** Welcome to NOW...

Does this phrase ring a bell: "I will give no deadly medicine to any one if asked, nor suggest any such counsel."

That is from the Hippocratic Oath. For centuries, new doctors have been swearing to uphold that oath when beginning to practice.

So what happens when they're asked to become part of the execution team in carrying out the death penalty? It is an ethical dilemma that's been propelled into a national controversy, with courts in California and elsewhere stepping into the fray. Senior correspondent Maria Hinojosa and producer Michelle Smawley have our report.

**HINOJOSA:** Jackson, Georgia is a small, southern, rural town, population just under 4,000. It's the kind of place where everyone knows your name and story. Jackson is also home to Georgia's death row, at this maximum security prison.

The folks in Jackson know that when an execution happens, it happens here...

A local we'll call Karen knows the details all too well. As a nurse Karen has participated in 14 executions at the prison.

These days doctors and nurses almost never speak publicly about taking part in executions. Karen agreed to do so only if we would conceal her identity.

**HINOJOSA:** Were you aware that the death penalty was, in fact, part of a huge national discussion

**KAREN:** I knew that there were people that were against the death penalty. But I really thought people would carry that out more by tryin' to get more legislation against it or something like that. Instead of personally going against the people who were just carrying out a law.

**HINOJOSA:** Karen is caught up in the latest controversy about executions and the death penalty. This time around it's not about guilt or innocence of the people on death row...instead the controversy now centers on how the executions are carried out and who oversees them. Since lethal injection came into existence doctors and nurses have become much more active participants in executions. That was a red flag for the American Medical Association. The AMA and most medical associations have said they oppose doctors and other medical personnel helping to carry out executions.

But Karen says all of this came as a surprise to her. For most of the last 26 years she has been working in nursing homes and hospitals. Then six years ago she took on a part time job with the execution team.

**HINOJOSA:** Take me back to the first time, the first time you took part in an execution by lethal injection.

**KAREN:** I was nervous. Because I had never seen anything like this. I've actually, you know, been with a lot of people when they died. But I had never, you know, witnessed any type of execution.

**HINOJOSA:** So what's the procedure like? How does it happen?

**KAREN:** Once the inmate is actually brought in and strapped on a gurney you treat 'em just like a patient. You know, you put the tourniquet in— on. This is going to be tight. You use your alcohol and help cleanse the area. And insert the— IV catheter into the site.

**HINOJOSA:** And then what happens?

**KAREN:** They read the death order— bring in any witnesses that they're going to have to witness. Then— they'll start the injections.

**KAREN:** Death comes so quickly. You're talking six, eight minutes, at the most.

**HINOJOSA:** Those final moments take place in this room where under Georgia law it is required that two nurses and three doctors attend the executions. Karen and a fellow nurse insert the IVs into the inmates arm. The doctors are on hand to monitor the procedure and to pronounce death. Correction officers actually administer the lethal injection from another room— continuing the tradition of shielding the condemned from the executioner.

Karen says during the procedure what's on her mind most is her role as a nurse—which is to provide her medical expertise and comfort to the inmate. She says she takes no personal responsibility for the outcome.

**KAREN:** I don't know that I consider anybody an executioner. Even the people that— that I know who push the drugs, I don't consider them an executioner either. I look at it as the state is the executioner.

**HINOJOSA:** And so someone like you who's putting the IV in, what are you then?

**KAREN:** We're just carrying out procedures.

**HINOJOSA:** We tried to talk to doctors who have worked with Karen on the execution team at this maximum security prison. We located 5 physicians, two of whom were long retired, and all of them spoke at length on the phone about their feelings regarding their participation. But in the end, when we asked them to go on the record, their answer was inevitably the same. None of them would come forward.

Karen understands why no one would come forward...she says the execution team members have experienced outright harassment.

**KAREN:** All of us have actually had complaints made where they tried to get the state to sanction or licenses. But some of the physicians actually got even more personal type— harassment. Got phone calls. Got notes left at their offices.

**HINOJOSA:** What kind of phone calls? What kind of notes?

**KAREN:** You know, basically calling saying they were killers. You know, making all kind of comments about how they shouldn't be participating.

