IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES H. ROANE, JR., et al.,** | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Case No.: 1:05-cv-2337 (RWR/DAR) |
| | : |
| **ALBERTO GONZALES, et al.,** | : |
| | : |
| Defendants. | : |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S MAY 2, 2007 DISCOVERY RULING

In March of this year, defendants first revealed to plaintiffs more than 100 individuals who participated in or otherwise were present at the three federal executions by lethal injection that have taken place to date. Eighty of these individuals were not named but were instead identified only by generic categories relating to their roles at executions pursuant to an extremely broad protective order in place in this action. Forty-six individuals—forty-three of them unnamed—were apparently present in some sort of official capacity, and at least sixteen appear to have been direct participants in the executions (as opposed to, for example, official witnesses or communications personnel). Defendants further revealed twelve unique unnamed individuals involved in the preparation of the protocol for execution by lethal injection. And plaintiffs have recently come to understand from publicly-available sources the possible existence of other key witnesses, about whom they know extremely little, including an individual who describes himself as the "coordinator of executions for the federal government."

Defendants guard the lethal execution process, and the participants in it, with intense secrecy. Accordingly, plaintiffs know almost nothing more about it than what defendants disclose, which to this point has been the existence of numerous important unspecified

1

individuals. In light of the substantial quantity of important witnesses about whom plaintiffs have virtually no information, plaintiffs sought a mechanism by which they could take an appropriate number of depositions (representing before the Magistrate Judge and now that they intend to take approximately twenty-five), but not be prejudiced in the event some of these mystery witnesses prove to possess little information of the sort plaintiffs need and are entitled to. The Magistrate Judge's ruling balances some minimal protections for plaintiffs with an eminently reasonable cap (permitting them eighty-four hours, the equivalent of twelve deposition days), and thus is plainly not "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72(a).

**A.      Background**

Plaintiffs in this case claim that the process by which the United States conducts executions by lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment, and that the regulations pursuant to which these executions are carried out were implemented in violation of the Administrative Procedure Act. The central foci of plaintiffs' depositions in this case will be (a) discovering exactly how the United States executes inmates— *i.e.*, discovering the roles, responsibilities, training, and qualifications of those that participate, and discovering what witnesses have observed at executions; and (b) discovering how the execution protocol was initially promulgated, how it has evolved, and what it is today.

On March 5, 2007, defendants responded to the discovery requests plaintiffs served on December 14, 2006, by identifying the participants in and other persons present at the three federal executions administered by lethal injection. They provided a list of more than 100 individuals, eighty of whom were unnamed and identified only by generic categories relating to their roles and responsibilities at executions pursuant to a very broad protective order on which defendants have insisted, and agreed to temporarily by the plaintiffs in order to at least get

discovery moving. (Defendants' attendee chart is attached as Exhibit A.) Although difficult to tell, plaintiffs read defendants' chart to say (and defendants did not contest) that some forty-six individuals, forty-three unnamed, appeared to have had official roles and responsibilities at the executions (*i.e.* as participants, communications personnel, other support staff, or official witnesses), and at least sixteen of those individuals have participated directly in executions by lethal injection. Defendants provided a second list of twelve unique unnamed individuals involved in designing the protocol for those executions. (This second chart is attached as Exhibit B.) Plaintiffs have learned from publicly available materials that a variety of unknown individuals from Florida, Tennessee, and California relatively recently received training or other presentations from the BOP on the lethal execution process. Plaintiffs have received no information from defendants about the content of or attendees at these presentations, and likely will have no choice but to depose some of the participants in these sessions to learn about them and explore the credibility and veracity of BOP testimony. Finally, plaintiffs have also found public documents that identify at least one other individual—the "coordinator of executions for the federal government"—identified by name in publicly available documents.[1] This individual was apparently not identified by defendants to plaintiffs in their March response, at least not as the "coordinator of executions," raising the possibility that there are yet more key witnesses plaintiffs do not know about.

