**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ANTHONY BATTLE                                    )
Inmate Number 11451-056                           )
U.S. Penitentiary Terre Haute                     )
Terre Haute, IN 47802                             )
                                                  )
    Plaintiff,                 )
                                                  )
       v.         )     Civ. Action No.1:05-CV-2337 (RWR )
                                                  )
ALBERTO GONZALES                                  )
Attorney General                                  )
U.S. Department of Justice                        )
950 Pennsylvania Avenue, NW                       )
Washington, DC 20530                              )
                                                  )
    and                        )
                                                  )
KAREN TANDY, Administrator                        )
Drug Enforcement Administration                   )
2401 Jefferson Davis Highway                      )
Alexandria, VA 22301                              )
                                                  )
    and                        )
                                                  )
HARLEY G. LAPPIN, Director                        )
Federal Bureau of Prisons                         )
U.S. Department of Justice                        )
320 First St., NW                                 )
Washington, DC 20534                              )
                                                  )
    and                        )
                                                  )
NEWTON E. KENDIG II., MD                          )
Medical Director                                  )
Health Services Division                          )
Federal Bureau of Prisons                         )
320 First St. NW                                  )
Washington, DC 20534                              )
                                                  )
    and                        )
                                                  )
                                                  )
                                                  )

RICHARD VEACH, Warden
U.S. Penitentiary Terre Haute                )
4700 Bureau Road South                       )
Terre Haute, IN 47802                        )
                                             )
        and                                  )
                                             )
THOMAS WEBSTER, M.D.                          )
Clinical Director                            )
U.S. Penitentiary Terre Haute                )
4700 Bureau Road South                       )
Terre Haute, IN 47802                        )
                                             )
        and                                  )
                                             )
JOHN DOES I-X                                )
                                             )
        Defendants.                          )
                                             )

## COMPLAINT

### Nature of Action

1.      This action is brought pursuant to (a) the United States Constitution for (i) violations

and threatened violations of the plaintiff's rights to Due Process under the Fifth Amendment

and (ii) violations and threatened violations of the plaintiff's rights to be free from cruel and

unusual punishment under the Eighth Amendment; and (b) violations and threatened violations

of the plaintiff's rights pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

("APA").

2.      The Plaintiff has been sentenced to death under federal law and, unless his capital

conviction and/or death sentence are overturned in another judicial proceeding or via executive

clemency, he will be killed by the defendants pursuant to an execution procedure that violates

(a) the Fifth and Eighth Amendments; and (b) the APA.  The plaintiff seeks a preliminary and

permanent injunction preventing the defendants from doing so, an Order declaring that the defendants' proposed execution procedure violates the Fifth and Eighth Amendments and the APA, and such other equitable relief as the court deems just and proper.

3.    The Fifth Amendment's Due Process Clause requires notice and the opportunity to be heard before the deprivation of life, liberty, or property. The defendants, however, have failed to disclose the procedures that will be utilized in carrying out the plaintiff's execution, preventing the plaintiff from determining whether any aspect of those procedures may constitute cruel and unusual punishment, and to consult medical experts concerning that possibility, in violation of the Due Process Clause.

4.    Moreover, it is a violation of the Eighth Amendment to use an arbitrary, cruel, and/or unreliable method of execution, which risks inflicting unnecessary pain, particularly when the risk of such unnecessary pain is foreseeable. Louisiana ex rel. Francis v. Resweber, 329 U.S. 459,463 (1947) (opinion of Reed, J.); Furman v. Georgia, 408 U.S. 238, 273 (1972) (citing Resweber). On information and belief, the means by which the defendants plan to kill the plaintiff is arbitrary, cruel and/or unreliable, and the process risks causing unnecessary and gratuitous suffering.

5.    Furthermore, the plaintiff was sentenced to death pursuant to 18 U.S.C. § 3592, *et seq.*, which authorizes a sentence of death in certain circumstances. The defendants have promulgated regulations which purport to authorize that a sentence of death be carried out by the injection of lethal chemicals. However, those regulations were promulgated without public notice and comment, and in violation of the APA's procedural requirements, and are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

6.    In addition, in the Controlled Substances Act ("CSA"), Congress established a federal scheme that comprehensively regulates the manufacture, distribution, possession and dispensing of "controlled substances."  The CSA makes it unlawful to "dispense" any controlled substance except pursuant to the prescription of a practitioner possessing a registration issued pursuant to the CSA.  21 U.S.C. §§ 822, 829 (2000).  To be effective, such a prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a) (2005).  The defendants intend to execute the plaintiff by administering a controlled substance – sodium thiopental – in violation of the CSA; *i.e.*, by dispensing that controlled substance not pursuant to a prescription issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice and possessing a valid registration issued pursuant to the CSA.  In doing so, the defendants have arbitrarily and capriciously failed to exercise their authority to enforce the CSA.

The claims in this complaint are cognizable under the Fifth and Eighth Amendments, as well as the APA.  This lawsuit is not, and should not be treated as, a successor habeas corpus petition.  See Hill v. McDonough, 126 S.Ct. 2096 (2006); Nelson v. Campbell, 541 U.S. 637 (2004).  In this action, the plaintiff does not challenge the validity of his conviction or death sentence.  Rather, he claims that the means by which the defendants plan to kill him violates the Fifth and Eighth Amendments, and the APA.

## Parties

7.    Plaintiff Anthony Battle ("Battle") is a United States citizen and resident of the state of North Carolina.  He is a death-sentenced inmate in the custody of the defendants and under the control and supervision of the Federal Bureau of Prisons, a department of the United States Department of Justice ("BOP").  He is incarcerated at the United States Penitentiary in Terre Haute, Indiana.  If his capital conviction and/or death sentence are not overturned in another judicial proceeding or through executive clemency, the defendants will kill him in the "death house" located on the grounds of the U.S. Penitentiary Terre Haute, which is operated and controlled by the defendants.

