**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ORLANDO CORDIA HALL<br>Inmate Number 26176-077<br>U.S. Penitentiary Terre Haute<br>Terre Haute, IN 47802 | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No.1:05-CV-2337 (RWR) |
| | ) | |
| ALBERTO GONZALES Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530 | ) ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| HARLEY G. LAPPIN, Director<br>Federal Bureau of Prisons<br>U.S. Department of Justice<br>320 First St., NW<br>Washington, DC 20534 | ) ) ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEWTON E. KENDIG II., M.D.<br>Medical Director<br>Health Services Division<br>Federal Bureau of Prisons<br>320 First St., NW<br>Washington, DC 20534 | ) ) ) ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| RICHARD VEACH, Warden<br>U.S. Penitentiary Terre Haute<br>4700 Bureau Road South<br>Terre Haute, IN 47802 | ) ) ) ) | |
| | ) | |
| and | ) | |
| | ) ) ) ) ) | |

THOMAS WEBSTER, M.D.                    )
Clinical Director                       )
U.S. Penitentiary Terre Haute           )
4704 Bureau Road South                  )
Terre Haute, IN 47802                   )
                                        )
        and                             )
                                        )
KAREN TANDY                             )
Administrator                           )
U.S. Drug Enforcement Administration    )
2401 Jefferson Davis Highway            )
Alexandria, VA 22301                    )
                                        )
        and                             )
                                        )
JOHN DOES I-X                           )
                                        )
Defendants.                             )
_____)

## COMPLAINT

### Nature of Action

1.    This action is brought pursuant to (a) the U.S. Constitution for violations and

threatened violations of (i) the Fifth Amendment and (ii) the Eighth Amendment

and (b) violations of the Administrative Procedures Act, 5 U.S.C.A. § 551 *et seq.*

("APA").

2.    Plaintiff Orlando Hall ("Mr. Hall") is under a sentence of death, has exhausted his

judicial appeals of the validity of his conviction and sentence, and has exhausted

his administrative appeals of the lethal injection method that will be used for his

execution (the "Lethal Injection Protocol" or the "Protocol").  Defendants now

intend to execute him using a lethal injection method that unnecessarily and

arbitrarily places him in danger of experiencing extreme and excruciating pain.

This execution method threatens to subject him to consciously experiencing asphyxiation and cardiac arrest.  This risk of extraordinary pain arises because the execution method fails to ensure proper administration of a sedative, and fails to adopt other safeguards to prevent gratuitous suffering.  Unless he is granted relief through a judicial proceeding or via executive clemency, he will be killed by defendants using this method of execution.

3.  By refusing to provide adequate information about the Protocol in response to Mr. Hall's requests, defendants violate his Fifth Amendment right to due process of law.  By adopting and participating in an execution method which poses a serious risk of causing extraordinary and gratuitous pain and suffering, defendants show a deliberate indifference to the medical needs of Mr. Hall and threaten to subject him to an unnecessarily painful death, in violation of the Eighth Amendment. Defendants' adoption and use of the Protocol, and failure to enforce federal drug control laws in administering the Protocol, also violates the APA.  To redress the serious risk of irreparable harm to him and to his statutory and constitutional rights, Mr. Hall seeks a preliminary and permanent injunction barring the defendants from setting an execution date for him and from executing him using the Protocol, an order declaring that the defendants' proposed method of execution violates the Eighth Amendment of the U.S. Constitution and the APA, and such other equitable relief as the Court deems just and proper.

4.  The Due Process Clause of the Fifth Amendment of the U.S. Constitution requires notice and the opportunity to be heard before deprivation of life, liberty, or property.  The defendants, however, have withheld critical information about the

- 4 -

Protocol.  In violation of the Due Process Clause, defendants are preventing Mr.

Hall from identifying aspects of the Protocol that may constitute cruel and

unusual punishment and deliberate indifference to his medical needs in violation

of the Eighth Amendment, and are preventing him from consulting medical

experts concerning that possibility.

5.     Execution methods violate the Eighth Amendment when they are arbitrary, cruel,

unreliable, and/or risk inflicting unnecessary pain, particularly when the risk of

such unnecessary pain is foreseeable.  Louisiana ex rel. Francis v. Resweber, 329

U.S. 459, 463 (1947) (opinion of Reed, J.); Furman v. Georgia, 408 U.S. 238, 273

(1972) (citing Resweber).  The Eighth Amendment also protects inmates against

deliberate indifference to their medical needs.  Estelle v. Gamble, 429 U.S. 97,

104 (1976); Farmer v. Brennan, 511 U.S. 825, 834 (1994).  On information and

belief, the Lethal Injection Protocol the defendants plan to use to kill Mr. Hall is

unconstitutional because it is arbitrary, cruel and/or unreliable, and risks causing

unnecessary and gratuitous suffering.  By using the Protocol, defendants also

violate the Eighth Amendment because they are deliberately indifferent to the

medical needs of Mr. Hall.

