TAYLOR1


IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


MICHAEL TAYLOR,                      )
                                     )
              Plaintiff,             )
                                     )    Case No.
         vs.                         )    05-4173-CV-S-FJG
                                     )
LARRY CRAWFORD, et al.,              )
                                     )    JUNE 12, 2006
              Defendant.             )    MORNING SESSION

                    VOLUME I
                 PAGES 1 - 136


        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS


    BEFORE THE HONORABLE FERNANDO J. GAITAN, JR.
              U.S. DISTRICT JUDGE


For the Plaintiff:      MS. GINGER D. ANDERS
                        MR. ERIC BERGER
                        MR. MATTHEW S. HELLMAN
                        Jenner & Block, LLP
                        601 13th Street NW
                        Washington DC 20005
                             and
                        MR. JOHN WILLIAM SIMON
                        2683 South Big Bend Blvd.
                        St. Louis, MO 63143-2100

For the Defendants:     MR. MICHAEL PRITCHETT
                        MR. STEVEN HAWKE
                        Missouri Attorney General's Office
                        P.O. Box 899
                        Jefferson City, MO 65102


              Donna M. Turner  RMR
         U.S. Court Reporter, Room 7552
       Charles Evans Whittaker Courthouse
              400 East Ninth Street
       Kansas City, MO 64106  (816) 512-5641


                  I N D E X

Roane, et al. v. Gonzales, et al.,
No. 05-2337 (D.D.C.)

Decl. Mark Heath
Exhibit T

TAYLOR1

20    you actually perform it.

21    Q     And based on your review of the evidence in this case,

22    do you have an opinion as to who determines what happens in

23    the execution?

24    A     In Missouri?

25    Q     Yes.

                                                                        18


1     A     John Doe One is the person who appears to be

2     functionally in charge of everything that happens, of

3     designing it and of how things are carried out.

4     Q     And John Doe One is the doctor who participates in the

5     execution in Missouri?

6     A     That's right, yes.

7     Q     And what is your understanding as to which parts of

8     the execution procedure John Doe One has control over?

9     A     My understanding is that he was involved at the very

10    beginning of Missouri's modern execution history.  He even

11    talks about being involved in the cyanide decision, using

12    cyanide, and then when they decided not to use a machine

13    that they had been using, he was called in to take over the

14    whole process.

15          As he says, there's nobody else involved in the

16    process who has a medical background.  And there are no

17    other states where physicians are taking the role that he's

18    taking so there is nobody else for him to talk to other

19    than him, as he describes it.

20          So what the drugs are, the actions of the drugs,

21    how the IV tubing is configured, how the IV access is

22    achieved, how many syringes there are, how much fluid is in

23    each syringe, how much drug is in each syringe, exactly

                              Page 17

TAYLOR1

24   what the execution injectors do, I think he's basically set

25   up everything about this in terms of the nonsecurity

19

1    issues.

2    Q     And to your knowledge, is there any other state in

3    which sole discretion of the medical aspects of the

4    procedure is seated in a single person without any guiding

5    protocol?

6    A     The way it bureaucratically appears to work in most

7    states is the commissioner of corrections or some

8    administrative type person is ultimately responsible for

9    everything that happens in the prison including everything

10   that happens in the executions, but from a functional point

11   of view, there's always a group of individuals who actually

12   are in charge of the mechanics of the lethal injection

13   procedure itself.  So this is a unique situation where

14   there is one individual and everything appears to have been

15   vested in him.  Everybody, including the administrators, do

16   what he says.  And often he doesn't even tell them what

17   he's going to do or what changes he's made.  And that's, to

18   my knowledge, unique.

19   Q     So just to clarify, the discretion about the medical

20   aspects of the procedures is vested in John Doe One, to

21   your understanding?

22   A     Yes.  That's how he describes it.

23   Q     And have you reviewed John Doe One's answers to

24   interrogatories and his deposition testimony?

25   A     I have, yes.

20

1    Q     And based on your medical knowledge and experience,

TAYLOR1

2    have you reached any conclusions with respect to John Doe

3    One's medical judgment and his competence with respect to

4    certain issues?

5    A    With respect to --

6    Q    Certain issues.  Have you reached any conclusions?

7    A    Well, certainly with respect to issues about the

8    induction and maintenance of general anesthesia, he's made

9    numerous important factual statements that are completely

10   wrong and make it clear that he's not a person who's

11   trained or credentialed or proficient in administering or

12   understanding general anesthesia and the drugs that we use.

13          He also has described a difficulty with numbers,

14   which is very problematic for a person who is going to be

15   supervising or drawing up drugs and the various

16   quantitative aspects of that.  And in the addition to

17   flat-out factual errors, important factual errors, I also

18   have concerns about judgments that he's made, medical

19   judgments.

20   Q    What do you base your opinion on?

21   A    On reading his depositions, or testimony and

22   interrogatories.

23   Q    Okay.  So first, I'd like to talk with you about John

24   Doe One's determination and his recordkeeping with respect

25   to the doses of thiopental given at an execution.  Have you

                                                              21

1    reviewed John Doe One's testimony with respect to his

2    determination of how much thiopental to give at the most

3    recent executions?

4    A    Yes, I have.

5    Q    The previous five executions.  And based on Doe One's

TAYLOR1

6    deposition testimony, can you tell me how much thiopental

7    Doe One prepared in each of the last five executions?

8    A    I can give you my -- a guess, but it's very unclear

9    exactly what happened because he's -- he has a poor memory

10   about what has transpired and has had to correct himself on

11   several occasions going back and forth about what was

12   given.  And also he has, as he says, a numerical dyslexia,

13   so it's difficult for him to be certain about numbers.

14         As best as I can tell, somewhere between --

15   somewhere five grams or below may have been given.  In many

16   it's possible that it was two and a half grams, but it's

17   very difficult to see what happened.

18         MS. ANDERS:  Your Honor, may the record reflect

19   that I am showing defense counsel what has been marked as

20   Plaintiff's Exhibit 25.

21         THE COURT:  The record will reflect that.

22         MS. ANDERS:  Thank you.  And may I approach the

23   witness, Your Honor?

24         THE COURT:  You may.  And you don't need to ask

25   each time.  Just go do what you need to do.

22

1    Q    (By Ms. Anders)  Have you seen this before?

2    A    Yes, I have.

3    Q    Is that the chemical log in which the -- how each drug

4    is used is recorded?

5    A    Yes, it is.

6    Q    Okay.  I'd like to draw your attention to a portion of

7    the testimony of John Doe One, just looking at page 14,

8    I'll read it to you so you don't need to follow along if

9    you don't want to.  He states, "I was unable to mix this.

10   We show that we gave the five grams because we have no

Page 20

TAYLOR1

11    provision for showing that we disposed of three and gave

12    two, or disposed of two and gave three, because this has

13    not been set up that way.  We either show we used it all or

14    disposed of it all."

15          Based on that testimony, what is your conclusion

16    with respect to the accuracy of the chemical log that I

17    just handed you?

18    A    Well, the chemical log has a column for the amount

19    that's injected, and the physician's testimony says that of

20    the amount they drew up, of the amount that was available,

21    some was given, some was not given, but there is no record

22    of exactly how much was -- falls into each category.  So

23    there is a log here that says numbers, but according to the

24    physician's testimony, they may or may not be accurate.

25    Q    And is it possible the tell from the chemical log how

23

1    many thiopental bottles were checked out?

