THE GOVERNOR'S COMMISSION
ON ADMINISTRATION OF LETHAL INJECTION

February 19, 2007

Tampa, Florida

Reporting:

Patricia K. Gough, CVR, CP
Certified Verbatim Reporter
State of Florida
Notary Public

Roane et al. v. Gonzales et al.,
Civ. No. 05-2337 (D.D.C.)

Pls.' Opp to Mot. J. on the Pleadings
and Mot. to Lift Stays

Exhibit 10

BAY PARK REPORTING
3410 Henderson Boulevard, Suite 100
Tampa, Florida  33609
(813) 490-0003

**APPEARANCES:**

<u>**COMMISSION MEMBERS**</u>:

JOHN W. JENNINGS, CHAIR

SENATOR VICTOR CRIST

DR. DAVID VARLOTTA

HARLEY LAPPIN

HARRY SINGLETARY

DR. STEVE MORRIS

CAROLYN SNURKOWSKI

HONORABLE STAN MORRIS

DR. PETER SPRINGER

RODNEY DOSS

REPRESENTATIVE DENNIS ROSS

**ALSO PRESENT:**

MAXIMILLIAN CHANGUS, ATTORNEY

PETER CANNON, ATTORNEY

90

MEDICALLY QUALIFIED MEMBER:  Yes.

**EXAMINATION OF MEDICALLY QUALIFIED MEMBER**

BY MR. JENNINGS:

Q    This is Bill Jennings.  I'm going to ask you to speak up so that everybody can hear you, okay?

A    Yes.

Q    Can you tell us, please, what position, as opposed to your name, what position you occupied on the execution team.

A    I am a medically qualified member of the execution team.

Q    And were you involved in the placement of the IVs?

A    Yes.

Q    Did you personally observe the IVs being placed?

A    Yes.

Q    Did you, yourself, place the IVs?

A    No.

Q    In your own words, can you tell us, please, what you observed as the IVs were being placed?

A    The IVs were started approximately 30 minutes on the condemned inmate prior to being moved into the death chamber.  Both IV lines were patent.  They remained that way.

Q    Was there a problem with either site?  That is, Site A or Site B.

A    Once the IV lines were established, there were no problems.

Q    In establishing the IV lines, were there any problems in doing that?

A    Not out of the ordinary.

Q    Was the original site successful in both arms?

A    Can you repeat the question, please?

Q    Sure.  The person that was inserting the IV, were they able to do it in each arm?

A    Yes.

Q    And did they have to change location in either arm before establishing the IV?

A    Yes.  The right arm.

Q    Which arm was that?

A    Right arm.

Q    And can you give us, please, your qualifications?

A    I am a medically qualified member of the execution team.

Q    What does medically qualified mean?

A    I participated in approximately 84 executions.  I serve as a resource to five states, including the federal government.

Q    And have you had medical training?

A    Yes.

Q    And have you had training above the nurse's level?

92

I'm sorry, did you hear the question?

    A    Yes.  I already explained my qualifications.

    Q    Do you treat patients?

    A    I'll refer that question to Mr. Changus for an answer.

        MR. CHANGUS:  Again, we're dealing with the same issue that has been difficult for members of the Commission as we proceeded through these various meetings.  I think this person is evidencing some concern about identifying themselves as far as what they do and what level because it might identify themselves personally.

        Again, I think they're indicating that they've had training, medical training. And, at this point, and under the statutes, they have some right to anonymity, and that's kind of a decision of the Department.  I understand that it's frustrating to members of the Commission, but I'm not in a position to compel them to answer more than they are comfortable with.

BY MR. JENNINGS:

    Q    After the IV lines were established, what did you do next?

