TAYLOR1


IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


MICHAEL TAYLOR,                    )
                                   )
              Plaintiff,           )
                                   )    Case No.
         vs.                       )    05-4173-CV-S-FJG
                                   )
LARRY CRAWFORD, et al.,            )
                                   )    JUNE 12, 2006
              Defendant.           )    MORNING SESSION

VOLUME I
PAGES 1 - 136


TRANSCRIPT OF BENCH TRIAL PROCEEDINGS


BEFORE THE HONORABLE FERNANDO J. GAITAN, JR.
U.S. DISTRICT JUDGE


For the Plaintiff:      MS. GINGER D. ANDERS
                        MR. ERIC BERGER
                        MR. MATTHEW S. HELLMAN
                        Jenner & Block, LLP
                        601 13th Street NW
                        Washington DC 20005
                             and
                        MR. JOHN WILLIAM SIMON
                        2683 South Big Bend Blvd.
                        St. Louis, MO 63143-2100

For the Defendants:     MR. MICHAEL PRITCHETT
                        MR. STEVEN HAWKE
                        Missouri Attorney General's Office
                        P.O. Box 899
                        Jefferson City, MO 65102


Donna M. Turner  RMR
U.S. Court Reporter, Room 7552
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, MO 64106  (816) 512-5641

Roane et al. v. Gonzales et al.,
Civ. No. 05-2337 (D.D.C.)

Pls.' Opp to Mot. J. on the Pleadings
and Mot. to Lift Stays

Exhibit 12

I N D E X

Page 1

TAYLOR1

JUNE 12, 2006

DR. MARK HEATH
Direct Examination by Ms. Anders                    9
Cross-examination by Mr. Hawke                     86
Redirect Examination by Ms. Anders                134

DR. STEPHEN JOHNSON
Direct Examination by Mr. Hellman                 137
Cross-examination by Mr. Hawke                    169
Redirect Examination by Mr. Hellman               185

DR. THOMAS HENTHORN
Direct Examination by Mr. Berger                  188
Cross-examination by Mr. Pritchett                232
Redirect Examination by Mr. Berger                253
Recross-examination by Mr. Pritchett              260


JUNE 13, 2006                                     262


DR. MARK DERSHWITZ
Direct Examination by Mr. Pritchett               262
Cross-examination by Ms. Anders                   301
Redirect Examination by Mr. Pritchett             332
Recross-examination by Mr. Anders                 338

TERRY MOORE
Direct Examination by Mr. Pritchett               340
Cross-examination by Mr. Berger                   348

LARRY CRAWFORD
Direct Examination by Mr. Pritchett               363
Cross-examination by Mr. Hellman                  374
Redirect Examination by Mr. Pritchett             393

EXHIBIT  INDEX

| PLAINTIFF'S | DESCRIPTION | RECEIVED |
|---|---|---|
| 1 - 23 | Discovery materials | 86 |
| 24 | Dr. Heath's CV | 10 |
| 26 | Print-out of package insert | 32 |
| 28 | Photo of triple lumen kit | 62 |
| 29 | Still picture of execution chamber | 74 |
| 30 | Still picture of execution chamber | 86 |
| 31 | Dr. Johnson's CV | 140 |
| 32 | Diagram of venous system | 144 |

TAYLOR1

| 33 | Demonstrative IV tubing & syringe kit | 166 |
| 34 | Dr. Henthorn's CV | 188 |
| 35 & 36 | Diagrams of circulatory system | 192 |
| 39 | Figure 1 prepared by Dr. Henthorn | 201 |
| 40 | Figure 2 prepared by Dr. Henthorn | 206 |
| 41 | Affidavit of Dr. Dershitz | 209 |
| 42 | Figure 3 prepared by Dr. Henthorn | 210 |
| 43 | Figure 4 prepared by Dr. Henthorn | 214 |
| 44 | Letter from State | 219 |
| 45 | Figure 5 prepared by Dr. Henthorn | 220 |
| 46 | Figure 6 prepared by Dr. Henthorn | 222 |
| 47 | Videotape of execution chamber | 75 |

DEFT'S

| 2 | Excerpt of Dr. Dershwitz' paper re BIS | 277 |

* * * * * * *

2

1              MONDAY, JUNE 12, 2006
2          THE COURT:  Good morning.  All right.  Ready to
3   begin?
4          MR. HELLMAN:  Yes, Your Honor.
5          THE COURT:  How about some introductions first.
6          MR. HELLMAN:  Absolutely.  I am Matthew Hellman
7   for plaintiff Taylor.
8          MR. SIMON:  John William Simon for plaintiff.
9          MR. ZAMAN:  Shahid Zaman for plaintiff.
10          MR. BERGER:  Eric Berger for plaintiff.
11          THE COURT:  Ms. Anders I know.  All right.
12   Let's begin.
13          As I previously indicated, no opening statements
14   would be necessary.  Your pretrial briefs were very
                        Page 3

TAYLOR1

11          MS. ANDERS:  Thank you, Your Honor.

12          MR. PRITCHETT:  May I ask if there is a set of

13    the exhibits that are marked so it will be easier for us to

14    follow?

15          MS. ANDERS:  Yes, we have a set that we're going

16    to have admitted as exhibits.

17          MR. PRITCHETT:  As we go along?  Okay.

18          MS. ANDERS:  And, Your Honor, would you like to

19    place the unredacted version of the John Doe One transcript

20    in your binder?

21          THE COURT:  That's fine.  I was part of the

22    deposition so I really don't require one I don't think.

23    At this time anyway.  And I think we have a copy, not the

24    redacted copy, but --

25          MS. ANDERS:  And the last thing we would like to

                                                              9


1    admit is the transcript of the Crawford deposition.

2          MR. PRITCHETT:  Although the witness is here to

3    testify, we'll consent to the deposition itself.

4          MS. ANDERS:  At this point, Your Honor, plaintiff

5    would like to call Dr. Mark Heath to the stand.

6    MARK HEATH, called as a witness on behalf of the

7    Plaintiff, being first duly sworn, testified:

8    DIRECT EXAMINATION BY MS. ANDERS:

9    Q    Dr. Heath, would you state your name, and spell it for

10   the record, please.

11   A    My name is Mark Heath.  The first name is M-a-r-k.

12   And the last name is H-e-a-t-h.

13   Q    And what is your occupation?

14   A    I'm an anesthesiologist.

                          Page 9

TAYLOR1

15   Q    Where do you practice?

16   A    In New York City at Columbia University.

17   Q    How long have you worked as anesthesiologist?

18   A    Since I finished my training.  For about 15 years.

19   Q    Are you board-certified?

20   A    I am, yes.

21   Q    And do you induce general anesthesia as part of your

22   practice in the operating room at Columbia?

23   A    Yes, routinely.

24        MS. ANDERS:  At this point I'd like to offer

25   Dr. Heath's CV.  For the record, I'm showing it to defense

10

1    counsel.  This has been previously marked as Plaintiff's

2    Exhibit No. 24.

3         May I approach the witness, Your Honor?

4         THE COURT:  You may.  It will be received,

5    assuming there's no objection.

6         MR. HAWKE:  No objection.

7    Q    (By Ms. Anders)  Is that your CV, Dr. Heath?

8    A    Yes, it is.

9    Q    Does it accurately reflect your training and

10   qualifications?

11   A    It does.

12   Q    Have you previously participated in cases involving

13   lethal injection?

14   A    I have, yes.

15   Q    About how many have you participated in?

16   A    About 30 cases.

17   Q    And as part of your -- in connection with your

18   participation in these cases, what research have you done?

19   A    I have reviewed the protocols and procedures from

Page 10

TAYLOR1

20    every state that conducts lethal injection and the federal

21    government.  I have attended hearings where participants in

22    lethal injection procedures have testified.  I have read

23    depositions that they have provided.  I have reviewed

24    hundreds of autopsy reports from lethal injection

25    procedures.  Many toxicology reports.  I have inspected the

                                                                    11

1    facilities that -- the chambers, the work rooms where

2    lethal injection is conducted from.  I have corresponded

3    with the individuals who initially created the first lethal

4    injection protocols.

5    Q    And so as part of that research, you have reviewed in

6    detail other states' lethal injection protocol?

7    A    I have, yes.

8    Q    And are you familiar basically with other states'

9    practices with respect to safety?

10   A    I am, yes.

11          MS. ANDERS:  Your Honor, we'd like to offer

12   Dr. Heath as an expert in anesthesiology and medicine and

13   lethal injection procedures.

14          MR. HAWKE:  No objection, Your Honor.

15   Q    (By Ms. Anders)  When did you begin participating in

16   lethal injection litigation?

17   A    I think it was in 2002.

18   Q    At that time did you have a position on the death

19   penalty?

20   A    I did not at that time, no.

21   Q    Do you have a position on the death penalty now?

22   A    I do, yes.

23   Q    And what is that?

TAYLOR1

24    A    I think it's very problematic to try to arrive at the

25    decision as to whether or not to execute a person based on

12

1    an adversarial process.

2    Q    Do you think that lethal injection can be performed

3    humanely?

4    A    Yes, it can.

5    Q    Could you explain your view on that?

6    A    Well, many household pets, cats and dogs, are given

7    lethal injection as part of what we call euthanasia or

8    putting an animal to sleep and that's done by qualified

9    veterinarians using appropriate drugs.  It's done routinely

10   thousands of times a day in our country.  And I am very

11   confident that the fashion in which it's being performed is

12   a humane process.

13   Q    Why did you agree to testify in this case?

14   A    One of the big problems is that the methods that are

15   being used for lethal injection in Missouri and some other

16   states conflicts with how it's being done for animals, with

17   the humane method that is being used for animals, is being

18   done in a completely different method that poses enormous

19   and unacceptable risks.

20   Q    And have you reviewed the documents produced in

21   discovery by the defendants in this case?

22   A    I have, yes.

23   Q    Specifically, have you reviewed interrogatory

24   responses by the John Doe defendants and defendant

25   Crawford?

13

1    A    I have, yes.

Page 12

TAYLOR1

2   Q    Have you reviewed the deposition testimony of John Doe
3   One?
4   A    Yes.
5   Q    And did you attend an inspection of the execution
6   facility at Bonne Terre, Missouri?
7   A    I did.
8   Q    At the inspection did you have the opportunity to
9   observe the equipment as it was set up -- as it would be
10  set up for an execution, and did you also have the
11  opportunity to speak to people there about the equipment?
12  A    Yes, I did.
13  Q    I'm going to be asking you questions about some of the
14  documents produced by the defendants so I'd just like to
15  hand you a couple of the exhibits that have already been
16  admitted.
17          This is a verified record that I'm showing
18  opposing counsel of John Doe One's answers to
19  interrogatories, all three sets, that's Plaintiff's
20  Exhibit 1, 6, and 11, as well as the redacted transcript
21  of the John Doe deposition.
22          May I approach, Your Honor.
23          THE COURT:  Okay.  Ms. Anders, when you turn your
24  back to the microphone I couldn't hear a word that you
25  said.  Which exhibits are you offering?

