# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

| | | |
|---|---|---|
| MICHAEL ANTHONY TAYLOR | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 05-4173-CV-W-FJG |
| | ) | |
| LARRY CRAWFORD, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## EXPERT WITNESS REPORT OF DR. THOMAS K. HENTHORN
## PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)

### Certificate of Service

I hereby certify a true and correct copy of the foregoing was forwarded by electronic mail and Federal Express this 23rd day of May, 2006, to the offices of:

> Michael Pritchett, Esq.
> Assistant Attorney General
> P.O. Box 899
> Jefferson City, Missouri 65102

> /s/ John William Simon
> Attorney for Plaintiff

Roane et al. v. Gonzales et al.,
Civ. No. 05-2337 (D.D.C.)

Pls.' Opp to Mot. J. on the Pleadings
and Mot. to Lift Stays

Exhibit 24

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

MICHAEL ANTHONY TAYLOR   )
                         )
        Plaintiff,        )
vs.                         )     No. 05-4173-CV-W-FJG
                         )
LARRY CRAWFORD, et al.,    )
                         )
        Defendants.     )
_____)

## EXPERT WITNESS REPORT OF DR. THOMAS K. HENTHORN
## PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)

       I have been retained to testify as an expert on behalf of Plaintiff Michael Anthony Taylor.  I submit this report in compliance with the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.  I expect to testify at trial regarding the matters stated in this report if asked by the Court or by the parties' attorneys.  I reserve the right to supplement or modify this report if and when appropriate.  I also reserve the right to supplement or modify this report to the extent that new or additional information is provided.  In this regard, I may give additional testimony based upon documents, issues, or testimony that is presented at trial.

## I.      Background and Qualifications

       1.      I have a B.A. from Drake University and an M.D. from Northwestern University Medical School.  Since 2001, I have been Professor and Chair of the Department of Anesthesiology at the University of Colorado School of Medicine in Denver.  My full credentials are listed in my curriculum vitae, which are attached as Exhibit A.

       2.      I have conducted extensive research in the area of pharmacokinetics, which studies the time course of drugs in the body and their effects (pharmacodynamics).  In particular, many of my studies have focused on the pharmacokinetics of the anesthetic thiopental (sodium pentothal).  I have published six articles on thiopental and authored an additional fourteen abstracts on this topic.

3.     In addition to my scholarly research, I am a practicing anesthesiologist at University of Colorado Hospital.  In the course of my practice, I am regularly responsible for anesthetizing patients about to undergo surgery or other medical procedures requiring anesthesia.  On average, I induce anesthesia in approximately 20 patients per week.

4.     In preparing this report, I have referred to and relied on:

    a.     my experience and research in the area of pharmacokinetics and particularly in the pharmacokinetics of thiopental;

    b.     my training and experience as a practicing anesthesiologist;

    c.     the articles listed below under "References";

    d.     the execution records and chemical logs provided by the State;

    e.     the Defendants' answers to interrogatories submitted by Mr. Taylor;

    f.     the affidavits provided by Dr. Mark Dershwitz in *Johnston v. Crawford* and in *Brown v. Beck* (the *Brown* affidavits are attached as Exhibit B);

    g.     information gleaned during the May 15, 2006 tour of the ERDCC execution chamber, with particular regard to the equipment used.

## II.     Summary of Opinions

5.     Missouri's practice of rapidly injecting each chemical one after the other creates a substantial risk that an inmate will not be properly anesthetized when he receives the potassium chloride.  In the doses used by Missouri, thiopental should produce sufficient unconsciousness in a human being to prevent them from feeling excruciating pain.  However, even in these large doses, thiopental does not begin taking effect immediately.  Because Missouri's procedure does not leave time for the thiopental to take effect in the brain, it creates a substantial risk of inflicting excruciating pain.

6.     The insertion of a femoral vein central catheter is not medically indicated for the infusion of any of the drugs involved in lethal injection.  There is no reason to put a femoral line in a patient when a peripheral line would serve the same purpose.  Insertion of a femoral line inevitably causes gratuitous, significant pain.  It also creates a substantial risk of serious, excruciating complications.

III.    **Thiopental**

   A.    **The Basic Properties of Thiopental and Its Effect on Consciousness**

   7.    Thiopental is a barbiturate with a rapid onset and offset of effect that can be used to induce anesthesia.  Like other anesthetics, thiopental must act in the central nervous system to be effective and the brain to affect consciousness.  As a result, the concentration of thiopental in the blood does not necessarily reflect its effectiveness.  Rather, concentration of thiopental in the blood is an approximation of its effect on the brain.  One of my areas of scholarly inquiry has been the correlation of thiopental concentration in the blood with its effect on the brain.  In particular, I have conducted studies analyzing when thiopental takes effect in the brain.

   8.    I have reviewed the affidavits supplied by Dr. Mark Dershwitz from *Johnston v. Crawford* and *Brown v. Beck* with regards to the pharmacokinetics and pharmacodynamics of thiopental following the 5 gram dose given to condemned inmates in Missouri.  Dr. Dershwitz's assumptions and use of simulations are generally correct.  In fact, when I performed similar computer simulations, using his assumptions I arrived at almost identical results.  I therefore have no argument that a 5 gram dose, if delivered reliably into the circulation by intravenous injection, will produce unconsciousness in any human being for many hours.  (Of course, if the full dose of thiopental is not delivered reliably into the veins, Dr. Dershwitz's conclusions become irrelevant.)  However, I disagree with Dr. Dershwitz on two points.  First, I believe he has selected an improper definition of consciousness.  Second, Dr. Dershwitz does not account for the time it takes for thiopental to take effect; instead, he focuses solely on the duration of its effect.

   9.    Different concentrations of anesthesics will have different effects across the spectrum of consciousness.  Light anesthesia will have less effect (i.e., rendering a patient unable to respond to verbal commands) than clinical anesthesia (i.e., rendering a patient unable to feel or respond to any stimuli, including excruciating pain).  In measuring the effect of thiopental on consciousness, clinical investigators have used a variety of stimuli to elicit a response from patients.  At the lowest end of the stimulus range is loss of response to simple voice command.  This corresponds to a thiopental effect-site or brain concentration of 7.4 mg/L.  This is what Dr. Dershwitz used for his simulations.  In other words, Dr. Dershwitz's analyses assume that a person who has a thiopental brain concentration of about 7.4 mg/L and is unable to respond to simple voice commands will be unable to respond to higher levels of stimulation.  This assumption is incorrect; this level of thiopental will not necessarily prevent a response from higher levels of stimulation, such as pain caused by the injection of potassium chloride.

   10.    Some responses that were observed by investigators to certain very powerful stimuli occurred at the point where thiopental had already completely silenced the cerebral cortex.  Thus, these responses were deemed to be reflexes mediated by lower parts of the central nervous system, not requiring the cortex or consciousness.  Therefore, it is possible for a person not to be able to respond to someone's voice but still to be able to respond in some way to a stronger stimulus, such as extreme pain.  It is generally

3

agreed that activity in the cerebral cortex is required for consciousness. Demonstration of the lack of cerebral function by EEG silence is a requirement of the legal definition of loss of consciousness and brain death if no drugs acting on the central nervous system are present. Therefore, if there is electrical silence in the brain, there is no chance that a person can experience pain. Similarly, if there is not electrical silence, there remains the possibility that a person still can experience pain.

11.     Investigators have used the thiopental concentration producing electroencephalographic (EEG) 'burst suppression' for 3 seconds duration as being clinically and physiologically equivalent to EEG silence. However, because it occurs at a lower thiopental concentration than total silence, it represents a level from which patients and human volunteer research subjects can readily recover. 'Burst suppression' means that the brain is 'flat line' for 3 seconds at a time, followed by a short burst of activity, followed by 3 more seconds of 'flat line,' and so on. Only at 'burst suppression' can we be certain that a person's response to noxious stimuli, such as the pain caused by potassium chloride coursing through a person's veins, is not a conscious one. Accordingly, the proper target for simulation in the case of lethal injection should be the thiopental concentration that produces 'burst suppression.' This state corresponds to a thiopental effect-site or brain concentration of 34 mg/L. This concentration is obviously significantly higher than the approximately 7.4 mg/L concentration necessary to block response to simple voice commands. It is true, though, that a 5 gram dose of thiopental, if properly administered, will eventually attain burst suppression.

