David A. Senior (# 108759)
McBreen & Senior
1880 Century Park East, Suite 1450
Los Angeles, CA  90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
Law Offices of John R. Grele
703 Market Street, Suite 550
San Francisco, CA  94103
Phone:  (415) 348-9300
Fax:  (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken (admitted *pro hac vice*)
Jenner & Block LLP
One IBM Plaza
Chicago, IL  60611-7603
Phone:  (312) 923-2938
Fax:  (312) 840-7338
rsteinken@jenner.com

Attorneys For Plaintiff MICHAEL ANGELO MORALES

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ANGELO MORALES,<br><br>Plaintiff,<br><br>v.<br><br>JAMES E. TILTON, Acting Secretary of the California Department of Corrections and Rehabilitation; ROBERT L. AYERS, JR., Acting Warden, San Quentin State Prison, San Quentin, CA; and DOES 1-50,<br>Defendants. | Case No.  C 06 219 (JF)<br>C 06 926 (JF)<br><br>**EXPERT REPORT OF DR. KEVIN CONCANNON** |

Roane et al. v. Gonzales et al.,
Civ. No. 05-2337 (D.D.C.)

Pls.' Opp to Mot. J. on the Pleadings
and Mot. to Lift Stays

Exhibit 25

1.      This expert report reflects my opinions and expected testimony with respect to the issues that I have been asked to address by counsel for Mr. Morales.  I reserve the right to supplement or modify this report if and when it is appropriate.  Further, I understand that discovery is still ongoing.  To the extent that subsequent discovery yields information relevant to the analysis contained in this report, I further reserve the right to supplement and modify this report based upon any such information.

## I.      Background

2.      I am a veterinarian and one of approximately 175 diplomates of the American College of Veterinary Anesthesiologists, a certification that I've held since 1992.  I obtained my veterinary degree from the University of Missouri in 1987.  This was followed by a general internship at the Veterinary Hospital of the University of Pennsylvania and then a residency in anesthesia/critical patient care at the University of California–Davis College of Veterinary Medicine.  I subsequently taught veterinary anesthesia to veterinary students, residents, and interns for two years at the University of California–Davis and at the North Carolina State University College of Veterinary Medicine.  I also shared oversight of the clinical anesthesia services at both institutions during this time.  I left NCSU to spend two years at the Duke University Medical Center as a research associate in the department of Radiation Oncology where I prepared a fellowship proposal to the National Institutes of Health (NIH) dealing with the measurement of consciousness in anesthetized laboratory animals.  I have worked for the past nine years at the Veterinary Specialty Hospital of the Carolinas (VSH), a referral veterinary hospital in Cary, North Carolina.  My roles have included emergency/critical care clinician, anesthesia consultant, and hospital director.

3.      My curriculum vitae, which further details my qualifications, is attached as Exhibit A hereto.

4.      I have previously submitted affidavits in *Brown v. Beck*, No. 5:06-CT-3018(H) (North Carolina), and *Page v. Beck*, No. 5:04-CT-04 (BO) (North Carolina).  Together with two other veterinarians, Dr. Dennis Geiser and Dr. Glenn Pettifer, I also submitted an amicus brief in *Hill v.*

Expert Report of Dr. Kevin Concannon
No. C 06 219 JF
No. C 06 926 JF

*McDonough*, the Supreme Court case regarding whether lethal injection challenges may be brought as civil rights actions.  I have not testified in court in connection with any case.

 5. In preparing this report, I have relied on:

  a. The 2000 Report of the AVMA Panel on Euthanasia including a preface page added in 2006, attached as Exhibit B;

  b. California's execution protocol, Operational Procedure No. 770; and

  c. My training, experience, and research as a practicing veterinary anesthesiologist.

 6. Based upon my review of this material and my knowledge of and experience in the field of veterinary anesthesiology, I believe to a reasonable degree of medical certainty that the execution protocol currently used in California would not be an acceptable method for euthanasia of animals.

## II. The Use of Potassium and the Need to Monitor Anesthetic Depth

 7. Veterinarians are morally and ethically obligated to minimize or eliminate pain and suffering during the euthanasia of an animal.  Standards have been established which provide guidance to veterinarians and which help to ensure humane treatment of the animal during the euthanasia procedure.  These standards are delineated in the 2000 Report of the AVMA Panel on Euthanasia.