**HINOJOSA:** Georgia has become a bit of a hot bed when it comes to executions. It all began with a challenge to lethal injection by a death row inmate named Michael Nance. Nance and his legal team argued that lethal injection was cruel and unusual punishment. His attorneys called upon members of the execution team to testify, bringing their identities out of obscurity and opening up the floodgates for controversy.

The names of Karen, and her colleagues became public. A coworker, Dr. Sanjeeva Rao, was subpoenaed. He testified about inserting a catheter into a prisoner's arm after nurses, including Karen, were unable to do so.

Rao's participation in executions was reported to the Georgia medical board. Ethics charges were filed against him—the charges stem back to the 1980 resolution the American medical association passed against physician participation in executions.

Rao chose to resign from the execution team. The medical board never took action on the complaint against him. And the motion to challenge lethal injections by the death row inmate Michael Nance, who started it all— was denied.

The doctors and nurses who continued participating in executions went underground—even changing the way the team gathers on the day of executions.

**KAREN:** We actually meet at an undisclosed place. And we even have to change that undisclosed place—from one injection time to another. And then we are picked up— all together in a vehicle that no one would know. And then we go straight to the death chamber

**GAWANDE:** We are in a place now where the government is actively asking physicians to subvert the core principles of what we do in medicine.

**HINOJOSA:** Dr. Atul Gawande is a surgeon and a former senior healthcare advisor for President Clinton. Under the Clinton administration Gawande backed the president's stance in favor of capital punishment. He says he began reevaluating his position when the debate about doctor participation became more public.

Gawande began researching the controversy. The result— a study published this year in the New England Journal of Medicine.

**HINOJOSA:** In your research, you actually talked about the fact that medical doctors have been involved in the issue of execution for a long time.

**GAWANDE:** Well, the guillotine was invented by Dr. Guillotine, because it was thought to be a more humane form of death, compared to stoning or hanging or other forms that people had turned to. And at each step along the way, it has become commonplace for physicians to be asked to help perfect the killing process.

**HINOJOSA:** Most people don't think of doctors, equal killing.

**GAWANDE:** And that's why the topic seemed to me extremely important. We've reached a point where the courts have more or less said that almost every form of execution is unacceptable, except lethal injection. And that's because instead of strapping somebody into a chair and electrocuting them, you're laying them on a gurney with a white sheet over them.

**HINOJOSA:** Gawande points to another reason why there was a shift to a more medicalized execution.

**GAWANDE:** You had the cultural change that our country did not want to witness the physical destruction of human beings. That we no longer wanted to gather round in squares, cheering as someone was hung or shot.

**HINOJOSA:** But society still says it approves of execution?

**GAWANDE:** The public is willing to approve of as long as first of all, there's confidence that it's the accurate diagnosis. Then second of all, that it's done in a humane way. The trouble is that for physicians, the idea of a humane execution is an oxymoron.

**HINOJOSA:** And that is exactly what the legal system is struggling with today. Take the case of Michael Morales in California. Morales is on death row for the rape and murder of a 17-year-old girl. This year Morales challenged his execution arguing that the lethal injection formula would cause unnecessary pain. His attorneys claimed the three drug combination would mask any pain Morales was feeling during the actual lethal injection. A federal judge agreed and ordered prison officials to have anesthesiologists on hand.

**GAWANDE:** Within two days of that decision, the state actually found two anesthesiologists who were willing to be there in the death chamber and helping out. But then as soon as they got there on the day of execution and people started working out the details.

"Well, you make sure you bring some of your medication so that you can help put them to death?" Immediately they said, "No, we are healers. We are not executioners."

**HINOJOSA:** Morales' execution was postponed and this year California imposed a de facto moratorium on executions.

All of these challenges to the system drove Gawande to explore the conflict further. He spoke to 4 doctors and one nurse but only one would allow his name to be published.

**GAWANDE:** The most challenging person to the concerns I had about physicians being in the death chamber is a physician named Carlo Musso, who is an emergency physician in Georgia. He is against the death penalty. And he participates in executions in Georgia.

**HINOJOSA:** Soon after the article came out— Musso granted a radio interview. Only a handful of doctors have spoken publicly about their work as part of an execution team.

Musso begins by talking about witnessing his first execution.