    Plaintiffs are "starting from scratch" in understanding the process by which executions are carried out by defendants. The intense secrecy with which defendants guard the executioners and the methods they use—along with the extremely broad protective order on which they have

---

[1] An email from this individual was sent to Tennessee Department of Corrections personnel apparently without protection of any court order or confidentiality requirement, and was ultimately made public in Tennessee. *See* Ex. A to Plaintiffs' Amended Motion to Extend Deadlines for Discovery and Dispositive Motions.

Case 1:05-cv-02337-RWR-DAR   Document 51   Filed 05/16/2007   Page 4 of 11

insisted, which keeps large amounts of otherwise discoverable information from plaintiffs—puts plaintiffs in a very difficult position in trying to ascertain whom they need to depose in order to obtain the information they are entitled to in this action.  For example, defendants have revealed twelve unnamed individuals who have worked in the "chemical room" during executions—most of them during all three executions—seven of whom apparently have different but overlapping roles and responsibilities in connection with preparing the syringes and administering the lethal injections, and at least eleven of whom appear to have had or to be contemplated to have direct involvement in conducting executions.[2]  While the "chemical room" is understood to be where the drugs are prepared, drawn into syringes, and injected into the inmate during an execution, plaintiffs have no way of knowing exactly what transpires there or which, if any, of these unnamed employees possess information most germane to this action.  Indeed, not that this would resolve the issue, but defendants have not produced a single current document that specifies any of the procedures used in the "chemical room"—procedures that are at the core of plaintiffs' claims—at any past or future execution by the United States.

In light of the substantial quantity of individual participants and official and non-official witnesses, plaintiffs sought a mechanism by which they could begin deposing blocks of individuals at Terre Haute (a location requested by defendants), with some comfort that they did not have to simply throw darts at defendants' chart, and without fear that they would be prejudiced in the event one or more of the unidentified witnesses proved not to have information of the sort expected.  For example, plaintiffs initially sought in April to depose Protected Persons #2-9 and #11-13, so long as they had some agreement that defendants would not oppose their

---

[2] Defendants would make much of plaintiffs' characterization of those in the chemical room as "apparently having overlapping roles and responsibilities."  This misplaced attention is discussed *infra* at 8-9.

4

taking more than ten depositions in light of the far greater number of key individuals. This initial block of eleven depositions would have covered most of the individuals identified by defendants as having roles in the chemical room, but only two of the people involved in designing the execution protocol, no BOP employees with supervisory roles, neither of the Marshals present in the execution room, no unofficial or official witnesses to the executions, and no non-executioner or out-of-jurisdiction attendees at BOP trainings. Absent protections like those afforded by the Magistrate Judge's order, plaintiffs would have to either (a) depose only a subset of Protected Persons 2-9 and 11-13 and hope they selected the right people; or (b) hope that because these depositions would exhaust the ten presumptively available under Rule 30, the Court would permit them to take additional depositions concerning pertinent matters other than activities in the chemical room.

Defendants initially suggested the idea of an hours cap rather than a number-of-depositions cap as a way of resolving this issue. However, they insisted that this agreed-upon-cap (and defendants would not agree to more than eighty-four hours) be the outside limit on plaintiffs' depositions, and that plaintiffs waive any ability to ask the Court for additional depositions should they prove necessary. Of course, plaintiffs could not do so knowing so little about the more than ninety total unnamed individuals identified by defendants, about any other undisclosed witnesses, and about the execution process generally. Accordingly, Plaintiffs sought permission to take more than the ten depositions presumptively permitted by Rule 30, and the Magistrate Judge granted the motion in part, giving Plaintiffs eighty-four hours of total deposition time, with no limit on the number of deponents.

Immediately after issuance of the Magistrate Judge's order, plaintiffs notified defendants that they wanted to conduct full-day depositions of Protected Persons 2 and 3, and half-day

depositions of Protected Persons 4-9 and 11-13. The parties discussed scheduling these depositions in June, following the Court's ruling on defendants' motion for a protective order to prevent plaintiffs from videotaping the depositions.