8.    Defendant Alberto Gonzales is the Attorney General of the United States.  The plaintiff was remanded into Department of Justice custody upon his conviction and the imposition of his death sentence, and Defendant Gonzales is the final executive authority responsible for carrying out sentences of death against federal prisoners.  He is sued here in his individual and official capacities for the purpose of obtaining declaratory and injunctive relief.

9.    Defendant Karen Tandy is the Administrator of the United States Drug Enforcement Agency ["DEA"].  In that role, she is responsible for exercising the authority delegated to her by the Attorney General to enforce the CSA.  She is sued here in her individual and official capacities for the purpose of obtaining declaratory and injunctive relief.

10.    Defendant Harley G. Lappin is the Director of the United States Bureau of Prisons. As such, he is charged with prescribing and directing, and is authorized to prescribe and direct, the promulgation of rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations and execution procedures.  He is sued here in his individual and official capacities for the purpose of obtaining declaratory and injunctive relief.

11.    Defendant Newton E. Kendig, II., M.D. is the Medical Director of the United States Bureau of Prisons.  In that position he is responsible for overseeing the provision of medical care to inmates at all BOP facilities, and for promulgating and implementing BOP policy with respect to medical care provided by BOP.  He is sued here in his individual and official capacity for the purpose of obtaining declaratory and injunctive relief.

12.    Defendant Richard Veach is the Warden of the United States Penitentiary at Terre Haute, Indiana, which is the BOP facility at which sentences of death are executed in the federal system.  In that position, he is charged with management of the U.S. Penitentiary Terre Haute and the oversight and conduct of operations there, including the oversight and conduct of executions carried out there.  He is sued here in his individual and official capacities for the purpose of obtaining declaratory and injunctive relief.

13.    Defendant Thomas Webster, M.D. is the Clinical Director at the United States Penitentiary Terre Haute.  In that position he is responsible for overseeing the provision of medical care to inmates at that facility.  He is sued here in his individual and official capacities for the purpose of obtaining declaratory and injunctive relief.

14.    Defendants John Does I - X are employed by the United States Bureau of Prisons to prepare for and carry out the plaintiff's execution.  The plaintiff does not know, and the defendants have not revealed, their identities.  They are sued here in their individual and official capacities for the purpose of obtaining declaratory and injunctive relief.

15.    The defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law.  Upon information and belief, unless preliminarily and permanently enjoined, the defendants, and each of them, intend to act

in their respective official capacities and under the authority of federal law in executing the plaintiff, in violation of the plaintiff's constitutional and statutory rights.

## Jurisdiction and Venue

16.    This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that it arises under the Constitution and laws of the United States in that it seeks to secure prospective, equitable relief directly under the Constitution, specifically the Fifth and Eighth Amendments; under 28 U.S.C. § 2201(a), in that one purpose of this action is to secure declaratory relief; and under 28 U.S.C. § 2202, in that one purpose of this action is to secure preliminary and permanent injunctive relief.  Judicial review of the agency action at issue is authorized by the APA, 5 U.S.C. §§ 702, 704 and 706.

17.    This Court has venue under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events giving rise to the claims made herein – *i.e.*, the formulation of the Bureau of Prison's procedures governing the execution of condemned inmates – took place in this District. Alternatively, this Court has venue under 28 U.S.C. § 1391(b)(3) because defendants Gonzalez, Lappin and Kendig reside here.

## Facts

18.    The plaintiff incorporates by reference all facts and allegations contained in paragraphs 1 - 17.

19.    The plaintiff was convicted in 1997 in the United States District Court for the Northern District of Georgia for killing a federal prison guard while serving a life sentence at USP Atlanta.  He was sentenced to death on March 12, 1997.  On July 15, 1999, his conviction was affirmed on appeal to the United States Court of Appeals for the Eleventh Circuit.  The United States Supreme Court denied *certiorari* on March 19, 2000.  The plaintiff filed a motion

to vacate his conviction and death sentence under 28 U.S.C. § 2255 on October 1, 2001. The United States District Court for the Northern District of Georgia denied that motion on April 30, 2003. The United States Court of Appeals affirmed on August 10, 2006, and the United States Supreme Court denied *certiorari* on April 16, 2007.

20.     On information and belief, the defendants intend to execute the plaintiff by injecting three chemicals, administered intravenously in sequence, separated by injections of saline solution. The chemicals include sodium thiopental or sodium pentothal (an ultra short-acting barbiturate); pancuronium bromide or pavulon (a curare-derived agent that paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or sensation), and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the inmate's veins and which interferes with the rhythmic contractions of the heart, causing cardiac arrest.) This combination of drugs causes death by suffocation and heart attack, which cause extraordinary and excruciating suffering. While this combination of drugs supposedly will render the plaintiff insensible to the pain of his death, it in fact can cast a "chemical veil'' over this excruciating suffering, leaving plaintiff conscious but trapped in a paralyzed body wracked by suffocation and a heart attack. At the same time, it will be impossible for those observing the execution – including witnesses to it, as well as John Does I-X, who are charged with actually carrying out the execution – to recognize and prevent the gratuitous pain and suffering being inflicted upon the plaintiff.

**The Lethal Injection Regulations**

21.     The plaintiff was sentenced to death pursuant to 18 U.S.C. § 3591, *et seq.*, the Federal Death Penalty Act (FDPA), which authorizes the imposition of a death sentence in certain

circumstances. The FDPA does not, however, specify the means by which an individual sentenced to death under the statute is to be executed.