6.     Mr. Hall was sentenced to death pursuant to Section 60002 of the Federal Death

Penalty Act of 1994  ("FDPA"), 18 U.S.C.S. § 3591(a)(2), based upon violation

of 18 U.S.C.S. § 1201(a)(1), which provides for the death sentence as a penalty

pursuant to Section 60003(a)(6) of the Violent Crime Control and Law

Enforcement Act of 1994, Pub. L. 103-322 ("VCCLEA").  The Federal Bureau of

Prisons ("BoP") carries out death sentences pursuant to regulations providing for

"intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substances be…administered by qualified personnel…" 28 C.F.R. § 26.3(a)(4) (the "Lethal Injection Regulations"). The Lethal Injection Protocol is inconsistent with the requirements of this regulation because the Protocol provides for use of drugs neither constitutionally required nor permitted by the regulation and does not call for qualified personnel to administer the drugs used in the Protocol. The defendants have exceeded that authority. Defendants' adoption of the Protocol is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of the APA.

7.     In addition, the Controlled Substances Act, 21 U.S.C.S. § 801 *et seq.* ("CSA") establishes a federal scheme that comprehensively regulates the manufacture, distribution, possession and dispensing of "controlled substances." The CSA makes it unlawful to "dispense" any controlled substance except pursuant to the prescription of a practitioner possessing a registration issued pursuant to the CSA. 21 U.S.C.S. §§ 822, 829 (2000). To be effective, such a prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a) (2005). The defendants intend to execute Mr. Hall by administering a controlled substance – sodium thiopental – in violation of the CSA; i.e., by dispensing that controlled substance not pursuant to a prescription issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice and possessing a valid registration issued pursuant to the CSA. By designing the Lethal Injection Protocol in a manner inconsistent with the CSA, defendants have

arbitrarily and capriciously failed to exercise their authority to enforce the CSA.

8.    This lawsuit is not a successive habeas corpus petition.  See Hill v. McDonough, 126 S.Ct. 2096 (2006); Nelson v. Campbell, 541 U.S. 637 (2004).  In this action, Mr. Hall does not challenge the validity of the underlying judgment of conviction upon which basis defendants propose to execute him, and he does not challenged the legality of capital punishment as a general matter.  Rather, he claims that the particular means by which the defendants plan to kill him violate the Eighth Amendment and the APA.  He also claims that the failure to disclose adequate information about those means violates the Fifth Amendment.

## Parties

9.    Plaintiff Orlando Cordia Hall is a citizen of the United States and, prior to his incarceration, was a resident of the state of Arkansas.  He is an inmate held in the custody of the defendants and under the control and supervision of the BoP, a department of the U.S. Department of Justice.  As he is under a sentence of death, he is incarcerated at the U.S. Penitentiary at Terre Haute, Indiana.  If he is not granted relief in a judicial proceeding or through executive clemency, the defendants will use the Lethal Injection Protocol to kill him in the "death house" located on the grounds of the U.S. Penitentiary Terre Haute, which is operated and controlled by the defendants.

10.    Defendant Alberto Gonzales is the Attorney General of the United States.  Mr. Hall was remanded into his custody upon his conviction and the imposition of his death sentence.  Defendant Gonzales is the final executive authority responsible

for carrying out sentences of death against federal prisoners.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

11.    Defendant Harley G. Lappin is the Director of the BoP.  As such, he is charged with prescribing and directing, and is authorized to prescribe and direct, the promulgation of rules and regulations for the BoP, including the rules and regulations for the conduct of prison operations and execution procedures.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

12.    Defendant Newton E. Kendig, II, M.D., is the Medical Director of BoP.  In that position he is responsible for overseeing the provision of medical care to inmates at all BoP facilities, and for promulgating and implementing BoP policy with respect to medical care provided by BoP.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

13.    Defendant Richard Veach is the Warden of the U.S. Penitentiary at Terre Haute, Indiana, which is the BoP facility at which sentences of death are executed in the federal system.  In that position, he is charged with management of the U.S. Penitentiary Terre Haute and the oversight and conduct of operations there, including the oversight and conduct of executions carried out there.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

14.    Defendant Thomas Webster, M.D., is the Clinical Director at the U.S. Penitentiary Terre Haute.  In that position he is responsible for overseeing the

provision of medical care to inmates at that facility.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

15.    Defendant Karen Tandy is the Administrator of the United States Drug Enforcement Agency ("DEA").  In that role, she is responsible for exercising the authority delegated to her by the Attorney General to enforce federal law regulating chemicals used in the Lethal Injection Protocol.  She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

16.    Defendants John Does I-X are employed by BoP to prepare for and carry out Mr. Hall's execution.  Mr. Hall does not know, and the defendants have not revealed, their identities.  They are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

17.    The defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and are and were in each instance acting under the color and authority of federal law.  On information and belief, unless preliminarily and permanently enjoined, the defendants and each of them intend to act or refrain from acting in their respective official capacities and under the authority of federal law in executing Mr. Hall and the existing plaintiffs in violation of the their constitutional and statutory rights.