2    A    Yes, it is.

3    Q    And looking at the chemical log, has that number

4    varied over the past five executions?

5    A    Well, in some cases it says that ten bottles were

6    checked out.  In some cases -- one case it says ten bottles

7    were checked out, but then that number is changed to an

8    eight.  In other cases -- in another case it says six.  In

9    another case it says five.  So there's variation of

10    probably between five and ten bottles.

11    Q    And based on that fact and the doctor's testimony, do

12    you think that both the intended dose and the actual dose

13    of thiopental have varied in the past several executions?

14    A    Well, clearly the intended dose has, in all

Page 21

TAYLOR1

15    likelihood, varied.  If they checked out ten bottles on

16    some occasions and five bottles in other occasions, that

17    appears to be an intent to give different amounts.

18         As far as the actual amount that's delivered, we

19    have no way of knowing how much active thiopental drug was

20    actually delivered into the prisoner's circulation.

21    Q    And based on your review of the discovery responses,

22    who oversees the process of recording the drugs that are

23    given in the chemical log?

24    A    The physician.

25    Q    John Doe One?

                                                                24


1    A    John Doe One.

2    Q    And to your knowledge, is the actual dose given at the

3    execution recorded anywhere?

4    A    No, it's not.

5    Q    In your practice inducing general anesthesia, do you

6    record the dose of anesthetic that you give?

7    A    Yes.  It's very important to record the precise amount

8    of drugs that are administered.

9    Q    So that's standard practice to record doses?

10    A    Yes.  That's essential standard practice.

11    Q    And do you train residents?

12    A    I do, yes.

13    Q    Do you teach residents about the importance of

14    recording actual doses given?

15    A    It's one of the first things they learn how to do is

16    to complete an accurate chart or record of what was done

17    during a procedure.

18    Q    If a resident consistently fails to record doses, what

19    would be the consequences?

                           Page 22

TAYLOR1

20  A    If they consistently failed, after being admonished
21  and told they needed to do this properly, they wouldn't be
22  allowed to continue through the residency.
23  Q    Does John Doe One's apparent unconcern with recording
24  precise actual doses raise concerns in your mind?
25  A    Yes.  It's very sloppy and it reflects a lack of

                                                            25


1   understanding of the importance of the quanity of drugs
2   that are being given.
3   Q    In an execution setting, does the actual dose of
4   thiopental that was given matter?
5   A    It matters enormously.  As I described before, in the
6   four phases of the execution or the lethal injection
7   procedure, that second phase is the only phase that
8   provides anesthesia.  So if the amount of thiopental given
9   is inadequate, then the anesthesia will be inadequate and
10  the procedure will be agonizing.
11  Q    Based on your review of materials produced in
12  discovery, is it possible to conclude that an inmate was
13  sufficiently anesthetized in any particular execution?
14  A    No.  Based on the material that's been provided, one
15  can't conclude either way whether these prisoners were or
16  were not properly anesthetized.
17  Q    And is part of that because you don't how much
18  thiopental was actually given?
19  A    Part of that is because we don't know how much
20  thiopental was successfully delivered into their
21  circulation and it's partly because the paralyzing drug is
22  given, so regardless of whether or not the execution in
23  fact is humane, it will appear to be peaceful and tranquil.

                        Page 23

TAYLOR1

24    Q    Thank you.

25         Now I'd like to ask you a few questions about

26

1    John Doe One's -- your opinions as to Joe Doe One's

2    training with respect to general anesthesia.  Do you have a

3    conclusion as to whether Joe Doe One is qualified to

4    oversee the induction of general anesthesia?

5    A    No, he's not.  If he were applying for a job as an

6    anesthesiologist in any hospital in this country, there is

7    no possibility that he would be hired as such.  He's not

8    qualified to do this in any manner.

9    Q    So just to clarify, you do have a conclusion?

10   A    Sorry.  I do have a conclusion, yes, and that is it.

11   Q    I'm sorry.  Would you restate?

12   A    My conclusion is that he is not in any way qualified

13   to perform or supervise the administration and the

14   induction, the maintenance of general anesthesia.

15   Q    Does he have any training in general anesthesia?

16   A    Apparently not.

17   Q    Why is it necessary to have training in general

18   anesthesia in order to determine doses of anesthetic and

19   induce general anesthesia?

20   A    Anesthesiology is a very complex task.  It takes four

21   years of medical school and then four years of

22   post-graduate training to have acquired the knowledge base

23   and skill set and judgment to carry it out in a safe and an

24   effective way.

25   Q    And based on your review of John Doe One's testimony,

27

1    did he make any statements that raise concerns in your mind

TAYLOR1

2    regarding his understanding of general anesthesia in

3    general and thiopental specifically?

4    A    Yes, he made numerous such statements and makes it

5    clear that he has not undergone that training.  He doesn't

6    understand what this drug is and how it works.

7    Q    I'd like to draw your attention to a statement that

8    John Doe One made in his deposition.  This is page 27 of

9    the transcript, and I am reading now.  He responds to a

10   question about thiopental, he says, quote, "The problem

11   with all these drugs is if you give the dose and you do not

12   get the effect you need, you cannot simply add more drug to

13   get the dose.  You must repeat the entire dose."  Do you

14   agree with that statement?

15   A    That's completely false.  It flies in the face of our

16   practice, what anesthesiologists do.

17   Q    Why is that?

18   A    When we give a dose of drug, we're anticipating a

19   certain effect, but we're aware of variability between

20   individuals and how they respond to drugs so if we don't

21   achieve that effect, we gauge by how much we missed that

22   intended or desired effect and we do sort of an on-the-fly

23   calculation that's part art and part science as to how much

24   additional drug would be required to remedy the situation,

25   and that amount of additional drug might be less than what

                                                              28


1    we gave before or it might be more than what we gave before

2    or it could, by coincidence, be the same amount.  But his

3    assertion that you have to go ahead and give the same

4    amount again is ridiculous.

5    Q    So do you consider this a significant factual error?

                          Page 25

TAYLOR1

6   A    Yes.  It's consistent with him not understanding what
7   anesthesiologists do, which isn't surprising.  He hasn't
8   been trained as an anesthesiologist.
9   Q    I'd like to draw your attention to another statement
10  from the deposition transcript.  Page 26, line 17.  And
11  again in discussing thiopental the doctor said, and I
12  quote, "The drug was chosen because it doesn't cause
13  cardiac vascular depression so it means you can give a lot
14  of it and your heart will still beat fine."  First, could
15  you define cardiac vascular depression for us?
16  A    What he is talking about is some drugs can cause
17  effects on the ability of the heart muscle to contract or
18  squeeze and that means that the heartbeat or the pulse is
19  weaker.  The heart can't eject as much blood with each
20  heartbeat.  We also talk about vascular depressants, the
21  drugs that lower blood pressure.  Blood vessels have
22  muscles that can constrict to tighten up or narrow the
23  blood vessels and raise the blood pressure, and some drugs,
24  some anesthetic drugs, as a side effect cause those muscles
25  to relax and then that lowers the blood pressure.  So a

29

1   drug that causes cardiac vascular depression is one that
2   depresses the pumping function of the heart and also the
3   blood pressure.
4   Q    And do you agree with John Doe One's statement that
5   thiopental does not cause cardiac vassular depression?
6   A    He's got it 100 percent backwards.  Thiopental is
7   notorious for causing cardiac vascular depression,
8   especially in patients who have had trauma.  John Doe One
9   talks about anesthetizing people in trauma situations,
10  which is a scary proposition if he thinks that thiopental

Page 26

TAYLOR1

11    does not cause cardiac vascular depression.  There were

12    many, many military deaths that occurred back in World

13    War II and the Korean War when thiopental was given to

14    trauma victims before people understood this effect.