    A    The IV lines were started approximately 30 minutes on the condemned inmate prior to being moved to the death chamber.  Both IV lines were patent.  They remained that

93

way.  People who have infiltrated IVs will let you or someone know about the discomfort.  The inmate was not sedated.  The inmate made no vocal mention or physical movement of being uncomfortable while waiting approximately 30 minutes prior to the final sentence being carried out. The IV lines were monitored to prevent fluid overload or complications and to assure patency.  It doesn't take a rocket scientist to see a collection of fluid had it infiltrated IV site.  At no time was there evidence of IV infiltration.

Q    So, prior to the time that Mr. Diaz was moved into the death chamber, you had a constant view of the IV sites?

A    Yes.

Q    Did Mr. Diaz, during that period of time, struggle, thrash about, anything of that nature?

A    I just explained his activities during that 30-minute period.

JUDGE MORRIS:  Would you ask him to explain it again?

BY MR. JENNINGS:

Q    Please explain it again.

A    The inmate was not sedated and made no vocal mention or physical movement of being uncomfortable while awaiting approximately 30 minutes.

Q    And after Mr. Diaz was moved into the death

94

chamber, what, if anything, did you do at that time?

        A    Again, patency was assured at both IV sites as
well as the IV bags, that they were running without any
problems.

        Q    Did you follow Mr. Diaz into the death chamber?

        A    Yes.

        Q    What, if anything, did you do at that point?

        A    I wait for the direction from the warden.

        Q    Did you, at anytime, go into the chemical room,
that being the room where the chemicals are administered?

        A    Yes.

        Q    Approximately how long before the chemicals were
started did you go into that room?

        A    I was there prior to them being started.

        Q    And were you there ten minutes or more before?

        A    Yes.

        Q    Did you have a clear view of what the lead
executioner was doing during the execution process?

        A    Yes.

        Q    Did the lead executioner ever discuss with you
that there was difficulty in pushing the syringes?

        A    On at least two occasions, the executioner felt
that the quality or the effort to push the chemicals, based
on the chemicals being used, might have more resistance than
usual.  Qualified medical team members tested the patency of

95

the line several times as a second opinion.

       At no time was there ever any evidence to suggest infiltration nor a compromise of the IV line, nor did it create a compromised IV.  It was the consensus to, apparently, switch before a problem did occur.

    Q    And did the lead executioner ask you your opinion as to switching from A to B?

    A    Yes.

    Q    And did you give the lead executioner your opinion?

    A    Yes.

    Q    You said to a prior question that you had tested the patency of the IV lines when there appeared to be a problem.  Can you tell us how you actually tested it, what you physically did?

    A    A qualified member, medically qualified on the team, pushed on the syringe to test the resistance involved.

    Q    Did anyone in the chemical room ever leave to go out to test or to look at the IV site in Mr. Diaz?

    A    No.

    Q    And was it your opinion to have the lead executioner start in Site B with what was the remainder of Syringe Number 4 from Rack A?

    A    At no time was there any evidence to suggest infiltration nor a compromise of the IV line.  The execution

proceeded.

Q    I understand.  But the decision -- somebody made the decision to switch from Site A to Site B with the remaining drugs from Rack A.  What I'm asking is did you make that decision or did the executioner make that decision on their own?

A    There were several members of the team.  It was the consensus of the team to, apparently, switch rather than create a problem.

Q    I think some of the other Commission members have questions for you.

DR. SPRINGER:  Hi.  This is Dr. Springer.  Three questions.  When the IVs were initially started and you stated that they were patent, do you know approximately how much fluid was administered into the patient from the time they were taken from the initial IV placement site to the execution room?  Can you give a rough estimate?

MEDICALLY QUALIFIED MEMBER:  Less than 200 cc's.

DR. SPRINGER:  The second question I have, when the decision was made to switch from Site A to Site B, was part of that decision process -- was part of the decision because it was taking longer than expected for the process or was it just solely based on the resistance or the abnormal sensation that the

executioner had when pushing the fluids?

MEDICALLY QUALIFIED MEMBER:  All of those factors were taken into consideration for the consensus.

DR. SPRINGER:  And then, the third question I have, have you seen the results, the autopsy results, or have you heard about the results?