                                                                14

1           MS. ANDERS:  I would like to hand the witness
2   Plaintiff's Exhibits 1, 6, 11 and 12.
3           THE COURT:  Okay.  You may approach the witness.
4           MS. ANDERS:  Thank you.
5   Q    (By Ms. Anders)  So, Dr. Heath, based on your review
                            Page 13

TAYLOR1

6    of Director Crawford's interrogatory answers, could you
7    briefly state your general understanding of the components
8    of the execution process in Missouri?
9    A    Yes.    There are four main stages to it.    The first
10   stage is the achieving of the intravenous access.    The
11   second stage is the administration of general anesthesia,
12   and that's important because the third and fourth stages
13   would be extremely painful if that second stage, the
14   general anesthesia stage, was not properly performed.    And
15   then the third stage is the administration of a paralyzing
16   drug that ensures that the procedure appears serene and
17   peaceful.    And then the fourth stage is the administration
18   of the actual drug that kills the prisoner, stops the
19   heart.
20   Q    And based on your review of the documents, is the
21   manner of performing each of these component parts written
22   down or formalized anywhere?
23   A    It's -- no, it's not written down in any documents or
24   procedures or policy manuals, if that's what you mean.
25   Q    Based on what John Doe One has testified to, have

15

1    these components varied in previous executions?
2    A    Yes, there has been variation of each of these four
3    stages or components of the execution.
4    Q    Could you just explain briefly how the stages have
5    varied?
6    A    Well, that first stage, which is the achieving of the
7    intravenous access, in some occasions it's performed with a
8    femoral vein access.    In some occasions it's performed in
9    what I believe is a subclavian access, under the collarbone
10   that's also been described as being in the neck.    And then

TAYLOR1

11    there's also been at least one occasion where it was
12    performed through what's called a peripheral IV, which is
13    an IV in the hand or arm or the foot.  So that's variations
14    in that first stage.
15              Then in the second stage, which is the provision
16    of the general anesthesia to reach the level of
17    unconsciousness, there has been significant variations
18    apparently in the doses of the thiopental, the drug that
19    provides the anesthesia.  The third stage is the delivery
20    of the paralyzing drug, and there appear to have been
21    dosing variations in that drug.  And the same applies for
22    the fourth stage, the potassium that stops the heart, there
23    have been variations for how much of that has been
24    administered.
25    Q    And based on your review of other states' practices

                                                            16

1    with respect to executions, is it standard in other states
2    to provide written guidelines or instructions to be
3    followed by the execution team?
4    A    I wouldn't even call them guidelines.  States have
5    what are called protocols.  It's a set of instructions that
6    detail the drugs, the doses, the flush solutions, and a
7    myriad of other features of the execution procedure.  It's
8    a complicated procedure, and those protocols set it forth
9    in very clear sequential instructions exactly what the
10    personnel need to do.  And that's a standard in other
11    states.
12    Q    And based on your review of other states' procedures,
13    do you think that maintaining a written protocol is a
14    positive step towards ensuring that an execution is humane?
                            Page 15

TAYLOR1

15  A    I think it is extremely important.  It's important
16  to remember that in most cases the personnel who are
17  performing the execution, to our knowledge, are not
18  individuals who are familiar with the provision of general
19  anesthesia or even the injection of medical drugs or
20  setting up IVs, so it's very important that they are given
21  very clear and clean, understandable instruction that they
22  can follow to ensure that the procedure unfolds as it's
23  supposed to.
24  Q    And to your knowledge, does any other state besides
25  Missouri not maintain a written protocol?

17

1   A    Everywhere else, to my knowledge, has a written
2   protocol.
3   Q    Why do you think it is important to have a written
4   protocol?
5   A    Again, if there's no written protocol, then the
6   interests of the State or the Department of Corrections,
7   which are to ensure that the prisoner dies humanely, and
8   the interest of the prisoner, which at the very least is to
9   ensure that what happens to him is humane, are not defended
10  against ad hoc changes or vagaries or misunderstandings or
11  absent-mindedness or other problems that can occur when a
12  complex endeavor is undertaken by a group of people.
13          Protocols are also important because it's very
14  important to rehearse these procedures, and the only way
15  you can rehearse something is if you have the steps written
16  down.  Just like rehearsing a play, you need to have a
17  script to rehearse off of.  And if you don't have the
18  written procedures there's no way of reliably making sure
19  all of these are followed in the rehearsals as well as when

TAYLOR1

20    you actually perform it.

21    Q    And based on your review of the evidence in this case,

22    do you have an opinion as to who determines what happens in

23    the execution?

24    A    In Missouri?

25    Q    Yes.

                                                              18


1    A    John Doe One is the person who appears to be

2    functionally in charge of everything that happens, of

3    designing it and of how things are carried out.

4    Q    And John Doe One is the doctor who participates in the

5    execution in Missouri?

6    A    That's right, yes.

7    Q    And what is your understanding as to which parts of

8    the execution procedure John Doe One has control over?

9    A    My understanding is that he was involved at the very

10   beginning of Missouri's modern execution history.  He even

11   talks about being involved in the cyanide decision, using

12   cyanide, and then when they decided not to use a machine

13   that they had been using, he was called in to take over the

14   whole process.

15            As he says, there's nobody else involved in the

16   process who has a medical background.  And there are no

17   other states where physicians are taking the role that he's

18   taking so there is nobody else for him to talk to other

19   than him, as he describes it.

20            So what the drugs are, the actions of the drugs,

21   how the IV tubing is configured, how the IV access is

22   achieved, how many syringes there are, how much fluid is in

23   each syringe, how much drug is in each syringe, exactly

                        Page 17

TAYLOR1

24  what the execution injectors do, I think he's basically set
25  up everything about this in terms of the nonsecurity

19

1   issues.
2   Q     And to your knowledge, is there any other state in
3   which sole discretion of the medical aspects of the
4   procedure is seated in a single person without any guiding
5   protocol?
6   A     The way it bureaucratically appears to work in most
7   states is the commissioner of corrections or some
8   administrative type person is ultimately responsible for
9   everything that happens in the prison including everything
10  that happens in the executions, but from a functional point
11  of view, there's always a group of individuals who actually
12  are in charge of the mechanics of the lethal injection
13  procedure itself.  So this is a unique situation where
14  there is one individual and everything appears to have been
15  vested in him.  Everybody, including the administrators, do
16  what he says.  And often he doesn't even tell them what
17  he's going to do or what changes he's made.  And that's, to
18  my knowledge, unique.
19  Q     So just to clarify, the discretion about the medical
20  aspects of the procedures is vested in John Doe One, to
21  your understanding?
22  A     Yes.  That's how he describes it.
23  Q     And have you reviewed John Doe One's answers to
24  interrogatories and his deposition testimony?
25  A     I have, yes.

20

1   Q     And based on your medical knowledge and experience,
                         Page 18

TAYLOR1

2    have you reached any conclusions with respect to John Doe

3    One's medical judgment and his competence with respect to

4    certain issues?

5    A    With respect to --

6    Q    Certain issues.  Have you reached any conclusions?

7    A    Well, certainly with respect to issues about the

8    induction and maintenance of general anesthesia, he's made

9    numerous important factual statements that are completely

10   wrong and make it clear that he's not a person who's

11   trained or credentialed or proficient in administering or

12   understanding general anesthesia and the drugs that we use.

13          He also has described a difficulty with numbers,

14   which is very problematic for a person who is going to be

15   supervising or drawing up drugs and the various

16   quantitative aspects of that.  And in the addition to

17   flat-out factual errors, important factual errors, I also

18   have concerns about judgments that he's made, medical

19   judgments.

20   Q    What do you base your opinion on?

21   A    On reading his depositions, or testimony and

22   interrogatories.

23   Q    Okay.  So first, I'd like to talk with you about John

24   Doe One's determination and his recordkeeping with respect

25   to the doses of thiopental given at an execution.  Have you

                                                              21


1    reviewed John Doe One's testimony with respect to his

2    determination of how much thiopental to give at the most

3    recent executions?

4    A    Yes, I have.

5    Q    The previous five executions.  And based on Doe One's

TAYLOR1

6   deposition testimony, can you tell me how much thiopental
7   Doe One prepared in each of the last five executions?
8   A    I can give you my -- a guess, but it's very unclear
9   exactly what happened because he's -- he has a poor memory
10  about what has transpired and has had to correct himself on
11  several occasions going back and forth about what was
12  given.  And also he has, as he says, a numerical dyslexia,
13  so it's difficult for him to be certain about numbers.
14          As best as I can tell, somewhere between --
15  somewhere five grams or below may have been given.  In many
16  it's possible that it was two and a half grams, but it's
17  very difficult to see what happened.
18          MS. ANDERS:  Your Honor, may the record reflect
19  that I am showing defense counsel what has been marked as
20  Plaintiff's Exhibit 25.
21          THE COURT:  The record will reflect that.
22          MS. ANDERS:  Thank you.  And may I approach the
23  witness, Your Honor?
24          THE COURT:  You may.  And you don't need to ask
25  each time.  Just go do what you need to do.

                                                              22


1   Q    (By Ms. Anders)  Have you seen this before?
2   A    Yes, I have.
3   Q    Is that the chemical log in which the -- how each drug
4   is used is recorded?
5   A    Yes, it is.
6   Q    Okay.  I'd like to draw your attention to a portion of
7   the testimony of John Doe One, just looking at page 14,
8   I'll read it to you so you don't need to follow along if
9   you don't want to.  He states, "I was unable to mix this.
10  We show that we gave the five grams because we have no

Page 20

TAYLOR1

11    provision for showing that we disposed of three and gave
12    two, or disposed of two and gave three, because this has
13    not been set up that way.  We either show we used it all or
14    disposed of it all."
15        Based on that testimony, what is your conclusion
16    with respect to the accuracy of the chemical log that I
17    just handed you?
18    A    Well, the chemical log has a column for the amount
19    that's injected, and the physician's testimony says that of
20    the amount they drew up, of the amount that was available,
21    some was given, some was not given, but there is no record
22    of exactly how much was -- falls into each category.  So
23    there is a log here that says numbers, but according to the
24    physician's testimony, they may or may not be accurate.
25    Q    And is it possible the tell from the chemical log how

                                                            23


1    many thiopental bottles were checked out?
2    A    Yes, it is.
3    Q    And looking at the chemical log, has that number
4    varied over the past five executions?
5    A    Well, in some cases it says that ten bottles were
6    checked out.  In some cases -- one case it says ten bottles
7    were checked out, but then that number is changed to an
8    eight.  In other cases -- in another case it says six.  In
9    another case it says five.  So there's variation of
10    probably between five and ten bottles.
11    Q    And based on that fact and the doctor's testimony, do
12    you think that both the intended dose and the actual dose
13    of thiopental have varied in the past several executions?
14    A    Well, clearly the intended dose has, in all

TAYLOR1

15  likelihood, varied.  If they checked out ten bottles on

16  some occasions and five bottles in other occasions, that

17  appears to be an intent to give different amounts.

18          As far as the actual amount that's delivered, we

19  have no way of knowing how much active thiopental drug was

20  actually delivered into the prisoner's circulation.

21  Q    And based on your review of the discovery responses,

22  who oversees the process of recording the drugs that are

23  given in the chemical log?

24  A    The physician.

25  Q    John Doe One?

                                                              24


1   A    John Doe One.

2   Q    And to your knowledge, is the actual dose given at the

3   execution recorded anywhere?

4   A    No, it's not.

5   Q    In your practice inducing general anesthesia, do you

6   record the dose of anesthetic that you give?

7   A    Yes.  It's very important to record the precise amount

8   of drugs that are administered.

9   Q    So that's standard practice to record doses?

10  A    Yes.   That's essential standard practice.

11  Q    And do you train residents?

12  A    I do, yes.

13  Q    Do you teach residents about the importance of

14  recording actual doses given?

15  A    It's one of the first things they learn how to do is

16  to complete an accurate chart or record of what was done

17  during a procedure.

18  Q    If a resident consistently fails to record doses, what

19  would be the consequences?

                              Page 22

TAYLOR1

20    A    If they consistently failed, after being admonished

21    and told they needed to do this properly, they wouldn't be

22    allowed to continue through the residency.

23    Q    Does John Doe One's apparent unconcern with recording

24    precise actual doses raise concerns in your mind?

25    A    Yes.  It's very sloppy and it reflects a lack of

                                                                    25


1    understanding of the importance of the quanity of drugs

2    that are being given.

3    Q    In an execution setting, does the actual dose of

4    thiopental that was given matter?

5    A    It matters enormously.  As I described before, in the

6    four phases of the execution or the lethal injection

7    procedure, that second phase is the only phase that

8    provides anesthesia.  So if the amount of thiopental given

9    is inadequate, then the anesthesia will be inadequate and

10    the procedure will be agonizing.

11    Q    Based on your review of materials produced in

12    discovery, is it possible to conclude that an inmate was

13    sufficiently anesthetized in any particular execution?

14    A    No.  Based on the material that's been provided, one

15    can't conclude either way whether these prisoners were or

16    were not properly anesthetized.

17    Q    And is part of that because you don't how much

18    thiopental was actually given?

19    A    Part of that is because we don't know how much

20    thiopental was successfully delivered into their

21    circulation and it's partly because the paralyzing drug is

22    given, so regardless of whether or not the execution in

23    fact is humane, it will appear to be peaceful and tranquil.