12.     Regardless of which endpoint is chosen, it is imperative that a clinician trained in anesthesia observe the condemned inmate in order to monitor the effects of the drugs. While the literature is replete with formulae for producing general anesthesia, no responsible anesthesiologist would ever suggest that it be conducted by untrained or inexperienced personnel, even if armed with a supposedly 'perfect' formula. One reason is that these drugs produce effects on respiration and the cardiovascular system that need appropriate intervention to prevent harm. Another reason is to assure that the expected effects are indeed happening and to troubleshoot the situation if they are not. Obviously, the physiologic support aspect is not necessary in an execution, but the monitoring for expected effects aspect certainly is. Multiple problems can arise that can prevent thiopental from taking complete effect. These include problems with drug delivery to the patient; problems with the patient's circulation slowing or blocking the delivery of drug to sites of action; and unusual reaction (sensitivity or resistance) of the individual patient to the drug. Unusual sensitivity would not be a problem in an execution but unusual resistance would be, especially if a smaller than expected dose gets delivered.

13.     It is not enough to have a trained specialist present viewing through a window in the next room. It is certainly not enough to have an untrained person (i.e., a person lacking training in anesthesiology) viewing through a window in the next room. A general surgeon would not have the proper training in anesthesiology to monitor anesthetic depth, even were he stationed at the inmate's bedside. And even a trained anesthesiologist would have to interact with the condemned inmate to know if the trajectory of drug effects were correct. An individual lying quietly under a sheet

4

produces insufficient information or feedback. For instance, it is not unusual for a patient to be lying quietly in a subhypnotic (not quite unconscious) state, but when asked if he or she is comfortable may indicate that he/she is in severe pain. This occurrence happens with some frequency in my practice as an anesthesiologist.

14.     Thiopental is not an analgesic (painkiller); it is only an anesthetic drug that induces sleep. Since no analgesics are part of the lethal injection prescription, it is possible for pain to be experienced and for no one to know about it if there is not direct interaction with a trained individual. Not only does thiopental not have analgesic properties, it is thought to actually be antianalgesic and to lower the pain threshold, thus increasing the necessity of delivering these drugs as intended by a trained individual.

**B.     The Pharmacokinetics of Thiopental**

15.     Traditionally, pharmacologists used pharmacokinetic models that assume instantaneous mixing throughout what is called the 'central compartment,' which is normally thought to comprise the blood and highly perfused tissues such as the brain. This simplification is done because it is computationally easier and because actual drug concentration data collected during the onset of effect has been lacking. With these assumptions, thiopental measured anywhere in the vascular system was once assumed to be the same as that found in heart and brain tissue. It was also assumed that all drug effects occur instantly without any delay in blood transit or diffusion into tissue and the subsequent production of the observed effect by the target tissue.

16.     Because an accurate description of the onset of effect is absolutely critical to anesthesia practice, investigators (including my laboratory) have, over the past 20 years, focused much time and attention to mathematically characterizing the equilibration delay of drug concentrations in the effect site (or brain in the case of thiopental) with that in the arterial blood and in describing the time course of drug transit through the circulation and its mixing within the heart and blood vessels by collecting arterial blood samples at high frequency from patients, human subjects and experimental animals. This research has helped demonstrate that the traditional view assuming instantaneous mixing is overly simplistic and incorrect.[1-6]

17.     I have no argument with the modeling performed by Dr. Dershwitz from approximately 4 minutes after the start of thiopental injection through the next 5 hours. After 4 minutes, he is correct that 5 grams of thiopental will attain burst suppression and that burst suppression will last for several hours thereafter (if the person lives that long). However, since he neglected to look at the pharmacokinetic events in the time during the onset of effect, I have performed simulations of the critical first 1-4 minutes after beginning the infusion of drug using the modeling techniques that I and my colleagues have developed for thiopental.

18.     The modeling assumptions that I used consisted of: (a) 8 ft of IV tubing from the syringe containing drug to the catheter in the inmate's femoral vein with 1.76 cc per ft (15 cc of deadspace), giving a 7.5 second mean transit time to reach the patient

5

with (b) an injection speed of 2 cc per second, (c) a 12 second mean transit time from the femoral vein to the heart, (d) a normal cardiac output of 5 L/min, (e) an 82 kg healthy male inmate, and (f) a central blood volume (heart, lungs and great vessels) of 2.5 L. To the extent these assumptions rely on details about the equipment, my understanding is that they are consistent with the equipment used by the State of Missouri in carrying out its executions. Variations in these assumptions, unless drastic, would yield only slight differences in my simulations and conclusions. Of course, some variations are to be expected from person to person, and from execution to execution. It should also be noted that most scientific modeling, including possibly the simulations discussed herein, likely relies on assumptions of which the scientist is unaware.

19. The results of this simulation are in Figure 1. (Figures 1-7 are attached to the end of this report). Figure 1 charts the course of thiopental into the body, the heart, and finally the brain, where it takes effect. The thiopental travels a long course to its destination. Assuming it is properly administered, the thiopental leaves the syringe, travels through the tube, into the catheter, into the vein, up to the heart, then to the lung and lung tissue, then back to the heart, where it is pumped into arteries and finally pumped up into the brain. It begins to take effect shortly thereafter. It is clear that it should take approximately 45 seconds for the chemicals to reach the arterial blood and begin to reach the tissues to produce an effect. While the arterial blood thiopental concentration is much higher than brain concentration at 2 minutes, at this dose the brain concentrations would also be expected to be high.

20. Clinically, we are interested in producing an effect with a drug that has at least a 95% probability of success. This is the case because a lower probability of success runs too great a risk of causing pain – sometimes severe – to the patient. As Dr. Dershwitz indicated, a dose of 5 grams will produce thiopental concentrations that far exceed the 95% probability of producing loss of 'voice recognition' consciousness. Though Dr. Dershwitz does not consider EEG burst suppression, it is almost certainly the case that a 5 gram dose of thiopental will also eventually produce 95% probability of burst suppression. The relevant question, however, is not just whether this will occur. We must also ask when it will occur. The reason is that if the injection sequence is too fast and does not take into account transit, mixing and blood-brain diffusion, then the beginning of the painful potassium chloride injection could begin while the inmate is still conscious and able to perceive pain. Dr. Dershwitz's analysis and models do not account for the time it takes for the thiopental to take effect.

21. Figure 2 shows that simple loss of consciousness (loss of motor control, 11.2 mg/L) would be expected to be 95% likely at a little over 67 seconds from the start of the thiopental injection. EEG burst suppression would follow shortly thereafter at just over 90 seconds. Because a large dose of thiopental likely reduces cardiac output because it weakens the heart, thiopental would likely take effect later than the times indicated in Figure 2. In other words, Figure 2 represents the time of the onset of thiopental effect before that time has been adjusted to account for the reduced cardiac output that would result from the thiopental and that would occur within a minute of the thiopental's entry into the venous system. Nevertheless, Figure 2 is a useful starting

point for understanding the time course of thiopental -- namely for understanding that it likely will not achieve burst suppression in less than 90 seconds.

22.     The prison records and Defendant Crawford's Answers to Plaintiffs' First Interrogatories (Exhibit C) reveal that on 2 recent occasions, it took as little as 2 minutes from the start of the thiopental injection to when death was declared due to the heart stopping effects of potassium chloride.  This means that the painful injection of potassium chloride began at least 45 seconds before death (see above description of transit and intravascular mixing in figure 1 that also applies to potassium chloride). Because potassium chloride was injected in these instances about 75 seconds into the execution, it is clearly possible that these inmates experienced pain, as the thiopental did not likely achieve burst suppression until after 90 seconds.

23.     As noted above, the question also arises concerning the effects of thiopental on the cardiovascular system, thus affecting thiopental's own pharmacokinetics.  In other words, thiopental usually reduces cardiac output, thus slowing the time it takes for the thiopental to reach the brain and actually take effect. Thiopental's effect on cardiac output will be especially likely and especially pronounced when administered in a large dose, such as 5 grams.  To address this, I constructed models in which the cardiac output was predicted to decrease by 25%, 50%, and 75% beginning about 60 seconds after its injection or 15 seconds after it reaches the arterial blood.  Research in this area suggests that it takes about 60 seconds for thiopental to decrease cardiac output.  Our previous work describes how changes in cardiac output affects transit, intravascular mixing and drug distribution to the tissues of the body.[7]   I used these principles in these simulations.

24.     We know that thiopental is a direct myocardial depressant, but the magnitude of the effects at a dose as large as 5 grams has not been well researched. Figure 3 shows the results of what I consider to be within the range of the not so very likely and the very likely depressant effects of thiopental on the heart and thus on its own kinetics.  The least likely is that 5 grams of thiopental will have no effect on the heart whatsoever and the time to burst suppression will be unaffected and remain at just over 90 seconds.  Given such a dose, it is highly unlikely that the thiopental would have no effect on cardiac output.  Indeed, far more likely, is that this massive dose of thiopental will have a profound effect on heart function, reducing it to nearly 25% of where it was before thiopental was administered.  This effect begins immediately upon reaching the heart (at about one minute into the injection).  My computer simulation shows that this will slow the delivery of thiopental to the brain and delay burst suppression by approximately one minute.  Thus, the thiopental would not have attained a 95% probability of burst suppression until more than 2.5 minutes.  Given that Missouri *completes* some of its executions within 2 minutes, there is a substantial likelihood that inmates executed in Missouri have suffered excruciating pain, because the thiopental had not yet achieved burst suppression when the potassium chloride was administered.