 8. Euthanasia can be divided into at least two parts -- rendering an animal unconscious followed by inhibition of brain, heart, or both brain and heart function.   Rather than solely focusing on which drugs may or may not be used during veterinary euthanasia, any discussion of the euthanasia process must be accompanied by an analysis of the manner in which the drugs are administered.  The AVMA Report does not suggest that a veterinarian rely completely on the use of particular drugs or drug combinations to ensure humane euthanasia.  The manner in which euthanasia drugs are administered and the circumstances surrounding euthanasia can make a drug or drug combination acceptable in some instances but not in others.  This fact is recognized in the AVMA

Expert Report of Dr. Kevin Concannon
No. C 06 219 JF
No. C 06 926 JF

report as it lists provisions that must be met to make certain methods of euthanasia "conditionally acceptable".

9.     The AVMA Report states that if potassium chloride is used as a means of causing death (by inhibiting heart function), it is necessary to monitor anesthetic depth throughout the procedure to ensure that the animal has been successfully rendered unconscious prior to administration of potassium.  "It is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously. Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli."  (Page 681.)

10.     The need to monitor anesthetic depth and ensure a surgical plane of anesthesia while using potassium chloride is driven by the need to ensure unconsciousness before inducing death.  An unconscious, properly anesthetized animal will not undergo physical or mental distress during the euthanasia process.  Potassium chloride injected into a vein of a conscious animal at high concentrations would be painful.  Secondly, high doses of potassium interfere with the conduction of electrical impulses through the heart.  This effect is manifested as a progressive slowing of the heartbeat with the beat originating at abnormal locations within the heart.  Eventually the heart will stop beating.  These changes to the heart are easily detected by a conscious animal and would lead to distress.

11.     I rely upon my knowledge of anesthetic drugs and of the patient to predict the desired effect of the drug within the patient.  I believe it is imperative to follow up my predictions with direct, physical assessment of the patient to definitively determine the effect of the anesthetic.  I believe to a reasonable degree of medical certainty that measuring consciousness without direct assessment of the patient and the patient's vital signs does not meet a minimum standard of care.  Problems with drug preparation, drug injection/administration, and patient variability will result in variability of drug effect.

4

12.     Determining level of consciousness is as much an art as a skill which requires training and experience.  No monitor exists which, by itself, will accurately assess the level of consciousness. Veterinary anesthesiologists agree that consciousness in animals can be measured by observing: 1) muscle relaxation 2) location of pupils in the orbit 3) absence or presence of eye movements 4) respiratory rate 5) heart rate 6) blood pressure 7) response to mildly painful stimulation and 8) movement.  I am unaware of any veterinarian program that teaches students to induce anesthesia or to completely monitor anesthetized patients from a room other than the one containing the patient.  I have never seen a veterinarian or a licensed veterinary technician monitor an anesthetized patient from a distant room if not dictated by medical necessity and without periodic, direct assessment of patient status.

13.     I  believe it is necessary to put my hands on an anesthetized patient to make an accurate observation of patient status, and I rely upon monitors to help provide data such as the electrocardiogram, heart rate and blood pressure.  Veterinary anesthesiologists agree that a qualified individual can make an educated and accurate assessment of level of consciousness only when that individual has collected a broad sample of pertinent data, which include the indicators listed above.

14.     The variables used to measure consciousness do not have a cut off which denote movement from one level of consciousness to the next or from consciousness to unconsciousness. Veterinary anesthesiologists are trained to recognize that vital signs change incrementally as unconsciousness is achieved.  Determination of the level of consciousness can be made confidently when the changes in one set of vital signs corroborates the changes seen with others.

15.     A technician or assistant without any training in anesthesia would not be able to monitor anesthetic depth properly.

16.     The fact that a euthanized animal will not ultimately emerge from anesthesia does not lessen the importance of minimizing physical pain and mental distress to the patient.  Where potassium is used to cause death, monitoring of anesthetic depth is absolutely necessary to ensure that euthanasia is accomplished humanely.

Expert Report of Dr. Kevin Concannon
No. C 06 219 JF
No. C 06 926 JF

III.    The Use of Pancuronium Bromide

17.    Pancuronium bromide is one member of a group of drugs called neuromuscular blocking agents, also know as muscle relaxants or neuromuscular blockers.  This group of drugs block the transmission of impulses from the nerves to the voluntary muscles of the body.  Voluntary muscles are those which an animal has control over such as the muscles of locomotion or breathing.  Involuntary muscles include the muscle of the heart or that in the stomach and intestine.  Administration of Pancuronium bromide causes weakness and then paralysis of all voluntary muscles.  The drug has no effect on consciousness or on perception of pain.