**MUSSO:** I can tell you I had several emotions. One was it was incredibly sad.

There was a level of anxiety and tension in the room which was palpable. I sat in that chair in the observation area and I had a stark realization that this was, indeed, an end-of-life issue. And at that point, I felt that it was my duty to make sure if someone were going to die, that he die or she die in the most humane way

possible.

**HINOJOSA:** Still Musso says he sets limits regarding his participation

**MUSSO:** I can't imagine being asked to push any of the drugs involved. I don't think I could do it. I feel that it is my duty that if this patient is going to die, my duty is to make sure that if he dies, he dies in a painless manner. However, I would not play the role of the executioner.

**HINOJOSA:** Gawande says he initially thought Musso's argument had merit - that Musso hopes to provide comfort to the prisoner. But, ultimately, Gawande questions whether Musso simply watching a heart monitor provides any comfort at all.

**GAWANDE:** All he does is watch a monitor. He keeps anonymous from the prisoner. He has no say over what— what medications are being pushed. And he has no say about, "Hey, wait a minute. Wait a minute. He— he— he's still feeling this." There was no real connection between him as a doctor and that person as a patient.

**HINOJOSA:** What happened after you put Dr. Musso's name out in public?

**GAWANDE:** I know it did—lead the AMA to act—to have a hearing. Their first hearing, I understand, in more than 50 years about an ethics charge for one of its members.

**HINOJOSA:** We spoke to the American Medical Association after learning that they were continuing to investigate Dr. Musso. They would not comment on the specifics of any of their past, present or future inquiries.

**BAUM:** In opposing patient participation in executions, I believe that organized medicine in the United States is really missing the point of what it means to be a physician in circumstances where preservation of life is not possible.

**HINOJOSA:** Dr. Ken Baum is an attorney with a medical degree. He is an outspoken proponent of physician participation in lethal injection.

**BAUM:** Although physicians have been involved in executions for hundreds of years, the issue has really come to a head recently. And I believe the reason is that the form of execution that we now use, lethal injections, draws physicians ever closer to the execution chamber. And again, as the form of execution becomes more medicalized, so do the challenges to the execution process.

**HINOJOSA:** Just a few months ago. Joseph Clark, a convicted murderer was to be put to death by lethal injection in Ohio, a state that does not require medical personnel to be present. Clark was on the gurney and prison officials began to administer the lethal injection. Witnesses say they were shocked a few minutes into the procedure when Clark raised his head from the gurney exclaiming, "It don't work, it don't work." In the end, it took technicians 90 minutes to put Clark to death.

**BAUM:** There is no debate that without competent medical oversight, numerous executions in this country have been horribly botched, resulting in unnecessary pain and suffering.

**HINOJOSA:** But the debate around the whole notion of lethal injection continues. Most doctors have chosen to remain publicly silent. But in the only survey of its kind— a majority of physicians who were questioned supported some level of doctor participation in lethal injection

In the end, Gawande says he stands by his opposition of physician participation in execution, and he says the practice is a troubling harbinger for the future.

**HINOJOSA:** And so you worry that this could be a very slippery slope?

**GAWANDE:** If we're on a slippery slope, we've slid. We're there. Some recent examples include at Guantanamo, using medical personnel to place feeding tubes to force feed prisoners who were on a hunger strike. Turning to medical personnel to manipulate the medications that prisoners needed in order to allow the interrogators to get more information from them. Public trusts in medicine to do right for people because we've earned that trust over time. As we abandon that, we will lose patients; we will lose the trust of the public and the ability to do good in society.

**BRANCACCIO:** You can get deeper into the debate over doctors and the death penalty by visiting our website at pbs.org/NOW.

In an era of disturbing developments in the Middle East, this week has been especially distressing. Mayhem in Baghdad has surged again, and now Israel finds itself fighting militants on two fronts with the new escalation in Lebanon. In this environment, how America spends its military dollars becomes even more important. You may have seen the headline about Halliburton? After years of complaints, the army says it will not renew its vast and exclusive contract with Halliburton to support the U.S. military effort overseas.

This came as welcome news to Bunnatine Greenhouse, who was once the top civilian watching the money for the army corps of engineers.

She was demoted last year after warning congress about potential fraud and abuse in Halliburton's Iraq contracts.