B.     **Defendants' Objections are Without Merit**

Pursuant to Fed. R. Civ. P. 26(b)(2), the Court has broad discretion to alter the presumptive discovery limits contained in the Rules. Defendants in no way show the Magistrate Judge's decision to be "clearly erroneous" or "contrary to law," as they must to prevail, Fed. R. Civ. P. 72(a), nor do they acknowledge the "great deference" afforded a Magistrate Judge's decision in this District. *Campbell v. Microsoft Corp.*, 2006 WL 463263 at *2 (D.D.C. 2006, Roberts, J.), *quoting Neuder v. Battelle Pacific Northwest Nat'l Laboratory*, 194 F.R.D. 289, 292 (D.D.C. 2000).

Astonishingly, *none* of defendants' cases involve a *reversal* of a Magistrate Judge's decision, while several uphold the same under a deferential standard. Defendants are simply attempting to relitigate this issue before this Court. But even if examined without deference to the Magistrate Judge's ruling, Defendants' arguments are without merit.

*First*, defendants raise the specter of eighty-four one-hour depositions. *See* Defendant's Objections to Magistrate Judge's May 2, 2007 Discovery Ruling, Dkt. #46 ("Objections") at 3. This argument is disingenuous. Plaintiffs have represented that they expect to take about twenty-five depositions, *see* Pl. Mot. for Additional Depositions, Dkt. #37 at 1, an entirely reasonable number given the numerous individual participants in and witnesses to the executions.[3] Plaintiffs

---

[3] Even in the case defendants appear to rely on most heavily, *Alexander v. F.B.I.*, 1999 WL 270024 (D.D.C. 1999), the plaintiff was limited to five additional depositions only after having already been permitted *twenty-eight depositions*, with a presumptive limit of six hours each. That is, the plaintiff was allowed a total of thirty-three depositions, or a total of *198 hours* of deposition time -- almost two-and-a-half times what the Magistrate Judge has allowed plaintiffs.

6

have already asked to take depositions of eleven persons and have allotted about forty-five hours to them, entirely consistent with their representations. The hour limit was defendants' suggestion and serves to cap discovery reasonably, but also to protect plaintiffs in the event that they notice the "wrong" people—entirely possible given the numerous unnamed, and vaguely described witnesses.[4]

Defendants next argue that even twenty-five depositions would be burdensome, principally because of the hardship associated with keeping the executioners' identities protected. Objections at 4. In other words, it is not enough that plaintiffs' counsel be denied the identities of the key witnesses in this case; plaintiffs' counsel should also be denied depositions they would otherwise be entitled to because of the difficulty of hiding those identities. This position is transparently unfair. Plaintiffs should not be prejudiced any more than they have been already by defendants' unsupported assertions of the need for total secrecy in this case.

Defendants also argue that depositions will burden deponents, who will be away from their corrections duties to prepare for depositions, and their counsel. Objections at 5. Many busy people with important jobs in this country are deposed in the context of civil litigation, and are called away from their work responsibilities because of it. Defendants rely heavily on *Alexander*, *supra* n. 3, where among the numerous individuals deposed *before* the court ordered additional depositions were Lanny Davis, James Carville, Paul Begala and George Stephanopoulos. Defendants make no showing that their concern justifies reversal of the

---

In defendants' next case, *Nat'l Union Fire Ins. Co. v. Hicks, Muse, Tate & Furst, Inc.*, 2002 WL 1822738, *2 (S.D.N.Y. 2002), the court noted parallel proceedings in another district where the same parties had already conducted "many" depositions involving the same pool of witnesses.
[4]And indeed, the implication that plaintiffs would seek to conduct numerous cumulative and duplicative depositions is particularly inappropriate here, where (a) the charge is utterly without foundation; and (b) plaintiffs' counsel—who are busy themselves with other matters and handle this case *pro bono*—have no interest whatsoever in conducting discovery in an inefficient manner.

Magistrate Judge's Order, nor do they explain how preparing witnesses for deposition is inconsistent with their counsel's responsibilities.