22. On November 30, 1992, the DOJ published a proposed rule purporting to "establish[] procedures" for carrying out a death sentence imposed under 21 U.S.C. § 848(1). 57 Fed. Reg. 56536 (1992). In response, DOJ received twenty-three comments concerning the proposed rule from medical associations and physicians, criminal defense attorneys, advocates for prisoners' rights and the media, and from private citizens.

23. The comments received by DOJ included those of United States Congressman Don Edwards, Chairman of the Subcommittee on Civil and Constitutional Rights of the U.S. House of Representatives, who stated that only Congress could establish such procedures, and that the proposed rule was therefore beyond the scope of DOJ's powers. DOJ rejected this comment, stating that it "does not need explicit authority to issue regulations establishing death penalty procedures." 58 Fed. Reg. 4898 (1993).

24. Another commenter warned that lethal injection is an unnecessarily painful method. DOJ rejected this comment without further inquiry or analysis, stating simply that it "disagree[d], and regard[ed] lethal injection as less problematic than the alternatives." Id.

25. DOJ also received comments "from medical associations and physicians objecting to the provisions that a physician be present at the execution, § 26.4(c)(1), and that a physician or other qualified personnel determine that the prisoner has died, § 26.4(g)." Id. The American Medical Association (AMA) and the American College of Physicians "agreed with most other physicians and medical associations commenting on the rule that medical ethics prohibit physicians from pronouncing the death of a prisoner." The two associations and other

commenters also stated that medical ethics prohibit physicians from even attending an execution in a professional capacity. In response, DOJ stated:

> [I]t cannot be said at this point that the statements of medical ethics offered by the associations and physicians who commented on the proposed rule necessarily conflict with orderly, professional executions. Perhaps, when it has developed detailed procedures for lethal injection, or has experience administering the injections, the Department will conclude that a physician need not be present. The proposed rule contemplated that the Bureau of Prisons might wish to select someone other than a doctor – a coroner, for instance – to pronounce death; here, too, there is no reason to insist in the rule itself that death might be pronounced by a physician.

> The rule has therefore been revised to eliminate the requirement of a physician's presence, and to eliminate the reference to a physician determining death. Because the Department may conclude that a physician's presence is necessary to a responsible execution, physician participation will not be barred.

Id. DOJ did not address the question of whether a physician's presence was required for any reason other than to pronounce death.

26.    The defendants rejected these comments and issued a Final Rule that purportedly took effect February 18, 1993. 58 Fed. Reg. 4898 (1993) (the "Final Rule"). The Final Rule stated merely that "a sentence of death shall be executed . . . by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal." 28 C.F.R. § 26.3(a)(4). The regulations adopted by the defendants do not specify what lethal substances shall be used to kill condemned inmates, what amount of such substances shall be used, how they shall be administered (including the order in which such substances shall be administered), or by whom they shall be administered.

27.    On information and belief, however, on one or more occasions since February 18, 1993, the defendants have adopted further regulations specifying in detail the means and

method by which executions by lethal injection are to be carried out (the "Lethal Injection Protocol").

28.    The defendants have not disclosed the Lethal Injection Protocol to the plaintiff, nor have they made public all material and relevant details surrounding the process by which the defendants adopted the Lethal Injection Protocol.

29.    On information and belief, the defendants and/or their agents simply adopted lethal injection protocols used by one or more states, without providing public notice and opportunity for comment, and without investing meaningful and independent efforts designed to ensure that the Lethal Injection Protocol complies with contemporary medical standards and long-standing constitutional standards that forbid the infliction of excruciating, cruel, and unusual pain and punishment.

**Lethal Injection**

30.    The defendants have repeatedly refused to divulge the specifics of the Lethal Injection Protocol, but plaintiff believes that they intend to execute him using sodium thiopental, pancuronium bromide, and potassium chloride.  This combination of drugs causes death by suffocation and heart attack, each of which causes extraordinary and excruciating suffering.  While the administration of sodium thiopental supposedly will render the plaintiff insensible to the pain of his death, on information and belief, the Lethal Injection Protocol creates a substantial risk that it will not do so, and that the administration of pancuronium bromide will merely cast a "chemical veil" over the excruciating pain experienced by the plaintiff, leaving him conscious but trapped in a paralyzed body wracked by conscious suffocation and/or heart attack, while making it impossible for those observing the execution – including witnesses as well as John Does I-X, who are charged with actually carrying out the

11

execution - to recognize and prevent the gratuitous pain and suffering being inflicted upon the plaintiff.

31.    Sodium thiopental is an ultra short-acting barbiturate with a very short shelf life in liquid form.  It is distributed in powder form to increase its shelf life, and must be mixed into a liquid solution by trained personnel before it can be injected.  When anesthesiologists use sodium thiopental, they do so for the purpose of temporarily anesthetizing patients in order to permit sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration.  Once this has been achieved, additional drugs are administered to maintain a "surgical depth" or "surgical plane" of anesthesia (*i.e.*, a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious for the duration of the surgical procedure).  The medical utility of sodium thiopental derives from its ultra short-acting properties:  if unanticipated obstacles hinder or prevent successful intubation, patients will quickly regain consciousness and will resume ventilation and respiration on their own.