**Jurisdiction and Venue**

18.    This Court has jurisdiction over this matter pursuant to 28 U.S.C.S. § 1331, in that

it arises under the Constitution of the laws of the United States, specifically the Fifth and Eighth Amendments, under 28 U.S.C.S. § 2201(a) in that one purpose of this action is to secure declaratory relief and under 28 U.S.C.S. § 2202, in that one purpose of this action is to secure preliminary and permanent injunctive relief. Judicial review of the agency action at issue is authorized by the APA, 5 U.S.C.A. §§ 702, 704 and 706.   In this case, defendants have conceded that this Court has subject matter jurisdiction over the same Constitutional claims and at least one of the APA claims raised by the existing plaintiffs.  See Def's Mot. to Dismiss, Nov. 9, 2006, at 4.

19.    This Court has venue under 28 U.S.C.S. § 1391(b)(2), in that a substantial part of the events and omissions giving rise to the claims asserted here – i.e., the formulation of the Lethal Injection Protocol – has been taking place in this District.  Alternatively, this court has venue under 28 U.S.C.S. § 1391(b)(3) because defendants Gonzales, Lappin, and Kendig are found here.

**Facts**

20.    Plaintiff incorporates by reference all facts and allegations contained in paragraphs 1 – 19.

21.    Mr. Hall was convicted in 1995 in the U.S. District Court for the Northern District of Texas of, among other offenses, the capital offense of kidnapping resulting in death in violation of the VCCLEA, 18 U.S.C.S. § 1201(a)(1).  Pursuant to the VCCLEA and to the FDPA, 18 U.S.C.S. § 3591(a)(2), Mr. Hall was sentenced to death.  The U.S. Court of Appeals for the Fifth Circuit affirmed his conviction by

decision of August 28, 1998.  United States v. Hall, 152 F.3d 381 (5th Cir. 1998).

On May 17, 1999, the U.S. Supreme Court denied the petition for certiorari to

review that decision.  Hall v. United States, 526 U.S. 1117 (1999).  On May 16,

2000, Mr. Hall filed a motion to vacate his conviction and death sentence under

28 U.S.C.S. § 2255.  The U.S. District Court for the Northern District of Texas

denied that motion on August 24, 2004.  Hall v. United States, 2004 WL 1908242

(N.D. Tex. Aug. 24, 2004).  The U.S. Court of Appeals for the Fifth Circuit

affirmed that decision on July 5, 2006.  United States v. Hall, 455 F.3d 508 (5th

Cir. 2006).  The Fifth Circuit denied Hall's petition for rehearing en banc on

September 1, 2006.  Hall filed a petition for *certiorari* review of that decision

with the U.S. Supreme Court on November 30, 2006.  On April 16, 2007, the

Supreme Court announced that it had denied that petition.  Hall v. United States,

Case No. 06-8178 (order of Apr. 16, 2007), 2007 WL 1110560 (U.S.).  Unless he

is granted relief in a judicial proceeding or via executive clemency, defendants

will set a date for his execution and he will be killed by defendants using the

Lethal Injection Protocol as the method of execution.

22.    On information and belief, the defendants intend to execute Mr. Hall by injecting

three chemicals, administered intravenously in sequence, separated by injections

of saline solution.  The chemicals include sodium thiopental or sodium pentothal

(an ultra short-acting barbiturate), pancuronium bromide or pavulon (a curare-

derived agent that paralyzes all skeletal or voluntary muscles including the

diaphragm, stopping breathing, but which has no effect whatsoever on awareness,

cognition or sensation), and potassium chloride (an extraordinarily painful

chemical which activates nerve fibers lining the inmate's veins creating a burning

sensation, and which interferes with the rhythmic contractions of the heart,

causing cardiac arrest).  The combination of drugs causes death by asphyxiation

and cardiac arrest, which cause extraordinary and excruciating suffering.  While

this combination of drugs supposedly will render Mr. Hall insensible to the pain

of his death, the combination in fact threatens to cast a "chemical veil" over this

extraordinary and excruciating suffering, leaving Mr. Hall conscious but trapped

in a paralyzed body wracked by asphyxiation and cardiac arrest.  At the same

time, it will be impossible for those observing the execution – including witnesses

to it, as well as John Does I-X, who are charged with actually carrying out the

execution – to recognize and prevent the gratuitous pain and suffering being

inflicted upon Mr. Hall.

### Lethal Injection Protocol

23.    Mr. Hall was sentenced to death pursuant to Section 60002 of the FDPA, 18

U.S.C.S. § 3591(a)(2), and Section 60003(a)(6) of the VCCLEA, 18 U.S.C.S. §

1201(a)(1), which authorize the imposition of a death sentence upon him.  These

statutes do not, however, specify the means by which he is to be executed.

24.    On November 30, 1992, the U.S. Department of Justice ("DoJ") published a

proposed rule purporting to "establish[] procedures" for carrying out a death

sentence imposed under federal criminal law.  57 Fed. Reg. 56536 (1992).

25.    In response, DoJ received twenty-three comments concerning the proposed rule

from medical associations and physicians, criminal defense attorneys, advocates

for prisoners' rights and the media, and private citizens, as well as a comment from a Member of Congress regarding the lack of authority for the proposed rule.

26.     One commenter warned that lethal injection is an unnecessarily painful method. DoJ rejected this comment without further inquiry or analysis, stating, without support, that it "disagree[d], and regard[ed] lethal injection as less problematic than the alternatives." Id.