15    Q    So would you expect that an anesthesiologist would

16    make this type of factual mistake?

17    A    No, it's not conceivable.

18    Q    Okay.  I'd like to draw your attention to another

19    statement from the deposition transcript.  This is on page

20    95, line 4.  Again in response to a question about

21    thiopental, John Doe One stated, I quote, "You want a rapid

22    onset of the drug, and these drugs are rapid onset drugs.

23    If you give them slowly they just don't work."  Do you

24    agree with the statement that it's necessary to inject

25    thiopental very quickly?

                                                                30

1    A    That statement is false.

2    Q    And why is that?

3    A    I just know factually I have injected -- used

4    thiopental many, many times to induce general anesthesia.

5    I do not inject it as quickly as I can.  I inject it at a

6    measured rate and it, nevertheless, achieves the desired

7    effect, the effect that I'm looking for.

8            He also talks about the drug being metabolized

9    while it's traveling up the arm, and that's just not true.

10    That's not how thiopental works.

11    Q    Do you consider this a significant error?

12    A    Yes.  It just shows that he doesn't know what he's

13    talking about when it comes to the use of thiopental.

14    Q    And again, would you expect anesthesiologists to make

                            Page 27

TAYLOR1

15  this type of factual error?

16  A    No.

17  Q    Is it necessary to understand the pharmacology of

18  thiopental when determining the dose of thiopental to be

19  used for induction of general anesthesia?

20  A    Yes, it is.

21  Q    And why is that?

22  A    Thiopental is a complicated drug and a lot of its

23  actions are counter-intuitive.  It's a drug that we

24  consider to have -- it's a high-risk or low safety margin

25  drug, and it's important to understand how it works, how it

                                                            31

 1  travels around the body, where it exerts its effects, and

 2  understand how different individuals -- how their responses

 3  can vary.

 4  Q    And does John Doe One have any training in the

 5  pharmacology of thiopental?

 6  A    No.

 7  Q    Based on his testimony and what we have spoken about

 8  so far, do you think that he understands the pharmacology

 9  of thiopental?

10  A    No, it's clear that he doesn't.

11         MS. ANDERS:  May the record reflect that I am

12  showing opposing counsel what has been marked as

13  Plaintiff's Exhibit 26.

14         MR. HAWKE:  We have not been provided a copy of

15  that.

16         MS. ANDERS:  I'm sorry.

17  Q    (By Ms. Anders)  Have you seen this before, what I

18  just gave you?

19  A    I have, yes.

TAYLOR1

20    Q     And what is it?

21    A     This is a printout of what's called a package insert.

22    A lot of times when drugs come, they come in a box and

23    there's a folded-up piece of paper inserted in that box

24    that has a lot of technical information about the compound.

25    Q     And would you and other anesthesiologists generally

32

1     rely on this when preparing and administering thiopental?

2     A     Yes.  It's always available so if you have a question,

3     if you want to know something about a certain situation,

4     then it's available in the kit.  Like an instruction

5     manual.

6           MS. ANDERS:  I'd like to offer Plaintiff's

7     Exhibit 26 into evidence.

8           MR. HAWKE:  No objection, Your Honor.

9           THE COURT:  It will be received.

10    Q     (By Ms. Anders)  If you'd look at page two for me,

11    Dr. Heath, under the heading Warnings, could you read the

12    sentence that starts with the words "This drug"?

13    A     It says, "This drug should be administered only by

14    persons qualified in the use of intravenous anesthetic."

15    Q     In your opinion, is John Doe One qualified in the use

16    of intravenous anesthetics?

17    A     No, he's not.

18    Q     Are your concerns about John Doe One's understanding

19    of intravenous anesthetics limited to thiopental?

20    A     No.  There are other intravenous anesthetics that he

21    clearly doesn't understand what they are or what they do.

22    Q     Is Versed a commonly-used intravenous anesthetic?

23    A     Yes.  Versed is one of the most commonly used

Page 29

TAYLOR1

24    anesthetic drugs in procedures.

25    Q    In John Doe One's interrogatory answers he states

33

1    that midazolam is the antidote to Versed, and that's the

2    answer to Interrogatory No. 37.  Do you agree with that

3    statement?

4    A    I'm sorry.  He says midazolam is the antidote --

5    Q    To Versed.

6    A    To Versed.  No, that's completely incorrect.  He has

7    it 100 percent backwards.

8    Q    And why is that?

9    A    There is an antidote to Versed, but it's not

10   midazolam.  Midazolam in fact is Versed, and it has

11   sedative properties.  The antidote to Versed is something

12   that would wake you up, make you more awake if you've been

13   given Versed, so he's got it completely backwards.

14   Q    Is that a factual error that you would expect

15   anesthesiologists to make?

16   A    No.  No anesthesiologist would make that error.

17   Q    Does John Doe One's incorrect understanding of Versed

18   raise doubts in your mind as to his understanding of

19   intervenous anesthetics?

20   A    Yes.  If he's confusing midazolam and Versed and the

21   antidotes, he doesn't know what he's talking about.

22   Q    I'd like to draw your attention to another portion of

23   the testimony of John Doe One's deposition.  This is line

24   26 -- I'm sorry, page 26, and John Doe One states that he

25   is dyslexic.  Does the doctor's dyslexia also raise

34

1    concerns in your mind regarding his ability to adequately

TAYLOR1

2  determine doses of general anesthesia and to proceed with
3  induction of general anesthesia?
4  A     Yes.  He described difficulty completing a cable bill
5  I think because he was transposing numbers and even though
6  he had a couple of hours to work on it things weren't
7  working properly for him in terms of getting the numbers
8  right.  And some people have that problem and those people
9  are unsuitable for anesthesiology or other medical
10 specialties that require a lot of calculations on the fly.
11 Q     Would that affect his ability to be a surgeon
12 necessarily?
13 A     No, he could well be very gifted with his hands and
14 with anatomy.  That's a completely different kind of
15 activity than having to make precise and rapid calculations
16 about drug doses.
17 Q     So in sum, do you think that John Doe One, based on
18 his training and testimony, is competent to determine doses
19 of and induce general anesthesia?
20 A     No.  He should not be entrusted with the provision,
21 the induction, the administration, or the maintenance of
22 general anesthesia.
23 Q     Do you think that entrusting John Doe One with those
24 responsibilities creates a significant risk that an inmate
25 will be inadequately anesthetized and, therefore, may

                                                          35


1  suffer severe pain during an execution?
2  A     Yes, it does.  Any time you entrust a complicated
3  activity like that to somebody who isn't qualified or
4  competent to do it, then that risk develops.
5  Q     Now I'd like to ask you a few questions about John Doe
                         Page 31

TAYLOR1

6  One's stated inability to mix five grams of thiopental, so

7  I'd like to direct your attention to John Doe One's answer

8  to the court's interrogatories, this is No. 5, where John

9  Doe One states that he was unable to administer the planned

10  five-gram dose of thiopental because of, quote, difficulty

11  dissolving powder in the solution that he was using.

12          In your experience, is the powder in the

13  thiopental bottle soluable in solution?

14  A    Yes, it is.  One of those properties of that powder

15  preparation is that we're able to dissolve it in solution.