MEDICALLY QUALIFIED MEMBER:  I glanced at them.

DR. SPRINGER:  And given the fact that there was substantial or such large bullae described, do you feel that that's partly from the process or from the administration or do you feel -- do you feel that it's explained well?  I'm sorry, when I'm asking this question I'm trying to specifically ask you.  Do you feel that now, knowing what you do now and knowing the results of the autopsy, do you feel the resistance or the abnormal situation that you came across could account for that, could account for the bullae that were described in the autopsy?

MEDICALLY QUALIFIED MEMBER:  To answer your question, after the execution, the body is limp.  The body is transferred over to a stretcher.  The arms are limp and flop about.  The arms were crossed across the body.  This movement will easily compress the antecubital IV sites as the body is being placed in the bag.  The body diagram on the autopsy shows the arm

position as being in a crossed arm position.

Pathologists routinely have to break rigor mortis and extend the upper extremities in order to adequately examine the antecubital spaces, which, in this particular instance, where the vein and catheter sites are in question.  This is not mentioned.  Either of these actions will rather easily move the venous catheter through the vein wall into the adjacent subcu tissue.

The pathologist mentions the IV catheters are actually in the vein lumen and in the same symptoms. It says the distal end of the catheters were outside the vein lumens supports this.  After the execution, if the catheters get moved into the subcutaneous soft tissue, the chemicals in the IV lines may continue to cause tissue irritation after the inmate is expired, which was not present at the end of this particular event.

Pancuronium bromide, when it comes in contact with thiopental sodium, may create a precipitate.  This looks very similar to what white silicone gel looks like.

There was no mention made of a finding of precipitate in the subcu tissue of the antecubital fossae which would suggest direct infiltration through

99

the anterior vein.

Blood samples taken from the deceased mention levels of the metabolites of both thiopental sodium as well as pancuronium bromide.  This is direct evidence of the levels of the chemicals actually used were mainline through patent venous access prior to death actually occurring.

DR. SPRINGER:  Follow-up question.  After the execution was complete, did one of the team members or did any of the team members stop or turn off the IV fluid?  Did they lock it closed or did it remain open?

MEDICALLY QUALIFIED MEMBER:  It remained open.

DR. SPRINGER:  Thank you.  That's all I have.

THE CHAIR:  Yes, Rodney.

MR. DOSS:  This is Rodney Doss.  Thank you, Mr. Chairman.  The Commission has heard testimony from medical personnel, including doctors that have testified, that with successful IV penetration and the use of the chemicals in the Florida protocol would most surely result in death in three to five minutes.  Do you have a -- being a medically qualified person, do you have any explanation that you can offer this Commission regarding the length of time that it took for this inmate to expire?

MEDICALLY QUALIFIED MEMBER:  Yes.

MR. DOSS:  Would you please offer that
explanation?

MEDICALLY QUALIFIED MEMBER:  Everything that is
done as far, as venous access, is done to as high a
standard as possible, with proper equipment, highly
qualified medical personnel, and using sterile
technique as is humanly possible.  Always, there may
be, and has been, the possibility of a legal stay.  No
way does there need to be anything detrimental done to
the condemned inmate.  No chance of sepsis or undue
discomfort if at all possible.  In all instances where
stays have been given, there's never been an IV site
issue.

Once the inmate is placed in the death chamber,
the final response from the Governor of the state of
Florida is given, there is nothing medical about the
event.  From this point onward, it is not a medical
procedure.  There's nothing medical about it nor to
equate to it.  An execution is absolutely nothing even
remotely connected to medicine.  No medical argument or
debate is possible comparing executions with what is
done in clinical settings.

From that point onward, the condemned inmate will
not leave the chamber alive.  The event is started as
simply as possible to avoid technical problems.  It's

also done as judiciously as possible and as humanely as
can be done under the circumstances.