                          Page 23

TAYLOR1

24    Q    Thank you.

25         Now I'd like to ask you a few questions about

26

1    John Doe One's -- your opinions as to Joe Doe One's

2    training with respect to general anesthesia.  Do you have a

3    conclusion as to whether Joe Doe One is qualified to

4    oversee the induction of general anesthesia?

5    A    No, he's not.  If he were applying for a job as an

6    anesthesiologist in any hospital in this country, there is

7    no possibility that he would be hired as such.  He's not

8    qualified to do this in any manner.

9    Q    So just to clarify, you do have a conclusion?

10   A    Sorry.  I do have a conclusion, yes, and that is it.

11   Q    I'm sorry.  Would you restate?

12   A    My conclusion is that he is not in any way qualified

13   to perform or supervise the administration and the

14   induction, the maintenance of general anesthesia.

15   Q    Does he have any training in general anesthesia?

16   A    Apparently not.

17   Q    Why is it necessary to have training in general

18   anesthesia in order to determine doses of anesthetic and

19   induce general anesthesia?

20   A    Anesthesiology is a very complex task.  It takes four

21   years of medical school and then four years of

22   post-graduate training to have acquired the knowledge base

23   and skill set and judgment to carry it out in a safe and an

24   effective way.

25   Q    And based on your review of John Doe One's testimony,

27

1    did he make any statements that raise concerns in your mind

Page 24

TAYLOR1

2  regarding his understanding of general anesthesia in

3  general and thiopental specifically?

4  A    Yes, he made numerous such statements and makes it

5  clear that he has not undergone that training.  He doesn't

6  understand what this drug is and how it works.

7  Q    I'd like to draw your attention to a statement that

8  John Doe One made in his deposition.  This is page 27 of

9  the transcript, and I am reading now.  He responds to a

10  question about thiopental, he says, quote, "The problem

11  with all these drugs is if you give the dose and you do not

12  get the effect you need, you cannot simply add more drug to

13  get the dose.  You must repeat the entire dose."  Do you

14  agree with that statement?

15  A    That's completely false.  It flies in the face of our

16  practice, what anesthesiologists do.

17  Q    Why is that?

18  A    When we give a dose of drug, we're anticipating a

19  certain effect, but we're aware of variability between

20  individuals and how they respond to drugs so if we don't

21  achieve that effect, we gauge by how much we missed that

22  intended or desired effect and we do sort of an on-the-fly

23  calculation that's part art and part science as to how much

24  additional drug would be required to remedy the situation,

25  and that amount of additional drug might be less than what

                                                          28


1  we gave before or it might be more than what we gave before

2  or it could, by coincidence, be the same amount.  But his

3  assertion that you have to go ahead and give the same

4  amount again is ridiculous.

5  Q    So do you consider this a significant factual error?

                          Page 25

TAYLOR1

6   A    Yes.  It's consistent with him not understanding what
7   anesthesiologists do, which isn't surprising.  He hasn't
8   been trained as an anesthesiologist.
9   Q    I'd like to draw your attention to another statement
10  from the deposition transcript.  Page 26, line 17.  And
11  again in discussing thiopental the doctor said, and I
12  quote, "The drug was chosen because it doesn't cause
13  cardiac vascular depression so it means you can give a lot
14  of it and your heart will still beat fine."  First, could
15  you define cardiac vascular depression for us?
16  A    What he is talking about is some drugs can cause
17  effects on the ability of the heart muscle to contract or
18  squeeze and that means that the heartbeat or the pulse is
19  weaker.  The heart can't eject as much blood with each
20  heartbeat.  We also talk about vascular depressants, the
21  drugs that lower blood pressure.  Blood vessels have
22  muscles that can constrict to tighten up or narrow the
23  blood vessels and raise the blood pressure, and some drugs,
24  some anesthetic drugs, as a side effect cause those muscles
25  to relax and then that lowers the blood pressure.  So a

29

1   drug that causes cardiac vascular depression is one that
2   depresses the pumping function of the heart and also the
3   blood pressure.
4   Q    And do you agree with John Doe One's statement that
5   thiopental does not cause cardiac vassular depression?
6   A    He's got it 100 percent backwards.  Thiopental is
7   notorious for causing cardiac vascular depression,
8   especially in patients who have had trauma.  John Doe One
9   talks about anesthetizing people in trauma situations,
10  which is a scary proposition if he thinks that thiopental

Page 26

TAYLOR1

11    does not cause cardiac vascular depression.  There were

12    many, many military deaths that occurred back in World

13    War II and the Korean War when thiopental was given to

14    trauma victims before people understood this effect.

15    Q    So would you expect that an anesthesiologist would

16    make this type of factual mistake?

17    A    No, it's not conceivable.

18    Q    Okay.  I'd like to draw your attention to another

19    statement from the deposition transcript.  This is on page

20    95, line 4.  Again in response to a question about

21    thiopental, John Doe One stated, I quote, "You want a rapid

22    onset of the drug, and these drugs are rapid onset drugs.

23    If you give them slowly they just don't work."  Do you

24    agree with the statement that it's necessary to inject

25    thiopental very quickly?

                                                              30

 1    A    That statement is false.

 2    Q    And why is that?

 3    A    I just know factually I have injected -- used

 4    thiopental many, many times to induce general anesthesia.

 5    I do not inject it as quickly as I can.  I inject it at a

 6    measured rate and it, nevertheless, achieves the desired

 7    effect, the effect that I'm looking for.

 8         He also talks about the drug being metabolized

 9    while it's traveling up the arm, and that's just not true.

10    That's not how thiopental works.

11    Q    Do you consider this a significant error?

12    A    Yes.  It just shows that he doesn't know what he's

13    talking about when it comes to the use of thiopental.

14    Q    And again, would you expect anesthesiologists to make

                              Page 27

TAYLOR1

15   this type of factual error?

16   A    No.

17   Q    Is it necessary to understand the pharmacology of

18   thiopental when determining the dose of thiopental to be

19   used for induction of general anesthesia?

20   A    Yes, it is.

21   Q    And why is that?

22   A    Thiopental is a complicated drug and a lot of its

23   actions are counter-intuitive.  It's a drug that we

24   consider to have -- it's a high-risk or low safety margin

25   drug, and it's important to understand how it works, how it

                                                              31

1    travels around the body, where it exerts its effects, and

2    understand how different individuals -- how their responses

3    can vary.

4    Q    And does John Doe One have any training in the

5    pharmacology of thiopental?

6    A    No.

7    Q    Based on his testimony and what we have spoken about

8    so far, do you think that he understands the pharmacology

9    of thiopental?

10   A    No, it's clear that he doesn't.

11        MS. ANDERS:  May the record reflect that I am

12   showing opposing counsel what has been marked as

13   Plaintiff's Exhibit 26.

14        MR. HAWKE:  We have not been provided a copy of

15   that.

16        MS. ANDERS:  I'm sorry.

17   Q    (By Ms. Anders)  Have you seen this before, what I

18   just gave you?

19   A    I have, yes.

                    Page 28

TAYLOR1

20    Q    And what is it?

21    A    This is a printout of what's called a package insert.

22    A lot of times when drugs come, they come in a box and

23    there's a folded-up piece of paper inserted in that box

24    that has a lot of technical information about the compound.

25    Q    And would you and other anesthesiologists generally

32

1    rely on this when preparing and administering thiopental?

2    A    Yes.  It's always available so if you have a question,

3    if you want to know something about a certain situation,

4    then it's available in the kit.  Like an instruction

5    manual.

6        MS. ANDERS:  I'd like to offer Plaintiff's

7    Exhibit 26 into evidence.

8        MR. HAWKE:  No objection, Your Honor.

9        THE COURT:  It will be received.

10    Q    (By Ms. Anders)  If you'd look at page two for me,

11    Dr. Heath, under the heading Warnings, could you read the

12    sentence that starts with the words "This drug"?

13    A    It says, "This drug should be administered only by

14    persons qualified in the use of intravenous anesthetic."

15    Q    In your opinion, is John Doe One qualified in the use

16    of intravenous anesthetics?

17    A    No, he's not.

18    Q    Are your concerns about John Doe One's understanding

19    of intravenous anesthetics limited to thiopental?

20    A    No.  There are other intravenous anesthetics that he

21    clearly doesn't understand what they are or what they do.

22    Q    Is Versed a commonly-used intravenous anesthetic?

23    A    Yes.  Versed is one of the most commonly used

Page 29

TAYLOR1

24    anesthetic drugs in procedures.

25    Q    In John Doe One's interrogatory answers he states

33

1    that midazolam is the antidote to Versed, and that's the

2    answer to Interrogatory No. 37.  Do you agree with that

3    statement?

4    A    I'm sorry.  He says midazolam is the antidote --

5    Q    To Versed.

6    A    To Versed.  No, that's completely incorrect.  He has

7    it 100 percent backwards.

8    Q    And why is that?

9    A    There is an antidote to Versed, but it's not

10    midazolam.  Midazolam in fact is Versed, and it has

11    sedative properties.  The antidote to Versed is something

12    that would wake you up, make you more awake if you've been

13    given Versed, so he's got it completely backwards.

14    Q    Is that a factual error that you would expect

15    anesthesiologists to make?

16    A    No.  No anesthesiologist would make that error.

17    Q    Does John Doe One's incorrect understanding of Versed

18    raise doubts in your mind as to his understanding of

19    intervenous anesthetics?

20    A    Yes.  If he's confusing midazolam and Versed and the

21    antidotes, he doesn't know what he's talking about.

22    Q    I'd like to draw your attention to another portion of

23    the testimony of John Doe One's deposition.  This is line

24    26 -- I'm sorry, page 26, and John Doe One states that he

25    is dyslexic.  Does the doctor's dyslexia also raise

34

1    concerns in your mind regarding his ability to adequately

TAYLOR1

2    determine doses of general anesthesia and to proceed with

3    induction of general anesthesia?

4    A    Yes.  He described difficulty completing a cable bill

5    I think because he was transposing numbers and even though

6    he had a couple of hours to work on it things weren't

7    working properly for him in terms of getting the numbers

8    right.  And some people have that problem and those people

9    are unsuitable for anesthesiology or other medical

10   specialties that require a lot of calculations on the fly.

11   Q    Would that affect his ability to be a surgeon

12   necessarily?

13   A    No, he could well be very gifted with his hands and

14   with anatomy.  That's a completely different kind of

15   activity than having to make precise and rapid calculations

16   about drug doses.

17   Q    So in sum, do you think that John Doe One, based on

18   his training and testimony, is competent to determine doses

19   of and induce general anesthesia?

20   A    No.  He should not be entrusted with the provision,

21   the induction, the administration, or the maintenance of

22   general anesthesia.

23   Q    Do you think that entrusting John Doe One with those

24   responsibilities creates a significant risk that an inmate

25   will be inadequately anesthetized and, therefore, may

                                                            35


1    suffer severe pain during an execution?

2    A    Yes, it does.  Any time you entrust a complicated

3    activity like that to somebody who isn't qualified or

4    competent to do it, then that risk develops.

5    Q    Now I'd like to ask you a few questions about John Doe

                          Page 31

TAYLOR1

6   One's stated inability to mix five grams of thiopental, so

7   I'd like to direct your attention to John Doe One's answer

8   to the court's interrogatories, this is No. 5, where John

9   Doe One states that he was unable to administer the planned

10  five-gram dose of thiopental because of, quote, difficulty

11  dissolving powder in the solution that he was using.

12       In your experience, is the powder in the

13  thiopental bottle soluable in solution?

14  A    Yes, it is.  One of those properties of that powder

15  preparation is that we're able to dissolve it in solution.

16  Q    And what does that mean?

17  A    Like when you put sugar in iced tea, you take a

18  spoonful of the sugar and you put it in the tea and you mix

19  it around and that solid material, those crystals,

20  disappear and they are now in solution in the iced tea.

21       It's the same with the thiopental powder.  The

22  powder is added into an aqueous or a water solution and one

23  mixes it until it disappears.

24  Q    What are the reasons that the powder in the thiopental

25  bottle might not dissolve easily?