25.     Figure 4 demonstrates the range of potential thiopental effects on the heart ranging from the least likely event of no effect (baseline) to the most likely, that it would

be on the order of a 75% reduction (so that cardiac output is 25% of the baseline). Note that no heart depressing effect predicts a shortening of the time to onset and that each incremental decrease in cardiac output adds time to when potassium chloride can be ethically given.

### C. Applying the Pharmacokinetics of Thiopental to Missouri's Lethal Injection Records

26. Since the sequencing and timing of the drugs used for lethal injection defines the specific effect that can be expected at each point in time, it is critical to know the times the drugs were injected down to within fractions of a minute in order to understand whether the current execution procedures are being done properly. The continuous ECG record that is used to determine the moment that death occurs provides this information accurate to within a second or two. The way that accurate time is determined from the ECG record is as follows.

27. The ECG tracing (or strip) periodically automatically prints out the heart rate from the ECG as well as the current time in hours, minutes and seconds as well as the value of other physiologic measures that this monitoring device could also provide if connected to the inmate, such as blood pressure and arterial hemoglobin oxygen saturation. A pulse oxymeter was in place in several of the executions, but I never saw a blood pressure recorded. Since the paper speed for the ECG strip is 25 mm/sec it is quite simple to count the graph lines from the point at which the time is printed or from the point at which prison personnel marked events on the moving paper and convert this distance into the precise time that elapsed. In most of the records that I examined, the start and end of the thiopental, pancuronium and potassium chloride injections are clearly marked. Thus it is a simple matter to derive the precise sequencing and timing of these events.

28. It should be noted that the time on the ECG is not exactly the same as that on the wall clock in the prison. The ECG clock appears to be 7 minutes behind the prison clock. However, from the written records it appears that there is good correspondence between the elapsed time from the ECG and the elapsed time for the same events handwritten on the record from examining the wall clock. This gives further reason to believe that the handwritten markings on the ECG report accurately marked the moment at which each drug was injected. It should be noted that the handwritten times do not contain the precision necessary to determine the pharmacokinetic events with the degree of accuracy needed to understand whether the thiopental effect has rendered the condemned inmate deeply unconscious before the painful potassium injection has begun. For instance, if it is written that the thiopental injection began at 2:40 am and the pancuronium injection began at 2:42 it is impossible to know whether the elapsed time was 1 minute 30 seconds or 2 minutes 30 seconds or something in between. With the ECG we can know that the elapsed time between 2:40 and 2:42 was 1 minute 37 seconds, exactly. Based on the times indicated on the ECG print-outs (and corroborated by the State's handwritten logs), I can tell, for instance, that during Vernon Brown's execution, the State began injection of potassium chloride a mere 52 seconds after it finished

8

injecting thiopental.  (The ECG from Vernon Brown's execution is attached as Exhibit D.)

29.     As noted above, the heart and its function are affected negatively by thiopental.  This is as a result of both decreased blood return to the heart as a result of venous dilation and by a direct depressant effect on the heart muscle itself.  In light of a thiopental dose that ranges from 2.5 grams to 5 grams (5 to 10 times normal clinical doses), it is extremely likely that a decrease in heart function will occur when these high thiopental concentrations reach the arterial circulation.  As shown in figure 1, this begins at about 45 seconds.  Assuming another 15 seconds for these cardiovascular effects to start manifesting, pharmacokinetic simulations were created in which the parameters describing the rate of distribution of thiopental to peripheral tissues, which depend on cardiac output, were reduced by 25, 50 and 75 percent from the baseline normal cardiac output.  The delays for venous transit and transit through the heart and lungs were similarly increased by 25, 50 and 75 percent from the baseline condition.  While it is speculation to what degree the heart will be affected in the minutes following a massive overdose of thiopental, it is certain that there will be an effect.  This effect likely resides between a small 25% reduction and a profound 75% reduction.  Given this massive dose, a larger reduction (closer to 75%) is the most likely.

30.     By using pharmacokinetic-pharmacodynamic simulations, the effects of a change in cardiac function on the time of onset of thiopental effect can be examined.  Figure 5 demonstrates a 5 gram dose of thiopental's effect on cardiac output, beginning at one minute from the start of the thiopental injection, on the time to reach EEG burst suppression.  Also shown is the potential painful effect of potassium chloride taken from the record of Vernon Brown.  He had a potassium chloride injection of one minute duration beginning just before 90 seconds after the start of the thiopental injection.  Accordingly, Figure 5 indicates that potassium chloride was injected just before 1.5 minutes.

31.     As demonstrated in Figure 5, there would be a 33% chance that burst suppression would not have been reached before the painful potassium chloride injection was started if there were no change in heart function.  This is seen by noting where the left edge of the potassium injection 'box' intersects the first or 'baseline' probability of burst suppression curve.  It intersects at 67% probability of effect – meaning that there is a 33% chance of burst suppression *not* being reached.  If cardiac output were reduced by 25%, the probability of burst suppression falls to 20%, meaning that there is an 80% probability that burst suppression is not reached.  (Again, note where the left edge of the potassium injection 'box' crosses the 'second' probability curve).  If cardiac output is 50% reduced the probability of burst suppression being attained before the potassium chloride is injected is 1%.  If the thiopental effect on the heart is profound (reducing the heart to 25% of its usual cardiac output), there is less than one five hundred thousandth percent chance that burst suppression will have occurred prior to 90 seconds.  Thus, there is an unacceptable risk of reaction to pain that could be interpreted as being conscious in all conditions, whether assuming no drug induced change on cardiac output, or any

9

postulated degree of change.  In fact, any change in heart function increases the probability of a conscious reaction to the pain of potassium chloride injection.

32.     Figure 6 contains similar pharmacokinetic-pharmacodynamic simulations, demonstrating a 2.5 gram dose of thiopental's effect on cardiac output.  As demonstrated in Figure 6, there would be a 93% chance of a lack of burst suppression at the time the potassium chloride was injected (again measured by the time potassium chloride was injected in the Vernon Brown execution) if there were no change in heart function.  (The "no change in cardiac output" probability curve crosses the left edge of the potassium injection 'box' at 7%, indicating a 7% chance that the thiopental has reached burst suppression.)  If cardiac output were reduced by 25% -- that is, to 75% of the baseline – there would be a 0.2% chance that thiopental would have achieved burst suppression at the time potassium chloride was injected.  If cardiac output were reduced by 50%, there is less than a .01% chance that 2.5 grams of thiopental would achieve burst suppression before the potassium chloride was injected.  Finally, if cardiac output were reduced by 75%, there is a less than one millionth of a chance that burst suppression would be reached.

33.     Additionally, to the extent Missouri's chemical logs suggest that it has sometimes prepared a 2.5 gram dose but not injected all of it, burst suppression would be delayed further still.  Page 2 of the State's chemical log indicates that on 10/26/05 the State apparently prepared only 2.5 grams of thiopental.  (The chemical log is attached as Exhibit E.)  However, the log seems to indicate that it only injected "40" units and flushed (or disposed of) another "20."  It thus appears that the State may have prepared 2.5 grams of thiopental in 60 units of solution, but injected only 40 units.  In that case, only 2/3 of the 2.5 grams of thiopental would have been injected -- or 1.67 grams.  (Of course, this is not the only possible reading of the log, but it is certainly a plausible one and to my understanding the State has done nothing to refute it.)

34.     Based on my simulations, a 1.67 gram dose of thiopental would delay burst suppression by approximately another 20 seconds.  Once again, the effect on cardiac output is uncertain, but we can be sure that there will be some effect.  Because a 1.67 gram dose is significantly less than a 5 gram dose, it might have a less profound impact on cardiac output than the 5 gram dose would.  In any event, as Figure 7 demonstrates, even if there is no effect on cardiac output (which is still unlikely, even at 1.67 grams), there is still less than a 1% chance that of reaching burst suppression before the potassium chloride is injected (assuming, again, that the potassium chloride will be injected when it was during the Vernon Brown execution).  As cardiac output decreases, so too does the already slim likelihood of reaching burst suppression before the potassium chloride.

35.     Moreover, if Missouri is only injecting 1.67 grams of thiopental, it is getting dangerously close to a dose that would not result in burst suppression 95% of the time.  Thus, a relatively small administration problem causing some of the thiopental to leak or not reach the inmate's veins for whatever reason would present a risk that the inmate might not attain burst suppression at all.