18.    Administration of Pancuronium bromide to a conscious patient would result in the outward appearance of unconsciousness.  A conscious veterinary patient given Pancuronium bromide would be aware of the need to breathe, the inability to do so and the terrifying experience of suffocation.

19.    During the practice of anesthesia, doses of analgesics and anesthetics must be adjusted to the patient's condition rather than relying on a neuromuscular blocker to provide optimal surgical conditions, i.e. a relaxed and unmoving patient.  Neuromuscular blocking agents are adjuncts, not substitutes, for analgesics or anesthetics.  It is therefore necessary to ensure that a patient is properly anesthetized before administering a neuromuscular blocking agent during the course of an anesthetic procedure.  Proper anesthetic depth must also be ensured for as long as the neuromuscular blocking agent remains in effect.

20.    Because of its paralytic effect, pancuronium can mask the signs of consciousness.  Any variable which is governed by voluntary muscles; i.e. spontaneous movement, muscle tone, location of the pupils in the orbit, changes in respiratory rate, and movement in response to mild or moderate stimulation, will be abolished.

21.    With fewer variables to monitor, a well trained veterinarian can be challenged to accurately determine level of consciousness in a paralyzed patient and an untrained observer will most likely be unable to determine level of consciousness.  Determining level of consciousness in a paralyzed patient relies heavily on knowledge of anesthetic/analgesic dose and effects and close

6

Expert Report of Dr. Kevin Concannon
No. C 06 219 JF
No. C 06 926 JF

monitoring of involuntary signs such as heart rate and blood pressure or, in some species, observation of lacrimation or sweating.

22.    The 2000 Report of the AVMA Panel on Euthanasia has explicitly concluded that the use of neuromuscular blocking drugs, to include Pancuronium bromide, as the sole euthanasia agent is unacceptable and absolutely condemned as a method of euthanasia.  The report does not list any neuromuscular blocking agents in any of the drug protocols deemed acceptable or conditionally acceptable.  I am unaware of any veterinarian or veterinary group that advocates the use of neuromuscular blocking agents during the euthanasia procedure.

23.    Pancuronium bromide masks the external signs of consciousness in a conscious patient.  The use of pancuronium in a euthanasia procedure, even after the administration of an anesthetic, is troubling and gives me great concern.  Administration of pancuronium to an anesthetized animal prior to potassium would greatly increase the difficulty of meeting one of the AVMA report's requirements, i.e. "It is of utmost importance that personnel … are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously."

IV.    **The Use of Thiopental**

24.    Thiopental is an ultra-short acting barbiturate most commonly used to induce anesthesia before other, longer-acting anesthetics are administered which maintain the anesthetic state of the patient.  If thiopental were given prior to other drugs in a veterinary euthanasia procedure, the veterinarian would need to assess adequacy of anesthesia and loss of consciousness prior to administration of other drugs.  Thiopental has the potential to wear off if any delays occur during the euthanasia procedure or if the complete dosage is not properly administered.

25.    The AVMA report states that barbiturates are acceptable for euthanasia when given intravenously.  The report states that long acting barbiturates are the most desirable agents to use during euthanasia and the use of pentobarbital is recommended.

26.    Dosage recommendations are available for veterinary euthanasia solutions and for pentobarbital based on the size of the patient.  I calculate my dosage based on these recommendations.  I also take into effect the excitation level of the patient since this will increase the

7

Expert Report of Dr. Kevin Concannon
No. C 06 219 JF
No. C 06 926 JF

amount of drug needed to produce anesthesia.  I treat each patient as an individual and base my course of action accordingly.

27.    Barbiturates depress the central nervous system first causing loss of consciousness progressing to anesthesia.  As the dose of barbiturate increases, breathing becomes irregular and shallow then stops completely due to depression of the respiratory center in the brain.  Once breathing stops, cessation of the heart beat quickly follows.  When I euthanize a patient and if no complications are encountered, I fully expect that the process will take no more than a minute or two at the maximum.

**V.    Conclusion**

28.    California's lethal injection protocol would not be an acceptable method of euthanasia for animals.

By:    ___/s/ Kevin Concannon____

Dr. Kevin Concannon

August 15, 2006

Expert Report of Dr. Kevin Concannon
No. C 06 219 JF
No. C 06 926 JF