**BRANCACCIO:** Well, Bunnatine Greenhouse, thanks for joining us.

**GREENHOUSE:** Thanks for having me.

**BRANCACCIO:** So the army now says that on a massive logistical contract like that, just dealing with Halliburton alone will no longer do. When you got the news, what did you think?

**GREENHOUSE:** I thought the army finally got it. It absolutely just warmed the cockles of my heart. And I have to say that. Because that is a common lingo of mine, is that they finally got it.

**BRANCACCIO:** But what did they get? What do you think the army finally has absorbed?

**GREENHOUSE:** Well, they finally realize that in— in order to assure best value, you have got to have continuous competition.

**BRANCACCIO:** It's amazing that— that this notion of competition in contracting is something that had to be learned. From your perspective inside the army corps when it did some of these contracts, you felt that there wasn't enough of this competitive spirit that might save taxpayers money?

**GREENHOUSE:** Absolutely. Absolutely. Every time an acquisition plan came in, I went through it with a fine tooth comb, making sure of that. Because usually, they would come in as a single award. And I'm saying no.

**BRANCACCIO:** It's not chump change. By one accounting, this thing was worth about 17 billion dollars, this contract that's currently there and won't be renewed.

**GREENHOUSE:** Well, it's time. And I hope that it's absolutely not a window dressing.

**BRANCACCIO:** And you didn't see effective competition too often.

**GREENHOUSE:** I did not see effective competition. And that was one of the concerns that they had with me was that, boy, she's still reading these acquisition plans.

**BRANCACCIO:** How dare you read these things.

**GREENHOUSE:** And still chopping them up and changing the plans that we had. But that was my responsibility as the procurement executive at the corps, was to make sure that there was effective competition.

**BRANCACCIO:** I remember one of the arguments for giving a contract like this to one big company for a long time—

**GREENHOUSE:** Yes.

**BRANCACCIO:** Is that we're gearing up for war. And it's more efficient that way. To get the job done, it was the most efficient path towards that goal.

**GREENHOUSE:** I disagree with that. Remember, competition doesn't take thirty days. It doesn't take several months. Competition can be done within hours. All it requires is two or more.

**BRANCACCIO:** What's at stake? Is it just making procurement professionals, as you call yourself, happy? And what— getting a contract like this right means what?

**GREENHOUSE:** It's billions of dollars.

**BRANCACCIO:** You're talking about value to taxpayers.

**GREENHOUSE:** We are stewards of the public trust. We have to make sure that whatever we do, the critical and the entrepreneurial thought has gone into it to determine what is best for that— for those dollars that have to be spent.

That is a responsibility of ours.

**BRANCACCIO:** Now, Halliburton/KBR denies any wrong doing in this big logistical contract. Says they've been doing a very good job, given what are terrible challenges in places like Iraq where ninety percent of its contract is being carried out. Is the message here not necessarily the actual performance on the part of Halliburton, but in fact bringing competition to the process?

**GREENHOUSE:** You always want to bring competition to the process. But there has to be aggressive, aggressive monitoring—to make sure that everybody understands that that contract and its terms are going to be lived up to.

**BRANCACCIO:** What's it like for you to still be working for the Corps but no longer in that position?

**GREENHOUSE:** Well nobody steals my joy. And I'm going to make sure that I'm contributing wherever I am. And it's a lot of humiliation, and that's unfortunate but that's just the way things are.

**BRANCACCIO:** Should the lesson be to people watching this that if they see examples of government not working right, they should keep their mouths shut?

**GREENHOUSE:** Well, that's the chill that's gonna have to be taken off of this whole thing. It is no way that I should have been punished for doing the things I should have done.

When you don't see the— the ultimate of competition that you know is gonna bring best value for those war fighters out there who are sacrificing, we need to make sure that the behavior of those contractors are changed...

**BRANCACCIO:** Is it an accounting thing, or a national security thing—how do you see trying to keep these contracts in line?

**GREENHOUSE:** It is a national security thing. The money that we save by aggressively managing our contracts is going to give us the opportunity for us to spend it other places.

**BRANCACCIO:** Well, Miss Greenhouse, thank you very much.

**GREENHOUSE:** Thank you. Thank you. It's a great day.