Defendants baldly assert the potential for cumulative or duplicative testimony—highlighting plaintiffs' supposed "conce[ssion]" that some of the individuals identified by defendants have "overlapping roles and responsibilities." Objections at 4-5. This is another disingenuous argument. Plaintiffs have little idea who the people in the "chemical room" are, or what they actually do when they execute an inmate. Defendants have provided no names, and have identified the roles of these individuals with phrases like "assist in preparing lethal substances," or "administers lethal substances," or "leadership trainee," in some cases using these expressions for multiple persons. Defendants have also provided no written document that specifies what happens in the "chemical room." Plaintiffs do not and cannot know what actually happens in the "chemical room," or what any one individual does as distinct from what other individuals do.

Defendants suggest this ambiguity they have created concerning participants' roles and responsibilities at executions means that plaintiffs do not really need to depose all of these individuals. Of course, (a) plaintiffs would have no way to determine which of these individuals to depose if they had to choose; and (b) plaintiffs need to understand what each executioner's role is as distinct from that of the other executioners. While describing the roles of persons in the chemical room in similar, generic terms on their charts, defendants appear to acknowledge the different roles actually played by each individual in an execution in their Motion for a Protective Order, where they argue against having witnesses bring equipment to the depositions in part because of the "limited" or "specialized" role each participant plays. *See* Def. Mot. for Protective Order, Dkt. # 47, at 7. Plaintiffs suspect it is true that each participant plays a

different role, though of course they know no more about the process than what defendants have disclosed in their charts, their other discovery responses, and their motion papers, and obviously do not "concede" anything about what role any participant plays. Finally, even if these individuals *did* play the same or similar roles in an execution, some might have different memories or understandings of the execution process, and could provide unique information.

Remarkably, Defendants suggest that plaintiffs are "fishing" or have not identified with sufficient specificity who they need to depose or what information they expect to gain. Plaintiffs cannot provide this exact information because *defendants, their employees, and their agents* possess *all* the relevant information about designing, training for, and conducting an execution. Only defendants know who the participants are and what each does, how they were trained, how the execution protocol was designed, who the official witnesses are, and how an execution is performed. By virtue of the protective order in this case, plaintiffs cannot gain any information about the key individuals in any manner other than by what defendants provide during discovery which to this point has included no description of the actual execution process, no description of or list of participants at trainings, no identities of executioners, and no specificity regarding the roles and responsibilities of the official participants. The idea that plaintiffs should be penalized for not identifying *with specificity* what information they expect to obtain from each witness defendants have failed to specify is absurd.

9

WHEREFORE, the plaintiffs respectfully request that the Court overrule defendants' objections and affirm the ruling of the Magistrate Judge.

Respectfully submitted,

/s/ Paul F. Enzinna
PAUL F. ENZINNA (D.C. Bar No. 421819)
JEREMY I. LEVIN
TIMOTHY LOPER
RACHEL McKENZIE
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004-2400
(202) 639-7752
Fax:  (202) 639-7980

*Counsel for Plaintiff James H. Roane, Jr.*

/s/ Charles A. Zdebski
CHARLES A. ZDEBSKI  (D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, NW
Suite 1000
Washington, D.C. 20004-2134
(202) 274-2909

STEPHEN A. NORTHUP (D.C. Bar. No. 54587)
Troutman Sanders LLP
1001 Haxall Point
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1240

FREDERICK R. GERSON
Robinson & Gerson, P.C.
7102 Three Chopt Road
Richmond, Virginia  23226

*Counsel for Plaintiff Richard Tipton*

10

/s/ Charles A. Zdebski_____
CHARLES A. ZDEBSKI  (D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, NW
Suite 1000
Washington, D.C. 20004-2134
(202) 274-2909

BARBARA HARTUNG
700 E. Main Street
Suite 1600
Richmond, Virginia 23219

EDWARD E. SCHER
Thorsen & Scher, LLP
3810 Augusta Avenue
Richmond, VA  23230

*Counsel for Plaintiff Cory Johnson*


/s/ William E. Lawler III_____
WILLIAM E. LAWLER III (D.C. Bar No.398951)
GRAHAM E. EDDY (D.C. Bar No. 495794)
Vinson & Elkins LLP
1455 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004-1008
(202) 639-6676

*Counsel for Plaintiff Bruce Webster*