32.    These benefits of sodium thiopental in the operating room engender serious risks in the execution chamber.  The dose of sodium thiopental used in the execution procedure is, on information and belief, administered in a single injection from a single syringe.  By contrast, on information and belief, the original design of the Lethal Injection Protocol called for the continuous intravenous administration of an ultra short-acting barbiturate.  The use of a continuous administration of the ultra short-acting barbiturate may be required to ensure continued and sustained unconsciousness during the administration of pancuronium bromide and potassium chloride.  The failure to administer a continuous infusion of thiopental creates a significant, but completely avoidable and therefore unnecessary, risk that the condemned inmate will consciously experience muscular paralysis, without loss of consciousness or

sensation, during the excruciating pain of both suffocation and the intravenous injection of potassium chloride. This unnecessary risk is also present in the Lethal Injection Protocol because, if the two mix in a syringe or IV line, pancuronium bromide can cause sodium thiopental to precipitate, lessening its sedative effect.

33.    Sensitivity to sodium thiopental varies greatly among individuals. Unless a superclinical dose is administered, the necessary dosage needed for effective use of sodium thiopental is susceptible to a number of factors, including body weight, body fat, prior drug usage, the presence in the body of other sedating agents (which may be provided to condemned inmates in the period immediately before their execution), and the level of anxiety or stress. The variable sensitivity and the range of known and unknown factors that influence the effectiveness of sodium thiopental make it imperative that the drug be administered by qualified individuals, in order to ensure that it brings about a deep, lengthy anesthetized state in a condemned individual, and prevents the infliction of unnecessary pain. Unless it is administered by a qualified individual, the condemned person may lose consciousness for only a brief period, leaving him sensible to the horrific pain resulting from the administration of potassium chloride, but unable to communicate that pain to those administering the lethal injection because of the paralyzing effect of pancuronium bromide. On information and belief, the Lethal Injection Protocol does not call for sodium thiopental to be administered by a person qualified to administer it.

34.    Sedating chemicals other than sodium thiopental are available that are potent, long-lasting, stable in solution and inexpensive. Compared to sodium thiopental, these alternative sedating chemicals pose substantially less risk that the prisoner will regain consciousness before the end of the execution process.

35.    Sodium thiopental is a Schedule III controlled substance under the CSA.

36.    The second chemical involved in the lethal injection process, pancuronium bromide, or pavulon, is a derivative of curare that acts as a neuromuscular blocking agent.  Pancuronium bromide paralyzes all skeletal muscles, including the diaphragm, causing the inmate to be unable to move or breathe.

37.    While pancuronium bromide causes muscular paralysis (including the diaphragm, stopping respiration), it does not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation.  If sodium thiopental and potassium chloride are given in doses sufficient to cause death, then there is no rational or medically justifiable place in the Lethal Injection Protocol for pancuronium bromide.  It is not necessary to cause death, and its function in the Lethal Injection Protocol is solely cosmetic or aesthetic.  By preventing the prisoner's muscles from moving and indicating pain, suffering or emotion, it makes the prisoner appear serene.  However, pancuronium bromide can lessen the sedating effect of sodium thiopental, and to the extent it does, or to the extent insufficient sodium thiopental is administered, pancuronium bromide masks the excruciating pain suffered by the inmate as he suffocates and endures cardiac arrest.

38.    If an unconscious condemned person is paralyzed after being administered pancuronium bromide and then regains consciousness, it is almost a certainty that the execution staff would be completely unaware that he had become conscious.  In such a scenario, the execution staff and witnesses would be completely unaware that the condemned person was experiencing excruciating pain from suffocation (because the diaphragm muscles would be paralyzed), burning in the veins from the injection of the potassium chloride, and finally a massive heart attack induced by the potassium chloride.  The signs and symptoms that indicate

14

how deeply a patient is anesthetized are subtle. On information and belief, the Lethal Injection Protocol does not provide for the presence in the execution chamber of staff with the training, experience, or expertise to assess these signs and symptoms, or for the presence in the execution chamber of any equipment capable of determining whether a prisoner to whom pancuronium bromide has been administered is, in fact, unconscious.

39.    The third and final chemical administered in the Lethal Injection Protocol is potassium chloride. This chemical induces cardiac arrest in the inmate by activating the nerve fibers lining the inmate's veins and interfering with the rhythmic contractions of the heart. The administration of potassium chloride to a patient who is not properly anesthetized is inhumanly painful. The American Veterinary Medical Association is so confident that death by potassium chloride will cause unnecessary suffering that it states that "[i]t is of utmost importance that personnel performing [euthanasia by injection of potassium chloride] are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously." American Veterinary Medical Association, 2000 Report of the AVMA Panel on Euthanasia, JAVMA No. 218, No. 5 (March 1, 2001) 669, 681. On information and belief, the defendants have chosen potassium chloride to induce cardiac arrest despite the availability of other chemicals which accomplish the same purpose while inflicting substantially less, or no, pain.

40.    The absence of appropriately qualified personnel and proper procedures has caused botched executions in the past. On at least 11 occasions since 1977, inmates executed by means of lethal injection in the United States have suffered violent and painful reactions to the chemicals administered during the execution:

    a.  On December 13, 1988, in Texas, Raymond Landry was pronounced dead 40
        minutes after being strapped to the execution gurney and 24 minutes after the

drugs first started flowing into his arms. Two minutes after the drugs were administered, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward witnesses. The curtain separating the witnesses from the inmate was then pulled, and not reopened for fourteen minutes while the execution team reinserted the catheter into the vein. Witnesses reported "at least one groan."

b.  On May 24, 1989, in Texas, Stephen McCoy had such a violent physical reaction to the drugs (heaving chest, gasping, choking, back arching off the gurney, etc.) that a male witness fainted, crashing into and knocking over another witness.

c.  On September 12, 1990, in Illinois, Charles Walker suffered excruciating pain during his execution because of equipment failure and human error. According to an engineer from the Missouri State Prison retained by the State of Illinois to assist with Walker's execution, a kink in the plastic tubing going into Walker's arm stopped the deadly chemicals from reaching Walker. In addition, the intravenous needle was inserted pointing at Walker's fingers instead of his heart, prolonging the execution.