27.     Comments from medical associations and physicians objected to "the provisions contemplating the presence of physicians at the execution, § 26.4(c)(1), and that a physician or other qualified personnel determine that the prisoner has died, § 26.4(g)." Id. The American Medical Association ("AMA") and the American College of Physicians "agreed with most other physicians and medical associations commenting on the rule that medical ethics prohibit physicians from pronouncing the death of a prisoner." The two associations and other commenters also stated that medical ethics prohibit physicians from even attending an execution in a professional capacity. In response, DoJ stated:

> [I]t cannot be said at this point that the statements of medical ethics offered by the associations and physicians who commented on the proposed rule necessarily conflict with orderly, professional executions. Perhaps, when it has developed detailed procedures for lethal injection, or has experience administering the injections, the Department will conclude that a physician need not be present. The proposed rule contemplated that the Bureau of Prisons might wish to select someone other than a doctor – a coroner, for instance – to pronounce death; here, too, there is no reason to insist in the rule itself that death might be pronounced by a physician.
>
> The rule has therefore been revised to eliminate the requirement of a physician's presence, and to eliminate the reference to a physician determining death. Because the Department may conclude that a physician's presence is necessary to a responsible execution, physician

presence will not be barred.

Id. DoJ did not address whether a physician's presence was required for any reason other than to pronounce death.

28.    The defendants issued a final rule, effective February 18, 1993. 58 Fed. Reg. 4898 (1993). This rule provides that "a sentence of death shall be executed . . . by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substance or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal." 28 C.F.R. § 26.3(a)(4). This core provision of the Lethal Injection Regulations adopted by defendants do not specify what lethal substances shall be used to kill condemned inmates, what amount of such substances shall be used, how they shall be administered (including the order in which such substances shall be administered), or by whom they shall be administered.

29.    On information and belief, however, on one or more occasions since February 18, 1993, defendants have adopted further regulations specifying in detail the means and method by which executions by lethal injection are to be carried out. These regulations and procedures constitute the "Lethal Injection Protocol".

30.    Through his administrative appeals, Mr. Hall has petitioned the defendants to disclose detailed and specific information about the Lethal Injection Protocol. The defendants have refused to disclose this information to Mr. Hall.

31.    On information and belief, in developing the Protocol, the defendants and/or their

agents simply adopted lethal injection protocols used by one or more states, without providing notice and opportunity for comment, and without investing meaningful and independent efforts to ensure that the Lethal Injection Protocol is carried out in a manner consistent with contemporary medical practices and long-standing constitutional standards that forbid infliction of excruciating, cruel, and unusual pain and punishment.

32.     The defendants repeatedly have refused to divulge the specifics of the Lethal Injection Protocol.  The defendants have indicated only that they intend to execute Mr. Hall using some combination of sodium thiopental, pancuronium bromide, and potassium chloride.  This combination of drugs causes death by suffocation and cardiac arrest, each of which causes extraordinary and excruciating suffering. The administration of sodium thiopental supposedly will render Mr. Hall insensible to this pain and suffering.  On information and belief, however, the Lethal Injection Protocol fails to address a substantial risk that the administration of pancuronium bromide will merely cast a "chemical veil" that blocks others from identifying excruciating pain experienced by Mr. Hall.  The Protocol exposes Mr. Hall to a serious risk of being conscious but trapped in a paralyzed body wracked by asphyxiation and cardiac arrest, while making it impossible for those observing the execution – including witnesses as well as John Does I-X, who are charged with actually carrying out the execution – to recognize and prevent the gratuitous pain and suffering being inflicted upon Mr. Hall.

33.     Sodium thiopental is an ultra short-acting barbiturate with a very short shelf life in liquid form.  It is distributed in powder form to increase its shelf life, and must be

mixed into a liquid solution by trained personnel before it can be injected.  When
anesthesiologists use sodium thiopental, they do so for the purpose of temporarily
anesthetizing patients in order to permit sufficient time to intubate the trachea and
institute mechanical support of ventilation and respiration.  Once this temporary
anesthesia has been achieved, additional drugs are administered to maintain a
"surgical depth" or "surgical plane" of anesthesia (i.e., a level of anesthesia deep
enough to ensure that a surgical patient feels no pain and is unconscious for the
duration of the surgical procedure).  The medical utility of sodium thiopental
derives from its ultra short-acting properties:  if unanticipated obstacles hinder or
prevent successful intubation, patients will quickly regain consciousness and will
resume ventilation and respiration on their own.

34.  The dose of sodium thiopental used in the execution procedure is, on information
and belief, administered in a single injection from a single syringe.  By contrast,
on information and belief, the original design of the Lethal Injection Protocol
called for the continuous intravenous administration of an ultra short-acting
barbiturate.  The continuous intravenous administration of an ultra short-acting
barbiturate may be required to ensure continued and sustained unconsciousness
during the administration of pancuronium bromide and potassium chloride.  The
failure to administer a continuous infusion of sodium thiopental creates a
significant, but completely avoidable and therefore unnecessary risk that the
condemned inmate will consciously experience muscular paralysis, without loss
of consciousness or sensation, during the excruciating pain of both suffocation
and the intravenous injection of potassium chloride.  This unnecessary risk is

exacerbated by the possibility that the pancuronium bromide would mix with sodium thiopental in a syringe or IV line, causing the sodium thiopental to precipitate and lessening its sedative effect.