16  Q    And what does that mean?

17  A    Like when you put sugar in iced tea, you take a

18  spoonful of the sugar and you put it in the tea and you mix

19  it around and that solid material, those crystals,

20  disappear and they are now in solution in the iced tea.

21          It's the same with the thiopental powder.  The

22  powder is added into an aqueous or a water solution and one

23  mixes it until it disappears.

24  Q    What are the reasons that the powder in the thiopental

25  bottle might not dissolve easily?

36

1  A    Well, one of the properties of thiopental is it does

2  dissolve quickly, just like the sugar that goes in the iced

3  tea.  If you put a spoonful of what you think is sugar in

4  the iced tea and you mix it and there's still, no matter

5  how much you mix it, grains of stuff left over, then there

6  may be sand or something else in that sugar.  It's not all

7  sugar.

8          The same with thiopental.  One of its properties

9  is that you can put it in water and it will dissolve.  So

10  if it doesn't dissolve, then you have to worry that maybe

TAYLOR1

11    the preparation is not pure thiopental, that it's degraded;

12    or if there's been a manufacturing error, an error in the

13    shipping or the handling of the thiopental or its storage;

14    or that the solution that you're putting it into isn't the

15    solution that you think it is.  It isn't the right mixing

16    solution, something is wrong; or you have done a

17    calculation error.  You're trying to put in a different

18    amount than you think you are.  Something is wrong with

19    that picture.  I don't know which of those things it is.

20    Q    So you mentioned that the thiopental might be

21    defective or might not have all the properties of

22    thiopental.  If that were the case, would the powder's

23    anesthetic properties also be affected?

24    A    Yes.  If it's not a thiopental, then that's not an

25    anesthetic anymore to provide anesthesia.

37

1    Q    And if it was defective, it couldn't be dissolved, it

2    could also not have the expected anesthetic properties?

3    A    Right.  If it can't be dissolved, then it's lacking

4    the properties of thiopental and it may not properly

5    induce or provide anesthesia.

6    Q    If that were to occur, if thiopental were to be

7    defective and the prisoner ended up inadequately

8    anesthetized, wouldn't that be obvious during the

9    execution?

10    A    Are you saying that if the thiopental wasn't working

11    properly, it wasn't thiopental, and the execution proceeded

12    using that bad compound, are you saying would that be

13    obvious to the witnesses?

14    Q    Yes.  I'm asking if you think that would be observable

Page 33

TAYLOR1

15  or obvious.

16  A    No, I think things would look very similar.  The

17  first -- the drug would go in, the thiopental, but it

18  wouldn't be thiopental so the prisoner, nothing would

19  happen to him.  And then the second drug would go in, which

20  is the pancuronium, which in this dose would cause a rapid

21  onset of paralysis so the prisoner would very rapidly

22  develop a relaxed look on his face and his eyes would

23  calmly close and he would look like he was peacefully

24  asleep when in fact he would be wide awake and unable to

25  draw a breath and was suffocating.  And when the potassium

38

1   was administered, normally that would make him scream and

2   struggle, but he would be unable to do that because the

3   pancuronium would still be paralyzing him.  So it would

4   look pretty much the same I think.

5   Q    I'd like to draw your attention to another statement

6   from John Doe One's deposition.  This is on page 45.  In

7   response to the question, "Did you ever consider the

8   possibility that the thiopental might be defective," he

9   answered, quote, "No.  It's a compound.  It's like salt or

10  sugar.  It's a chemical.  There is nothing -- it

11  deteriorates after it's been mixed, but there is nothing in

12  pentothal that can out-date as long as it's in powder."

13          So do you agree with the statement that because

14  pentothal is stable in powder form it couldn't possibly be

15  defective?

16  A    That statement is incorrect.  There can be problems

17  with the manufacture of thiopental so that it doesn't

18  dissolve properly, so that it's not working properly.  And

19  so he's just wrong there.

TAYLOR1

20    Q    To your knowledge, does the manufacturer of pentothal

21    recognize that batches of thiopental could be defective?

22    A    The package insert discusses what to do when the

23    thiopental doesn't properly go into solution and it

24    says one should not use that solution.  It should be

25    discarded.

39

1    Q    And looking at another statement in John Doe One's

2    deposition transcript, page 44, he states about the

3    thiopental, "Some medications have an inert compound in or

4    a secondary compound to prevent improper dose."  First, is

5    there an inert compound in thiopental that limits its

6    solubility in water?

7    A    Thiopental is mixed with a powder which is sort of

8    inert in the sense it doesn't cause anesthesia or any

9    medical effects.  It's mixed with a salt powder called

10    sodium carbonate, but that does not hinder its solubility

11    in any way.

12    Q    On what are you basing this opinion?

13    A    On the package insert.  And I also, when I saw John

14    Doe discussing especially the amount of changes he made in

15    the thiopental mix, I telephoned the company that

16    manufactures it to find out if in fact any such changes had

17    been made that I wasn't aware of and I talked with a

18    specialist at the manufacturing company who informed me

19    there had not been any such changes or additives.

20    Q    You mentioned speaking with the manufacturer.  When

21    you have a question about a drug, is it normal practice to

22    call up the manufacturer and speak with a specialist?

23    A    Sure.  They put the number on the package insert just

Page 35

TAYLOR1
24    like an instruction manual for a computer or something.
25    You can call them up and get answers to your questions.

40

1    Q    And would you rely on those answers?
2    A    Yes.
3    Q    Do you think there should be any difference in the
4    solubility effect of the thiopental between the five-gram
5    vial and 500-milligram vial simply because of the different
6    amounts provided in the vials?
7    A    No.  The manufacturer should be making the exact same
8    powder and the package insert applies for all the different
9    sizes of vials, so the preparation should be identical
10    regardless of how much is put in the bottle by the company.
11    Q    And what is your conclusion with respect to John Doe
12    One's theory as to why the thiopental was not soluable?
13    A    It doesn't make any sense.
14    Q    Have you reached any conclusions with respect to Doe
15    One's decision, during the first execution in which he
16    encountered the problem, to go ahead with the execution
17    using the lower dose?
18    A    That wasn't the right decision to make.
19    Q    And why do you think that?
20    A    Well, the concern is if the compound isn't behaving as
21    it's supposed to, there may be some problem with the
22    compound.  If anything, one would want to increase the dose
23    to ensure that one was getting the right amount in.  So
24    reducing it is trying to make a correction, but it's in the
25    wrong direction.

41

1    Q    Have you reached any conclusions with respect to John
Page 36

TAYLOR1

2   Doe One's failure to investigate the potential problem with

3   thiopental after the first execution in which this

4   occurred?

5   A     Yes.  It's very troubling.

6   Q     And do you have any conclusion with respect to John

7   Doe One's exercise of medical judgment in not simply

8   preparing additional syringes of thiopental?

9   A     That doesn't make any sense.  He ought to have not

10  used the preparation at all.  That's what he should have

11  done.  That's what the manufacturer says.  But given that

12  he decided to go ahead, which was the wrong decision, he

13  should have made up a lot more of it, not less of it.

14  Q     And looking at his deposition testimony again, on page

15  29, he stated, quote, "I go to the execution chamber and

16  we're on a time frame.  I have minutes to get the drugs

17  ready, minutes to ensure a perfect IV.  There is no time to

18  call the drug company at midnight, the Director, or nursing

19  staff, to change.  I am required to deal with what I'm

20  given and make it come out right and make it happen I guess

21  is the best way to say it."