MR. DOSS:  I'm not sure -- I heard your
explanation and I'm not sure I understand.  I was
hoping that you might provide -- even though it's not a
medical procedure, I was hoping you would be able to
provide a more technical explanation as to why it may
have taken the chemicals as long to take effect in the
instant execution as opposed to what has been
accustomed a much shorter period of time in previous
lethal injection executions.

MEDICALLY QUALIFIED MEMBER:  I think that would be
speculation or opinion, and I think each of the
Commission needs to deal with that.

MR. DOSS:  Thank you, Mr. Chairman.

MS. SNURKOWSKI:  This is Carol Snurkowski.  I'd
like, if you could, to clarify two things.  Could you
tell me, since you -- I think you testified that you
went into the execution chamber with Mr. Diaz; is that
correct?

MEDICALLY QUALIFIED MEMBER:  Yes.

MS. SNURKOWSKI:  At anytime, could you tell
whether he was able to move his arms or was able to, in
any way, disrupt the venous or the -- I forgot now.
The IV, thank you.

MEDICALLY QUALIFIED MEMBER:  Can you repeat the question?

MS. SNURKOWSKI:  At any point when you were transporting him from the hallway into the execution chamber, was there any possibility he could have moved either or both of his arms to disrupt the IVs?

MEDICALLY QUALIFIED MEMBER:  Yes.

MS. SNURKOWSKI:  Did you see anything like that?

MEDICALLY QUALIFIED MEMBER:  From where I stood, I did not observe that.

MS. SNURKOWSKI:  Okay.  And secondly, you indicated that you were continually -- or somebody was continually monitoring the IV site.  Is that a correct statement?

MEDICALLY QUALIFIED MEMBER:  Yes.

MS. SNURKOWSKI:  When would have been the last time a medically trained person would have personally visually observed those sites?

MEDICALLY QUALIFIED MEMBER:  They are constantly monitored throughout the entire process.

MS. SNURKOWSKI:  Well, to the point where you could touch it, you could actually reinsert the needle if you had to.  When would have been the last time?  Was it in the execution chamber when all the people left?  Would that have been the last time it was

observed?

MEDICALLY QUALIFIED MEMBER:  The last time was when someone was in the chamber, which was right before the curtains were opened.

MS. SNURKOWSKI:  Okay.  And that would have been just prior to the execution commencing or before -- how soon before the execution would have started?

MEDICALLY QUALIFIED MEMBER:  Minutes.

MS. SNURKOWSKI:  Minutes?  It would have been before the inmate had made his final statement?

MEDICALLY QUALIFIED MEMBER:  Yes.

MS. SNURKOWSKI:  Okay.  And, at that time, were you in a position, when he was making his final statement, to observe him?

MEDICALLY QUALIFIED MEMBER:  Yes.

MS. SNURKOWSKI:  And at that time, besides making his final statement, did you see any activity or any attempt to move or, in any way, would have been able to dislodge the IVs?

MEDICALLY QUALIFIED MEMBER:  We did notice some movement.  We did not see any grimacing.  There was nothing audible to suggest pain.

MS. SNURKOWSKI:  Could you explain why -- I think we had a report that indicated that after there seemed to be a compromise with Line B there was a -- you all

went back to Line A.  Do you remember having any
discussions with regard to that?

MEDICALLY QUALIFIED MEMBER:  There never was a
compromise with the IV line.

MS. SNURKOWSKI:  I'm sorry, I couldn't understand
what you said, sir.

MEDICALLY QUALIFIED MEMBER:  Can you repeat your
question?

MS. SNURKOWSKI:  At anytime during -- in the
reports, with regard to what transpired during Mr.
Diaz's execution, there was a point in time where the
lines were transferred from Rack A to Rack B to
continue because there was a disruption in the
syringes, okay, from Rack A.  But I think during the
point in time, everything went back to Rack A again.
Apparently, there was some difficulty in pushing in
Line B and it was reverted back to Line A.  Do you
recall anything like that?