36

1   A    Well, one of the properties of thiopental is it does

2   dissolve quickly, just like the sugar that goes in the iced

3   tea.  If you put a spoonful of what you think is sugar in

4   the iced tea and you mix it and there's still, no matter

5   how much you mix it, grains of stuff left over, then there

6   may be sand or something else in that sugar.  It's not all

7   sugar.

8        The same with thiopental.  One of its properties

9   is that you can put it in water and it will dissolve.  So

10  if it doesn't dissolve, then you have to worry that maybe

TAYLOR1

11    the preparation is not pure thiopental, that it's degraded;

12    or if there's been a manufacturing error, an error in the

13    shipping or the handling of the thiopental or its storage;

14    or that the solution that you're putting it into isn't the

15    solution that you think it is.  It isn't the right mixing

16    solution, something is wrong; or you have done a

17    calculation error.  You're trying to put in a different

18    amount than you think you are.  Something is wrong with

19    that picture.  I don't know which of those things it is.

20    Q    So you mentioned that the thiopental might be

21    defective or might not have all the properties of

22    thiopental.  If that were the case, would the powder's

23    anesthetic properties also be affected?

24    A    Yes.  If it's not a thiopental, then that's not an

25    anesthetic anymore to provide anesthesia.

                                                              37


1    Q    And if it was defective, it couldn't be dissolved, it

2    could also not have the expected anesthetic properties?

3    A    Right.  If it can't be dissolved, then it's lacking

4    the properties of thiopental and it may not properly

5    induce or provide anesthesia.

6    Q    If that were to occur, if thiopental were to be

7    defective and the prisoner ended up inadequately

8    anesthetized, wouldn't that be obvious during the

9    execution?

10   A    Are you saying that if the thiopental wasn't working

11   properly, it wasn't thiopental, and the execution proceeded

12   using that bad compound, are you saying would that be

13   obvious to the witnesses?

14   Q    Yes.  I'm asking if you think that would be observable

                              Page 33

TAYLOR1

15    or obvious.

16    A    No, I think things would look very similar.    The

17    first -- the drug would go in, the thiopental, but it

18    wouldn't be thiopental so the prisoner, nothing would

19    happen to him.    And then the second drug would go in, which

20    is the pancuronium, which in this dose would cause a rapid

21    onset of paralysis so the prisoner would very rapidly

22    develop a relaxed look on his face and his eyes would

23    calmly close and he would look like he was peacefully

24    asleep when in fact he would be wide awake and unable to

25    draw a breath and was suffocating.    And when the potassium

38

1    was administered, normally that would make him scream and

2    struggle, but he would be unable to do that because the

3    pancuronium would still be paralyzing him.    So it would

4    look pretty much the same I think.

5    Q    I'd like to draw your attention to another statement

6    from John Doe One's deposition.    This is on page 45.    In

7    response to the question, "Did you ever consider the

8    possibility that the thiopental might be defective," he

9    answered, quote, "No.    It's a compound.    It's like salt or

10    sugar.    It's a chemical.    There is nothing -- it

11    deteriorates after it's been mixed, but there is nothing in

12    pentothal that can out-date as long as it's in powder."

13            So do you agree with the statement that because

14    pentothal is stable in powder form it couldn't possibly be

15    defective?

16    A    That statement is incorrect.    There can be problems

17    with the manufacture of thiopental so that it doesn't

18    dissolve properly, so that it's not working properly.    And

19    so he's just wrong there.

                              Page 34

TAYLOR1

20    Q     To your knowledge, does the manufacturer of pentothal
21    recognize that batches of thiopental could be defective?
22    A     The package insert discusses what to do when the
23    thiopental doesn't properly go into solution and it
24    says one should not use that solution.  It should be
25    discarded.

39

1     Q     And looking at another statement in John Doe One's
2     deposition transcript, page 44, he states about the
3     thiopental, "Some medications have an inert compound in or
4     a secondary compound to prevent improper dose."  First, is
5     there an inert compound in thiopental that limits its
6     solubility in water?
7     A     Thiopental is mixed with a powder which is sort of
8     inert in the sense it doesn't cause anesthesia or any
9     medical effects.  It's mixed with a salt powder called
10    sodium carbonate, but that does not hinder its solubility
11    in any way.
12    Q     On what are you basing this opinion?
13    A     On the package insert.  And I also, when I saw John
14    Doe discussing especially the amount of changes he made in
15    the thiopental mix, I telephoned the company that
16    manufactures it to find out if in fact any such changes had
17    been made that I wasn't aware of and I talked with a
18    specialist at the manufacturing company who informed me
19    there had not been any such changes or additives.
20    Q     You mentioned speaking with the manufacturer.  When
21    you have a question about a drug, is it normal practice to
22    call up the manufacturer and speak with a specialist?
23    A     Sure.  They put the number on the package insert just

Page 35

TAYLOR1

24    like an instruction manual for a computer or something.

25    You can call them up and get answers to your questions.

40

1    Q    And would you rely on those answers?

2    A    Yes.

3    Q    Do you think there should be any difference in the

4    solubility effect of the thiopental between the five-gram

5    vial and 500-milligram vial simply because of the different

6    amounts provided in the vials?

7    A    No.  The manufacturer should be making the exact same

8    powder and the package insert applies for all the different

9    sizes of vials, so the preparation should be identical

10    regardless of how much is put in the bottle by the company.

11    Q    And what is your conclusion with respect to John Doe

12    One's theory as to why the thiopental was not soluable?

13    A    It doesn't make any sense.

14    Q    Have you reached any conclusions with respect to Doe

15    One's decision, during the first execution in which he

16    encountered the problem, to go ahead with the execution

17    using the lower dose?

18    A    That wasn't the right decision to make.

19    Q    And why do you think that?

20    A    Well, the concern is if the compound isn't behaving as

21    it's supposed to, there may be some problem with the

22    compound.  If anything, one would want to increase the dose

23    to ensure that one was getting the right amount in.  So

24    reducing it is trying to make a correction, but it's in the

25    wrong direction.

41

1    Q    Have you reached any conclusions with respect to John

Page 36

TAYLOR1

2    Doe One's failure to investigate the potential problem with

3    thiopental after the first execution in which this

4    occurred?

5    A    Yes.  It's very troubling.

6    Q    And do you have any conclusion with respect to John

7    Doe One's exercise of medical judgment in not simply

8    preparing additional syringes of thiopental?

9    A    That doesn't make any sense.  He ought to have not

10    used the preparation at all.  That's what he should have

11    done.  That's what the manufacturer says.  But given that

12    he decided to go ahead, which was the wrong decision, he

13    should have made up a lot more of it, not less of it.

14    Q    And looking at his deposition testimony again, on page

15    29, he stated, quote, "I go to the execution chamber and

16    we're on a time frame.  I have minutes to get the drugs

17    ready, minutes to ensure a perfect IV.  There is no time to

18    call the drug company at midnight, the Director, or nursing

19    staff, to change.  I am required to deal with what I'm

20    given and make it come out right and make it happen I guess

21    is the best way to say it."

22            In your experience, does time pressure exacerbate

23    the risks of improperly mixing thiopental, or any other

24    drug?

25    A    Yes.  When one is trying to undertake a complex

42

1    endeavor, if there's a lot of time pressure, then one is

2    much more likely to make errors.

3    Q    Does time pressure also exacerbate the difficulty of

4    calculating and keeping track of how much thiopental has

5    already been mixed?

Page 37

TAYLOR1

 6    A    Yes, especially if I'm dyslexic.

 7    Q    In your practice, would you accept time constraints

 8    that you felt were overly restrictive in preparing a dose

 9    of anesthesia?

10    A    Under exigent circumstances, if there is an emergency

11    and somebody needs general anesthesia immediately, then

12    everything would be very rushed and we would be working

13    under time pressure and we'd have to accept that because

14    the risks of delay would outweigh the benefits.

15    Q    And in a nonemergency situation, would you accept time

16    constraints?

17    A    No.  In a nonemergency situation we arrive in time in

18    the morning to set things up and have things in an orderly

19    fashion to check and doublecheck everything to make sure

20    that we have our ducks in a row and that we have done

21    things properly.

22    Q    From a medical perspective, is an execution an exigent

23    circumstance.

24    A    No.  My understanding is there is a many-hour window

25    in which it can legally occur, a many-day window.  But

                                                              43


 1    certainly I don't think it has to occur at a certain

 2    precise time.  And even if it did, the physician could show

 3    up an hour or two hours earlier, whatever it took, to allow

 4    his team to set things up in a more orderly and considered

 5    fashion.

 6    Q    And given John Doe One's difficulties in mixing the

 7    thiopental, do you have concerns about whether the

 8    thiopental prepared was effective?

 9    A    Yeah, I don't know whether the -- it was effective or

10    not.

                        Page 38

TAYLOR1

11    Q     Is it possible to be certain that inmates given

12    insoluable thiopental were properly anesthetized during

13    their executions?

14    A     Not from the information we have available.   Some

15    states perform toxicology.   They measure the blood levels

16    of thiopental after an execution.   And that might have

17    provided information in these executions, but I don't

18    believe Missouri did that.

19    Q     And do you believe that John Doe One's use of

20    insoluable thiopental created considerable risk of pain in

21    these executions?

22    A     If the thiopental didn't work properly, if he wasn't

23    given the amount of actual thiopentothal that he was

24    intending to, then the prisoner's execution would have been

25    excruciating.

44

1    Q     I'd like to move on to another topic now.   Have you

2    reviewed John Doe One's statement regarding the risks and

3    benefits of gaining venous access through the femoral vein?

4    A     Yes, I have.

5    Q     What are your conclusions with regard to those

6    statements?

7    A     He's again made factual statements that are not

8    correct and then he's made errors of judgment.

9    Q     Assuming that John Doe One testified that it's

10    impossible to pierce the femoral artery, do you agree with

11    that statement?

12    A     No, that's completely false, and I know that because I

13    have accidentally pierced the femoral artery while

14    attempting to place a femoral venous access.

Page 39

TAYLOR1

15    Q    And mechanically how does one pierce the femoral
16    artery; how does that occur?
17    A    Well, we don't know by looking at the outside of a
18    person's body exactly where the femoral vein is.  We use
19    landmarks and our anatomical knowledge and feeling the
20    pulse of the femoral artery, which is close to the femoral
21    vein, to make our best guess as to where the femoral vein
22    is.  But there is variation between individuals and it's
23    always a mixture of art and science to try and understand
24    where the vein is.
25              So we go in with a needle, a hollow needle, and

45

1     we're aspirating with a syringe, drawing back and probing
2     until we get a return of blood.  And more often than not
3     that initial blood is venous blood, and we can tell that
4     because it's a dark blue or purple color, but sometimes the
5     first blood that comes back is bright red, it's arterial
6     blood, and that means to get that we have had to have
7     punctured the femoral artery.
8     Q    Is it possible to pierce the artery with a .22 gauge
9     needle?
10    A    Absolutely.  You can pierce it with any needle.
11    Q    And does the Seldinger method of catheterization used
12    by John Doe One require the use of a needle?
13    A    Yes.  The Seldinger technique means that one pushes a
14    needle into the blood vessel and then passes a wire through
15    that needle and then uses that wire to insert the catheter.
16    So one has to pierce blood vessels in order to perform the
17    Seldinger technique.
18    Q    So you disagree with John Doe One's statement that
19    piercing the artery is impossible using the Seldinger
              Page 40

TAYLOR1

20    method?

21    A    It's just completely wrong.  It's a well-recognized

22    complication that the femoral artery can be punctured or

23    pierced or lacerated during femoral venous access.

24    Q    Would you say that arterial puncture is a particularly

25    rare complication?

46

1    A    No.  I think it happens frequently.

2    Q    What are the potential complications of an arterial

3    puncture?

4    A    Depends on how big the hole is and for how long it

5    goes untreated.  If the hole is large and nothing is done

6    about it, then one can lose a tremendous amount of blood

7    out of that hole.

8    Q    Okay.  So I'd like to show you a photo -- some photos

9    that's contained in what's already been marked and admitted

10   as Plaintiff's Exhibit 18.  This is from the materials

11   produced from the Johnston execution.  Have you seen this

12   photo before?