10

36.     As the foregoing analysis and accompanying graphs should make clear, there will be substantial variation in the time it takes for thiopental to achieve burst suppression, depending on the amount injected into the veins and its effect on cardiac output.  As noted above, the precise effect of various doses of thiopental on cardiac output is poorly documented, but it is likely that the thiopental, especially in these doses, will have some significant effect on cardiac output.  As the graphs and ECG printouts collectively demonstrate, there is a substantial risk that the State's lethal injection practices inject potassium chloride into the inmate's veins before burst suppression, thus creating a substantial risk of excruciating pain.

37.     This analysis demonstrates that it is medically contraindicated to inject these chemicals so rapidly.  This rapid injection creates a substantial danger of excruciating pain.  It also demonstrates that the State does not understand what it is doing.  In addition to exacerbating the risk of excruciating pain, the rapid injection also makes it more difficult to monitor the inmate and makes administration failures more likely.  No doctor in a clinical setting would ever inject chemicals in such rapid succession, except perhaps in an emergency trauma scenario where drastic measures are necessary to attempt to revive a patient and save him from an otherwise almost certain death.

38.     Additionally, because thiopental will have had some effect before it achieves burst suppression, there is a substantial risk that the inmate could not express that pain and that such pain would not be visible to an observer.  As explained in Figure 2, "Loss of Consciousness" -- that is, the level of consciousness at which a person responds incorrectly to verbal commands -- occurs about 20 seconds before burst suppression.  When a patient has reached "Loss of Consciousness," he often is unable to indicate pain.  The typical cues that might alert a person without training in anesthesia that a patient is in pain would have a substantial risk of being masked by the effect of the thiopental.  There is thus usually a 20 second window during which an observer could not tell that a person was suffering from excruciating pain.  Of course, the risk of observers not being able to notice such pain is heightened further by the fact that there is no anesthesiologist monitoring the inmate by his side.

39.     I conclude from all of these calculations and simulations a few important conclusions.  First, 5 grams (or even 1.67 grams) of thiopental injected intravenously will produce a state of deep unconsciousness.  Second, while this state will surely occur with lethal injection doses in almost all people, it does not happen instantaneously and requires time.  Some of the time needed (i.e., for injection, transit through IV tubing as well as transit through the veins, heart, lungs, and arteries) is not affected by dose.  That is, giving more drug will not speed up the time needed to reach the brain (this takes about 45 seconds).  The other time needed is that required for the drug to diffuse from the capillaries into the brain tissue until the drug concentrations in brain produce the desired effect.  The time for the diffusion process to reach a particular concentration by diffusion is greatly affected by dose.  So by increasing the dose, one can speed this part of the onset time.  Similarly, decreasing the dose will slow the onset time.  This part of the onset time,

which is added on to the 45 seconds for transit, can vary from just a few seconds to as long as approximately 3 minutes, depending on the dose.

40.     I can not imagine any anesthesiologist choosing to produce unconsciousness before a painful procedure in the way described quite clearly in the prison records.  First, one would want to give thiopental sufficient time to work before administering a paralytic or causing pain.  The six seconds from the end of thiopental injection until starting pancuronium is too short, as is the 52 seconds until starting the potassium chloride (as documented in the Vernon Brown case).  With this sequence and timing of drugs, there is nearly a 50:50 chance that an inmate will register pain or distress before reaching deep unconsciousness (even in the unlikely event that cardiac output was not reduced).  I can think of no reason to inject these drugs in this way.  Second, an anesthesiologist will always want to stimulate the patient in some way (e.g., verbal, light touch or even a moderately painful stimulus), often repeatedly, in order to determine the trajectory of the drug's effect on consciousness.  This is necessary because drug is not always delivered to the venous or subsequently to the arterial blood as expected and because each individual will have a different response to the drug.  If the expected response is not observed, a clinician will troubleshoot the situation (i.e., form a differential diagnosis) and make appropriate adjustments (most often as simple as waiting more time for the drug to work).   The hands-off and even eyes-off approach to monitoring the onset of anesthesia described in the prison record is well outside of any practice standard for how these drugs should be administered to human or even animal patients.

## IV.     Femoral Vein Access

41.     The femoral vein is a large, central vein near the groin.  Unlike peripheral veins, which can be accessed using small needles a fraction of an inch beneath the skin, femoral veins can only be accessed with large bore needles inserted deep under skin and tissues.  Because the femoral vein runs in a bundle with the nerve and artery, femoral vein access necessary runs the risk of hitting and damaging other critical structures located near the femoral vein.

42.     The insertion of a femoral vein central catheter is not medically indicated for the infusion of any of the drugs involved in lethal injection.  It is substantially more risky, painful, and invasive than the insertion of a peripheral line.  No responsible physician would ever put a femoral line in a patient when a peripheral line would serve the same purpose.  Unless an inmate's veins are compromised, peripheral vein access can be used to inject the chemicals at issue here.  By selecting a femoral vein central catheter, the State will necessarily cause additional, significant pain during its insert as compared with a peripheral intravenous catheter.  The femoral vein access also creates a substantial risk of much more serious complications associated with its insertion.  These risks include hitting the artery, nerve, or bone; puncturing the vein, artery, bladder, or bowel; hematomas; infection; and thrombosis.  Collectively, the probability of such complications occurring is approximately 17%.[8]

12

43.     Because significant pain is almost inevitable and because there is a substantial risk of excruciating pain, the insertion of a femoral vein central catheter should not be performed without first giving a strong sedative.  An oral sedative would likely be insufficient; a sedative through an IV drip in a peripheral vein would be preferable.  Local anesthesia, while also necessary, would likely not protect against the pain from most of these complications, because it works only on the surface skin and most of these complications occur far underneath the skin, in veins, arteries, nerves, and tissue.  Even when given in tandem, a strong sedative and local anesthesia would not protect against the excruciating pain resulting from some of the complications connected with femoral vein access.

44.     One complication would be damage to the femoral nerve that runs just lateral to the femoral vein and artery.  Damage to the femoral nerve caused by the large bore (16 or 18 gauge) needle would be excruciating.  More frequent complications of femoral venous cannulation involve damage to the adjacent artery.  One may accidentally insert the catheter into the femoral artery, as well as lacerate or transect it.  These complications would result in arterial blood leaking into the surrounding tissues, producing a hematoma.  A hematoma is created when blood collects under pressure, distorting and distending the surrounding tissues.  Hematomas are painful and can be extremely painful depending on the extent of the leak and the size of the hematoma.  (Some hematomas can be the size of a grapefruit or larger.)  The loss of blood from this vessel through a puncture site, laceration or its complete transaction can sometimes be severe enough to cause cardiovascular instability and require immediate treatment including blood transfusion.  Applying direct pressure to the arterial puncture is the usual treatment for an inadvertent puncture of the femoral artery.   However, applying pressure does not reliably stop the blood from leaking, especially if a clot does not form.  Sometimes a vascular surgeon is needed to repair the artery in order to stop blood from leaking and more rarely to repair a transected or severely lacerated artery.  Of course, such surgery would probably not be performed in the execution setting, but serious bleeding could result and lead to an excruciating death.  The femoral vein can also be damaged by puncture, laceration, or transaction but, because the pressure in this vessel is normally less than one quarter of that in the artery, blood leakage from a femoral venous injury is not as likely to result in severe pain or cardiovascular instability.

45.     Anesthesiologists would never choose to place a femoral central venous catheter for infusion of thiopental and pancuronium unless a peripheral vein was not available.  And when doing so, would do their utmost to assure themselves that proper medical backup was available to treat the complications should they occur.

46.     In the photographs provided from the execution of Mr. Johnston (Exhibit F), it appears that the femoral artery may have been mistakenly cannulated or injured.  I say this for several reasons.  First, the blood present on the field is bright red, signifying the likelihood that the blood was well oxygenated arterial blood.  Venous blood would likely not be that bright red color.  Second, there is much more blood present on the field than would be expected from even a difficult femoral venous catheter insertion, indicating that blood may have been leaking rapidly from the high pressure artery.

Finally, the two photographs show signs of hematoma formation: swelling and a bluish red mottling of the tissues in the area of swelling. There are also signs that this catheter may have been left *in situ*, but abandoned. Two of the catheter extension lines are severed and knotted, while the third is clamped and knotted. I can think of no reason that anyone would tie knots in these lines other than as a means of signaling to others to not inject into the line and, if someone inadvertently tried to inject into it flow would be prevented by the knot. For both thiopental and potassium chloride, arterial injection would have horrendous consequences in terms of pain and tissue damage downstream from the catheter (leg and foot). (Thiopental itself can be excruciatingly painful if administered extravascularly.)

47. Additionally, femoral venous access presents the potential of additional complications that might arise in the event of a last minute stay. Deep venous thrombosis (blood clotting) occurs with some regularity after femoral venous catheter placement. Similarly, groin infection is another complication that might result were the execution not completed.