d.  On March l0, 1992, in Oklahoma, Robyn Lee Parks had a violent reaction to the drugs used in his execution. Two minutes after the drugs were dispensed, the muscles in his jaw, neck, and abdomen began to react spasmodically for approximately 45 seconds. Parks continued to gasp and violently gag until death came, eleven minutes after the drugs were first administered. A *Tulsa World* reporter wrote that the execution looked "painful and ugly," and "scary."

e.  According to an Associated Press reporter, on May 7, 1992, in Texas, Justin Lee May "went into a coughing spasm, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing, his eyes and mouth remained open."

f.  On May 10, 1994, in Illinois, after the execution of John Wayne Gacy began, the lethal chemicals unexpectedly solidified, clogging the IV tube that lead into Gacy's arm, and prohibiting any further passage. Blinds covering the window through which witnesses observed the execution were drawn, and the execution team replaced the clogged tube with a new one. Ten minutes later, the blinds were reopened and the execution process resumed. It took 18 minutes to complete. Anesthesiologists blamed the problem on the inexperience of prison officials who were conducting the execution, saying that proper procedures taught in "IV 101" would have prevented the error.

g.  On May 3, 1995, in Missouri, seven minutes after the lethal chemicals began to flow into Emmitt Foster's arm, the execution was halted when the chemicals stopped circulating. With Foster gasping and convulsing, the blinds

16

were drawn so that witnesses could not view the scene. Death was pronounced thirty minutes after the execution began, and three minutes *later* the blinds were reopened so the witnesses could view the corpse. According to the Washington County Coroner who pronounced death, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney; they were so tight that the flow of chemicals into the veins was restricted. Foster did not die until several minutes after a prison worker finally loosened the straps.

h. On May 8, 1997, in Oklahoma, Scott Dawn Carpenter was pronounced dead 11 minutes after the lethal injection was administered. As the drugs took effect, Carpenter began to gasp and shake. This was followed by a guttural sound, multiple spasms and gasping for air, until his body stopped moving three minutes later.

i. On April 23,1998, in Texas, it took two attempts to complete the execution of Joseph Cannon. After Cannon made his final statement, the execution process began. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of the witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and the execution process resumed.

j. On June 28, 2000, in Missouri, Bert Leroy Hunter repeatedly coughed and gasped for air after the lethal chemicals were injected and before he lapsed into unconsciousness. A witness reported that Hunter had "violent convulsions. His head and chest jerked rapidly upward as far as the gurney restraints would allow, and then he fell quickly down upon the gurney. His body convulsed back and forth . . . repeatedly. . . . He suffered a violent and agonizing death."

k. On June 20, 2006 in Texas, Lamont Reese, who had to be carried into the execution chamber, said, "[t]his is some nasty," and gasped as the drugs began to be administered. He was pronounced dead eight minutes later.

See www.deathpenaltyinfo.org/article.php?scid=8&did=478; 'This is some nasty,' dying inmate says, CNN.com, June 21, 2006 (available at http://edition.cnn.com/LAW/06/21/texas.execution.ap/index.html).

41. In addition, on numerous occasions, delays in locating veins suitable for lethal injection have resulted in significant delays and other torment of condemned prisoners:

a. March 13, 1985, Texas. Because of Stephen Peter Morin's history of drug abuse, the execution technicians were forced to probe both of Morin's arms and one of his legs with needles for nearly 45 minutes before they found a suitable vein.

b. August 20, 1986, Texas.  Randy Woolls, a drug addict, was required to help the execution technicians find a useable vein for the execution.

c. June 24, 1987, Texas.  Because of collapsed veins, it took nearly an hour to complete the execution of Elliot Rod Johnson.

d. January 24, 1992, Arkansas.  It took medical staff more than 50 minutes to find a suitable vein in Rickey Ray Rector's arm.  Witnesses were kept behind a drawn curtain and not permitted to view this scene, but reported hearing Rector's eight loud moans throughout the process.  During the ordeal Rector (who suffered from serious brain damage) helped the medical personnel find a vein.

e. April 23, 1992, Texas.  Billy Wayne White was pronounced dead 47 minutes after being strapped to the execution gurney.  The delay was caused by difficulty finding a vein.  White had a long history of heroin abuse.  During the execution, White attempted to assist the authorities in finding a suitable vein.

f. January 23, 1996, Virginia.   The execution of Richard Townes, Jr. was delayed for 22 minutes while medical personnel struggled to find a vein large enough for the needle.   After unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes' right foot.

g. July 18, 1996, Indiana.  Because of unusually small veins, it took one hour and nine minutes for Tommie J. Smith to be pronounced dead after the execution team began sticking needles into his body.  For sixteen minutes, the execution team failed to find adequate veins, and then a physician was called.  Smith was given a local anesthetic and the physician twice attempted to insert the tube in Smith's neck.  When that failed, an angio-catheter was inserted in Smith's foot.  Only then were witnesses permitted to view the process.  The lethal drugs were finally injected into Smith 49 minutes after the first attempts, and it took another 20 minutes before death was pronounced.

h. June 13, 1997, South Carolina.  Because Michael Eugene Elkins's body had become swollen from liver and spleen problems, it took nearly an hour to find a suitable vein for the insertion of the catheter.  Elkins tried to assist the executioners, asking "Should I lean my head down a little bit?" as they probed for a vein.   After numerous failures, a usable vein was finally found in Elkins's neck.

i. August 26, 1998, Texas.   The execution of Genaro Ruiz Camacho was delayed approximately two hours due, in part, to problems finding suitable veins in Camacho's arms.