35.     Sensitivity to sodium thiopental varies greatly among individuals. Unless a superclinical dose is administered, the necessary dosage needed for effective use of sodium thiopental is susceptible to a number of factors, including body weight, body fat, prior drug usage, the presence in the body of other sedating agents (which may be provided to condemned inmates in the period immediately before their execution), and the level of anxiety and stress. The variable sensitivity and the range of known and unknown factors that influence the effectiveness of sodium thiopental make it imperative that the drug be administered by qualified individuals, to ensure that it brings about a deep, lengthy anesthetized state in a condemned individual, and prevents the infliction of unnecessary pain.

36.     Sodium thiopental is a Schedule III controlled substance under the Controlled Substances Act, 21 U.S.C.S. §§ 822, 829 (2000) ("CSA"), implemented at 21 C.F.R. §§ 1301.11, 1306.04(a) (2005). Unless sodium thiopental is administered by a qualified individual, the condemned person may lose consciousness for only a brief period, leaving him sensible to the horrific pain resulting from the administration of potassium chloride, but unable to communicate that pain to those administering the lethal injection because of the paralyzing effect of pancuronium bromide. On information and belief, the Lethal Injection Protocol does not call for sodium thiopental to be administered by a person qualified to administer it.

37.    Sedating chemicals other than sodium thiopental are available that are potent, long-lasting, stable in solution and inexpensive.  Compared to sodium thiopental, these alternative sedating chemicals pose substantially less risk that the prisoner will regain consciousness before the end of the execution process.

38.    The second chemical involved in the lethal injection process, pancuronium bromide, or pavulon, is a derivative of curare that acts as a neuromuscular blocking agent.  Pancuronium bromide paralyzes all skeletal muscles, including the diaphragm, causing the inmate to be unable to move or breathe.  In lay terms, the drug suffocates him.

39.    While pancuronium bromide causes muscular paralysis (including the diaphragm, stopping respiration), it does not affect sensation, consciousness, cognition, or the ability to feel pain.  If sodium thiopental and potassium chloride are given in doses sufficient to cause death, then there is no rational or medically or constitutionally justifiable place in the Lethal Injection Protocol for pancuronium bromide.  Pancuronium bromide is not necessary to cause death, and its function in the Lethal Injection Protocol is solely cosmetic or aesthetic.  By preventing the prisoner's muscles from moving and indicating pain, suffering or emotion, pancuronium bromide makes the prisoner appear serene.  Including pancuronium bromide in the Protocol also increases the threat of unnecessary pain and suffering.  Pancuronium bromide also can lessen the sedating effect of sodium thiopental, and to the extent it does, or to the extent sodium thiopental is ineffectively administered, pancuronium bromide masks the excruciating pain suffered by the inmate as he suffocates and endures cardiac arrest.

40.     If an unconscious person is paralyzed after receiving pancuronium bromide and
        then regains consciousness, it is almost a certainty that the execution staff would
        not be able to tell he had become conscious.  The execution staff and witnesses
        would not know that the condemned person was experiencing excruciating pain
        from paralysis of the diaphragm muscles, burning in the veins from the injection
        of the potassium chloride, and a massive cardiac arrest induced by the potassium
        chloride.  The signs and symptoms that indicate how deeply a patient is
        anesthetized are subtle.  On information and belief, the Lethal Injection Protocol
        does not provide for the presence in the execution chamber of staff with the
        training, experience, and expertise to assess these signs and symptoms, or for the
        presence in the execution chamber of any equipment capable of determining
        whether a prisoner to whom pancuronium bromide has been administered is, in
        fact, unconscious.

41.     The third and final chemical administered in the Lethal Injection Protocol is
        potassium chloride.  This chemical induces cardiac arrest in the inmate by
        activating the nerve fibers lining the inmate's veins and interfering with the
        rhythmic contractions of the heart.  The administration of potassium chloride to a
        patient who is not properly anesthetized is inhumanly painful.  The American
        Veterinary Medical Association is so confident that death by potassium chloride
        will cause unnecessary suffering that it states that "[i]t is of utmost importance
        that personnel performing [euthanasia by injection of potassium chloride] are
        trained and knowledgeable in anesthetic techniques, and are competent in
        assessing anesthetic depth appropriate for administration of potassium chloride

intravenously." American Veterinary Medical Association, 2000 report of the AVMA Panel on Euthanasia, JAVMA No. 218, No. 5 (Mar. 1, 2001) 669, 681. On information and belief, the defendants have chosen potassium chloride to induce cardiac arrest, despite the availability of other chemicals which accomplish the same purpose while inflicting substantially less, or no, pain.

42.    The absence of appropriately qualified personnel and proper procedures for administering the drugs used in the Protocol has caused botched executions in the past. Existing plaintiffs in this action have set forth these failures in detail. See Am. Compl., ¶45; Webster Compl., ¶41.