22              In your experience, does time pressure exacerbate

23  the risks of improperly mixing thiopental, or any other

24  drug?

25  A     Yes.  When one is trying to undertake a complex

                                                        42


1   endeavor, if there's a lot of time pressure, then one is

2   much more likely to make errors.

3   Q     Does time pressure also exacerbate the difficulty of

4   calculating and keeping track of how much thiopental has

5   already been mixed?

                        Page 37

TAYLOR1

6    A    Yes, especially if I'm dyslexic.

7    Q    In your practice, would you accept time constraints

8    that you felt were overly restrictive in preparing a dose

9    of anesthesia?

10   A    Under exigent circumstances, if there is an emergency

11   and somebody needs general anesthesia immediately, then

12   everything would be very rushed and we would be working

13   under time pressure and we'd have to accept that because

14   the risks of delay would outweigh the benefits.

15   Q    And in a nonemergency situation, would you accept time

16   constraints?

17   A    No.  In a nonemergency situation we arrive in time in

18   the morning to set things up and have things in an orderly

19   fashion to check and doublecheck everything to make sure

20   that we have our ducks in a row and that we have done

21   things properly.

22   Q    From a medical perspective, is an execution an exigent

23   circumstance.

24   A    No.  My understanding is there is a many-hour window

25   in which it can legally occur, a many-day window.  But

43

1    certainly I don't think it has to occur at a certain

2    precise time.  And even if it did, the physician could show

3    up an hour or two hours earlier, whatever it took, to allow

4    his team to set things up in a more orderly and considered

5    fashion.

6    Q    And given John Doe One's difficulties in mixing the

7    thiopental, do you have concerns about whether the

8    thiopental prepared was effective?

9    A    Yeah, I don't know whether the -- it was effective or

10   not.

Page 38

TAYLOR1

11   Q    Is it possible to be certain that inmates given

12   insoluable thiopental were properly anesthetized during

13   their executions?

14   A    Not from the information we have available.  Some

15   states perform toxicology.  They measure the blood levels

16   of thiopental after an execution.  And that might have

17   provided information in these executions, but I don't

18   believe Missouri did that.

19   Q    And do you believe that John Doe One's use of

20   insoluable thiopental created considerable risk of pain in

21   these executions?

22   A    If the thiopental didn't work properly, if he wasn't

23   given the amount of actual thiopentothal that he was

24   intending to, then the prisoner's execution would have been

25   excruciating.

44

1    Q    I'd like to move on to another topic now.  Have you

2    reviewed John Doe One's statement regarding the risks and

3    benefits of gaining venous access through the femoral vein?

4    A    Yes, I have.

5    Q    What are your conclusions with regard to those

6    statements?

7    A    He's again made factual statements that are not

8    correct and then he's made errors of judgment.

9    Q    Assuming that John Doe One testified that it's

10   impossible to pierce the femoral artery, do you agree with

11   that statement?

12   A    No, that's completely false, and I know that because I

13   have accidentally pierced the femoral artery while

14   attempting to place a femoral venous access.

Page 39

TAYLOR1

15  Q    And mechanically how does one pierce the femoral

16  artery; how does that occur?

17  A    Well, we don't know by looking at the outside of a

18  person's body exactly where the femoral vein is.  We use

19  landmarks and our anatomical knowledge and feeling the

20  pulse of the femoral artery, which is close to the femoral

21  vein, to make our best guess as to where the femoral vein

22  is.  But there is variation between individuals and it's

23  always a mixture of art and science to try and understand

24  where the vein is.

25           So we go in with a needle, a hollow needle, and

                                                                45


1   we're aspirating with a syringe, drawing back and probing

2   until we get a return of blood.  And more often than not

3   that initial blood is venous blood, and we can tell that

4   because it's a dark blue or purple color, but sometimes the

5   first blood that comes back is bright red, it's arterial

6   blood, and that means to get that we have had to have

7   punctured the femoral artery.

8   Q    Is it possible to pierce the artery with a .22 gauge

9   needle?

10  A    Absolutely.  You can pierce it with any needle.

11  Q    And does the Seldinger method of catheterization used

12  by John Doe One require the use of a needle?

13  A    Yes.  The Seldinger technique means that one pushes a

14  needle into the blood vessel and then passes a wire through

15  that needle and then uses that wire to insert the catheter.

16  So one has to pierce blood vessels in order to perform the

17  Seldinger technique.

18  Q    So you disagree with John Doe One's statement that

19  piercing the artery is impossible using the Seldinger

                            Page 40

TAYLOR1

20    method?

21    A    It's just completely wrong.  It's a well-recognized

22    complication that the femoral artery can be punctured or

23    pierced or lacerated during femoral venous access.

24    Q    Would you say that arterial puncture is a particularly

25    rare complication?

46

1    A    No.  I think it happens frequently.

2    Q    What are the potential complications of an arterial

3    puncture?

4    A    Depends on how big the hole is and for how long it

5    goes untreated.  If the hole is large and nothing is done

6    about it, then one can lose a tremendous amount of blood

7    out of that hole.

8    Q    Okay.  So I'd like to show you a photo -- some photos

9    that's contained in what's already been marked and admitted

10    as Plaintiff's Exhibit 18.  This is from the materials

11    produced from the Johnston execution.  Have you seen this

12    photo before?

13    A    I have, yes.

14    Q    And have you reached any conclusions with respect to

15    it?

16    A    This photo appears to show a triple lumen catheter

17    placed in the groin.  It's probably in the femoral vein,

18    although I can't be certain where the tip of the catheter

19    is because I can't see that.

20    Q    And I'd like to give you a hard copy of this so you

21    can mark where you see.

22    A    Okay.

23            THE COURT:  He can mark at his location.

Page 41

TAYLOR1

24                THE COURTROOM DEPUTY:  Use your finger, and if

25      you want to clear it, just press this (indicating.)

47

1       Q     (By Ms. Anders)  So using that, could you mark for us

2       where you see the hematoma in this photograph?

3       A     So -- can you hear me like that?

4             So hematoma is a mass of blood, a collection of

5       blood that occurs inside the body where blood has leaked

6       out of a blood vessel.  And what you see here is the

7       catheter going into the groin and there's a ridge at the

8       end of the catheter, a raised ridge, that's got a blue

9       discoloration, and that's a hematoma.

10            And then it's important to understand that in the

11      thigh it can hold a lot of blood.  Several -- it can hold a

12      liter of blood, which is the size of a liter bottle of

13      soda, can be concealed in the thigh.  So when one is

14      looking at the hematoma in the groin or the thigh, it's

15      important to understand it may be the tip of the iceberg or

16      you may be seeing all of it.

17            But what it looks to me is like the swelling is

18      extended into the deeper tissue into a larger area causing

19      this bulge under here in the side of the thigh.  And there

20      is also an area of blue discoloration in this zone here.

21      So it looks like there's -- beneath this here is a larger

22      area of blood collection and that this blue raised area is

23      the superficial manifestation of that.

24      Q     Okay.  I'd like the record to reflect that Dr. Heath

25      has marked an oval-shaped portion around the catheter

48

1       entrance that's shown on the photo.

Page 42

TAYLOR1

2            Is the fact that a hematoma occurred here

3    indicative of medical negligence or error?