MEDICALLY QUALIFIED MEMBER:  Line A was used.
There was a question concerning the effort to push.  It
was tested and observed.  Consensus opinion was to
change to Line B.  This was done.  The sequence of the
chemicals remained the same.

MS. SNURKOWSKI:  So, you don't recall ever having
any discussions about bringing it back to Line A, the

rest of the drugs in Rack B being transferred to Line A.

MEDICALLY QUALIFIED MEMBER:  I'm sorry, but just listening to you describe that is very confusing.  I don't know exactly what you're trying to ask.

THE CHAIR:  Let me see if I can -- this is Bill Jennings.  After the pushing problem with Line A occurs, the fourth syringe from Rack A is then begun in Line B and the rest of Rack A is then finished in Line B; is that correct?

MEDICALLY QUALIFIED MEMBER:  Yes.

THE CHAIR:  At some point, in the fourth or fifth syringe, Rack B is commenced in Line A; is that correct?

MEDICALLY QUALIFIED MEMBER:  Your chemicals in the top rack were given in the sequence when the inmate's heart rate had not diminished, they were begun from the second rack of chemicals.

THE CHAIR:  Okay.  So, was Rack B given to the -- in which site was Rack B given?

MEDICALLY QUALIFIED MEMBER:  Some was given in each line.

THE CHAIR:  Can you tell us, from your advantage point, which chemicals from Rack B were given into which line?  And could you go through the order for us?

MEDICALLY QUALIFIED MEMBER:  The syringes in the top rack were given partially in Line A and partially in Line B.  The first half of the chemicals in the second rack were given in Line B.  The potassium from the end of the second rack was given in Line A.

THE CHAIR:  Can you tell me which syringe -- when Line A was again used, which syringe was the first one to be used at that point in Line A?

MEDICALLY QUALIFIED MEMBER:  Could you repeat your question?

THE CHAIR:  Sure.

MEDICALLY QUALIFIED MEMBER:  It's confusing.

THE CHAIR:  Let me first ask this.  Did the backup executioner push any of the chemicals during this execution?

MEDICALLY QUALIFIED MEMBER:  Yes.

THE CHAIR:  Did the backup executioner push chemicals from Rack B?

MEDICALLY QUALIFIED MEMBER:  Yes.

THE CHAIR:  In which line, A or B, did the second executioner push the chemicals?

MEDICALLY QUALIFIED MEMBER:  Line A.

THE CHAIR:  And which syringe did the second executioner commence with from Rack B?

MEDICALLY QUALIFIED MEMBER:  Number 8.

THE CHAIR:  Number 8.  After the second executioner finished with Syringe Number 8 from Rack B, what did that executioner next push, if anything?

MEDICALLY QUALIFIED MEMBER:  Syringe Number 7.

THE CHAIR:  And after Syringe Number 7, what, if any, syringe from Rack B did the backup executioner push?

MEDICALLY QUALIFIED MEMBER:  Either the first executioner or the second executioner pushed one of the number 3 or the number 4 syringes.  There was one syringe left over that was not given.

THE CHAIR:  Okay.

JUDGE MORRIS:  This is Stan Morris.  Do you happen to have a copy of the task force report regarding the execution of Angel Diaz done by the Department available to you?

MEDICALLY QUALIFIED MEMBER:  Yes.

JUDGE MORRIS:  If you go to page 5 of that, it lists -- the questions have been coming from the recitation of the order of the administration of chemicals that's contained on that page.

MEDICALLY QUALIFIED MEMBER:  Yes.

JUDGE MORRIS:  It seems, to me, that the key part is during the administration, with guidance from the assisting execution team members, the secondary

executioner started with a saline flush from Line B to
Line A, and then administered syringes of potassium
chloride from Line B into Line A.  So, the pancuronium
bromide from Line B was not used?  Or from Rack B.

MEDICALLY QUALIFIED MEMBER:  That's correct.
There was an initial flush given and the sequence is
outlined on page 5 of the report.