13   A    I have, yes.

14   Q    And have you reached any conclusions with respect to

15   it?

16   A    This photo appears to show a triple lumen catheter

17   placed in the groin.  It's probably in the femoral vein,

18   although I can't be certain where the tip of the catheter

19   is because I can't see that.

20   Q    And I'd like to give you a hard copy of this so you

21   can mark where you see.

22   A    Okay.

23            THE COURT:  He can mark at his location.

Page 41

TAYLOR1

24              THE COURTROOM DEPUTY:  Use your finger, and if
25      you want to clear it, just press this (indicating.)

                                                                    47


1       Q    (By Ms. Anders)  So using that, could you mark for us
2       where you see the hematoma in this photograph?
3       A    So -- can you hear me like that?
4               So hematoma is a mass of blood, a collection of
5       blood that occurs inside the body where blood has leaked
6       out of a blood vessel.  And what you see here is the
7       catheter going into the groin and there's a ridge at the
8       end of the catheter, a raised ridge, that's got a blue
9       discoloration, and that's a hematoma.
10              And then it's important to understand that in the
11      thigh it can hold a lot of blood.  Several -- it can hold a
12      liter of blood, which is the size of a liter bottle of
13      soda, can be concealed in the thigh.  So when one is
14      looking at the hematoma in the groin or the thigh, it's
15      important to understand it may be the tip of the iceberg or
16      you may be seeing all of it.
17              But what it looks to me is like the swelling is
18      extended into the deeper tissue into a larger area causing
19      this bulge under here in the side of the thigh.  And there
20      is also an area of blue discoloration in this zone here.
21      So it looks like there's -- beneath this here is a larger
22      area of blood collection and that this blue raised area is
23      the superficial manifestation of that.
24      Q    Okay.  I'd like the record to reflect that Dr. Heath
25      has marked an oval-shaped portion around the catheter

                                                                    48


1       entrance that's shown on the photo.
                        Page 42

TAYLOR1

2          Is the fact that a hematoma occurred here

3    indicative of medical negligence or error?

4    A    Not at all.  Hematoma is a recognized complication of

5    femoral venous access because as I said you can't know

6    exactly where the artery and vein are.  And it's happened

7    to me.  A hematoma can occur in the best of hands, and does

8    occur in the best of hands.  It happens to everybody, to

9    all patients.  Excuse me, it happens to many patients.  It

10   happens to all physicians who perform these things

11   frequently.

12   Q    I'd just like to refer you to another part of John Doe

13   One's deposition testimony.  When asked about the hematoma

14   in the photo he stated, quote, "What they are seeing is the

15   site where I injected my local anesthesia.  It causes a

16   little blue mark."  Page 102.

17          In your experience in inserting a femoral line

18   for the induction of anesthesia, local anesthesia, has it

19   ever caused a blue mark?

20   A    No, local anesthesia is a clear solution and it can't

21   cause blue discoloration.  I suppose when injecting the

22   local anesthesia he could have ruptured a blood vessel and

23   caused a hematoma, but either way, whatever it was that

24   caused this, this is blue and it's from blood collecting

25   there.  It's not from local anesthetic.  That's just not

49

1    possible.

2    Q    Have you ever heard of a blue mark from local

3    anesthesia occurring, in your discussions with colleagues?

4    A    No, unless they injected -- they caused a hematoma in

5    the act of injecting it.  But the local anesthetic itself

Page 43

TAYLOR1

6    doesn't cause a blue discoloration.

7    Q    So does Doe One's explanation change your conclusion

8    that there is a hematoma here?

9    A    No.  The photograph shows a hematoma.

10   Q    Now I'd like to show you another photograph.  This is

11   contained in Plaintiff's Exhibit 21, which has been marked

12   and admitted.  This is from the Smith execution.

13             THE COURT:  What exhibit?  You say this is a

14   different exhibit?

15             MS. ANDERS:  Yes.  This is from the Smith

16   execution contained in Plaintiff's Exhibit 21.

17   Q    (By Ms. Anders)  So this is from another execution,

18   the Smith execution.  Do you see a blue mark on this photo?

19   A    No, I don't.

20   Q    And looking at this photo, is there any indication

21   that any complication arose during this femoral procedure?

22   A    No, there isn't.

23   Q    But there is such evidence in the photo from the

24   Johnston execution that we just saw?

25   A    Yes.  The photographs are very different.  It clearly

                                                              50


1    shows a hematoma is present.

2    Q    Does it raise concerns in your mind that John Doe One

3    isn't admitting that the hematoma exists?

4    A    Yes.  It's right there in the photograph.  It's a

5    recognized complication that can occur.  I don't understand

6    why he doesn't see it there.

7    Q    Could hematoma such as the one that occurred during

8    the Johnston execution be painful?

9    A    Yes.

10   Q    How does a hematoma cause pain?
                         Page 44

TAYLOR1

11    A    Well, when the hematoma forms in the groin it distends
12    and stretches and distorts the tissue and the groin is an
13    area that has a lot of nerve or sensory nerve innervation,
14    it's a sensitive area, so when that tissue is distorted and
15    stretched that causes pain.
16    Q    Can you tell definitively whether the hematoma in the
17    Johnston photo was painful?
18    A    The only way you know for sure is to ask him whether
19    it hurt.  I don't know for sure.  It looks painful.
20    Q    How would someone behave if they were in pain?
21    A    A restrained -- a nonrestrained person would wriggle
22    around.  Probably put their hand on the area that was
23    hurting.  He would probably try adjusting his position,
24    flex his thigh, his groin, trying to find a comfortable
25    position, those kind of movements.

51

1         He's restrained so I'm not sure how much movement
2    you'd be able to see.
3    Q    And what else could you rely on in ascertaining
4    whether Johnston felt pain from the hematoma?
5    A    You can't rely for sure on anything without asking
6    him, but you can see how other people described his
7    behavior.
8    Q    So would you rely on an observer's account in
9    determining whether or ascertaining whether someone might
10    have been in pain from the hematoma?
11    A    Yes.  I think that's one of the reasons the state
12    wants witnesses to be there to be able to report whether or
13    not pain occurred, whether or not it was humane.
14    Q    I'd like to quote to you a newspaper article about the

Page 45

TAYLOR1

15    Johnston execution.

16         MR. HAWKE:  Objection, Your Honor.  This has not

17    been part of discovery and appears to be hearsay.

18         MS. ANDERS:  We're not admitting it in evidence.

19    It's just something that he's relied on in testifying,

20    whether it's consistent with --

21         THE COURT:  I'm going to sustain the objection.

22    Q    (By Ms. Anders)  So do you agree with John Doe One's

23    statement that there are no risks to the inmate from

24    femoral catheterization?

25    A    That statement is false.

52

1     Q    And do you think that John Doe One fails to

2     acknowledge some of the common complications of femoral

3     catheterization?

4     A    Yes, he does.

5     Q    In your opinion, is it dangerous for a physician to

6     perform a procedure and not to acknowledge the risks that

7     could flow from the procedure?

8     A    Yes.  Before we're allowed to do them on our own

9     without supervision we have to be able to recite what the

10    complications are, what the risks are that can occur.

11         MS. ANDERS:  I'd like to ask the witness about

12    something right now that was redacted from the Doe One

13    transcript.

14         (Counsel approached the bench and conferred

15    off the record.)

16         MS. ANDERS:  I'm just going to ask a question or

17    two about something that's been redacted from the John Doe

18    One transcript.

19    Q    (By Ms. Anders)  Dr. Heath, in performing a femoral

Page 46

TAYLOR1

20    catheterization, is it important for the doctor doing it to
21    be proficient in the procedure?
22    A    Yes, it is.
23    Q    Why is that?
24    A    Any femoral line is a complex procedure and it's being
25    done in a critical area of the body where there are large

53

1    blood vessels and a large nerve and if one is not
2    proficient in this, then severe complications are more
3    likely to ensue.
4    Q    John Doe One stated in interrogatory responses that he
5    has not regularly inserted femoral lines in the past few
6    years.  He testified in his deposition that he is not in
7    active practice.  Do those facts raise concerns in your
8    mind about John Doe One's proficiency in performing femoral
9    catheterizations?
10    A    Yes.  Part of what proficiency is, one element is a
11    thing we call currency.  It's like pilots flying planes.
12    One has to be doing it with a certain frequency to be
13    considered suitable to continue doing it.  And if he hasn't
14    been performing this for a number of years, then he lacks
15    the currency that would be necessary.
16    Q    Is it your practice when performing femoral
17    catheterization to sedate a patient before inserting the
18    femoral line?
19    A    Yes.  Some of my patients are already under general
20    anesthesia when I'm placing a central line or femoral line,
21    but if somebody were not under general anesthesia, then I
22    would start a peripheral IV to give them analgesics or
23    painkillers and sedation.

Page 47

TAYLOR1

24    Q    Why would you do that?

25    A    Because it's a very nasty procedure to endure without

54

1    any sedation or pain killer.

2    Q    And to your knowledge, does John Doe One sedate

3    prisoners before performing femoral catheterization?

4    A    He does not, no.

5    Q    In your testimony are you distinguishing between the

6    local anesthetic and intravenous sedation?

7    A    Right.  Intravenous sedation obviously goes everywhere

8    in the body including the brain and intravenous analgesics

9    or painkillers also travel throughout the body, and so

10   that's different from local anesthesia which is just given

11   directly in the groin area and does not affect one's

12   ability to experience pain or level of consciousness.

13   Q    So do you believe that the failure to sedate an inmate

14   before performing catheterization is indicative of

15   questionable medical judgment on the part of John Doe One?

16   A    Yes.  It's standard, whenever possible when one can

17   obtain a peripheral IV, which is the case in almost all

18   patients, that one first puts in a peripheral IV and uses

19   that to give sedation and analgesia and then you put in the

20   femoral venous line.

21   Q    I'd like to draw your attention to some more of the

22   deposition transcript.  On page 104 John Doe One states he

23   was unable to place a femoral line and therefore placed a

24   subclavian line.  Are there different risks inherent in

25   placing a subclavian line?

55

1    A    There certainly are, yes.

Page 48

TAYLOR1

2    Q    And could you describe them?

3    A    Well, the subclavian line goes in right by the

4    collarbone.  It's close to the heart and close to the

5    lungs.  And it's a very well-recognized complication that

6    the needle can open up the -- can damage the lung and cause

7    air to enter the spaces that surround the lung and cause a

8    compression of the lung which is a thing we call

9    pneumothorax or tension pneumothorax, and that's an

10   emergency situation that's extremely agonizing.  One is

11   basically suffocating to death and it needs emergency

12   intervention.

13            Another problem that can occur when using a

14   Seldinger technique, the subclavian technique, is that the

15   wire tends to enter the heart and can cause arrhythmia, can

16   cause the heart to beat improperly, or even stop the heart,

17   and obviously that's another emergency situation that needs

18   to be corrected immediately.

19   Q    I'd like to draw your attention to a statement from

20   the deposition transcript of John Doe One in discussing

21   subclavian line access.  He says, quote, "Yes, but it

22   requires significant modification of the facility.  In

23   other words, the bed must have the capability of being

24   tilted with the feet up so these veins would dilate

25   sufficiently to guarantee safety.  Plus it would be

56

1    prudent to have chest tube capability available.  I have

2    rudimentary chest tube capability on this tray as I have

3    selected.  But if you said I would always do subclavian, I

4    would have chest tube available on every occasion."

5            Is it your understanding from that testimony that

Page 49

TAYLOR1

6    John Doe One does not have the equipment necessary to treat

7    the complications of subclavian access in the execution?

8    A    Yes, that's right.  He's saying that -- he's correctly

9    stating that when one embarks on this procedure one needs

10   to have available certain equipment and supplies including

11   the equipment to put in a chest tube, which is a large tube

12   about the size of one's finger that goes between the ribs

13   into the space outside the lungs.

14   Q    What complication would that chest tubing be necessary

15   to treat?

16   A    It would be necessary to treat what's called a tension

17   pneumothorax which is where air is collecting outside the

18   lung and inside the chest and collapsing or compressing the

19   lung.