48. Of course, a femoral line may be used instead of a peripheral line in certain circumstances where a patient's peripheral veins are scarred or compromised as a result of intravenous drug abuse and/or chemotherapy. It may also be sometimes the first method used for certain specific kinds of procedures, none of which are at issue here. Femoral vein access should never be the first choice for administration of anesthesia or any of the chemicals at issue in this case.

49. To sum up, insertion of a femoral vein central catheter is a significantly more invasive, risky, and painful means of accessing an inmate's veins for lethal injection. Even without complications, the procedure is far more painful than peripheral IV access. Additionally, serious complications – including significant bleeding from inadvertent arterial injury and accidental femoral arterial placement – occur with some frequency resulting in excruciating pain. Consequently, in my medical and professional judgment, the insertion of a femoral vein central catheter should not be used for the administration of thiopental and pancuronium bromide unless the peripheral veins are too compromised to access.

## V.    Compensation

50. I am being compensated at the rate of $250.00 per hour.

## VI.   Other Cases

51. I have not testified as an expert at trial or by deposition within the last four years.

# References

1. Shanks, C. A., Avram, M. J., Krejcie, T. C., Henthorn, T. K., and Gentry, W. B. A pharmacokinetic-pharmacodynamic model for quantal responses with thiopental. Journal of Pharmacokinetics & Biopharmaceutics 21(3), 309-21. 93.

2. Gentry, W. B., Krejcie, T. C., Henthorn, T. K., Shanks, C. A., Howard, K. A., Gupta, D. K., and Avram, M. J. Effect of infusion rate on thiopental dose-response relationships. Assessment of a pharmacokinetic-pharmacodynamic model. Anesthesiology 81(2), 316-24; discussion 25A. 94.

3. Avram, M. J., Krejcie, T. C., and Henthorn, T. K. The relationship of age to the pharmacokinetics of early drug distribution: the concurrent disposition of thiopental and indocyanine green [see comments]. Anesthesiology 72(3), 403-11. 90. Notes: Comment in: Anesthesiology 1990 Mar;72(3):399-402.

4. Niemann CU, Henthorn TK, Krejcie TC, Shanks CA, Enders-Klein C, Avram MJ: Indocyanine green kinetics characterize blood volume and flow distribution and their alteration by propranolol. Clin Pharmacol Ther 2000; 67: 342-50

5. Buhrer M, Maitre PO, Hung OR, Ebling WF, Shafer SL, Stanski DR: Thiopental pharmacodynamics. I. Defining the pseudo-steady-state serum concentration-EEG effect relationship. Anesthesiology 1992; 77: 226-36

6. Hung OR, Varvel JR, Shafer SL, Stanski DR: Thiopental pharmacodynamics. II. Quantitation of clinical and electroencephalographic depth of anesthesia. Anesthesiology 1992; 77: 237-44

7. Avram MJ, Krejcie TC, Henthorn TK, Niemann CU: Beta-adrenergic blockade affects initial drug distribution due to decreased cardiac output and altered blood flow distribution. J Pharmacol Exp Ther 2004; 311: 617-24

8. Merrer J, De Jonghe B, Golliot F, Lefrant JY, Raffy B, Barre E, Rigaud JP, Casciani D, Misset B, Bosquet C, Outin H, Brun-Buisson C, Nitenberg G: Complications of femoral and subclavian venous catheterization in critically ill patients: a randomized controlled trial. JAMA 2001; 286: 700-7

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.


                                                                        ___/s/ Thomas K. Henthorn_____
                                                                        Dr. Thomas K. Henthorn

Dated:  May 23, 2006

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| MICHAEL ANTHONY TAYLOR | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 05-4173-CV-W-FJG |
| | ) | |
| LARRY CRAWFORD, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## EXPERT WITNESS REPORT OF DR. THOMAS K. HENTHORN
## PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)

### Certificate of Service

I hereby certify a true and correct copy of the foregoing was forwarded by

electronic mail and Federal Express this 23rd day of May, 2006, to the offices of:

Michael Pritchett, Esq.
Assistant Attorney General
P.O. Box 899
Jefferson City, Missouri 65102

/s/ John William Simon
Attorney for Plaintiff

# EXHIBIT E

| DATE | TIME | SODIUM PENTATHIOL | | | PANCURONIUM BROMIDE | | | POTASSIUM CHLORIDE | | | PURPOSE | STAFF NAMES AND SIGNATURES |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | AMOUNT INJECTED | FLUSHED | VIAL | AMOUNT INJECTED | FLUSHED | VIAL | AMOUNT INJECTED | FLUSHED | VIAL | | |
| 10/25 | | 5g | 5b | 60 | | 80 | 60 | 10 | 120 | 120 | 20 | | Execution Start |
| 3/15 | | 5g | 1 | | Versed | | 10 | 12 | 120 | 120 | 20 | 6 | Execution Start |
| 3/16 | | 5g | 60 | 10 | 80 | 60 | 10 | 120 | 120 | 20 | 6 | Stanley Hall |
| 4/26 | | 5g | 60 | 10 | 80 | 600 | | | | | | Donald Davis Orollo |
| 4/26 | | Versed & viral | | | | | | | | | | |

| DATE | TIME | SODIUM PENTATHOL | | | PANCURONIUM BROMIDE | | | POTASSIUM CHLORIDE | | | PURPOSE | STAFF NAMES AND SIGNATURES |
|------|------|------------------|---|---|---------------------|---|---|--------------------|---|---|---------|-----------------------------|
| | | AMOUNT INJECTED | FLUSHED | VIAL | AMOUNT INJECTED | FLUSHED | VIAL | AMOUNT INJECTED | FLUSHED | VIAL | | |
| 5/7/65 | 945 | 5 cc 50 | 10 | 10 | 80 | 60 | 10 | 120 | 120 | 120 | | Verna Brown |
| 5/7/06 | | 50 | 50 | 6 | 80 | 60 | 10 | 120 | 120 | 20 | | Verna Brown |
| 10/26 | 12 | 25g | 40 | 20 | 80 | 60 | 10 | 120 | 120 | 20 | Disposal | |
| 4/06 | 11:30 | 2.5 | 4 | 40 | | | | | | 120 | | |

# EXHIBIT D

II   17 May 2005 23:36:53   ▽ 98   BP ---/--   SpO₂ 99

5 mm/mV

0.5 – 40 Hz –

25 mm/s

SpO₂









2005  2:24:28  ♡ 65  BP ---/---  SpO₂ 100





25 mm/s
0.5 – 40Hz –
20 mm/mV
I
18 May 2005  2:24:52   ♥ 76   BP ---/--   SpO₂ 99

SpO₂





♡ 75    BP ---/---    SpO₂ 99







BP ---/--

SpO₂ 99















SpO₂

25 mm/s

20 mm/mV
0.5 – 40Hz –

I

18 May 2005  2:27:04















2005 2:27:58

∇ ---

BP ---/---

SpO$_2$ ---

# EXHIBIT C

THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

MICHAEL ANTHONY TAYLOR, et al.  )
                                )
          Plaintiffs,           )
                                )
     v.                         )    Case No. 05-4173-CV-C-SOW
                                )
LARRY CRAWFORD, et al.,         )
                                )
          Defendants.           )

## DEFENDANT CRAWFORD'S ANSWERS TO
## PLAINTIFFS' FIRST INTERROGATORIES

Defendant Crawford, through counsel, hereby responds to
Plaintiffs' First Interrogatories, as follows:

**General Objection:** Defendant objects to the definitions
and instructions set out before the interrogatories in that
they extend the duties of a party beyond those required by
the rules of civil procedure.

## INTERROGATORIES

**1.** Please identify each position you have held since
January 10, 1994. For each position identified, provide:

**a.** the name of the office and component in which the
position was organizationally located;

**ANSWER:** January 13, 2005 - present: Director of the
Missouri Department of Corrections

**m.** If the answer the foregoing lettered subdivision of this interrogatory is in the affirmative, the flow rates of the chemicals, drugs, or other substances used in the lethal injection process;

**ANSWER:** The flow rates of all drugs used in the lethal injection process are at approximately 2 cc per second depending on flow resistance.