j. October 5, 1998, Nevada.  It took 25 minutes for the execution team to find a vein suitable for the lethal injection of Roderick Abeyta.

k.  May 3, 2000, Arkansas. Christina Marie Riggs' execution was delayed for 18 minutes when prison staff couldn't find a suitable vein in her elbows. Finally, Riggs agreed to the executioners' requests to have the needles in her wrists.

l.  June 8, 2000, Florida. It took execution technicians 33 minutes to find suitable veins for the execution of Bennie Demps. "They butchered me back there," said Demps in his final statement. "I was in a lot of pain. They cut me in the groin; they cut me in the leg. I was bleeding profusely. This is not an execution, it is murder." The executioners had no unusual problems finding one vein, but because Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures.

m.  December 7, 2000, Texas. The execution of Claude Jones, a former intravenous drug abuser, was delayed 30 minutes while the executioners struggled to insert an IV into a vein. One member of the execution team commented, "They had to stick him about five times. They finally put it in his leg."

n.  November 7, 2001, Georgia. Jose High was pronounced dead more than one hour after his execution began. After attempting to find a useable vein for 39 minutes, the emergency medical technicians under contract to do the execution abandoned their efforts. Eventually, one needle was stuck in High's hand, and a physician was called in to insert a second needle between his shoulder and neck.

On May 2, 2006 in Ohio, Joseph Clark shouted "it don't work" five times, and begged, "can you just give me something by mouth to end this?" as his executioners struggled to end his life. Witnesses reported that after the curtains were drawn to block their view, they heard sounds of a struggle, and Clark's repeated groans and guttural sounds. Clark finally died after ninety minutes in the execution chamber.

www.deathpenaltyinfo.org/article.php?scid=8&did=478; Paul E. Kostyu Copley, Execution runs into problems, Canton Repository (May 3, 2006); Andrew Welsh-Huggins, Botched Execution Leads To Ohio Review, ABC News, May 12, 2006, http://abcnews.go.com/US/wireStory?id=1952093.

o.  December 13, 2006, Florida. It took two injections and 34 minutes for Angel Diaz to die. Witnesses saw Diaz moving and grimacing in pain. A Florida Department of Corrections spokesperson claimed that the delay was due to a liver condition. However, the medical examiner's autopsy revealed that the needle had gone through Diaz's vein, causing the deadly chemicals to be injected into Diaz's soft tissue, not his vein. Two days later, Florida Governor Jeb Bush suspended all executions in the state and appointed a commission to consider the humanity and constitutionality of the death penalty.

Michael L. Radelet, <u>Some Examples of Post-Furman Botched Executions</u>, Death Penalty Information Center, Dec. 16, 2006, http://www.deathpenaltyinfo.org/article.php?scid=8&did=478; Chris Tisch and Curtis Kruege, <u>Executed Man Takes 34 Minutes to Die</u>, St. Petersburg Times, Dec. 13, 2006, available at http://www.sptimes.com/2006/12/13/State/Executed_man_takes_34.shtml.

## <u>Lethal Injection Protocol, Personnel and Processes</u>

42.   The preparation of drugs, particularly for intravenous use, is a technical task requiring significant training in pharmaceutical concepts and calculations. There are many risks associated with drug preparation that, if not properly addressed by properly credentialed and trained personnel, further elevate the risk that an inmate will consciously experience excruciating pain during lethal injection.

43.   The correct and safe management of intravenous drug and fluid administration requires a significant level of professional acumen, and cannot be performed adequately by personnel lacking the requisite training and experience. The great majority of nurses are not trained in the use of ultra short-acting barbiturates; indeed, this class of drugs is normally used only by nurses who have significant experience in intensive care units and as nurse anesthetists. Very few paramedics are trained or experienced in the use of ultra short acting barbiturates.

44.   The risk of inflicting severe and unnecessary pain and suffering upon the plaintiff in the Lethal Injection Protocol is particularly grave because, upon information and belief, the procedures and protocols designed by the defendants do not include safeguards regarding the manner in which the execution is to be carried out, do not establish the minimum qualifications and expertise required of the personnel performing critical tasks in the Lethal Injection Protocol, and do not establish appropriate criteria and standards that these personnel must meet in carrying out the Lethal Injection Protocol.

45.    On information and belief, the Lethal Injection Protocol does not call for available medical equipment which, if used by properly trained personnel, could alert defendants and their agents if the sodium thiopental has failed but the pancuronium bromide has taken effect, leaving the condemned prisoner conscious but experiencing extreme pain.  The Lethal Injection Protocol violates the plaintiff's constitutional rights by reason of the absence of procedures for the use of medical monitoring equipment and other such necessary procedures and properly-trained execution personnel to respond appropriately to the information revealed by such medical equipment.

46.    Upon information and belief, the Lethal Injection Protocol fails to address additional factors necessary to ensure compliance with constitutional requirements, including but not limited to the following factors:

    a.  the minimum qualifications, expertise, and training required for the different personnel performing the tasks involved in the Lethal Injection Protocol;

    b.  the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will be determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

    c.  the consideration of individualized factors, including body weight and individual sensitivity to or tolerance for the chemicals used in the Lethal Injection Protocol, that affect the appropriate dosage of each of the chemicals to be administered;

    d.  the manner in which the IV tubing, three-way valve, saline solution or other apparatus shall be modified or repaired in the event it malfunctions during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

    e.  the manner in which a monitoring system shall be installed and utilized to ensure that the plaintiff is deeply sedated while dying; and the qualifications and expertise required for the person who operates this equipment;

f.  the manner in which the N catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required for the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned in favor of some other constitutionally-acceptable procedure; and the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next step of the Lethal Injection Protocol would not inflict severe and unnecessary pain and suffering on the plaintiff;

g.  the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on the plaintiff, and the criteria to be used in exercising this discretion; and

h.  the minimum qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to unanticipated problems or events arising during the Lethal Injection Protocol, and the criteria that shall be used in exercising this discretion.

i.  dispensation and administration of controlled substances used in the Protocol based upon a prescription issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice and possessing a registration as required under the CSA, 21 U.S.C. §§ 822,829 (2000); 21 C.F.R. §§ 1301.11, 1306.04 (a)(2005).