43.    In addition, on numerous occasions, delays in locating veins suitable for lethal injection of the drugs used in the Protocol have resulted in significant delays and other torment of condemned prisoners. Existing plaintiffs to this action have set forth these failures in detail. See Am. Compl., ¶46; Webster Compl., ¶42.

44.    The preparation of drugs, particularly for intravenous use, is a technical task requiring significant training in pharmaceutical concepts and calculations. There are many risks associated with drug preparation that, if not properly addressed by properly credentialed and trained personnel, further elevate the risk that an inmate will consciously experience excruciating pain during lethal injection.

45.    The correct and safe management of intravenous drug and fluid administration requires a significant level of professional acumen, and cannot be performed adequately by personnel lacking the requisite training and experience. The great majority of nurses are not trained in the use of ultra short-acting barbiturates;

indeed, this class of drugs normally is only used by nurses who have significant experience in intensive care units and as nurse anesthetists. Very few paramedics are trained or experienced in the use of ultra short acting barbiturates.

### Defects in the Lethal Injection Protocol

46.   The risk that the Lethal Injection Protocol will inflict severe and unnecessary pain and suffering upon Mr. Hall is particularly serious because, on information and belief, the Lethal Injection Protocol does not include safeguards regarding the manner in which the execution is to be carried out, does not establish the minimal qualifications, expertise, and training required of the personnel performing critical tasks, and does not establish appropriate criteria and standards that these personnel must meet in carrying out the Lethal Injection Protocol.

47.   The Lethal Injection Protocol fails to address the serious risk that sodium thiopental will be misadministered or otherwise fail to induce deep anesthesia. The Protocol fails to ensure qualified medical personnel administer and monitor his sedation, fails to establish the manner in which a monitoring system shall be installed and utilized, and fails to establish the qualifications and expertise required for medical personnel who operate this monitoring equipment. The chief official in charge of medical care at the facility where Mr. Hall will be executed expressly has declined to participate in any way in the executions of the existing plaintiffs, casting doubt upon whether properly-trained medical personnel will play any role in administering the Lethal Injection Protocol. See Def's Partial Mot. to Dismiss, Nov. 9, 2006, Ex. B (Declaration of Thomas Webster). On

- 21 -

information and belief, the Lethal Injection Protocol also does not call for use of

available medical equipment which, if used by properly-trained medical

personnel, could alert defendants and their agents if the sodium thiopental has

failed but the pancuronium bromide has taken effect, leaving the condemned

prisoner consciously experiencing extreme and excruciating pain.

48.     On information and belief, the Lethal Injection Protocol fails to address additional

factors necessary to ensure compliance with constitutional requirements,

including but not limited to the following factors:

  b.  the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will be determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

  c.  the consideration of individualized factors, including body weight and individual sensitivity to or tolerance for the chemicals used in the Lethal Injection Protocol, that affect the appropriate dosage of each of the chemicals to be administered;

  d.  the manner in which the IV tubing, three-way valve, saline solution or other apparatus shall be modified or repaired in the event it malfunctions during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

  e.  the manner in which the N catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required for the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned in favor of some other constitutionally-acceptable procedure; and the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next step of the Lethal Injection Protocol would not inflict severe and unnecessary pain and suffering on Mr. Hall;

  g.  the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on Mr. Hall, and the criteria to be used in

- 22 -

exercising this discretion;

h.      the minimum qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to unanticipated problems or events arising during the Lethal Injection Protocol, and the criteria that shall be used in exercising this discretion; and

i.      dispensation and administration of controlled substances used in the Protocol based upon a prescription issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice and possessing a registration as required under the CSA, 21 U.S.C.S. §§ 822, 829 (2000); 21 C.F.R. §§ 1301.11, 1306.04(a) (2005).

49.     Defects such as these, and their harmful consequences in prior executions, have led the U.N. Committee against Torture (the "U.N. Committee") to express serious concerns about whether lethal injection protocols in the United States are consistent with the legal duty of the United States to prevent acts of cruel, inhuman or degrading treatment or punishment under its jurisdiction, as required by Article 16 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "U.N. Convention"). Based upon reports that anesthesia is not properly administered in U.S. executions by lethal injection, the Committee recently declared that it "is concerned by the fact that substantiated information indicates that executions in the [United States] can be accompanied by severe pain and suffering (articles 16, 1 and 2)." To ensure compliance with Article 16 of the U.N. Convention, the U.N. Committee instructed that the United States "should carefully review its execution methods, in particular lethal injection in order to prevent severe pain and suffering." U.N. Committee against Torture Conclusions and Recommendations on the Report of the United States of America Submitted under Article 19 of the United Nations

Convention against Torture (May 2006), at ¶ 31.  The scientific community

recognizes the absence of such studies.  One scientific researcher has observed

that,

> [i]n stark contrast to animal euthanasia, lethal injection for judicial
> execution was designed and implemented with no clinical or basic
> research whatsoever.  To our knowledge, no ethical or oversight groups
> have ever evaluated the protocols and outcomes in lethal injection.
> Furthermore, there are no published clinical or experimental data
> regarding the safety and efficacy of the three-drug lethal injection
> protocol.