4    A    Not at all.  Hematoma is a recognized complication of

5    femoral venous access because as I said you can't know

6    exactly where the artery and vein are.  And it's happened

7    to me.  A hematoma can occur in the best of hands, and does

8    occur in the best of hands.  It happens to everybody, to

9    all patients.  Excuse me, it happens to many patients.  It

10   happens to all physicians who perform these things

11   frequently.

12   Q    I'd just like to refer you to another part of John Doe

13   One's deposition testimony.  When asked about the hematoma

14   in the photo he stated, quote, "What they are seeing is the

15   site where I injected my local anesthesia.  It causes a

16   little blue mark."  Page 102.

17           In your experience in inserting a femoral line

18   for the induction of anesthesia, local anesthesia, has it

19   ever caused a blue mark?

20   A    No, local anesthesia is a clear solution and it can't

21   cause blue discoloration.  I suppose when injecting the

22   local anesthesia he could have ruptured a blood vessel and

23   caused a hematoma, but either way, whatever it was that

24   caused this, this is blue and it's from blood collecting

25   there.  It's not from local anesthetic.  That's just not

                                                            49


1    possible.

2    Q    Have you ever heard of a blue mark from local

3    anesthesia occurring, in your discussions with colleagues?

4    A    No, unless they injected -- they caused a hematoma in

5    the act of injecting it.  But the local anesthetic itself

                        Page 43

TAYLOR1

6      doesn't cause a blue discoloration.

7      Q    So does Doe One's explanation change your conclusion

8      that there is a hematoma here?

9      A    No.  The photograph shows a hematoma.

10     Q    Now I'd like to show you another photograph.  This is

11     contained in Plaintiff's Exhibit 21, which has been marked

12     and admitted.  This is from the Smith execution.

13              THE COURT:  What exhibit?  You say this is a

14     different exhibit?

15              MS. ANDERS:  Yes.  This is from the Smith

16     execution contained in Plaintiff's Exhibit 21.

17     Q    (By Ms. Anders)  So this is from another execution,

18     the Smith execution.  Do you see a blue mark on this photo?

19     A    No, I don't.

20     Q    And looking at this photo, is there any indication

21     that any complication arose during this femoral procedure?

22     A    No, there isn't.

23     Q    But there is such evidence in the photo from the

24     Johnston execution that we just saw?

25     A    Yes.  The photographs are very different.  It clearly

                                                                    50


1      shows a hematoma is present.

2      Q    Does it raise concerns in your mind that John Doe One

3      isn't admitting that the hematoma exists?

4      A    Yes.  It's right there in the photograph.  It's a

5      recognized complication that can occur.  I don't understand

6      why he doesn't see it there.

7      Q    Could hematoma such as the one that occurred during

8      the Johnston execution be painful?

9      A    Yes.

10     Q    How does a hematoma cause pain?

                          Page 44

TAYLOR1

11    A    Well, when the hematoma forms in the groin it distends

12    and stretches and distorts the tissue and the groin is an

13    area that has a lot of nerve or sensory nerve innervation,

14    it's a sensitive area, so when that tissue is distorted and

15    stretched that causes pain.

16    Q    Can you tell definitively whether the hematoma in the

17    Johnston photo was painful?

18    A    The only way you know for sure is to ask him whether

19    it hurt.  I don't know for sure.  It looks painful.

20    Q    How would someone behave if they were in pain?

21    A    A restrained -- a nonrestrained person would wriggle

22    around.  Probably put their hand on the area that was

23    hurting.  He would probably try adjusting his position,

24    flex his thigh, his groin, trying to find a comfortable

25    position, those kind of movements.

                                                        51


1            He's restrained so I'm not sure how much movement

2    you'd be able to see.

3    Q    And what else could you rely on in ascertaining

4    whether Johnston felt pain from the hematoma?

5    A    You can't rely for sure on anything without asking

6    him, but you can see how other people described his

7    behavior.

8    Q    So would you rely on an observer's account in

9    determining whether or ascertaining whether someone might

10    have been in pain from the hematoma?

11    A    Yes.  I think that's one of the reasons the state

12    wants witnesses to be there to be able to report whether or

13    not pain occurred, whether or not it was humane.

14    Q    I'd like to quote to you a newspaper article about the

Page 45

TAYLOR1

15   Johnston execution.

16           MR. HAWKE:  Objection, Your Honor.  This has not

17   been part of discovery and appears to be hearsay.

18           MS. ANDERS:  We're not admitting it in evidence.

19   It's just something that he's relied on in testifying,

20   whether it's consistent with --

21           THE COURT:  I'm going to sustain the objection.

22   Q    (By Ms. Anders)  So do you agree with John Doe One's

23   statement that there are no risks to the inmate from

24   femoral catheterization?

25   A    That statement is false.

52

1    Q    And do you think that John Doe One fails to

2    acknowledge some of the common complications of femoral

3    catheterization?

4    A    Yes, he does.

5    Q    In your opinion, is it dangerous for a physician to

6    perform a procedure and not to acknowledge the risks that

7    could flow from the procedure?

8    A    Yes.  Before we're allowed to do them on our own

9    without supervision we have to be able to recite what the

10   complications are, what the risks are that can occur.

11           MS. ANDERS:  I'd like to ask the witness about

12   something right now that was redacted from the Doe One

13   transcript.

14           (Counsel approached the bench and conferred

15   off the record.)

16           MS. ANDERS:  I'm just going to ask a question or

17   two about something that's been redacted from the John Doe

18   One transcript.

19   Q    (By Ms. Anders)  Dr. Heath, in performing a femoral

Page 46

TAYLOR1

20    catheterization, is it important for the doctor doing it to
21    be proficient in the procedure?
22    A    Yes, it is.
23    Q    Why is that?
24    A    Any femoral line is a complex procedure and it's being
25    done in a critical area of the body where there are large

53

1    blood vessels and a large nerve and if one is not
2    proficient in this, then severe complications are more
3    likely to ensue.
4    Q    John Doe One stated in interrogatory responses that he
5    has not regularly inserted femoral lines in the past few
6    years.  He testified in his deposition that he is not in
7    active practice.  Do those facts raise concerns in your
8    mind about John Doe One's proficiency in performing femoral
9    catheterizations?
10    A    Yes.  Part of what proficiency is, one element is a
11    thing we call currency.  It's like pilots flying planes.
12    One has to be doing it with a certain frequency to be
13    considered suitable to continue doing it.  And if he hasn't
14    been performing this for a number of years, then he lacks
15    the currency that would be necessary.
16    Q    Is it your practice when performing femoral
17    catheterization to sedate a patient before inserting the
18    femoral line?
19    A    Yes.  Some of my patients are already under general
20    anesthesia when I'm placing a central line or femoral line,
21    but if somebody were not under general anesthesia, then I
22    would start a peripheral IV to give them analgesics or
23    painkillers and sedation.

Page 47

TAYLOR1

24    Q    Why would you do that?

25    A    Because it's a very nasty procedure to endure without

54

1    any sedation or pain killer.

2    Q    And to your knowledge, does John Doe One sedate

3    prisoners before performing femoral catheterization?

4    A    He does not, no.

5    Q    In your testimony are you distinguishing between the

6    local anesthetic and intravenous sedation?

7    A    Right.  Intravenous sedation obviously goes everywhere

8    in the body including the brain and intravenous analgesics

9    or painkillers also travel throughout the body, and so

10   that's different from local anesthesia which is just given

11   directly in the groin area and does not affect one's

12   ability to experience pain or level of consciousness.

13   Q    So do you believe that the failure to sedate an inmate

14   before performing catheterization is indicative of

15   questionable medical judgment on the part of John Doe One?