JUDGE MORRIS:  When you were explaining to us that
once that inmate is in the chambers and once this
proceeding starts, he's not going to come out alive and
that it's not a medical procedure.  Is that, basically,
what this was about, that this was the way to conclude
this procedure by going directly to the third -- after
the saline flush, directly to the third drug?

MEDICALLY QUALIFIED MEMBER:  That would be an
opinion.

JUDGE MORRIS:  Well, I assume there was some
discussion about it as you've related and decisions
made, and you offered an explanation of how this is not
a medical procedure.  I'm simply asking was that part
of the reason that that choice was made as opposed to
administering the drugs in the order that they would,
otherwise, be administered in.

MEDICALLY QUALIFIED MEMBER:  You would want to use
a flush to separate the chemicals.

JUDGE MORRIS:  Right.  And they did.  They used saline.  But then they went directly to the third chemical.

MEDICALLY QUALIFIED MEMBER:  Yes.

JUDGE MORRIS:  And was there any discussion or reason for that given?

MEDICALLY QUALIFIED MEMBER:  That was the consensus.

JUDGE MORRIS:  And that would be the lethal drug.

MEDICALLY QUALIFIED MEMBER:  Yes.

JUDGE MORRIS:  Thank you.

DR. VARLOTTA:  I have a question.  It's Dr. David Varlotta.  Are you aware of the pharmacokinetics of these three drugs when they're given to an individual?

MEDICALLY QUALIFIED MEMBER:  Yes.

DR. VARLOTTA:  Do you understand the effects and the purposes that the three drugs have in this scenario?

MEDICALLY QUALIFIED MEMBER:  Yes.

DR. VARLOTTA:  Are you aware of any information or any information as to whether what happens to these drugs if they're not injected directly into the vascular system?

MEDICALLY QUALIFIED MEMBER:  I can barely hear you.  Can you speak up, please?

DR. VARLOTTA:  Do you have any knowledge or understanding of how these drugs might work differently if they're not injected directly into the vascular system?

MEDICALLY QUALIFIED MEMBER:  Yes.

DR. VARLOTTA:  Can you account for how the the drugs might act differently if they're not injected into the vascular system?

MEDICALLY QUALIFIED MEMBER:  I think the only thing I could offer at this time would be an opinion.

DR. VARLOTTA:  I didn't hear what he said.

JUDGE MORRIS:  The only thing he could offer at this time would be an opinion.

DR. VARLOTTA:  That's all I have.  Thank you.

THE CHAIR:  Anybody else have a question?  On behalf of the Commission, I want to thank you for calling in.  We appreciate the information.  Thank you.

MEDICALLY QUALIFIED MEMBER:  Thank you.

MR. CHANGUS:  Just for the record, while they were testifying.  Just so you know, that was Dr. Sorensen trying to call in.  I wasn't communicating with the witness while this was going on.  So, I just wanted to make that clear.  And I will try to alert Dr. Sorensen now that you guys are ready for her.  Hello, Dr. Sorensen?

DR. SORENSEN:  Yes.  This is me.  I'm here also with my acting general counsel, Tom Cunz (phonetic).

MR. CHANGUS:  Dr. Sorensen, this is Max.  I'm going to turn it over to Bill Jennings, who is the chair of this Commission.

DR. SORENSEN:  All right.

### EXAMINATION OF BONITA SORENSEN

**BY MR. JENNINGS:**

Q    Good afternoon, Doctor.

A    Good afternoon.

Q    Could you state your full name for the record, please.

A    Bonita Jean Sorensen.

Q    And how are you employed?

A    I'm an employee of the Florida Department of Health.

Q    And did you have an occasion to be involved in an investigating team that was assembled by the Department of Corrections that looked into the Diaz execution?

A    Yes, I did participate.

Q    And as part of that, as part of your duties, did you travel to Florida State Prison?

A    Yes, I did.

Q    Can you tell the Commission members, please, when you began your investigation and what you discovered.