20   Q    John Doe One also said in what I just read that there

21   is rudimentary chest tube capability in the catheter tray

22   that he uses.  Do you know what he means by that?

23   A    There is no chest tube capability.  There is a small

24   catheter like the catheter that's used for putting in

25   peripheral IVs.  And he's quite right, that can be

57

1    introduced into the chest wall to -- as a temporary

2    measure, as an initial measure, to help reduce the

3    pneumothorax or stop it from getting worse, but that would

4    be vastly below the standard of care to rely solely upon

5    that very small catheter when in fact what is needed is a

6    much larger tube and all the equipment to insert that tube

7    and the presence of suction so that the chest can be

8    evacuated.

9    Q    In your practice, would you perform a procedure even

10   once knowing you did not have the necessary equipment to

Page 50

TAYLOR1

11    treat that complication?

12    A    Again, under an exigent circumstance, if somebody

13    needed a subclavian line on the roadside or whatever and

14    they are going to die if you didn't have it, then you would

15    try to put it in and hope you didn't get any of these

16    terrible complications.  But in an elective procedure where

17    it's scheduled ahead of time and one has time to obtain and

18    deploy the necessary emergency equipment, then one of

19    course needs to do that.

20    Q    Okay.  I'd like to discuss with you potassium chloride

21    and whether it hurts when injected into the vein.  Could

22    you just explain for me what makes potassium hurt in the

23    veins?

24    A    Yes.  Potassium is a salt solution that is used by

25    nerve membranes and the membranes in the heart to regulate

58

1    their electrical activity, to regulate the voltage across

2    the membrane.  And when potassium is put on a nerve ending

3    or in the heart it interferes with how the nerve maintains

4    its voltage across the membrane and it makes the nerve fire

5    signals so the nerve thinks it's being activated in the

6    same way it would be if the tissue were being cut or heated

7    or traumatized.

8    Q    And looking at John Doe One's deposition testimony, on

9    page 57 he states, in discussing potassium, "The only way

10   it hurts is by causing spasm in a vessel in your hand or in

11   your arm or in your leg."  Do you agree with the statement

12   that potassium does not hurt if the vein does not spasm?

13   A    It's not the spasm that hurts.  It's the activation of

14   the nerves in the walls of the vessel.  Anybody could

Page 51

TAYLOR1

15    potentially inject it into a vein or just in the muscle or

16    under the skin and it would be extremely painful.

17    Q    So potassium would be painful even in veins that do

18    not spasm?

19    A    It would be painful anywhere that has nerves, sensory

20    nerves.

21    Q    And looking at the directly following testimony on

22    page 58 of the John Doe deposition transcipt, he states,

23    "Plus the drug is diluted instantly.  The amount of blood

24    flowing through the interior vena cava amounts to a quart

25    every two seconds, so it's instantly dissolved."

59

1            Could potassium not hurt in a femoral vein

2    because it is diluted by blood volume?

3    A    I think he's very wrong about that.

4    Q    And why is that?

5    A    I did some thumbnail calculations and discussed it

6    with colleagues.  We estimated that -- we know that the

7    normal flow of blood in the body is about five liters every

8    minute.  And we estimated that about one liter a minute is

9    coming from the lower part of the body and flowing past

10    where the catheter tip would be in the configuration used

11    in the Missouri executions.  So you have one liter flowing

12    through that vein every minute.

13            I think he describes the delivery of the

14    potassium as occurring over about 30 seconds at one point.

15    So in 30 seconds about half a liter or 500 mls would flow

16    past the end of the catheter, and during that time they're

17    injecting potassium.  I'm not sure if they're injecting 120

18    milliequivalents or 240 milliequivalents because of the

19    confusion about the dosing, but let's take the lower dose

TAYLOR1

20    just to give him the benefit of the doubt.  If 120
21    milliequivalents of potassium is injected into half a
22    liter, that will result in a concentration of 240
23    milliequivalents per liter, plus the normal five
24    milliequivalents per liter that's in the blood already so
25    it will result in the concentration of potassium that's

60

1    20-fold higher -- is that right, I'm sorry.  No, 40-fold
2    higher than what's normally present in the blood, and more
3    than 20 fold, and that would be far higher than necessary
4    to maximally activate the nerve fibers.
5    Q    And is the concentration of potassium high enough to
6    stop the heart?
7    A    Yes.  And it stops the heart in the same way that it
8    activates nerve fibers.  It's basically activating the
9    nerve fibers -- or the fibers in the heart that are like
10    the nerve fibers that carry electrical statements to the
11    heart.  So if you are giving enough to stop the heart,
12    you're also giving enough to cause pain in the veins.  And
13    in fact we know from reports where accidentally in a
14    therapeutic setting a high concentration of potassium was
15    given to a patient, and it was a terrible mistake
16    obviously, but before stopping the heart it causes extreme
17    pain in the veins.
18    Q    John Doe One states in his deposition testimony that
19    it's not necessary to do any calculations to be sure that
20    the potassium would be sufficiently diluted so that it
21    doesn't hurt.  That's on page 61.  Do you agree with that?
22    A    You can't know it's unnecessary to do calculations
23    until you do them, so if you run through the numbers like I

Page 53

TAYLOR1
24    did, and again I'm making some assumptions, but I think
25    they're all reasonable ones, then you end up with a

                                                          61


 1    concentration that basically almost no matter what
 2    reasonable assumption one makes, it's a very high
 3    concentration and it would certainly activate nerve fibers.
 4    Q    I'd next like to draw your attention to the deposition
 5    testimony of John Doe One on page 61.  He states, "We use
 6    the femoral vein to insert a catheter that I think is about
 7    16 inches long, so actually from the femoral vein if you
 8    measure up to your xiphoid which would mean it's about two
 9    inches from the heart, so the catheter is almost in the
10    heart when -- so the drug is directly injected below the
11    heart as it enters."
12            In your experience, do catheterization trays
13    always come with such a long catheter?
14    A    This -- the triple lumen catheter is what we're
15    talking about here are not -- did you say 18 inches long?
16    Q    16 inches.
17    A    They are not 16 inches long and they don't go anywhere
18    near the heart.
19            MS. ANDERS:  I'd like the record to reflect that
20    I'm showing opposing counsel what's been marked as
21    Plaintiff's Exhibit 28.
22    Q    (By Ms. Anders)  Do you recognize this photo,
23    Dr. Heath?
24    A    Yes.  It's the package or kit that the triple lumen
25    catheter is supplied in.  It's a sterile and sealed kit.

                                                          62


 1    Q    So is this an accurate representation of the catheter
               Page 54

TAYLOR1

2    tray that you observed during the tour of the execution
3    facility?
4    A    Yes, it is.
5            MS. ANDERS:  I'd like to offer Exhibit No. 28
6    into evidence, Your Honor.
7            MR. HAWKE:   No objection.
8            THE COURT:   Be received.
9    Q    (By Ms. Anders)  Could you read the length of the
10   catheter that is included in the catheter tray?
11   A    Yes.  It's in the first line here.  It says that the
12   catheter is 5 and 7/8th inches long, almost 6 inches long.
13   Q    Thank you.  And even if the catheter did go all the
14   way almost to the heart, could the potassium still hurt?
15   A    Yes.  The heart has many sensory fibers.  We all know
16   that because a heart attack is an extremely painful thing.
17   And so in stopping the heart it's also activating those
18   nerve fibers.  Also, to be pumped through the actual muscle
19   of the heart, the potassium has to travel through the right
20   side of the heart, which is the side of the heart that
21   pumps venous blood into the lungs, has to travel through
22   the right side of the heart and has to be pumped through
23   the lungs which themselves have a lot of sensory nerve
24   endings, and then flow back from the lungs after it has
25   picked up oxygen and be carried to the left side of the

                                                        63


1    heart, and from there it's pumped into the aorta and into
2    the actual muscle of the heart.
3            It's quite possible that in order to get to the
4    actual heart muscle it has to be pumped all the way through
5    the lungs regardless of where it's being introduced.  But

TAYLOR1

6   in this setting, it's being introduced no way near the
7   heart.  It's being introduced down in the pelvis six inches
8   from the groin where the catheter is inserted.
9   Q    So more broadly, are John Doe One's statements with
10   respect to the possibility of pain arising from the
11   potassium injection, in your view, failure to acknowledge
12   the risks of the execution?
13   A    Yes.  He's not acknowledging that there are numerous
14   things that can go wrong and that those things can cause
15   problems with drug delivery and cause problems with the
16   humaneness of the procedure.
17   Q    In John Doe One's answers to the plaintiff's first
18   interrogatories, this is No. 33, John Doe One states that
19   pancuronium, quote, will mitigate likely seizure activity
20   and involuntary movements and thus result in a more
21   peaceful and humane death.  Do you agree with that
22   statement?
23   A    He's partly correct.  It will stop involuntary
24   movements.  It stops all movement, all the muscles in the
25   body except the heart and the muscles in the blood vessels.

64

1   But it will stop the movement of all the muscles in the
2   arms and the legs which are normally moving around in a
3   seizure.  But he's wrong, it won't stop the seizure.  The
4   seizure is actually a thing that happens in the brain.
5   It's abnormal electrical activity in the brain, and when we
6   see somebody jerking around in a seizure that's what we
7   call the motor manifestations, the muscle manifestations of
8   what's occurring in the brain, and pancuronium wouldn't
9   afect that.  It doesn't really enter the brain.  And so
10   while it will stop physical movement, it wouldn't stop the

TAYLOR1

11    seizure from occurring.  It certainly wouldn't make it any
12    more humane.
13    Q     Does pancuronium have any anesthetic or sedative
14    effect?
15    A     None whatsoever.  The only effect it has is to stop
16    one's ability to move muscles that we're normally able to
17    control.  It doesn't affect our thinking or ability to feel
18    pain, our consciousness or awareness, and it doesn't affect
19    whether a seizure occurs or not.
20    Q     So have John Doe One's statements in this case given
21    you concerns about whether he's competent to ensure that
22    executions are performed humanely?
23    A     Well, given how these executions are being performed
24    in a way that requires general anesthesia to first be
25    successfully administered and monitored, no, he's not

65

1    competent to do that.
2    Q     What are you basing that on?
3    A     On the numerous factual errors, some of which you
4    raised here, but he has things just completely backwards.
5    It's like he's driving on the wrong side of the road and
6    doesn't realize it.  That's very concerning.
7    Q     Do these factual errors raise concerns in your mind
8    about John Doe One's medical judgment?
9    A     Well, first of all, you can't have good medical
10    judgment -- if your facts are wrong, then your judgment
11    can't be good.  But even if he had the right facts, some of
12    the judgment calls that he's made are very concerning.
13    Q     Do you believe that entrusting John Doe One with
14    responsibility for inducing general anesthesia, including

TAYLOR1

15    the preparation of thiopental, creates a significant risk

16    that the inmate will be improperly anesthetized?

17    A    It does, yes.  He should never be entrusted with

18    general anesthesia under any circumstances unless he's

19    going to undergo a considerable amount of training.

20    Q    So is there significant risk, therefore, that inmates

21    will suffer excruciating pain?

22    A    Yes, there is.

23    Q    And do you believe that entrusting John Doe One with

24    responsibility for the femoral catheterization procedure

25    also creates a significant risk that inmates will suffer

66

1    pain from the procedure?

2    A    Yes.

3    Q    Okay.  Now I'd like to talk with you a little bit

4    about the drug delivery system that's maintained in

5    Missouri at Bonne Terre.

6              THE REPORTER:  Ms. Anders, I need to change

7    paper.

8              THE COURT:  Why don't we take a recess, about ten

9    minutes.  Give you a chance to stand and stretch a little.

10                    (Recess)

11             MS. ANDERS:  Your Honor, just very quickly I'd

12    like to ask if it's okay with the court if the expert

13    witnesses sit in on the testimony.  I think the parties

14    have agreed that would be okay, and I'm very sorry.  I

15    think we misunderstood.

16             THE COURT:  If there is an agreement there, I

17    don't have a problem.

18             MR. HAWKE:  There is.  It's no problem.

19             MR. PRITCHETT:  Just so it's clear, the agreement

Page 58

TAYLOR1

20    included Mr. Moore could come in as well.