**n.** With respect to each prisoner executed, please state the time of the injection of the initial drug and the time of death of each prisoner;

**ANSWER:**

| Name | Date of Execution | Injection Time of First Drug | Time of Death |
|------|-------------------|------------------------------|---------------|
| Vernon Brown | 5/18/2005 | 2:32 am | 2:35 am |
| Donald Jones | 4/27/2005 | 12:02 am | 12:07 am |
| Stanley Hall | 3/16/2005 | 12:04 am | 12:07 am |
| John Smith | 10/29/2003 | 12:01 am | 12:05 am |
| Kenneth | 2/5/2003 | 12:01 am | 12:03 am |

21

| Kenley | | | |
|---|---|---|---|
| William Jones | 11/20/2002 | 12:02 am | 12:04 am |
| Daniel Basile | 8/14/2002 | 10:01 pm | 10:05 pm |
| Paul Krueter | 4/10/2002 | 12:01 am | 12:05 am |
| Jeffrey Tokar | 3/6/2002 | 12:01 am | 12:04 am |
| Michael Owsley | 2/6/2002 | 12:02 am | 12:07 am |

**o.** Whether a cut-down procedure was employed during any lethal injection execution and, if so, please state the name of the prisoner involved, the name of the person who performed the cut- down procedure, and the training, credentials, qualifications, and experience (if any) who performed it;

**ANSWER:** Objection. The information requested is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence in that this case alleges issues with regard to the drugs used in the lethal

**s.** Documented blood levels of sodium penthothal

(thiopental), at the time of death, of each person

executed; and

**ANSWER:**  None back through the last ten executions.

**t.** The time from administration of each of the three

chemicals to the time of death of each person executed.

**ANSWER:**

| Name | Date of Execution | Injection Time of First Drug | Injection Time of Second Drug | Injection Time of Third Drug |
|------|-------------------|-------------------------------|-------------------------------|-------------------------------|
| Vernon Brown | 5/18/2005 | 2:32 am | 2:33 am | 2:34 am |
| Donald Jones | 4/27/2005 | 12:02 am | 12:03 am | 12:04 am |
| Stanley Hall | 3/16/2005 | 12:04 am | 12:05 am | 12:06 am |
| John Smith | 10/29/2003 | 12:01 am | 12:02 am | 12:02 am |
| Kenneth Kenley | 2/5/2003 | 12:01 am | 12:02 am | 12:03 am |
| William Jones | 11/20/2002 | 12:02 am | 12:02 am | 12:03 am |
| Daniel | 8/14/2002 | 10:01 pm | 10:02 pm | 10:03 pm |

| Basile | | | | |
|---|---|---|---|---|
| Paul Krueter | 4/10/2002 | 12:01 am | 12:02 am | 12:02 am |
| Jeffrey Tokar | 3/6/2002 | 12:01 am | 12:02 am | 12:02 am |
| Michael Owsley | 2/6/2002 | 12:02 am | 12:03 am | 12:04 am |

Times of death are provided in response to Interrogatory 6n.

**7.** Please state whether any modifications or changes have been made to the Missouri execution protocol, practices, and procedures and, if so, please state the following:

**a.** The date of each modification or change;

**b.** The nature of each modification or change;

**c.** The reason for each modification or change;

**d.** The name of the person or persons under whose direction the modification or change was made;

**e.** The name of the person(s) who made the actual modification or change and his/her training, credentials, qualifications and experience.

26

## THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

MICHAEL ANTHONY TAYLOR, et al. )
　　　　　　　　　　　　　　　　　　 )
　　　　　　Plaintiffs,　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
v.　　　　　　　　　　　　　　　　　 )　　　Case No. 05-4173-CV-C-SOW
　　　　　　　　　　　　　　　　　　 )
LARRY CRAWFORD, et al.,　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　　　　Defendants.　　　　　　　 )

### DEFENDANT CRAWFORD'S SUPPLEMENTAL ANSWER TO PLAINTIFFS' INTERROGATORY NO. 6n

Defendant Crawford, through counsel, hereby supplements his response to Plaintiffs' Interrogatory No. 6n, as follows:

6. Please state the following with respect to every lethal injection execution held in the State of Missouri from January 1, 1989, to the present date:

General Objection to Interrogatory 6. The interrogatory seeks information regarding the lethal injection process from its beginning. Information for this full length of time is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. The information provided in response to each part of Interrogatory 6, covers the last twelve executions in Missouri.

n. With respect to each prisoner executed, please state the time of the injection of the initial drug and the time of death of each prisoner;

A-222

EXHIBIT J

| Name | Date of Execution | Injection Time of First Drug | Time of Death* |
|------|------|------|------|
| Marlin Gray | 10/26/05 | 12:04 am | 12:07 am |
| Timothy Johnston | 8/31/05 | 12:02 am | 12:07 am |
| Vernon Brown | 5/18/2005 | 2:32 am | 2:35 am |
| Donald Jones | 4/27/2005 | 12:02 am | 12:07 am |
| Stanley Hall | 3/16/2005 | 12:04 am | 12:07 am |
| John Smith | 10/29/2003 | 12:01 am | 12:05 am |
| Kenneth Kenley | 2/5/2003 | 12:01 am | 12:03 am |
| William Jones | 11/20/2002 | 12:02 am | 12:04 am |
| Daniel Basile | 8/14/2002 | 10:01 pm | 10:05 pm |
| Paul Krueter | 4/10/2002 | 12:01 am | 12:05 am |
| Jeffrey Tokar | 3/6/2002 | 12:01 am | 12:04 am |
| Michael Owsley | 2/6/2002 | 12:02 am | 12:07 am |

\* "Time of Death" means the time of death as pronounced by a medical professional, who is present at the execution, after all three drugs have been administered. Pronouncement of death is not made until the all electrical activity of the heart ends as shown by the electrocardiogram machine. As I understand it, breathing has already ceased for a time and

JAN-25-2006  12:56     MO ATTORNEY GENERAL                      573 751 5456     P.19/20

the heart has already stopped beating for a time by the time that all electrical activity of the heart has ended.

| | |
|---|---|
| STATE OF MISSOURI | ) |
| | ) ss. |
| COUNTY OF COLE | ) |

Larry Crawford upon his oath states that he is the Director of the Department of Corrections of the State of Missouri; that he has read the foregoing answers to the accompanying interrogatories; that the statements and facts contained therein are true and correct to the best of his knowledge and belief.

LARRY CRAWFORD
Director, Department of Corrections

Subscribed and sworn to before me this 23rd day of January 2006.

Notary Public, in and for

_____ County, Missouri.

My commission expires: _____

DEBORAH L. VANCE
Notary Public---Notary Seal
State of Missouri
Callaway County
My Commission Expires: Dec. 5, 2008
Commission #04624108

-3-

UMass Memorial Medical Center

TEACHING EXPERIENCE:

| | |
|---|---|
| 1976-1980 | Dental Hygiene Pharmacology<br>Northwestern University Dental School<br>5 hours and Course Director |
| 1977-1979 | Medical Pharmacology<br>Illinois College of Podiatric Medicine<br>22 hours and Course Director |
| 1978-1981 | Dental Pharmacology<br>Northwestern University Dental School<br>3 hours |
| 1979-1982 | General Pharmacology<br>Illinois College of Optometry<br>20 hours and Course Director |
| 1979-1982 | Ocular Pharmacology<br>Illinois College of Optometry<br>10 hours and Course Director |
| 1980-1981 | Nursing Pharmacology, Northwestern University<br>5 hours |
| 1994- | HST 150 Introduction to Pharmacology<br>Harvard-MIT Program in Health, Science and Technology<br>4 hours |
| 1996- | Harvard Anesthesia Review and Update<br>1-2 hrs |
| 2001- | Medical Pharmacology<br>University of Massachusetts Medical School<br>11-14 hrs |

VISITING PROFESSORSHIPS:

| | |
|---|---|
| April 6-7, 1994: | University of Pennsylvania |
| May 17-18, 1994: | University of North Carolina at Chapel Hill |
| Sept. 20-22, 1994: | State University of New York at Stony Brook |
| April 5-6, 1995: | Albany Medical College |
| May 8-10, 1997: | University of Texas Southwestern Medical Center |
| Dec. 8-9, 1998 | Temple University |

Dec. 16-17, 1998        University of Pittsburgh
COMMITTEE MEMBERSHIPS:

    LOCAL:

    2000 -              Pharmacy and Therapeutics Committee
                        UMass Memorial Medical Center

    2001 -              Physician Health and Well-Being Committee
                        UMass Memorial Medical Center

    NATIONAL:

    1999 -2002          Subcommittee on Anesthetic Action and Biochemistry
                        American Society of Anesthesiologists

    2001 -              Subcommittee on Drug Disposition
                        American Society of Anesthesiologists

BIBLIOGRAPHY:

ORIGINAL REPORTS:

1.  Novak RF, Dershwitz M, Novak FC.  The interaction of benzene with human hemoglobin as studied by $^1$H Fourier transform NMR spectroscopy.  **Biochem. Biophys. Res. Commun.** 1978; 82:634-40.

2.  Novak RF, Dershwitz M, Novak FC.  Characterization of the interaction of the aromatic hydrocarbons benzene and toluene with human hemoglobin.  **Mol. Pharmacol.** 1979; 16:1046-58.