47.  Defects such as these, and their harmful consequences in prior executions, have led the U.N. Committee against Torture (the "U.N. Committee") to express serious concerns about whether lethal injection protocols in the United States are consistent with the legal duty of the United States to prevent acts of cruel, inhuman or degrading treatment or punishment under its jurisdiction, as required by Article 16 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "U.N. Convention").  Based upon reports that anesthesia is not properly administered in U. S. executions by lethal injection, the Committee recently declared that it "is concerned by the fact that substantiated information indicates that executions in the [United States] can be accompanied by severe pain and suffering (articles 16, 1 and 2)."  To ensure compliance with article 16 of the U.N. Convention,

the U.N. Committee instructed that the United States "should carefully review its execution methods, in particular lethal injection in order to prevent severe pain and suffering."  U.S. Committee against Torture Conclusions and Recommendations on the Report of the United States of America Submitted under Article 19 of the United Nations Convention against Torture (May 2006), at ¶ 31.  On information and belief, the U. S. Government has not undertaken any such study of the Lethal Injection Protocol and has not provided any meaningful response to the concerns raised by the U.N. Committee against Torture.  Failure to respond to the concerns of the Committee not only flaunts the dictates of the U.N. Convention to prevent cruel, unusual, or degrading treatment, but similarly runs afoul of the Eighth Amendment, which the United States implicitly recognizes as equivalent to Article 16 of the U.S. Convention.  *See* Reservations of the United States to the U.N. Convention (1994), available at http://www.ohchr.org/english/countries/ratification/9.htm#N11.

48.    Although the Lethal Injection Protocol calls for the dispensing and administration of chemicals which are controlled substances under the CSA, on information and belief, it calls for those controlled substances to be dispensed and administered without the prescription of a practitioner issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice and possessing a registration under the CSA.  21 U.S.C. §§ 822, 829 (2000); 21 C.F.R. §§ 1301.11; 1306.04(a) (2005).

**Exhaustion of Remedies**

49.    Except for a response from the Central Office of the United States Bureau of Prisons to his final administrative grievance, submitted by United States Mail on March 27, 2007 and received by the Administrative Remedies Section of the Bureau of Prisons on April 2, 2007, Anthony Battle has exhausted his administrative remedies to the extent that they are available

having filed and had denied an informal grievance, a grievance to the Warden at USP Terre Haute and a grievance to the BOP's North Central Regional Director.

### First Claim:  Fifth Amendment Violation - Denial of Due Process

50.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 49.

51.    The Due Process Clause requires notice and the opportunity to be heard before the deprivation of life, liberty, or property.

52.    The defendants, acting under color of federal law, have refused to disclose the procedures that will be utilized in carrying out plaintiff's execution, preventing the plaintiff from determining whether any aspect of the Lethal Injection Protocol may constitute cruel and unusual punishment, and to consult medical experts concerning that possibility, in violation of the Due Process Clause.

### Second Claim: Eighth Amendment Violation - Cruel and Unusual Punishment

53.    Plaintiff incorporates by reference the allegations of paragraphs 1 - 52.

54.    The Eighth Amendment forbids the government, in carrying out a death sentence, to inflict pain beyond that necessary to end the condemned prisoner's life.  In re Kemmler, 136 U.S. 436, 447 (1890).  "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life."  Id.

55.    Defendants, acting under color of federal law, intend to execute the plaintiff in a manner that is arbitrary, cruel, and/or unreliable, and which will inflict, or has a foreseeable and significant, but completely avoidable and therefore unnecessary, risk of causing the plaintiff excruciating but unnecessary pain in the process of carrying out his execution.  Because it is foreseeable that it will inflict unnecessary and savage pain upon the plaintiff, it violates the plaintiff's constitutional right to be free from arbitrary, capricious, cruel, and unusual

punishment, a right secured and guaranteed to him by the Eighth Amendment of the United States Constitution.

### Third Claim: Eighth Amendment Violation - Deliberate Indifference

56.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 55.

57.    The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," Estelle v. Gamble, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to an inmate.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

58.    BOP undertakes to provide inmates with medical care that is "presently medically necessary," defined as treatment "without which an inmate could not be maintained . . . without significant pain or discomfort."  Federal Bureau of Prisons, U.S. Dep't of Justice, Program Statement, No. 6000.04 (Dec. 15, 1994) ("Health Services Manual"), Ch. 1, § 1.

59.    The choice of a course of medical treatment may violate the Eighth Amendment where it is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition."  Thomas v. Pate, 493 F.2d 151, 158 (7th Cir. 1974), *vacated and remanded on other grounds sub nom.* Cannon v. Thomas, 419 U.S. 813 (1974).

60.    The defendants are required to provide the plaintiff with appropriate medical care until the moment of his death.  Thus, the Eighth Amendment's proscription against "deliberate indifference" requires that they administer the death penalty without the "unnecessary and wanton infliction of pain."  However, the means chosen by the defendants to anesthetize the plaintiff to prevent him from experiencing the excruciating pain associated with the lethal injection of potassium chloride are "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition."  Thus, the means by which

the defendants have chosen to anesthetize the plaintiff prior to his execution violates the plaintiff's right, secured and guaranteed to him by the Eighth Amendment of the United States Constitution, to be free from deliberate indifference to serious medical needs.