Zimmers TA, et al., Lethal Injection for Execution: Chemical Asphyxiation?, 4

PLoS Med. 646, 648-49 (Apr. 2007) (first known academic medical study,

focusing on data from use of lethal injection protocols in North Carolina and

California).  This study is available at

<http://medicine.plosjournals.org/perlserv/?request=get-

document&doi=10.1371/journal.pmed.0040156>.  Nonetheless, on information

and belief, the U.S. Government has not undertaken any such study of the Lethal

Injection Protocol and has not provided any meaningful response to the concerns

raised by the U.N. Committee against Torture.  Failure to respond to the concerns

of the Committee not only flaunts the dictates of the U.N. Convention to prevent

cruel, unusual, or degrading treatment, but similarly runs afoul of the Eighth

Amendment, which the United States implicitly recognizes as equivalent to

Article 16 of the U.N. Convention.  See Reservations of the United States to the

U.N. Convention (1994), available at

<http://www.ohchr.org/english/countries/ratification/9.htm#N11>.

**Exhaustion of Remedies**

- 24 -

50.    Mr. Hall has exhausted his administrative remedies, filing a complaint with the

U.S. Penitentiary Terre Haute, in compliance with the Administrative Remedy

Procedure for Inmates, Bureau of Prisons Program Statement 1330.13,

challenging the Lethal Injection Protocol as a violation of his rights under the

Eighth Amendment to be free from cruel and unusual punishment and from

deliberate indifference to his medical needs and requesting information about the

process that would be used for his execution.  The Warden and the BoP Regional

Administrator summarily denied his challenge and his request.  Each claimed,

without elaboration, that the Protocol complied with the lethal injection

regulations adopted at 28 C.F.R. § 26.3.  In November 2006, the BoP Central

(National) Administrator similarly denied his challenge and request, summarily

concluding that the Protocol is administered in a "humane manner and by

appropriately trained and qualified personnel."  At no time during these

administrative appeals did the BoP provide any information in support of its

conclusions that the Protocol complies with the regulation, as informed by the

Eighth Amendment of the Constitution.  See Administrative Appeal Pleadings,

Exhibit A.

### Statement of Claim

51.    Mr. Hall incorporates by reference the allegations of paragraphs 1 – 50.

52.    Mr. Hall seeks relief from this Court, inter alia, declaring the defendants in

violation of the Fifth Amendment for their constitutionally inadequate disclosure

of information about the Lethal Injection Protocol, and seeks declaratory and

injunctive relief on the grounds that the Lethal Injection Protocol violates the Eighth Amendment of the U.S. Constitution and the APA.

**Count I:  Fifth Amendment Violation – Denial of Due Process**

53.    Mr. Hall incorporates by reference the allegations of paragraphs 1 – 52.

54.    The Due Process Clause of the Fifth Amendment of the U.S. Constitution requires that a person be given notice and the opportunity to be heard before being deprived of life, liberty, or property by the Government.

55.    The defendants intend to use the Lethal Injection Protocol take Mr. Hall's life. Yet the defendants, acting under color of federal law, have refused to disclose the procedures that will be utilized in carrying out his execution, preventing Mr. Hall from determining whether any aspect of the Lethal Injection Protocol may constitute cruel and unusual punishment, and to consult medical experts concerning that possibility, in violation of the Due Process Clause.

**Count II:  Eighth Amendment Violation – Cruel and Unusual Punishment**

56.    Mr. Hall incorporates by reference the allegations of paragraphs 1 – 55.

57.    The Eighth Amendment of the U.S. Constitution forbids the government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. In re Kemmler, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." Id.

58.   Defendants, acting under color of federal law, intend to execute Mr. Hall in a
      manner that is arbitrary, cruel, and/or unreliable, and which will inflict, or has a
      foreseeable and significant, but completely avoidable and therefore unnecessary,
      risk of causing the plaintiff excruciating but unnecessary pain.  Because it is
      foreseeable that this method of execution will inflict unnecessary and savage pain
      on Mr. Hall, the Lethal Injection Protocol violates his Eighth Amendment right to
      be free from arbitrary, capricious, cruel, and unusual punishment.

      **Count III:  Eighth Amendment Violation – Deliberate Indifference**

59.   Mr. Hall incorporates by reference the allegations of paragraphs 1 – 58.

60.   The Eighth Amendment forbids "deliberate indifference" to serious medical needs
      of prisoners," Estelle v. Gamble, 429 U.S.C 97, 104 (1976), and to a substantial
      risk of serious harm to an inmate.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

61.   BoP undertakes to provide inmates with medical care that is "presently medically
      necessary," defined as treatment "without which an inmate could not be
      maintained . . . without significant pain or discomfort."  Federal BoP, U.S. DoJ,
      Program Statement, No. 6000.04 (Dec. 15, 1994) ("Health Services Manual"),
      Ch. 1, § 1.

62.   The choice of a course of medical treatment may violate the Eighth Amendment
      where it is "so blatantly inappropriate as to evidence intentional mistreatment
      likely to seriously aggravate the prisoner's condition."  Thomas v. Pate, 493 F.2d
      151, 158 (7th Cir. 1974), *vacated and remanded on other grounds sub. nom,*

<u>Cannon v. Thomas</u>, 419 U.S. 813 (1974).