16   A    Yes.  It's standard, whenever possible when one can

17   obtain a peripheral IV, which is the case in almost all

18   patients, that one first puts in a peripheral IV and uses

19   that to give sedation and analgesia and then you put in the

20   femoral venous line.

21   Q    I'd like to draw your attention to some more of the

22   deposition transcript.  On page 104 John Doe One states he

23   was unable to place a femoral line and therefore placed a

24   subclavian line.  Are there different risks inherent in

25   placing a subclavian line?

55

1    A    There certainly are, yes.
                        Page 48

TAYLOR1

2  Q    And could you describe them?

3  A    Well, the subclavian line goes in right by the

4  collarbone.  It's close to the heart and close to the

5  lungs.  And it's a very well-recognized complication that

6  the needle can open up the -- can damage the lung and cause

7  air to enter the spaces that surround the lung and cause a

8  compression of the lung which is a thing we call

9  pneumothorax or tension pneumothorax, and that's an

10 emergency situation that's extremely agonizing.  One is

11 basically suffocating to death and it needs emergency

12 intervention.

13          Another problem that can occur when using a

14 Seldinger technique, the subclavian technique, is that the

15 wire tends to enter the heart and can cause arrhythmia, can

16 cause the heart to beat improperly, or even stop the heart,

17 and obviously that's another emergency situation that needs

18 to be corrected immediately.

19 Q    I'd like to draw your attention to a statement from

20 the deposition transcript of John Doe One in discussing

21 subclavian line access.  He says, quote, "Yes, but it

22 requires significant modification of the facility.  In

23 other words, the bed must have the capability of being

24 tilted with the feet up so these veins would dilate

25 sufficiently to guarantee safety.  Plus it would be

56

1  prudent to have chest tube capability available.  I have

2  rudimentary chest tube capability on this tray as I have

3  selected.  But if you said I would always do subclavian, I

4  would have chest tube available on every occasion."

5          Is it your understanding from that testimony that

TAYLOR1

6    John Doe One does not have the equipment necessary to treat

7    the complications of subclavian access in the execution?

8    A    Yes, that's right.  He's saying that -- he's correctly

9    stating that when one embarks on this procedure one needs

10   to have available certain equipment and supplies including

11   the equipment to put in a chest tube, which is a large tube

12   about the size of one's finger that goes between the ribs

13   into the space outside the lungs.

14   Q    What complication would that chest tubing be necessary

15   to treat?

16   A    It would be necessary to treat what's called a tension

17   pneumothorax which is where air is collecting outside the

18   lung and inside the chest and collapsing or compressing the

19   lung.

20   Q    John Doe One also said in what I just read that there

21   is rudimentary chest tube capability in the catheter tray

22   that he uses.  Do you know what he means by that?

23   A    There is no chest tube capability.  There is a small

24   catheter like the catheter that's used for putting in

25   peripheral IVs.  And he's quite right, that can be

                                                              57


1    introduced into the chest wall to -- as a temporary

2    measure, as an initial measure, to help reduce the

3    pneumothorax or stop it from getting worse, but that would

4    be vastly below the standard of care to rely solely upon

5    that very small catheter when in fact what is needed is a

6    much larger tube and all the equipment to insert that tube

7    and the presence of suction so that the chest can be

8    evacuated.

9    Q    In your practice, would you perform a procedure even

10   once knowing you did not have the necessary equipment to

                                Page 50

TAYLOR1

11    treat that complication?

12    A    Again, under an exigent circumstance, if somebody

13    needed a subclavian line on the roadside or whatever and

14    they are going to die if you didn't have it, then you would

15    try to put it in and hope you didn't get any of these

16    terrible complications.  But in an elective procedure where

17    it's scheduled ahead of time and one has time to obtain and

18    deploy the necessary emergency equipment, then one of

19    course needs to do that.

20    Q    Okay.  I'd like to discuss with you potassium chloride

21    and whether it hurts when injected into the vein.  Could

22    you just explain for me what makes potassium hurt in the

23    veins?

24    A    Yes.  Potassium is a salt solution that is used by

25    nerve membranes and the membranes in the heart to regulate

58

1    their electrical activity, to regulate the voltage across

2    the membrane.  And when potassium is put on a nerve ending

3    or in the heart it interferes with how the nerve maintains

4    its voltage across the membrane and it makes the nerve fire

5    signals so the nerve thinks it's being activated in the

6    same way it would be if the tissue were being cut or heated

7    or traumatized.

8    Q    And looking at John Doe One's deposition testimony, on

9    page 57 he states, in discussing potassium, "The only way

10    it hurts is by causing spasm in a vessel in your hand or in

11    your arm or in your leg."  Do you agree with the statement

12    that potassium does not hurt if the vein does not spasm?

13    A    It's not the spasm that hurts.  It's the activation of

14    the nerves in the walls of the vessel.  Anybody could

Page 51

TAYLOR1

15    potentially inject it into a vein or just in the muscle or

16    under the skin and it would be extremely painful.

17    Q    So potassium would be painful even in veins that do

18    not spasm?

19    A    It would be painful anywhere that has nerves, sensory

20    nerves.

21    Q    And looking at the directly following testimony on

22    page 58 of the John Doe deposition transcipt, he states,

23    "Plus the drug is diluted instantly.   The amount of blood

24    flowing through the interior vena cava amounts to a quart

25    every two seconds, so it's instantly dissolved."

                                                              59


1         Could potassium not hurt in a femoral vein

2    because it is diluted by blood volume?

3    A    I think he's very wrong about that.

4    Q    And why is that?

5    A    I did some thumbnail calculations and discussed it

6    with colleagues.   We estimated that -- we know that the

7    normal flow of blood in the body is about five liters every

8    minute.   And we estimated that about one liter a minute is

9    coming from the lower part of the body and flowing past

10    where the catheter tip would be in the configuration used

11    in the Missouri executions.   So you have one liter flowing

12    through that vein every minute.

13         I think he describes the delivery of the

14    potassium as occurring over about 30 seconds at one point.

15    So in 30 seconds about half a liter or 500 mls would flow

16    past the end of the catheter, and during that time they're

17    injecting potassium.   I'm not sure if they're injecting 120

18    milliequivalents or 240 milliequivalents because of the

19    confusion about the dosing, but let's take the lower dose

TAYLOR1

20    just to give him the benefit of the doubt.  If 120
21    milliequivalents of potassium is injected into half a
22    liter, that will result in a concentration of 240
23    milliequivalents per liter, plus the normal five
24    milliequivalents per liter that's in the blood already so
25    it will result in the concentration of potassium that's

                                                            60

1    20-fold higher -- is that right, I'm sorry.  No, 40-fold
2    higher than what's normally present in the blood, and more
3    than 20 fold, and that would be far higher than necessary
4    to maximally activate the nerve fibers.
5    Q    And is the concentration of potassium high enough to
6    stop the heart?
7    A    Yes.  And it stops the heart in the same way that it
8    activates nerve fibers.  It's basically activating the
9    nerve fibers -- or the fibers in the heart that are like
10   the nerve fibers that carry electrical statements to the
11   heart.  So if you are giving enough to stop the heart,
12   you're also giving enough to cause pain in the veins.  And
13   in fact we know from reports where accidentally in a
14   therapeutic setting a high concentration of potassium was
15   given to a patient, and it was a terrible mistake
16   obviously, but before stopping the heart it causes extreme
17   pain in the veins.
18   Q    John Doe One states in his deposition testimony that
19   it's not necessary to do any calculations to be sure that
20   the potassium would be sufficiently diluted so that it
21   doesn't hurt.  That's on page 61.  Do you agree with that?
22   A    You can't know it's unnecessary to do calculations
23   until you do them, so if you run through the numbers like I
                              Page 53