21            THE COURT:  I kind of figured.

22    Q    (By Ms. Anders)  I'd like to talk with you about your

23    inspection of the execution facility at Bonne Terre and the

24    drug delivery system used by the Missouri execution team.

25    I believe you testified before that as part of your

                                                            67


1    participation in the execution system you observed the

2    equipment as well as the facility itself; is that correct?

3    A    That's correct.

4    Q    And did you draw any conclusions with respect to

5    whether the drug delivery system allows the execution team

6    to ensure a humane execution?

7            MR. HAWKE:  Objection, Your Honor.  This line of

8    questioning is beyond the scope of the Court of Appeals'

9    remand.  The issues before the court concern the efficacy

10    and humaneness of the three-drug protocol as well as the

11    use of the femoral access.  It does not involve drug

12    delivery systems and things like that.

13            MS. ANDERS:  Dr. Heath testified before that

14    components of the execution procedure include the manner in

15    which the drugs are delivered into the inmate, and a large

16    part of the issue here is whether the anesthetic can be

17    successfully delivered into the inmate's circulation.  So

18    because of that, the drug delivery system is very, very

19    relevant.

20            THE COURT:  I agree.  Objection is overruled.

21    Q    (By Ms. Anders)  Dr. Heath, did you draw any

22    conclusions with respect to whether the drug delivery

23    system allows the execution team to ensure an humane

TAYLOR1

24    execution?

25    A     I did, yes.

68

1    Q     And what are your conclusions?

2    A     There are several problems with the layout in the

3    execution chamber and the drug preparation room or the work

4    room that's right next to the execution chamber.   The drugs

5    are delivered from one room through a wall into the room

6    where the prisoner is and the IV tubing disappears into a

7    hole in a desk and goes down under that desk and out

8    through the wall and then runs along the bed underneath the

9    sheet so one cannot survey as is necessary the tubing

10   through which the drugs are supposed to flow.

11   Q     So I believe it's implicit in your answer, but does

12   the execution team administer the drugs from a different

13   room?

14   A     Yes, they're standing in one room, and in a completely

15   separate isolated room is the prisoner who is being

16   executed.

17   Q     When, if ever, do anesthesiologists induce general

18   anesthesia from a remote location?

19   A     One would never induce general anesthesia from a

20   remote location.   That would be completely, deeply beneath

21   any reasonable standard of care.

22   Q     Does remote induction of general anesthesia create a

23   risk of improper anesthetization?

24   A     Yes, it does.   One is unable, if one is in a different

25   room, to assess whether one has achieved the desired or

69

1    necessary anesthetic depth.

TAYLOR1

2    Q    Why is it -- what does monitoring anesthetic depth

3    entail?

4    A    It's a very complicated thing.  It's essential for an

5    anesthesiologist to do.  It involves integrating an array

6    of different information from monitors, from different

7    monitors, from what the patient is doing, and being able to

8    touch the patient and perform various tests.

9    Q    And why is it necessary to monitor anesthetic depth?

10   A    Because anesthetic depth is not something that one can

11   predict based on what one has done, so we give -- what we

12   do is we do what's called titrating for effect.  It's

13   like somebody who is trying to get a certain level of

14   intoxication from alcohol.  They drink a certain amount.

15   They see what effect they get and then they drink however

16   much more they need to get to where they want to be.

17              Anesthesiologists are doing the same thing.

18   We're giving drugs and we don't know exactly what they're

19   going to do to any individual when you give the amount that

20   we need to give to get an effect.  And if we don't have

21   that effect, then we continuously adjust that so we know

22   how much more or less we need to give and we need to have

23   some way of knowing how deep their level of anesthesia is.

24   Q    Is it necessary to monitor anesthetic depth even when

25   a large dose of thiopental is being given?

                                                              70


1    A    Yes, it's always necessary to monitor anesthetic depth

2    when you're using intravenous anesthetic drugs.  With the

3    gases that people inhale for anesthesia, we can actually

4    measure how much gas they're breathing in and breathing out

5    and that tells us in real time how much drug is present in

                          Page 61

TAYLOR1

6    their body.  But with intravenous anesthetics we don't have

7    any, unfortunately, have any tests or devices or machines

8    that tell us the concentration of drug in the body, so we

9    have to do the next best thing which is rely on different

10   monitors and other tests and to integrate that information

11   in a continuous real time basis to come up with our best

12   estimate of what the anesthetic depth is.

13   Q    And so is there any other way besides monitoring

14   anesthetic depth to determine that the entire intended dose

15   of anesthetic has been delivered and has the desired

16   effect?

17   A    No.  We think we're getting a certain amount of the

18   drug, but we don't know that for sure unless -- we don't

19   know that we have given the right amount, that it's

20   successfully entered the circulation until we test or

21   assess what the result was, and that's why it's always

22   important to test anesthetic depth before initiating any

23   painful or uncomfortable procedure.

24   Q    And so is it necessary to monitor anesthetic depth

25   even if there is no need to bring the inmate out of the

71

1    anesthesia?

2    A    It's important for you to know that for a humane

3    execution to take place.  If you care about that, then you

4    have to in some way assess and show that a surgical plane

5    of anesthesia, which is a deep enough level of anesthesia

6    that you could do surgery on a person and it wouldn't cause

7    them pain or suffering.  So if you want to know that it's

8    humane, you need to show that there is a surgical plane of

9    anesthesia.

10   Q    Based on your observation during your inspection of

Page 62

TAYLOR1

11    the execution facility, does the execution team's vantage
12    point in another room allow them to monitor anesthetic
13    depth?
14    A    No.  They only have one -- they have two monitors, but
15    only one useful monitor for assessing anesthetic depth and
16    that's the monitor giving them the heart rate information
17    and that's a monitor that can be used, when integrated with
18    many other monitors, other medical signs, to give
19    indication of anesthetic depth.  But they can't, as we need
20    to be, be physically in contact with the patient, standing
21    right by their head and able to test various reflexes and
22    do tests along those lines.  And they don't have other
23    monitors like blood pressure and other things that we use.
24    So from where they are, they cannot make any meaningful
25    determination of anesthetic depth.

72

1    Q    Can a heart rate monitor alone give you a meaningful
2    reading or meaningful sense of anesthetic depth?
3    A    Not by itself.  It's one of many different monitors
4    and clinical signs that we continuously integrate.  We
5    continuously absorb that stream of information from many
6    sources and use it to synthesize our assessment of what the
7    anesthetic depth is.
8    Q    And how does the execution team visually observe the
9    inmate?
10    A    They're standing in a different room.  There is a
11    window between the execution room and the -- I'm sorry,
12    there is a window between the room where the executioners
13    are standing and where the prisoner is lying on the bed.
14    So they're looking down with a view from the head of the

Page 63

TAYLOR1
15    prisoner down towards his feet.
16    Q    While at the inspection, did you perform a simulation
17    to determine what view the execution team had through the
18    window into the execution chamber?
19    A    Yes.  We had one of the people who was present lay
20    down on the bed that's used at the executions and then the
21    door to the execution chamber was closed and everybody went
22    into the work room where they inject the drugs from and the
23    camera person stood at each of the locations where each of
24    the executioners were standing to record a video version of
25    the view that they would have during the execution.

73

1    Q    And could you describe the view through the window?
2    A    Well, it's difficult to describe.  Maybe a picture
3    would help.  But you're looking down from the head of the
4    prisoner towards his feet and all you can see is the top of
5    his head or a very shallow view of his face.  And then
6    you're looking through a venetian blind, a screen that
7    partly obstructs the view.  And then the window is also --
8    it's a one-way mirror, a partly silvered mirror, so -- a
9    window, so I think it's kind of like looking through
10    sunglasses.  It obstructs some of the flow of the light.
11    Q    I'd like the record to show I'm showing opposing
12    counsel what has been marked as Plaintiff's Exhibit 29.
13            Do you recognize this scene, Dr. Heath?
14    A    Yes, I do.
15    Q    And what is it?
16    A    This is a picture taken by the video filmer of one of
17    the people who was present at the inspection and he's lying
18    on the bed that's used for the executions and he's covered
19    with a sheet, which is how the prison personnel describe
Page 64

TAYLOR1

20    the execution being done.  And to his -- to the right of

21    his head you can see a window and I believe that's where

22    some of the witnesses sit.  I'm not sure if it's the

23    official witnesses or family members.  And then to the left

24    of his head, which is sort of above his head, is a window

25    that leads into a different room where the execution

74

1    personnel and the physician and other individuals are

2    present.

3            You can see under that window there's a hole in

4    the wall and IV tubing coming out from that hole and under

5    the sheet, and then it runs into the groin of the condemned

6    prisoner.  So that IV tubing was set up to simulate -- set

7    up by the prison personnel to show how things are set up

8    during an execution.

9    Q    So based on your observation during the execution

10    chamber tour, this is an accurate rendition of the view on

11    the gurney?

12    A    This is what we saw on the tour, and the prison

13    personnel indicated this is how things generally look

14    during an actual execution.

15    Q    Thank you.

16            MS. ANDERS:  I'd like to admit Exhibit 29 into

17    evidence.

18            MR. HAWKE:  No objection, Your Honor.

19            THE COURT:  Received.

20            Do you plan on offering the videotape at some

21    point in time?

22            MS. ANDERS:  Yes, I believe --

23            THE COURT:  Because if this is contained on that,

Page 65

TAYLOR1
24    we can save some time.  It will be part of the record.
25    It's of no real value for me to see this because I have

                                                                    75


1    seen it.
2              MS. ANDERS:  We don't have the videotape here.
3              MR. HELLMAN:  But we can offer it, yes, Your
4    Honor.
5              MS. ANDERS:  We would like to offer the videotape
6    of the tour into evidence.
7              THE COURT:  We'll make it part of the record, if
8    there are no objections.
9              MR. HAWKE:  No objections.
10             MS. ANDERS:  Thank you, Your Honor.
11   Q    (By Ms. Anders)  So from this perspective --
12             THE COURT:  What would the number of that be?
13             MS. ANDERS:  I'm sorry.  The number of the
14   videotape will be 47.
15             THE COURT:  Show it received.
16   Q    (By Ms. Anders)  So, Dr. Heath, from this
17   perspective, is it possible to see the inmate's face?
18   A    Yes.
19   Q    And is it possible to see the IV tubing?
20   A    I can see a little bit of the IV tubing, yes.
21   Q    And I show you another photo that is part of
22   Plaintiff's Exhibit 47.  Have you seen this scene before?
23   A    Yes, I have.
24   Q    And could you describe what this photo shows?
25   A    This is a simulation again of the prisoner lying on

                                                                    76


1    the bed or the gurney.  Now, this is in a different room.
                              Page 66

TAYLOR1

2      This is in the work room or the room where the executioner

3      stands, and it's looking down from where the IV tubing, the

4      end of the tubing is and where the drugs are injected from,

5      looking down at the top of the person's head.  It would be

6      the prisoner's head.

7      Q      And do you believe that you'd be able to ascertain

8      whether general anesthesia has been successfully induced

9      using this view?

10     A      No, you can't make any such assessment.

11     Q      Why not?

12     A      You're in a different room.  You can't see the

13     person's face well.  The top of the head doesn't really

14     show, or doesn't show any indications of whether somebody

15     is anesthetized or not.  The face can reveal information

16     about that.  You can't see any part of his body, and again,

17     there are no -- there aren't the monitors that we normally

18     deploy to help us assess anesthetic depth.  And you

19     certainly can't touch the person, which is one of the

20     important things or methods we have available to us to

21     assess anesthetic depth.

22     Q      I'd like to draw your attention to a statement from

23     the John Doe One deposition transcript, page 41, in

24     response to the question, "Did you monitor Mr. Gray's

25     anesthetic depth during execution?"  He stated, quote, "The

77

1      only thing that can be monitored is facial expression and

2      you can judge when the effect of the drug is accomplished,

3      and that can be seen from across the room through a

4      window."