3.  Dershwitz M, Novak RF.  Lack of inhibition of glutathione reductase by unnitrated derivatives of nitrofurantoin.  **Biochem. Biophys. Res. Commun.** 1980; 92:1313-19.

4.  Dershwitz M, Novak RF.  Lack of inhibition of glutathione reductase by anthracycline antibiotics.  **Biochem. Pharmacol.** 1981; 30:676-8.

5.  Dershwitz M, Novak RF.  Generation of superoxide anion via the interaction of nitrofurantoin with human hemoglobin.  **J. Biol. Chem.** 1982; 257:75-9.

6.  Dershwitz M, Novak RF.  Studies on the mechanism of nitrofurantoin-mediated red cell toxicity.  **J. Pharm. Exp. Ther.** 1982; 222:430-4.

7.  Dershwitz M, Ts'ao CH, Novak RF.  Metabolic and morphologic effects of the antimicrobial agent nitrofurantoin on human erythrocytes in vitro.  **Biochem. Pharmacol.** 1985; 34:1963-70.

8.  Dershwitz M, Sréter FA, Ryan JF.  Ketamine does not trigger malignant hyperthermia in susceptible swine.  **Anesth. Analg.** 1989; 69:501-3.

9.  Dershwitz M, Ryan JF, Guralnick W.  Safety of amide local anesthetics in patients susceptible to malignant hyperthermia.  **J. Am. Dent. Assoc.** 1989; 118:276-80.

10. Dershwitz M, Sréter FA.  Azumolene reverses episodes of malignant hyperthermia in susceptible swine.  **Anesth. Analg.** 1990; 70:253-5.

11. Dershwitz M, Rosow CE, Di Biase PM, Zaslavsky A.  Comparison of the sedative effects of butorphanol and midazolam.  **Anesthesiology** 1991; 74:717-24.

12. Dershwitz M, Sherman EP.  Acute myocardial infarction symptoms masked by epidural morphine?  **J. Clin. Anesth.** 1991; 3:146-8.

13. Dershwitz M, Rosow CE, Di Biase PM, Joslyn AF, Sanderson PE.  Ondansetron is effective in decreasing postoperative nausea and vomiting.  **Clin. Pharmacol. Ther.** 1992; 52:96-101.

14. Dershwitz M, Di Biase PM, Rosow CE, Wilson RS, Sanderson PE, Joslyn AF.  Ondansetron does not affect alfentanil-induced ventilatory depression or sedation.  **Anesthesiology** 1992; 77:447-52.

15. McKenzie R, Sharifi-Azad S, Dershwitz M, Miguel R, Joslyn A, Tantisira B, Rosenblum F, Rosow C, Downs J, Bowie J, Odell S, Lessin J, Di Biase P, Nations M.  A randomized, double-blind pilot study examining the use of intravenous ondansetron in the prevention of postoperative nausea and vomiting in female inpatients.  **J. Clin. Anesth.** 1993; 5:30-6.

16. Dershwitz M, Randel GI, Rosow CE, Fragen RJ, Connors PM, Librojo ES, Shaw DL, Peng AW, Jamerson BD.  Initial clinical experience with remifentanil, a new opioid metabolized by esterases.  **Anesth. Analg.** 1995; 81:619-23.

17. Dershwitz M, Hoke JF, Rosow CE, Michałowski P, Connors PM, Muir KT, Dienstag JL.  Pharmacokinetics and pharmacodynamics of remifentanil in volunteer subjects with severe liver disease.  **Anesthesiology** 1996; 84:812-20.

18. Dershwitz M, Rosow CE.  The pharmacokinetics and pharmacodynamics of remifentanil in volunteers with severe hepatic or renal dysfunction.  **J. Clin. Anesth.** 1996; 8:88S-90S.

19. Kovac AL, Scuderi PE, Boerner TF, Chelly JE, Goldberg ME, Hantler CB, Hahne WF, Brown RA, Dolasetron Mesylate PONV Treatment Study group.  Treatment of postoperative nausea and vomiting with single intravenous doses of dolasetron mesylate: a multicenter trial.  **Anesth Analg** 1997; 85:546-52.

20. Hoke JF, Shlugman D, Dershwitz M, Michałowski P, Malthouse-Dufore S, Connors PM, Marten D, Rosow CE, Muir KT, Rubin N, Glass PSA. Pharmacokinetics and pharmacodynamics of remifentanil in subjects with renal failure compared to healthy volunteers. **Anesthesiology** 1997; 87:533-41.

21. Gan TJ, Glass PS, Windsor A, Payne F, Rosow C, Sebel P, Manberg P, BIS Utility Study Group. Bispectral index monitoring allows faster emergence and improved recovery from propofol, alfentanil, and nitrous oxide anesthesia. **Anesthesiology** 1997; 87:808-15.

22. Kearse LA, Rosow C, Zaslavsky A, Connors P, Dershwitz M, Denman W. Bispectral analysis of the electroencephalogram predicts conscious processing of information during propofol sedation and hypnosis. **Anesthesiology** 1998; 88:25-34.

23. Dershwitz M, Conant JA, Chang YC, Rosow CE, Connors PM. A randomized double-blind dose-response study of ondansetron in the prevention of postoperative nausea and vomiting. **J Clin Anesth** 1998; 10:314-20.

24. Philip BK, Pearman MH, Kovac AL, Chelly JE, Wetchler BV, McKenzie R, Monk TG, Dershwitz M, Mingus M, Sung YF, Hahne WF, Brown RA, Dolasetron PONV Prevention Study Group. Dolasetron for the prevention of postoperative nausea and vomiting following outpatient surgery with general anaesthesia: a randomized, placebo-controlled study. **Eur J Anaesthesiol** 2000; 17:23-32.

25. Philip BK, McLeskey CH, Chelly JE, McKenzie R, Kovac AL, Diemunsch P, DuBois DM, Dolasetron Prophylaxis Study Group. Pooled analysis of three large clinical trials to determine the optimal dose of dolasetron mesylate needed to prevent postoperative nausea and vomiting. **J Clin Anesth** 2000; 12:1-8. (erratum published in J Clin Anesth 2000; 12:577-78).

26. Dershwitz M, Walsh JL, Morishige RJ, Connors PM, Rubsamen RM, Shafer, SL, Rosow C. Pharmacokinetics and pharmacodynamics of inhaled versus intravenous morphine in healthy volunteers. **Anesthesiology** 2000; 93:619-28.

27. Dershwitz M, Michałowski P, Chang YC, Rosow CE, Conlay LA. Postoperative nausea and vomiting following total intravenous anesthesia with propofol and remifentanil or alfentanil. How important is the opioid? **J Clin Anesth** 2002; 14:275-78.

28. Dershwitz M. Droperidol: should the black box be light gray? **J Clin Anesth** 2002; 14:598-603.

29. Dershwitz M. There should be a threshold dose for the FDA black-box warning on droperidol (letter). **Anesth Analg** 2003; 97:1542-3.

30. Dershwitz M. Is droperidol safe? Probably... **Semin Anesth** 2004; 23:291-301.

PROCEEDINGS OF MEETINGS:

1. Kharasch ED, Dershwitz M, Novak RF. Differential hemeprotein involvement in microsomal and red cell lysate quinone and nitro group reduction. In: Sato R, Kato R, eds. **Microsomes, Drug Oxidations, and Drug Toxicity.** New York: Wiley Interscience, 1982:237-8.

BOOKS:

1. Stelmack TR, Dershwitz M. **Manual for the Use of Pharmaceutical Agents for Ocular Diagnostic Purposes,** ICO Press, Chicago, 1980.

2. Dershwitz M, ed. **The MGH Board Review of Anesthesiology.** 4th ed. Norwalk, CT: Appleton & Lange, 1994.

3. Dershwitz M, ed. **The MGH Board Review of Anesthesiology.** 5th ed. Norwalk, CT: Appleton & Lange, 1998.

4. Dershwitz M, Walz JM, eds. **McGraw-Hill Specialty Board Review: Anesthesiology.** 6th ed. New York: McGraw-Hill, 2006.

CHAPTERS IN BOOKS:

1. Dershwitz M, Ten Eick RE. Pharmacology. In: **National Boards Examination Review for Part I, Basic Sciences.** Garden City, NY: Medical Examination Publishing Co., 1981.

2. Dershwitz M. Pharmacology. In: **National Boards Examination Review for Part I, Basic Sciences.** New Hyde Park, NY: Medical Examination Publishing Co., 1984.

3. Dershwitz M. Pharmacology. In: **National Boards Examination Review for Part I, Basic Sciences.** New York: Elsevier Science Publishing Co., Inc., 1987.

4. Dershwitz M. Local anesthetics. In: Firestone LL, Lebowitz PW, Cook CE, eds. **Clinical Anesthesia Procedures of the Massachusetts General Hospital,** 3rd ed. Boston: Little, Brown and Co., 1988.