### Fourth Claim: Violation of Administrative Procedure Act - Agency Action That Is Arbitrary, Capricious, An Abuse Of Discretion And Otherwise Not In Accordance With Law.

61.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 60.

62.     The APA imposes upon the defendants a number of non-discretionary duties regarding rulemaking procedures. 5 U.S.C. § 553 (2000). The APA requires a federal agency to provide adequate notice to the public regarding the nature, scope and effects of any proposed or final agency action. The APA also requires that the federal agency provide the public with a full and fair opportunity to comment regarding any proposed agency action. The defendants failed to provide adequate notice, or opportunity for the public to comment on, the Lethal Injection Protocol prior to its promulgation.

63.     The APA also requires a federal agency to fully articulate its basis and reasons regarding any final agency action and prohibits action not authorized by law. The defendants have failed to explain adequately the basis and reason(s) for the specific procedures adopted in the Lethal Injection Protocol, which provide for the use of chemical substances not authorized by the Lethal Injection Regulations and allow the administration of chemical substances by unqualified personnel.

64.     The defendants' failure to comply with the APA's procedural requirements, failure to articulate their basis and reasons regarding any final agency action, and adoption of a Protocol calling for use of unauthorized chemical substances and unqualified personnel was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Therefore, in

promulgating the Lethal Injection Protocol, the defendants violated the APA, and their actions must be set aside.

### Fifth Claim: Violation of Administrative Procedure Act - Arbitrary And Capricious Failure To Exercise Enforcement Authority Under The CSA.

65.    Plaintiff incorporates by reference the allegations of paragraphs 1 - 64.

66.    The CSA makes it unlawful to "dispense" any "controlled substance" except pursuant to a prescription "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice" and who has obtained a registration pursuant to the statute.  21 U.S.C. §§ 822, 829; 841(a)(1) (2000).

67.    Sodium thiopental is a Schedule III controlled substance.

68.    Regulations promulgated by the Drug Enforcement Administration provide that every person who "dispenses" a "controlled substance" is required to obtain a "registration."  21 C.F.R. § 1301.11 (2005).  The regulations also provide that the Administrator of the Drug Enforcement Administration "shall deny" an application for registration unless the issuance of a registration is "required under the CSA." 21 C.F.R. § 1301.35 (2005).

69.    On information and belief, the Lethal Injection Protocol calls for the dispensing of sodium thiopental absent a valid prescription, by a person or persons who lack a valid registration.  Moreover, on information and belief, the defendants have arbitrarily and capriciously failed to exercise their authority to enforce the CSA, by not requiring the persons whom the defendants intend to dispense controlled substances to the plaintiff to apply for a registration, and will continue to act arbitrarily and capriciously by permitting them to dispense a controlled substance without doing so.  Such arbitrary and capricious action violates the APA.

27

**Prayer for Relief**

70.   In order to prevent the defendants from violating the plaintiff's rights under the Fifth and Eighth Amendments to the United States Constitution and the Administrative Procedure Act, the plaintiff requests that this Court grant preliminary and permanent injunctive relief barring the defendants from executing the plaintiff by means of the Lethal Injection Protocol.

71.   The plaintiff is entitled to a preliminary injunction barring the defendants from executing him by the Lethal Injection Protocol because (a) there is a significant likelihood that the plaintiff will prevail on the merits; (b) the plaintiff will suffer irreparable harm if he is executed pursuant to the Lethal Injection Protocol; (c) there is a compelling public interest in ensuring that our government not behave like nations we condemn for utilizing execution methods violative of our nation's constitutional proscription against cruel and unusual punishment; and (d) there is a substantial possibility that others under a sentence of death will suffer unconstitutional executions unless this Court requires that defendants design and adopt constitutionally-acceptable execution procedures.

72.   The plaintiff does not seek relief herein as a means of attacking his underlying conviction or death sentence; rather than seeking to stop his execution *per se*, he seeks to stop the defendants from executing him in a manner that violates his constitutional and statutory rights.  If the defendants implement execution procedures that do not violate the plaintiff's constitutional rights, then the defendants will be entitled to execute the plaintiff, barring relief granted through some other judicial or clemency proceeding.

73.   The plaintiff further requests that this Court grant declaratory relief by issuing an Order declaring that the defendants' current means, methods, practices, procedures, and

customs regarding execution violate the Fifth and Eighth Amendments to the United States Constitution, and the Administrative Procedure Act.

74.    The plaintiff requests that this Court grant him reasonable attorney fees pursuant to 42 U.S.C. § 1988 and the laws of the United States.

75.    The plaintiff requests that the Court grant such further relief as it deems just and proper.

This 26th day of April, 2007.

Respectfully submitted,


/s/ Joshua C. Toll

Joshua C. Toll
Washington, D. C. Bar No:  463073
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC  20006
(202) 737-8616
(202) 626-3737 (fax)
jtoll@kslaw.com

Margaret O'Donnell
McNally & O'Donnell, P.S.C.
P.O. Box 1243
513 Capitol Avenue
Frankfort, KY 40602
(502) 227-2142
(502) 227-4669 (fax
 mod@dcr.net

William E.  Hoffmann, Jr.
Christopher C. Burris
Latif Oduola-Owoo
Kristen A. Swift
Tomesha L. Faxio
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309

(404) 572-4600
(404) 572-5136 (fax)
bhoffman@kslaw.com
cburris@kslaw.com
loduola-owoo@kslaw.com
kswift@kslaw.com
tfaxio@kslaw.com

Counsel for Plaintiff Anthony Battle