63.    The defendants must provide Mr. Hall with appropriate medical care until the moment of his death.  The Eighth Amendment's proscription against "deliberate indifference" requires that they administer the death penalty without the "unnecessary and wanton infliction of pain."  Yet the means chosen by the defendants to try to anesthetize Mr. Hall to prevent him from experiencing the excruciating pain associated with lethal injection are "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition."  493 F.2d at 158.  Thus, the means by which the defendants will seek to anesthetize Mr. Hall prior to his execution constitute an unconstitutional deliberate indifference to his medical needs, in violation of the Eighth Amendment.

**Count IV:  Violation of the APA – Agency Action That Is Arbitrary, Capricious, An Abuse Of Discretion And Otherwise Not In Accordance With Law**

64.    Plaintiff incorporates by reference the allegations of paragraphs 1 – 63.

65.    The APA imposes upon the defendants a number of non-discretionary duties regarding rulemaking procedures.  5 U.S.C.A. § 553 (2000).  The APA requires a federal agency to provide adequate notice to the public regarding the nature, scope and effects of any proposed or final agency action.  The APA also requires that the federal agency provide the public with a full and fair opportunity to comment regarding any proposed agency action.  The defendants failed to provide adequate notice, or opportunity for public comment on, the Lethal Injection

Protocol prior to its promulgation.

66.    The APA also requires a federal agency to fully articulate its basis and reasons

regarding any final agency action and prohibits action not authorized by law.  The

defendants have failed to explain adequately the basis and reason(s) for the

specific procedures adopted in the Lethal Injection Protocol, which provide for

the use of chemical substances not authorized by the Lethal Injection Regulations

and do not provide for chemical substances to be administered by qualified

personnel.

67.    The defendants' failure to comply with the APA's procedural requirements and

failure to articulate its basis and reasons regarding any final agency action was

arbitrary, capricious, an abuse of discretion or otherwise not in accordance with

law.  For these reasons, in promulgating the Lethal Injection Protocol, the

defendants violated the APA, and their actions must be set aside.

**Count V:  Violation of the APA – Arbitrary And Capricious Failure To Exercise**

**Enforcement Authority Under The CSA**

68.    Mr. Hall incorporates by reference the allegations of paragraphs 1 – 68.

69.    The CSA makes it unlawful to "dispense" any "controlled substance" except

pursuant to a prescription "issued for a legitimate medical purpose by an

individual practitioner acting in the usual course of his professional practice" and

who has obtained a registration pursuant to the statute.  21 U.S.C.S. §§ 822, 829;

841(a)(1) (2000).

70.     Sodium thiopental is a Schedule III controlled substance.

71.     Regulations promulgated by the Drug Enforcement Administration provide that

        every person who "dispenses" a "controlled substance" is required to obtain a

        "registration." 21 C.F.R. § 1301.11 (2005). The regulations also provide that the

        Administrator of the Drug Enforcement Administration "shall deny" an

        application for registration unless the issuance of a registration is "required under

        the CSA." 21 C.F.R. § 1301.35 (2005).

72.     On information and belief, the Lethal Injection Protocol calls for the dispensing of

        sodium thiopental absent a valid prescription, by a person or persons who lack a

        valid registration. Defendants arbitrarily and capriciously have failed to exercise

        their authority to enforce the CSA, by not requiring the persons whom the

        defendants intend to dispense controlled substances to Mr. Hall to apply for a

        registration, and will continue to act arbitrarily and capriciously by permitting

        them to dispense a controlled substance without doing so. Such arbitrary and

        capricious action violates the APA.

<u>**Prayer for Relief**</u>

73.     Mr. Hall respectfully prays that this Court grant the relief herein requested on the

        basis of the challenges set forth herein.

74.     Mr. Hall requests that this Court grant preliminary injunctive relief barring the

        defendants from setting an execution date for him. The grounds for granting this

        relief are set forth in a separate motion filed with this complaint.

75.     Mr. Hall requests that this Court grant declaratory relief by issuing an order

declaring that the defendants' current means, methods, practices, procedures, and

customs regarding execution, collectively constituting the Lethal Injection

Protocol, violate the Eighth Amendment of the U.S. Constitution and the APA.

76.     Mr. Hall requests that this Court grant preliminary and permanent injunctive relief

barring defendants from executing him by means of the Lethal Injection Protocol.

77.     Mr. Hall further prays that this Court grant such further relief as it deems proper,

including to remedy violations of the Fifth Amendment rights of Mr. Hall.

Dated:  April 26, 2007

Respectfully submitted,

 s/ Mark J. Hulkower

MARK J.  HULKOWER (D.C. Bar No. 400463)
OWEN BONHEIMER (D.C. Bar No. 484984)*
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
(202) 429-3000

ROBERT C. OWEN
Texas Bar No. 15371950
Owen & Rountree, LLP
P.O. Box 40428
Austin, Texas  78704
(512) 804-2661

MARCIA A. WIDDER
Louisiana Bar No. 23367
636 Baronne St.
New Orleans, LA  70113
(504) 558-9867

Counsel for Plaintiff Orlando Hall

*Pending application for admission to this Court

- 31 -