TAYLOR1

24    did, and again I'm making some assumptions, but I think
25    they're all reasonable ones, then you end up with a

61

1     concentration that basically almost no matter what
2     reasonable assumption one makes, it's a very high
3     concentration and it would certainly activate nerve fibers.
4     Q    I'd next like to draw your attention to the deposition
5     testimony of John Doe One on page 61.  He states, "We use
6     the femoral vein to insert a catheter that I think is about
7     16 inches long, so actually from the femoral vein if you
8     measure up to your xiphoid which would mean it's about two
9     inches from the heart, so the catheter is almost in the
10    heart when -- so the drug is directly injected below the
11    heart as it enters."
12            In your experience, do catheterization trays
13    always come with such a long catheter?
14    A    This -- the triple lumen catheter is what we're
15    talking about here are not -- did you say 18 inches long?
16    Q    16 inches.
17    A    They are not 16 inches long and they don't go anywhere
18    near the heart.
19            MS. ANDERS:  I'd like the record to reflect that
20    I'm showing opposing counsel what's been marked as
21    Plaintiff's Exhibit 28.
22    Q    (By Ms. Anders)  Do you recognize this photo,
23    Dr. Heath?
24    A    Yes.  It's the package or kit that the triple lumen
25    catheter is supplied in.  It's a sterile and sealed kit.

62

1     Q    So is this an accurate representation of the catheter
Page 54

TAYLOR1

2   tray that you observed during the tour of the execution

3   facility?

4   A    Yes, it is.

5            MS. ANDERS:  I'd like to offer Exhibit No. 28

6   into evidence, Your Honor.

7            MR. HAWKE:  No objection.

8            THE COURT:  Be received.

9   Q    (By Ms. Anders)  Could you read the length of the

10  catheter that is included in the catheter tray?

11  A    Yes.  It's in the first line here.  It says that the

12  catheter is 5 and 7/8th inches long, almost 6 inches long.

13  Q    Thank you.  And even if the catheter did go all the

14  way almost to the heart, could the potassium still hurt?

15  A    Yes.  The heart has many sensory fibers.  We all know

16  that because a heart attack is an extremely painful thing.

17  And so in stopping the heart it's also activating those

18  nerve fibers.  Also, to be pumped through the actual muscle

19  of the heart, the potassium has to travel through the right

20  side of the heart, which is the side of the heart that

21  pumps venous blood into the lungs, has to travel through

22  the right side of the heart and has to be pumped through

23  the lungs which themselves have a lot of sensory nerve

24  endings, and then flow back from the lungs after it has

25  picked up oxygen and be carried to the left side of the

63

1   heart, and from there it's pumped into the aorta and into

2   the actual muscle of the heart.

3            It's quite possible that in order to get to the

4   actual heart muscle it has to be pumped all the way through

5   the lungs regardless of where it's being introduced.  But

Page 55

TAYLOR1

6   in this setting, it's being introduced no way near the

7   heart.  It's being introduced down in the pelvis six inches

8   from the groin where the catheter is inserted.

9   Q    So more broadly, are John Doe One's statements with

10  respect to the possibility of pain arising from the

11  potassium injection, in your view, failure to acknowledge

12  the risks of the execution?

13  A    Yes.  He's not acknowledging that there are numerous

14  things that can go wrong and that those things can cause

15  problems with drug delivery and cause problems with the

16  humaneness of the procedure.

17  Q    In John Doe One's answers to the plaintiff's first

18  interrogatories, this is No. 33, John Doe One states that

19  pancuronium, quote, will mitigate likely seizure activity

20  and involuntary movements and thus result in a more

21  peaceful and humane death.  Do you agree with that

22  statement?

23  A    He's partly correct.  It will stop involuntary

24  movements.  It stops all movement, all the muscles in the

25  body except the heart and the muscles in the blood vessels.

64

1   But it will stop the movement of all the muscles in the

2   arms and the legs which are normally moving around in a

3   seizure.  But he's wrong, it won't stop the seizure.  The

4   seizure is actually a thing that happens in the brain.

5   It's abnormal electrical activity in the brain, and when we

6   see somebody jerking around in a seizure that's what we

7   call the motor manifestations, the muscle manifestations of

8   what's occurring in the brain, and pancuronium wouldn't

9   afect that.  It doesn't really enter the brain.  And so

10  while it will stop physical movement, it wouldn't stop the

Page 56

TAYLOR1

11   seizure from occurring.  It certainly wouldn't make it any
12   more humane.
13   Q     Does pancuronium have any anesthetic or sedative
14   effect?
15   A     None whatsoever.  The only effect it has is to stop
16   one's ability to move muscles that we're normally able to
17   control.  It doesn't affect our thinking or ability to feel
18   pain, our consciousness or awareness, and it doesn't affect
19   whether a seizure occurs or not.
20   Q     So have John Doe One's statements in this case given
21   you concerns about whether he's competent to ensure that
22   executions are performed humanely?
23   A     Well, given how these executions are being performed
24   in a way that requires general anesthesia to first be
25   successfully administered and monitored, no, he's not

                                                           65

1    competent to do that.
2    Q     What are you basing that on?
3    A     On the numerous factual errors, some of which you
4    raised here, but he has things just completely backwards.
5    It's like he's driving on the wrong side of the road and
6    doesn't realize it.  That's very concerning.
7    Q     Do these factual errors raise concerns in your mind
8    about John Doe One's medical judgment?
9    A     Well, first of all, you can't have good medical
10   judgment -- if your facts are wrong, then your judgment
11   can't be good.  But even if he had the right facts, some of
12   the judgment calls that he's made are very concerning.
13   Q     Do you believe that entrusting John Doe One with
14   responsibility for inducing general anesthesia, including

                        Page 57

TAYLOR1

15    the preparation of thiopental, creates a significant risk

16    that the inmate will be improperly anesthetized?

17    A    It does, yes.  He should never be entrusted with

18    general anesthesia under any circumstances unless he's

19    going to undergo a considerable amount of training.

20    Q    So is there significant risk, therefore, that inmates

21    will suffer excruciating pain?

22    A    Yes, there is.

23    Q    And do you believe that entrusting John Doe One with

24    responsibility for the femoral catheterization procedure

25    also creates a significant risk that inmates will suffer

66

1    pain from the procedure?

2    A    Yes.

3    Q    Okay.  Now I'd like to talk with you a little bit

4    about the drug delivery system that's maintained in

5    Missouri at Bonne Terre.

6              THE REPORTER:  Ms. Anders, I need to change

7    paper.

8              THE COURT:  Why don't we take a recess, about ten

9    minutes.  Give you a chance to stand and stretch a little.

10                   (Recess)

11             MS. ANDERS:  Your Honor, just very quickly I'd

12    like to ask if it's okay with the court if the expert

13    witnesses sit in on the testimony.  I think the parties

14    have agreed that would be okay, and I'm very sorry.  I

15    think we misunderstood.

16             THE COURT:  If there is an agreement there, I

17    don't have a problem.

18             MR. HAWKE:  There is.  It's no problem.

19             MR. PRITCHETT:  Just so it's clear, the agreement