5                  Do you agree with that statement based on your

Page 67

TAYLOR1
6    observations of your view into the execution chamber?
7    A    Well, first of all, you don't have a good view of the
8    face.  You certainly don't have the kind of view that you
9    would need to monitor facial expression if you're using it
10    to monitor anesthetic depth.  But much more importantly,
11    he's totally wrong about being able to use facial
12    expression in this context to monitor anesthetic depth.  If
13    the thiopental didn't work properly, when the pancuronium
14    goes in, it will cause a relaxed facial expression, similar
15    or identical to what expression we get with thiopental.  So
16    from being -- even if one were standing right next to the
17    person, the rapid onset of pancuronium and the rapid onset
18    of thiopental would be very similar.
19    Q    And based on your observation of the IV tubing, is it
20    possible to monitor the flow of drugs through the IV?
21    A    No.  You only see a very small part of the IV, maybe
22    and few inches where it comes out of the hole in the desk,
23    and you can't see any of the rest of the extent of the IV.
24    Most importantly, you can't see the connection where the IV
25    plugs into the triple lumen catheter.  That's underneath

78

1    the blanket or the sheet.
2    Q    So if the IV tubing can't be seen, are there potential
3    problems that could arise with the IV tubing that cannot be
4    detected?
5    A    Yes.  It can disconnect or partly disconnect and leak.
6    It can have a hole in it.  It can kink.  There are numerous
7    problems.  And that's why it's our standard of care when
8    we're inducing general anesthesia in a patient whenever
9    possible to have the full extent of the IV tubing
10    completely visible and laid out in a neat fashion so that
Page 68

TAYLOR1

11    we can clearly see that the conduit through which the drugs

12    will flow is working properly.

13    Q    And based on your observation of the IV tubing, do you

14    know whether the execution team uses an IV bag or drip?

15    A    They do not use an IV bag or drip.  They just inject

16    straight into the end of the IV tubing.

17    Q    Is it standard medical practice to use an IV bag and

18    drip of saline or other solution when inducing general

19    anesthesia?

20    A    Yes.  What we normally do is connect a bag with a drip

21    chamber so we can see the rate of fluid as it enters the IV

22    and when we introduce the drugs into the IV line, we can

23    see that the fluid is flowing properly.

24    Q    So to your knowledge, does any other state not use an

25    IV bag in its execution procedure?

                                                                79

1    A    Everywhere else that I'm aware of, unless they have

2    made a recent change that I'm not aware of, does use IV

3    bags.

4    Q    When you are injecting drugs through IV tubing, are

5    there any tactile clues that can help you ascertain whether

6    the drugs are flowing properly?

7    A    Yes.  There is a thing that we call back pressure.

8    When you are pushing on the plunger of the syringe, there

9    is a certain amount of resistance to pushing that plunger

10    in, and it depends on many factors.  If there's just air in

11    the syringe, you can push that plunger very easily.  If

12    there is fluid in the syringe, then you have to push

13    harder.  And it depends on the viscosity of the fluid.  And

14    if it's connected to an IV tubing into a catheter, then one

                            Page 69

TAYLOR1

15    needs to push even harder.

16            And we learn from experience what the normal feel

17    of that pressure is for a given size syringe, and if we're

18    not feeling that normal feeling that's one of the

19    indications that we have that something is going wrong with

20    the injection.  It's hard to describe in words.  Sort of

21    like riding a bicycle.  It's something you need to get a

22    feel for, how a plunger should normally feel.

23    Q    So how does a person acquire that feel for the back

24    pressure?

25    A    The way you learn that something is going wrong is

80

1    if you have -- over time from learning how to inject drugs

2    and how to induce anesthesia, one has bedside experience in

3    giving the drugs and seeing what happens.  And sometimes we

4    do have an infiltration or a problem or a leakage, and, for

5    example, if you're injecting and there's a leakage, things

6    won't feel right and you'll see a leakage and you connect

7    that in your brain and you know in the future when things

8    don't feel right that maybe that's what the problem is.

9    Q    Do the persons who inject the drugs have any medical

10    training?

11    A    Apparently not.

12    Q    And do they perform rehearsals or train in pushing the

13    syringes, based on your review of the documents?

14    A    No, they don't.  There are some states where there

15    is rigorous training protocols where the guards or the

16    injection personnel are timed injecting the syringe at a

17    certain rate and knowing what the feel -- what the back

18    pressure feels like.  But there is no indication that

19    that's been done here.

                            Page 70

TAYLOR1

20     Q     And are rehearsals important to the execution

21     procedure?

22     A     Yes, it is very important.  One needs to have a

23     protocol and one needs to rehearse that protocol because

24     several people are involved in effecting the execution.

25     It's a series of steps that have to be taken in the right

81

1     order and the right way.  Everybody has to know what their

2     responsibilities are and where to stand.  And the rehearsal

3     process allows a quality assurance.  It allows one to work

4     out the kinks and the bugs that are inevitably present in a

5     complex endeavor.

6     Q     Based on your observations of the execution chamber,

7     is it possible to see the catheter site?

8     A     No.  That's covered up by the sheet that's placed over

9     the prisoner.

10     Q     So if the catheter had infiltrated would the execution

11     team be able to detect it?

12     A     By infiltration you mean if the fluid was leaving the

13     catheter and not going into the vein, what we call

14     extravascular position of the catheter tip, they would not

15     be able to see that in this configuration.

16     Q     And if a large hematoma had formed, would the

17     execution team be able to detect it?

18     A     Not in this configuration unless the sheet became

19     blood-soaked.  That might give them a clue that something

20     was going wrong, but that would require the blood to

21     actually be leaving the body as opposed to collecting

22     inside the body in a hematoma.

23     Q     I'd like to draw your attention to a statement from

Page 71

TAYLOR1
24    the transcript of John Doe One's testimony in his
25    deposition, page 31 of the transcript, he states, "The

                                                        82

 1    people who do the injections are nonmedical and they're in
 2    the dark so they have a small flashlight that they're able
 3    to quickly identify the syringes."  Does injecting the
 4    drugs in the dark create a risk of mistakenly injecting the
 5    syringes in the wrong order?
 6    A    Yes.    That's a ridiculous thing that they're being
 7    asked to work in this encumbered or hindered situation
 8    where they don't have good visibility of what they're
 9    doing.    That's a completely needless set-up for a problem.
10    Q    So in general, do the problems in monitoring the
11    inmate for anesthetic depth exacerbate the risk that
12    complications could go undetected?
13    A    Yes, they do.
14    Q    Does the inability of the execution team to detect
15    problems or complications exacerbate a risk that a mistake
16    by John Doe One or any other member of the team could go
17    undetected?
18    A    Yes.
19    Q    So is it your -- do you have an opinion as to whether
20    the drug delivery system used by Missouri creates a
21    significant risk of pain to the inmate?
22    A    It does, a significant and needless remedial risk.
23    Q    Assuming that the doctor -- John Doe One's discretion
24    is in the future limited and he is required to give five
25    grams of thiopental, does that allay your concerns

                                                        83

 1    regarding the doctor's lack of qualifications to induce
                            Page 72

TAYLOR1

2  anesthesia?

3  A    No, it doesn't.  First of all, my understanding is

4  that ultimately the warden or the director of the

5  Department of Corrections is responsible for all --

6  everything that happens regarding an execution, including

7  the details.  But the doctor has said that he's the person,

8  the only person they have to advise him about any of

9  this -- of these features of the execution, of any of the

10  medical aspects, so it's pretty clear that any directive

11  that would come from the higher-level person would be

12  initiated by the doctor himself.  So it's just sort of a

13  bureaucratic work-around and it leaves him basically as the

14  sole person who is guiding what's occurring.

15         And as we have discussed, he's completely lacking

16  in the credentials and qualifications and knowledge, skill

17  set and experience to be entrusted with the delivery of

18  general anesthesia, especially in an incredibly important

19  thing like an execution.

20  Q    And does determining the intended dose of thiopental

21  ensure that that is the dose that will be delivered

22  successfully into circulation?

23  A    I'm sorry.  Could you ask that again?

24  Q    Does determining with certainty what the intended dose

25  of thiopental is, does that guarantee that that intended

84

1  dose will be delivered successfully into the circulation?

2  A    No.  You could be intending to give five grams, you

3  could be intending to give 50 grams, it doesn't really

4  matter.  When you give intravenous drugs you need to

5  undertake some independent method of assessing what the

Page 73

TAYLOR1

6   effects of that intended dose is and find out what in fact

7   actually happened.  That's absolutely essential.

8   Q    Earlier you testified about the components of a

9   written execution protocol.  Is a directive that specifies

10   the dosage of the drugs the equivalent, in your opinion, of

11   a written execution protocol?

12   A    No.  It's more like you're saying it's a list that

13   says the name of a drug and the dose of the drug.  That's

14   just a list of ingredients.  What you really need is a full

15   protocol that lays out in clear and concise detailed

16   instructions everything that needs to happen.  If you don't

17   put that in writing, then it might not happen and that

18   jeopardizes the interests of the state and the Department

19   of Corrections and of the prisoner.

20   Q    Assuming that the doctor still has discretion to

21   determine alternative means of IV access, do you have

22   concerns regarding the safety of the IV access procedure?

23   A    This doctor has made a huge error in judgment in how

24   he decided to obtain IV access.  No other state to my

25   knowledge proceeds by putting a femoral line or a

85

1   subclavian line in a person when a peripheral IV catheter

2   placement can be achieved.  So he should not -- he's just

3   made, I think, too many mistakes and he shouldn't be

4   entrusted with any part of this process.

5   Q    Are there complications that can arise during any part

6   of the execution that would require a doctor to make quick

7   decisions using his medical judgment?

8   A    Oh, sure.  Sometimes things go wrong when we're

9   inducing general anesthesia, just like they can go wrong

10   when the plane is taking off or whatever, and you want the

Page 74

TAYLOR1

11    pilot of the plane and you want the anesthesiologist to be

12    nimble and adept in figuring out what to do, and that

13    includes making on-the-fly-calculations and understanding

14    doses of drugs.

15         This doctor in his deposition basically said he'd

16    have a hard time doing this stuff.  He has his nurses help

17    him out with these things, and he's no good with numbers.

18    If he can't do his cable bill, then he should not be

19    charged with making these on-the-fly ad hoc changes that

20    sometimes a doctor would need to make inducing and

21    maintaining general anesthesia.

22    Q    So then given that John Doe One would still be

23    participating in or overseeing the execution procedures, or

24    assuming that he would be, do you still think there would

25    be a significant risk of unnecessary pain in the execution

                                                              86


1    procedure?

2    A    Yes, I do.

3         MS. ANDERS:  Your Honor, if I could have a

4    moment.

5         That concludes my direct examination, Your Honor,

6    but I'd just like to confirm that the Exhibits 1 through

7    23, which are the discovery materials, have been admitted

8    into evidence.

9         THE COURT:  Those are the ones agreed upon in

10    advance?

11         MR. HAWKE:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MS. ANDERS:  The photo stills that we showed from

14    the video, we separately marked those as exhibits.  Would

Page 75

TAYLOR1
15  it be acceptable if we enter those into evidence, just for
16  convenience?
17          THE COURT:  I have no problem with that.  They
18  are part of the video anyway.
19          MR. HAWKE:  No objection.
20          MS. ANDERS:  Thank you.
21  CROSS-EXAMINATION BY MR. HAWKE:
22  Q    Can you describe for the record what the execution
23  chamber at the Eastern Reception and Diagnostic Center
24  looks like?
25  A    The chamber itself, or the overall layout of all the

                                                      87


1   rooms?
2   Q    The chamber itself.
3   A    It's a room, I'd make a very broad estimate, of maybe
4   twenty feet by twelve feet or something along those lines.
5   There's very little in the room.  The main thing is the bed
6   that the prisoner is placed on, and I believe there are
7   windows on all four walls of that room and I believe there
8   were I think at least two doors to that room, one going to
9   a work room where the executioners stand and one I think
10  leading to the area where the prisoner -- the holding cell
11  where he's kept before the execution.
12  Q    And is the room constructed of block material,
13  concrete block material?
14  A    I'm sorry.  I don't recall what the construction was.
15  I think the walls might have been painted, so I'm not sure
16  what it was made of.
17  Q    And can you describe -- I believe you said during
18  direct examination there was a window between the execution
19  chamber and what was described as the execution support
                    Page 76