5. Dershwitz M. Antiemetics. In: Bowdle TA, Horita A, Kharasch ED, eds. **The Pharmacological Basis of Anesthesia.** New York: Churchill Livingstone, 1994.

6. Dershwitz M. Antiemetic drugs. In: White PF, ed. **Ambulatory Anesthesia and Surgery.** London: W.B. Saunders Co., 1997.

7. Rosow CE and Dershwitz M. Opioid analgetics. In: Longnecker DE, Tinker JH, Morgan GE, eds. **Principles and Practice of Anesthesiology,** 2nd ed. Philadelphia: Mosby-Year Book, Inc., 1997.

8.  Starnbach A, Dershwitz M.  Intravenous and inhalation anesthetics.  In:  Hurford WE, Bailin MT, Davison JK, et al., eds.  **Clinical Anesthesia Procedures of the Massachusetts General Hospital,** 5th ed.  Philadelphia: Lippincott-Raven, 1998.

9.  Dershwitz M.  Agents for general anesthesia.  In:  Schirmer BD, Rattner DW, eds.  **Ambulatory Surgery.**  Philadelphia: W.B. Saunders Co., 1998.

10. Dershwitz M.  Intravenous and inhalation anesthetics.  In:  Hurford WE, ed.  **Clinical Anesthesia Procedures of the Massachusetts General Hospital,** 6th ed.  Philadelphia: Lippincott Williams and Wilkins, 2002.

11. Dershwitz M, Landow L, Joshi-Ryzewicz W.  Anesthesia for bedside procedures.  In:  Irwin RS, Cerra FB, Rippe JM, eds.  **Irwin and Rippe's Intensive Care Medicine,** 5th ed.  Philadelphia: Lippincott, Williams, and Wilkins, 2003.

12. Dershwitz M, Landow L, Joshi-Ryzewicz W.  Anesthesia for bedside procedures.  In:  Irwin RS, Rippe JM, Curley FJ, Heard SO, eds.  **Procedures and Techniques in Intensive Care Medicine,** 3rd ed.  Philadelphia: Lippincott, Williams, and Wilkins, 2003.

13. Dershwitz M.  Antipsychotics.  In:  Fink M, Abraham E, Vincent J-L, et al., eds.  **Textbook of Critical Care,** 5th ed.  Philadelphia: Elsevier, 2005.

14. Dershwitz M.  Analgesic cyclooxygenase inhibitors for ambulatory anesthesia.  In:  Steele S, Nielsen K, eds.  **Ambulatory Anesthesia and Perioperative Analgesia.**  New York: McGraw Hill, 2005.

15. Walz JM, Dershwitz M.  Anesthesia for bedside procedures.  In:  Irwin RS, Rippe JM, eds.  **Manual of Intensive Care Medicine,** 4th ed.  Philadelphia: Lippincott Williams & Wilkins, 2006.

REVIEWS AND EDUCATIONAL MATERIALS:

1.  Dershwitz M.  Advances in antiemetic therapy.  **Anesth. Clinics North Amer.** 1994; 12:119-32.

2.  Dershwitz M.  How can the costs of anesthesia be decreased?  **Intravenous Anesth. Today** 1994; 1(3):4-9.

3.  Dershwitz M.  5-HT$_3$ antagonists in postoperative nausea and vomiting.  **Ambulatory Anesth.** 1995; 10(1):9-11.

4.  Ballantyne JC, Dershwitz M.  The pharmacology of non-steroidal anti-inflammatory drugs for acute pain.  **Curr. Opin. Anaesthesiol.** 1995; 8:461-68.

5.  Dershwitz M, Rosow CE.  Remifentanil: a truly-short-acting opioid.  **Semin. Anesth.** 1996; 15:88-96.

6.    Dershwitz M, Rosow CE. Remifentanil: an opioid metabolized by esterases. **Exp Opin Invest Drugs** 1996; 5:1361-76.

7.    Dershwitz M. Should we measure depth of anesthesia? **Semin. Anesth.** 2001; 20:246-56.


NON-PRINT MATERIALS:

1.    Dershwitz M. Use of short-acting analgesia in surgery: achieving cost-effective care (videotape). Rancho Mirage, CA: Annenberg Center for Health Sciences, 1996.

2.    Dershwitz M. General considerations (section editor). In: Bailin M. ed. **Harvard Department of Anesthesia Electronic Library** (CD-ROM). Philadelphia: Lippincott Williams & Wilkins, 2001.

3.    Dershwitz M. Practical pharmacokinetics of intravenous anesthetics. In: Bailin M. ed. **Harvard Department of Anesthesia Electronic Library** (CD-ROM). Philadelphia: Lippincott Williams & Wilkins, 2001.


ABSTRACTS:

1.    Bruer P, Cantarella J, Dershwitz M, Undy L, Young DC. Polarographic studies of copper (II) complexes of glycine peptides. Abstract #6, Anachem Society Meeting, Detroit, MI, 1976.

2.    Dershwitz M, Novak RF. The interaction of nitrofurantoin with human hemoglobin. **Fed. Proc.** 1979; 38:544.

3.    Dershwitz M, Novak RF. Metabolic effects of nitrofurantoin on the human erythrocyte. **The Pharmacologist** 1979; 21:170.

4.    Dershwitz M, Novak RF. Depletion of erythrocyte adenosine-5'-triphosphate and reduced glutathione levels by nitrofurantoin and unnitrated derivatives. **Fed. Proc.** 1980; 39:748.

5.    Dershwitz M, Lack of inhibition of glutathione reductase by unnitrated derivatives of nitrofurantoin. **Fed. Proc.** 1980; 39:1751.

6.    Dershwitz M, Novak RF. Oxidation of human hemoglobin by nitrofurantoin. **Biophys. J.** 1981; 33:81a.

7.    Dershwitz M, Novak RF. The effects of ethyl isocyanide on nitrofurantoin-mediated depletion of red cell glutathione. **Fed. Proc.** 1981; 40:667.

8.   Dershwitz M, Novak RF.  Studies on the mechanism of nitrofurantoin-mediated red cell toxicity.  **Eighth International Congress on Pharmacology,** Tokyo, Japan, 1981.

9.   Kharasch ED, Dershwitz M, Novak RF.  Differential hemeprotein involvement in microsomal and red cell lysate quinone and nitro group reduction.  **Fifth International Symposium on Microsomes and Drug Oxidations,** Tokyo, Japan, 1981.

10.  Dershwitz M, Novak RF.  On the mechanism of nitrofurantoin-mediated red cell toxicity.  **The Pharmacologist** 1981; 23:211.

11.  Dershwitz M, Novak RF.  Generation of activated oxygen species in human red cells by nitrofurantoin.  **Seventh International Biophysics Congress and Third Pan-American Biochemistry Congress,** Mexico City, Mexico, 1981.

12.  Dershwitz M, Sréter FA.  Substrate requirements for glutathione maintenance in pig red cells in vitro.  **The Pharmacologist** 1987; 29:210.

13.  López JR, Dershwitz M, Sanchez V, Sréter FA.  [$K^+$] and [$Na^+$] in malignant hyperthermia-susceptible swine.  **Biophys. J.** 1988; 53:609a.

14.  Chang RJ, Dershwitz M, Sréter FA, Smilowitz H.  Skeletal muscle from malignant hyperthermia-susceptible swine contains decreased levels of monoclonal antibody reactive dihydropyridine receptor.  **The Pharmacologist** 1988; 30:A88.

15.  Kim DH, Lee YS, Sréter FA, Ohkisa T, Dershwitz M, Ikemoto N.  Effects of azumolene on the kinetics of Ca release from normal and malignant hyperthermic sarcoplasmic reticulum.  **Biophys. J.** 1990; 57:497a.

16.  Dershwitz M, Sréter FA.  Reversal of malignant hyperthermia episodes by azumolene in susceptible swine.  **Anesth. Analg.** 1990; 70:S81.

17.  Dershwitz M, Rosow CE, Di Biase PM, Zaslavsky A.  Characterization of the sedative effects of butorphanol in humans.  **The Pharmacologist** 1990; 32:139.

18.  Dershwitz M, Rosow CE, Di Biase PM, Joslyn AF, Sanderson PE.  Prophylaxis of postoperative vomiting by ondansetron.  **Clin. Pharm. Ther.** 1991; 49:184.

19.  Dershwitz M, Rosow CE, Di Biase PM, Joslyn AF, Sanderson PE.  Ondansetron is effective in decreasing postoperative nausea and vomiting.  **Jap. J. Anesthesiol.** 1991; 40:S312.

20.  Dershwitz M, Di Biase PM, Rosow CE, Wilson RS.  Ondansetron does not affect alfentanil-induced ventilatory depression.  **Anesthesiology** 1991; 75:A321.