## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **JAMES ROANE, JR.**, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2337 (RWR/DAR) |
| | ) | |
| **ALBERTO GONZALES**, *et al.,* | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' AND INTERVENOR PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION AND CORRECTED MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO LIFT THE STAY OF THE PLAINTIFFS' EXECUTIONS

## REDACTED VERSION - PUBLICLY FILED

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

PROCEDURAL POSTURE OF THE CASE ..................................................................3

STANDARD OF REVIEW ................................................................................................4

ARGUMENT ......................................................................................................................5

    I.    **Laches Does Not Bar this Action** ................................................................5

        A.    Defendants' Failure to Plead the Affirmative Defense of Laches Bars the Court's Consideration of this Claim ........................................................5

        B.    Claims of Undue Delay Present Factual Questions That Cannot Be Resolved on the Face of the Pleadings .........................................................6

        C.    Plaintiffs Did Not Unduly Delay Filing Their Lethal Injection Challenges and Defendants Have Not Been Prejudiced by Any Delay .........................7

            1.    Plaintiffs Did Not Unreasonably Delay Filing Suit ........................8

            2.    Defendants Cannot Show Prejudice from Any Delay ...................12

    II.    **The Statute of Limitations Does Not Bar this Action** .......................................14

        A.    Statutes of Limitations Do Not Apply to Method of Execution Claims....14

        B.    Nothing on the Face of the Pleadings Shows That Plaintiffs' Claims Are Barred by Limitations .........................................................................17

        C.    Plaintiffs' Claims Could Not Accrue until They Had Actual Notice of the Unconstitutional Manner in Which Their Executions Would Be Conducted ..............................................................................18

    III.    **The Stays of Execution Agreed to by the Federal Government Should Continue until this Lawsuit Has Been Resolved on the Merits** .......................21

        A.    Defendants Fail to Meet Their Burden to Justify a Change in Status-quo ......................................................................................21

        B.    Defendants Should be Estopped from Changing the Conditions Under Which Intervenors Entered the Case.................................................22

        C.    Defendants Apply an Incorrect Standard to Requests for Preliminary Injunctive Relief.................................................................................26

D.   The Balance of Relevant Factors Weighs Strongly in Favor of Continuing the Stays of Execution ........................................................ 28

    1.   The Contemporary Standard of Decency Requires Assurance of Anesthetic Depth ................................................................................ 30

    2.   Success on the Merits Is Proof That Compels Defendants to Correct Unconstitutional Protocols and Procedures ..................... 34

    3.   Plaintiffs Will Be Able to Compel Defendants to Change Their Protocol and Thus Can Show a Likelihood of Success on the Merits ................................................................................................... 36

        a.   The Defendants Have Consulted with and Relied upon the Persons Responsible for the Botched Diaz Execution ...................................................................... 37

        b.   The Defendants Rely upon the Services ███████ ██████████████████████████████ ................ 38

        c.   The Defendants' Own Expert Has Acknowledged That Their Multi-Drug Synergism Creates Avoidable Risks ..... 40

        d.   The Defendants Use a Form of Intravenous Access That Is Highly Invasive, Painful, Unnecessary, and Which Has Been Rejected by Courts .................................................... 41

        e.   The Defendants Fail to Provide Adequate Visualization of the Site(s) of Intravenous Access ................................. 42

        f.   The Defendants Fail to Provide Comprehensible Directions on Thiopental Preparation ............................... 42

        g.   The Defendants Have Administered Thiopental So Quickly That They Have Failed to Allow Sufficient Time for the Condemned to Reach an Adequate Plane of Anesthesia ................................................................. 45

        h.   Defendants Do Not Have a Qualified Person Monitor Anesthetic Depth ............................................................. 45

    D.   Public Interest Is Served by the Continuation of the Injunction and Defendants Would Not be Injured by a Continuation of Stays ..... 48

CONCLUSION ........................................................................................................ 48

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Al-Marri v. Bush, No. Civ. A 04-2035,*
  2005 WL 774843 (D.D.C. Apr. 4, 2005) ...................................................................27

*Anderson, et al. v. Evans, et al., No. Civ-05-0825,*
  2006 WL 83093 (W.D. Okla. Jan. 11, 2006) ......................................................18, 20

*ATC Petroleum,*
  860 F.2d 1104 (D.C. Cir. 1988) ..............................................................................22

*Apex Liquors, Inc. v. District of Columbia,*
  303 F.2d 206 (D.C. Cir. 1962) ...................................................................................6

*Atlanta Journal & Const. v. City of Atlanta Dep't of Aviation,*
  6 F. Supp. 2d 1359 (N.D. Ga. 1998) ........................................................................21

*Britt v. United States Army Corps of Engineers,*
  769 F.2d 84 (2d Cir. 1985) .........................................................................................6

*Burka v. Aetna Life Ins. Co.,*
  56 F.3d 1509 (D.C. Cir. 1995) ...................................................................................5

*Chase Securities Corp. v. Donaldson,*
  325 U.S. 304 (1945) .................................................................................................15

*Cobell v. Babbitt,*
  30 F. Supp. 2d 24 (D.D.C. 1998) .............................................................................17

*Cobell v. Norton,*
  391 F.3d 251 (D.C. Cir. 2004) .................................................................................27

*Cooey v. Strickland,*
  __ F.3d. __, 2007 WL 1574663 (6th Cir. June 1, 2007) ............................................9

*Costello v. United States,*
  365 U.S. 265 (1961) ...................................................................................................6

*Cristwell v. Veneman,*
  224 F. Supp. 2d 54 (D.D.C. 2002) ...........................................................................20

*Currier v. Radio Free Europe,*
  159 F.3d 1363 (D.C. Cir. 1998) ...............................................................................22

*Estelle v. Gamble,*
    429 U.S. 97 (1976)...................................................................................................31

*Evans v. Saar,*
    412 F. Supp. 2d 519 (D. Md. 2006)..................................................................20

*Farmer v. Brennan,*
    511 U.S. 825 (1994)...............................................................................................30

*First Am. Disc. Corp. v. Commodity Futures Trading Comm.,*
    222 F.3d 1008, 1016 (D.C. Cir. 2000)..............................................................22

*First Chicago Int'l v. United Exchange Co.,*
    836 F.2d 1375 (D.C. Cir. 1988).............................................................................4

*Furman v. Georgia,*
    408 U.S. 238 (1972)...............................................................................................30

*General Accounting Office v. General Accounting Office Personnel Appeals Bd.,*
    698 F.2d 516, 526 n.57 (D.C. Cir. 1983).........................................................23

*Gonzales v. North Township of Lake County,*
    800 F. Supp. 676 (N.D. Ill. 1992).....................................................................16

*Graham v. SEC,*
    222 F.3d 994 (D.C. Cir. 2000)............................................................................22

*Grayson v. Allen, et al.,*
    No. 06-cv-1032, 2007 WL 1491009 (M.D. Ala. May 21, 2007).............15, 38

*Gregg v. Georgia,*
    428 U.S. 153 (1976)...............................................................................................30

*Grumman Ohio Corp. v. Dole,*
    776 F.2d 338 (D.C. Cir. 1985)............................................................................23

*Gull Airborne Instruments, Inc. v. Weinberger,*
    694 F.2d 838 (D.C. Cir. 1982)............................................................................12

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)........................................................................................15, 16

*Heard v. Sheahan,*
    253 F.3d 316 (7th Cir. 2001) .........................................................................15, 16

*Heckler v. Community Health Servs.,*
    467 U.S. 51 (1984)............................................................................23, 24

*Hertzberg v. Veneman,*
    273 F. Supp. 2d 67 (D.D.C. 2003) ...................................................22, 23

*Hill v. McDonough,*
    __ U.S. __, 126 S. Ct. 2096 (2006)..........................................................5

*Holmberg v. Armbrecht,*
    327 U.S. 392 (1946)..................................................................................15

*Insight Tech. Inc. v. Surefire, LLC,*
    447 F. Supp. 2d 120 (D.N.H. 2006)........................................................27

*Johnson v. Johnson County Comm'n Bd.,*
    925 F.2d 1299 (10th Cir. 1991) ...............................................................19

\*    *Jones v. Allen, et al.,*
    __ F. Supp. 2d __, 2007 WL 1140416 (M.D. Ala. Apr. 20, 2007)........5, 12, 13, 14, 15

*Jones v. Rogers Memorial Hosp.,*
    442 F.2d 773 (D.C. Cir. 1971) ................................................................17

*In re Kemmler,*
    136 U.S. 436 (1890)..................................................................................30

*Kroot v. District of Columbia,*
    800 F. Supp. 976 (D.D.C. 1992) .............................................................18

*Kuhnle Bros., Inc. v. County of Geauga,*
    103 F.3d 516 (6th Cir. 1997) ...................................................................16

*LaGrand v. Stewart,*
    173 F.3d 1144 (9th Cir. 1999) .................................................................30

*Major v. Plumbers Local Union No. 5,*
    370 F. Supp. 2d 118 (D.D.C. 2005) .......................................................6, 7

\*    *Morales v. Hickman [Morales I],*
    415 F. Supp. 2d 1037 (N.D. Cal. 2006) ..........................................29, 31, 34

\*    *Morales v. Tilton [Morales II],*
    465 F. Supp. 2d 972 (N.D. Cal. 2006) ............................................33, 34, 45, 47

*National Fair Housing Alliance, Inc. v. Prudential Ins. Co.*,
   208 F. Supp. 2d 46 (D.D.C. 2002) .................................................................7

*Nelson, v. Campbell*,
   541 U.S. 637 (2004) ....................................................................................41

*Neville v. Johnson*,
   440 F.3d 221 (5th Cir. 2006) ...................................................................5, 8

*New Hampshire v. Maine*,
   532 U.S. 745 (2001) ................................................................................9, 23

*Nicholson v. Board of Comm'rs of the Alabama State Bar Ass'n*,
   338 F. Supp. 48 (M.D. Ala. 1972) ............................................................15

*Office of Personnel Management v. Richmond*,
   496 U.S. 414 (1990) ...................................................................................23

*Page v. United States*,
   729 F.2d 818 (D.C. Cir. 1984) ..................................................................16

*Patton v. Jones, et al.*,
   No. Civ.-06-0591, 2006 WL 2246441 (W.D. Okla. Aug. 4, 2006) ..............7

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ...................................................................................23

*Peters v. National R.R. Passenger Corp.*,
   966 F.2d 1483 (D.C. Cir. 1992) ..................................................................4

*Pitts v. City of Kankakee*,
   267 F.3d 592 (7th Cir. 2001) .....................................................................17

*Ramirez v. United States Custom & Border Protection*,
   477 F. Supp. 2d 150 (D.D.C. 2007) ..........................................................27

*Rehabilitation Ass'n of Virginia, Inc. v. Kozlowski*,
   838 F. Supp. 243 (E.D. Va. 1993) ............................................................15

*Reynolds v. Guiliani*,
   118 F. Supp. 2d 352 (S.D.N.Y. 2000) .......................................................21

*Richards v. Mileski*,
   662 F.2d 65 (D.C. Cir. 1981) ....................................................................17

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ................................................................27

\*     *Taylor v. Crawford, et al.*,
    No. 05-4173, 2006 WL 1779035
    (W.D. Mo. June 26, 2006) ................................11, 29, 33, 35, 39, 42, 44, 47

\*     *Taylor v. Crawford et al.*,
    __ F.3d __, 2007 WL 1583874 (8th Cir. June 4, 2007) ............................11, 30, 31, 35

*United States v. Philip Morris*,
    300 F. Supp. 2d 61 (D.D.C. 2004) ............................................................22

*United States v. Quinn*,
    403 F. Supp. 2d 57 (D.D.C. 2005) ..............................................................9

*United States v. Tipton, et al.*,
    90 F. 3d 861 (4th Cir. 1996) ....................................................................11

## STATE AND DISTRICT OF COLUMBIA COURT OF APPEALS CASES

*Baze, et al. v. Rees, et al.*,
    No. 04-CI-01094, Findings of Fact and Conclusions of Law, at 13 (Franklin
    Cir. Ct. Ky. July 8, 2005) ......................................................................33

*Thoubboron v. Ford Motor Co.*,
    809 A.2d 1204 (D.C. 2002) ....................................................................22

*Worthington v. Missouri*,
    166 S.W. 3d 566 (Mo. 2005) ....................................................................9

## DOCKETED CASES

*Alderman v. Donald, et al.*,
    No. 07-cv-00896 (N.D. Ga.) ..................................................................44

*Brown v. Beck, et al.*,
    No. 5:06-CT-3018-H (E.D.N.C.) ..........................................................31, 35, 36

*Grayson v. Allen, et al.*,
    No. 06-cv-1032 (M.D. Ala.) ....................................................................5

*Jackson v. United States of America*,
    Civ. No. 04-00251 (W.D.N.C.) ..................................................................8

*Nooner v. Norris, et al.,*
    No. 5:06-CV-00110 (E.D. Ark.) ........................................................... 7

*Patton v. Jones, et al.,*
    No. Civ.-06-0591 (W.D. Okla.) ........................................................... 6

*Taylor v. Crawford,*
    Civ. No. 05-4173 (W.D. Mo.) ................................................... 33, 39, 40

*United States of America v. Dustin John Higgs,*
    Cr. No. 98-0520 (D. Md.) ...................................................................... 8

## FEDERAL STATUTES AND RULES

28 C.F.R. § 26.2(a)(2) ................................................................... 10, 40

28 U.S.C. § 2255 ................................................................................. 8

Fed. R. Civ. P. 8 ................................................................................. 6

Fed. R. Civ. P. 11(b)(3) .................................................................... 10

## OTHER REFERENCES

10B CHARLES ALLEN WRIGHT, ARTHUR MILLER & M. KANE, FEDERAL PRACTICE AND
    PROCEDURE § 2741 (2d ed. 1983 and Supp. 2007) ...................................... 5

11A CHARLES ALLEN WRIGHT, ARTHUR MILLER & M. KANE, FEDERAL PRACTICE AND
    PROCEDURE § 2949 (2d ed. 1983 and Supp. 2007) .................................... 27

*2000 Report of the American Veterinary Medical Association Panel on
    Euthanasia,* 218 (5) J. Am. Vet. Med. Ass'n 669, 681 (2001) ...................... 47

Elizabeth Cohen, *Lethal Injection Creator: Maybe It's Time to Change Formula,*
    CNN.com ............................................................................................ 41

J. Kohler, *Behind the Mask of the Missouri Execution Doctor,*
    ST. LOUIS POST-DISPATCH (Jan. 12, 2007) ............................................ 39

The [Florida] Governor's Commission on Administration of Lethal Injection, *Final
    Report with Findings and Recommendations* (March 1, 2007) ...................... 37

*U.S. Executes McVeigh,* 2001 WLNR 10642743,
    CHICAGO TRIBUNE (June 11, 2001) ...................................................... 19

N.B. Pursuant to Local Rule LCvR7(a), Plaintiffs have placed asterisks in the margin to the left of cases on which they principally rely.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JAMES ROANE, JR.**, *et al.*,<br><br>   Plaintiffs,<br><br>v.<br><br>**ALBERTO GONZALES**, *et al.*,<br><br>   Defendants. | Civil Action No. 05-2337 (RWR/DAR)<br><br>**ORAL ARGUMENT REQUESTED**<br><br><u>**REDACTED VERSION**</u> |

### PLAINTIFFS' AND INTERVENOR PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION AND CORRECTED MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO LIFT THE STAY OF THE PLAINTIFFS' EXECUTIONS

Plaintiffs James Roane, Jr., Richard Tipton, and Cory Johnson (collectively, "Initial Plaintiffs"), and Intervenor Plaintiffs Bruce Webster, Anthony Battle, and Orlando Hall (collectively, "Intervenors") (Initial Plaintiffs and Intervenors, collectively "Plaintiffs"), respectfully submit this opposition to Defendants' *Motion and Corrected Motion for Judgment on the Pleadings and Motion to Lift the Stay of the Plaintiffs' Executions.* Docs. 60, 61, 62.

### INTRODUCTION

Defendants move for judgment on the pleadings and to lift the extant stays of execution on the eve of depositions, the number and conditions of which they have vigorously opposed. This motion, filed some nineteen months after the case was initiated and after Defendants' express agreement to stay executions, does not reflect a true concern that unnecessary delay or untimeliness should bar the continuation of this action. Instead, Defendants wish to prevent Plaintiffs from piercing the veil of secrecy over the manner and means by which they conduct Federal executions. Understandably so. The evidence shows that Defendants have much to conceal.

For example, Director Lappin confesses that he "*assumes*" the medical personnel he has retained are qualified to perform the tasks of execution, but the facts show he has consulted with and relied upon medical persons who are *not* qualified to participate in executions.  This includes a medical person responsible for the most egregious botched execution in modern times – that of Mr. Angel Diaz in Florida – ███████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

The Defendants do not have a comprehensible written protocol for anesthetic drug preparation or administration and the documents they have concerning those crucial steps cannot guarantee reliable delivery of their intended 5 gram dose.  Defendants take affirmative steps to conceal the sites of intravenous injection from view by covering the condemned inmate with a sheet – assuring that no one, neither lay person nor qualified medical person, can ascertain whether the sites are patent and capable of adequately delivering the execution drugs.  With no medical justification, Defendants have selected a form of intravenous access (placing a nearly half-foot long catheter into the groin of the condemned), that is highly invasive, painful, and which has been banned as a default form of intravenous access by the only other Federal court to consider its use in executions.  These, and other flaws, show that Defendants' execution procedures fail to meet contemporary standards of decency and that Plaintiffs will be able to succeed on the merits and compel Defendants to change their execution procedures.

As demonstrated below, there is no basis in fact or law to dismiss Plaintiffs' claim on the grounds of delay or untimeliness and the stays of Plaintiffs' executions currently in place should remain in effect.  Not only have Defendants failed to meet the heavy burden they bear in seeking to change the status quo by having the stays lifted, but the limited evidence presently available

2

(before Defendants have fully answered interrogatories and requests for production or produced relevant persons for depositions) shows a myriad of flaws in the Federal execution process. This baseless motion is merely an attempt to foreclose further investigation of Defendants' execution procedures which risk unconstitutional pain and suffering. This action should be allowed to proceed under the current stays of execution so that Defendants' unconstitutional conduct can be fully explored and remedied.

## PROCEDURAL POSTURE OF THE CASE

The Defendants are generally correct in their description of the procedural posture of this case. Certain dates, however, are particularly relevant to the disposition of the instant motions. This action was filed on December 6, 2005. Doc. 1. Initial Plaintiffs filed a request for preliminary injunction barring their executions on February 2, 2006. Doc. 2. The Defendants *agreed* that the case should be stayed and Initial Plaintiffs' executions should be enjoined. Doc. 4, at 2 ("[C]oncur[ing] that the proceedings should be stayed and plaintiffs' executions enjoined pending the Supreme Court's disposition of *Hill*."). The court granted a preliminary injunction to Initial Plaintiffs on February 27, 2006. Doc. 5. Even though a decision in *Hill* was issued by the Supreme Court on June 12, 2006, the Defendants did not move for judgment on the pleadings or to lift the stays for more than a year, until they filed the instant motion. In the sixteen months between the issuance of Initial Plaintiffs' stays and the filing of this motion, Defendants have not opposed intervention nor, until now, any stays of execution. On February 21, 2007, the court granted a stay of execution to Intervenor Webster. On June 4, 2007, the court granted motions to intervene by Hall and Battle. Just three days after Hall and Battle were added to the case, Defendants moved for judgment on the pleadings and to lift all stays of execution. Doc. 60, 61.

3

## STANDARD OF REVIEW

Defendants move for dismissal and judgment on the pleadings. Doc. 62,[1] Motion, at 1 (citing FED. R. CIV. P. 12(b)(6) and 12(c)). Defendants assert that the "standard applied to Defendant's [sic] motion for judgment on the pleadings is the same as that under a Rule 12(b) motion to dismiss." Doc. 62, Memo., at 9. Although the standards can be similar, the burden actually applied depends on the Defendants' assertions. When a Rule 12(c) motion is brought to raise procedural defects in a complaint, courts apply the standards applicable to motions to dismiss. However, when a 12(c) motion is addressed to the substantive merits, the proper standard to apply is that applicable to a motion for summary judgment. A Rule 12(c) motion should be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (Granting judgment on the pleadings only if the moving party demonstrates that "no material fact is in dispute and that it is entitled to judgment as a matter of law.") (internal quotations omitted).

To the extent that Defendants' motion for judgment on the pleadings rests on the introduction of extrinsic facts by Defendants and requires Plaintiffs to introduce extrinsic facts in defense, Plaintiffs object to the motion as premature and as an attempt to circumvent the order scheduling a time for dispositive motions after Plaintiffs have completed discovery. *See First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1379 (D.C. Cir. 1988) (concluding it is "premature for the district court to grant summary judgment without first permitting discovery on the merits"); *see generally* 10B CHARLES ALLEN WRIGHT, ARTHUR MILLER & M. KANE,

---

[1] There are three parts to Defendants' document 62. Part one is the errata sheet. Part two of document 62 is that part of Exhibit 1 which is the Defendants' Corrected Motion for Judgment on the Pleadings and Motion to Lift the Stay of the Plaintiffs' Executions, which Plaintiffs will refer to throughout as "Doc. 62, Motion." Part three of document 62 is that part of Exhibit 1 containing Defendants' Memorandum in Support of the Motion. Plaintiffs will refer to the Memorandum throughout as "Doc. 62, Memo."

FEDERAL PRACTICE AND PROCEDURE § 2741 (2d ed. 1983 and Supp. 2007) ("One of the most common reasons offered under Rule 56(f) for being unable to present specific facts in opposition to a summary judgment motion is insufficient time or opportunity to engage in discovery.").

## ARGUMENT

I.    **Laches Does Not Bar This Action**

Defendants claim that Plaintiffs waited until the "Eleventh Hour" to present their method of execution challenge, were "dilatory," and should now be barred on equitable grounds from pursuing remedies for the Defendants' unconstitutional conduct. Doc. 62, Memo., at 9, 12 (citing *Jones v. Allen, et al.,* 485 F.3d 635 (11th Cir. 2007)). Defendants are wrong. There is no equitable bar to this action.

A.    **Defendants' Failure to Plead the Affirmative Defense of Laches Bars the Court's Consideration of this Claim**

Defendants interlace their charges that Plaintiffs delayed in instituting this lawsuit with comments about ripeness and the effect of delay on the issuance of stays of execution. *See, e.g.,* Doc. 62, Memo., at 12 (citing *Hill v. McDonough,* __ U.S. __, 126 S. Ct. 2096 (2006) (articulating standards for stays of execution) and *Neville v. Johnson,* 440 F.3d 221, 222-23 (5th Cir. 2006) (discussing ripeness of method of execution challenges)). There is a reason Defendants conflate the elements and proof for the distinct claims of delay, ripeness, and stay of execution. The claim of delay is fundamentally a claim that laches bars suit. *See Burka v. Aetna Life Ins. Co.,* 56 F.3d 1509, 1514 (D.C. Cir. 1995) (characterizing the issue that one party has been prejudiced by the other party's delay in bringing suit as laches). But, unlike other Defendants in lethal injection actions, the Defendants in this case did not plead laches as an affirmative defense. *Compare* Doc. 14 (Defendants' Answer to Amended Complaint) *with* Doc. 8 (Defendants' Answer), at 7, *Grayson v. Allen, et al.,* No. 06-cv-1032 (M.D. Ala.) (pleading as

an affirmative defense that "Plaintiff's claims are barred by laches and applicable statutes of limitation."); *see also* Doc. 36 (Defendants' Answer), at 8, *Patton v. Jones, et al.,* No. Civ.-06-0591 (W.D. Okla.).

Laches is an affirmative defense that must be pled in answer or it is waived. *See* FED. R. CIV. P. 8(b), (c); *Apex Liquors, Inc. v. District of Columbia*, 303 F.2d 206, 208 (D.C. Cir. 1962) ("Appellant did not plead laches. This defense is required to be made affirmatively . . . by a responsive pleading.") (internal quotations ellipses omitted); *Britt v. United States Army Corps of Engineers*, 769 F.2d 84, 88 (2d Cir. 1985) (declining to consider laches in light of Defendants' failure to plead it as an affirmative defense). By failing to raise laches as an affirmative defense, Defendants have waived the right to rely on it. For this reason alone, Defendants' request for judgment on the pleadings on the equitable grounds of undue delay must fail.

**B.     Claims of Undue Delay Present Factual Questions That Cannot Be Resolved on the Face of the Pleadings**

Even if Defendants could raise an affirmative defense which they failed to plead, they cannot prevail on the claim. To establish laches, Defendants must show "'(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Major v. Plumbers Local Union No. 5*, 370 F. Supp. 2d 118, 127 (D.D.C. 2005) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)). The burden of establishing the defense is squarely on the defendant. *Id.* at 128. But the Defendants cite to nothing on the face of the pleadings that proves Plaintiffs' lack of diligence or facts which demonstrate prejudice to Defendants. To ascertain whether there was, in fact, a lack of diligence causing prejudice to Defendants, the court would have to undertake an evaluation of the time of filing in the context of the information available to the Plaintiffs (including an assessment of what was known or reasonably could be known about the Defendants' conduct). The court would then have to

6

balance those facts against Defendants' actions (which include concealing execution details, concealing the qualifications of execution personnel, concealing changes to the execution protocol, agreeing willingly to stays of execution, and attempting to slow the prosecution of this lawsuit by engaging in meritless discovery disputes). Any balancing of this complex web of facts cannot be performed prior to the completion of discovery, and should not be resolved on a motion for judgment on the pleadings. *See, e.g., Major*, 370 F. Supp. 2d at 128 ("Because [the laches] inquiry requires facts not in the pleadings, it is not appropriate to resolve at this time defendants' laches defense."); *National Fair Housing Alliance, Inc. v. Prudential Ins. Co.*, 208 F. Supp. 2d 46, 48 (D.D.C. 2002) (same); *see also* Doc. 24 (Order), at 7, *Nooner v. Norris, et al.*, No. 5:06-CV-00110 (E.D. Ark. June 19, 2006) ("In this case, the allegations in the complaint do not confirm the existence of an unreasonable, inexcusable delay on the part of Nooner . . . ."); *Patton v. Jones, et al.*, No. Civ.-06-0591, 2006 WL 2246441, at *4 (W.D. Okla. Aug. 4, 2006) ("The laches defense raises fact questions regarding the existence of any delays, the reasons for any such delays, the prejudice created by any delays, and the balance of equities. These issues cannot be determined on a motion to dismiss.").

Because a full analysis of the questions of laches requires evidence outside the pleadings, Defendants' claim for judgment on the pleadings on grounds of undue delay must be denied.

**C.    Plaintiffs Did Not Unduly Delay Filing Their Lethal Injection Challenges and Defendants Have Not Been Prejudiced by Any Delay**

Plaintiffs believe that this claim cannot be adjudicated on the pleadings or prior to the completion of discovery. However, without waiving their objections to such an adjudication, Plaintiffs believe the facts known at this time show there exist genuine issues of material fact that preclude judgment on the pleadings.

## 1.    Plaintiffs Did Not Unreasonably Delay Filing Suit

The Defendants suggest that Plaintiffs should have filed this lawsuit at the end of the direct review of their cases. *See* Doc. 62, Memo., at 12 (citing *Neville v. Johnson*, 440 F.3d 221, 222 (5th Cir. 2006) ("A challenge to a method of execution may be filed at any time after the plaintiff's conviction has become final on direct review.")). Defendants misread *Neville*, and conflate the issues of ripeness, accrual of claims, and delay. Simply because a claim may, under some circumstances be ripe (and Plaintiffs do not concede that the end of direct review is a trigger point for their method of execution claims), does not mean that it has accrued for purposes of statutes of limitations (if applicable). Nor does failure to file the moment a claim is ripe constitute unreasonable delay.

Plaintiffs filed suit when their respective cases had completed merits review. Only then was execution a real possibility and only then was a method of execution claim appropriate. Indeed, Defendants well understand that, had Plaintiffs brought their claims earlier, they would have been denied or deferred as being unripe. ***In fact, that is exactly what the Defendants have argued in response to lethal injection claims raised in 28 U.S.C. § 2255 motions brought by other persons in federal custody.*** In response to a lethal injection challenge presented by a 2255 petitioner, the United States responded that "[Petitioner] cannot challenge his prospective execution because the issue is not yet ripe." *See* Doc. 520 (Excerpt, Motion to Strike and Response to Petitioner's Motion for Relief Pursuant to 28 U.S.C. § 2255) (filed Nov. 8, 2006), at 203, *United States of America v. Dustin John Higgs*, Cr. No. 98-0520 (D. Md.), attached hereto as Ex. 1; *see also*, Doc. 43 (Government's Resp. in Opp. to Petitioner's Motion to Vacate Conviction and Sentence Pursuant to 28 U.S.C. § 2255) (filed Nov. 15, 2006), at 167, *Jackson v. United States of America*, Civ. No. 04-00251 (W.D.N.C.) (same), attached hereto as Ex. 2. If the

8

claim is not ripe during the pendency of post-conviction proceedings, then clearly Plaintiffs who wait until the completion of those proceedings cannot be considered to have unduly delayed in bringing suit. Moreover, the Defendants should not benefit in equity from pursuing two such flatly contradictory positions. *Cf. United States v. Quinn*, 403 F. Supp. 2d 57, 64 (D.D.C. 2005) (doctrine of judicial estoppel prevents a party from asserting a claim that is clearly inconsistent with a claim made by the party in a previous proceeding); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("'absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory'") (quoting 18 C Charles A. Wright, Arthur Miller, & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4477, p. 782 (1981)).

It would be a waste of time and resources to review method of execution claims at the end of direct review because a host of changes can occur between that time and the end of post-conviction review that will alter the method of execution analysis. Plaintiffs' claims can be mooted by judicial relief on the merits. Departments of Correction can and do change methods of execution. *See, e.g., Worthington v. Missouri*, 166 S.W. 3d 566, 583 n.3 (Mo. 2005) (finding it premature to consider method of execution claim because "it is unknown what method, if any, of lethal injection may be utilized by the State of Missouri at such future time, if any, as Mr. Worthington's right to seek relief in state and federal courts is concluded and his execution date and method are set"). Defendants' assertion that the end of direct review signals the appropriate time for filing a method of execution challenge invites premature and conflicting litigation. *See, e.g., Cooey v. Strickland*, ___ F.3d. ___, No. 05-4057, 2007 WL 1574663, at * 2 (6th Cir. June 1, 2007) ("The majority's opinion [that the end of direct review triggers limitations] will lead to

simultaneous, and contradictory, proceedings in state and federal court.") (Gillman, J., Martin, J., Daughtrey, J., Moore, J., Cole, J., and Clay, J., dissenting).

But even more to the point, a plaintiff must have a good faith factual basis on which to base his claim. *See* FED. R. CIV. P. 11(b)(3). At the time of sentencing or enactment of Federal regulations, Plaintiffs could only know that Defendants intended to use a "substance or substances" to cause their deaths by lethal injection. *See* 28 C.F.R. § 26.2. Plaintiffs could not know that the manner and means by which the Defendants intended to carry out their executions would be unconstitutional. That is particularly true because Defendants have publicly touted their method of execution as the most humane method possible. *See* BOP Doc. 126 ("Why was lethal injection chosen as the method for execution? . . . . In an area where issues of humanity are of paramount concern, lethal injection is believed to be the most humane method of execution."), attached hereto as Ex. 3.

In fact, Plaintiffs have never received notice, not even to this date, of the precise manner and means by which the Defendants intend to execute them. What Plaintiffs know now about the precise manner and means of Federal executions (which is discussed more fully *infra* part III) has been pieced together from Defendants' highly disjointed production of documents and a tour of the Terre Haute execution facility. This limited information has revealed fundamental issues with the execution protocol of which Plaintiffs could not have been aware prior to filing suit. Indeed, to the extent that Plaintiffs could have known anything about the Federal execution methods, they would have anticipated that Defendants would use a peripheral vein method of intravenous access. *See, e.g.*, Declaration of Mark Heath M.D. (at Decl. Ex. O, showing intent to create intravenous access in the arm), attached hereto as Ex. 4 [hereinafter "Heath Decl."]. Plaintiffs did not and could not have known that Defendants contemplated femoral vein

intravenous line placement, a method of IV access roundly rejected by the courts. *See Taylor v. Crawford, et al.*, No. 05-4173, 2006 WL 1779035, at *9 (W.D. Mo. June 26, 2006) (rejecting automatic use of the femoral vein as a site of injection), *rev'd in part on other grounds, Taylor v. Crawford et al.*, __ F.3d __, No. 06-3651, 2007 WL 1583874 (8th Cir. June 4, 2007).[2]

Defendants err in relying on the inclusion of challenges to the federal regulations in Initial Plaintiffs' direct appeals as a sign of notice of the issues presented by this case. On direct appeal Initial Plaintiffs' litigated only those issues they could then identify – that their death sentences were imposed without federal statutes or regulations providing a "specific means of executing such sentences." *See United States v. Tipton, et al.*, 90 F.3d 861, 902 (4th Cir. 1996). The limited scope of that litigation shows that Plaintiffs could not at that time challenged the *manner and means* by which the sentences would be carried out.

As important as the facts are to a plaintiff who wishes to ascertain whether he has a right to sue, so also is having an appropriate procedural vehicle in which to raise claims. The Defendants agreed with Plaintiffs that it was unclear whether Plaintiffs even had the right to bring this action when they agreed to stay this case pending the outcome of the Supreme Court's review of that question in *Hill v. McDonough*. *See* Doc. 4, at 2. When the Defendants concede that there are open questions regarding the propriety of this cause of action that were not finally settled until after this lawsuit was underway, it can hardly be said that Plaintiffs engaged in unreasonable delay.

Defendants also miss the mark in suggesting that Plaintiffs' conduct adds support to the claim that this suit was filed at the eleventh hour. *See* Doc. 62, Memo., at 12 n.5. Plaintiffs are hard pressed to understand how the conduct of discovery relates in any way to the timing of the

---

[2] The Eighth Circuit did not reverse Judge Gaitan's holding that the absence of a meaningful protocol with appropriate protections was unconstitutional; rather, it held only that the revised protocol submitted by the State of Missouri was constitutionally sufficient.

institution of suit. As this court is well aware, and Plaintiffs will not rehash here, the delay in

discovery has been caused by the Defendants' recalcitrant production of documents (which has

obliged Plaintiffs to spend many days in review of evidence from other cases in order to "catch"

Defendants' failure to produce requested documents) and meritless objections to the number and

conditions of depositions.

In sum, there is no evidence that the timing of Plaintiffs' suit was the result of undue

delay rather than a reasoned judgment based on Defendants' position taken in 2255 lawsuits, the

realities of what Plaintiffs could discover about Defendants' means of carrying out executions,

and the reasonable availability of a viable procedural mechanism to bring suit.

### 2.    Defendants Cannot Show Prejudice from Any Delay

Defendants' stated claim of prejudice – that the "government . . . has a strong interest in

carrying out Plaintiffs' and Plaintiffs-Intervenor' judicial sentences," Doc. 62, Memo., at 12 –

rings hollow in the circumstances of this case. "Two kinds of prejudice support a laches defense.

Plaintiff's delay in filing suit may have resulted in a loss of evidence or witnesses supporting

defendant's position or the defendant may have changed its position in a manner that would not

have occurred but for plaintiff's delay." *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d

838, 844 (D.C. Cir. 1982). The traditional prudential considerations of protecting against "stale"

actions are not served in actions like this which complain about events yet to occur. *Cf. Jones v.*

*Allen, et al.,* __ F. Supp. 2d __, No. 06-cv-986, 2007 WL 1140416, at *7 (M.D. Ala. Apr. 20,

2007) ("None of the[] policy reasons behind a statute of limitations applies to a case where the

plaintiff's injury has yet to occur. Nothing in this case is 'stale,' because the defendants are still

planning on carrying out the complained-of act . . . .") (footnote omitted), *aff'd*, 485 F.3d 635

(11th Cir. 2007).

Defendants are at no risk of loss of evidence or witnesses in support of their position, since the event complained of has yet to occur and all evidence and witnesses should be readily available. Nor can the Defendants suggest that they have changed their position in a manner that would not have occurred but for Plaintiffs' alleged delay. Defendants willingly agreed that this suit should be stayed during the pendency of *Hill* and then made no move to lift the stays for a year after *Hill* was decided. Defendants have not sought the execution of Plaintiffs for over nineteen months, even though they were entitled to do so. Defendants plainly are not in a rush to execute. In fact, Defendants made no move to curtail this litigation and assert a right to a timely execution until they lost their attempt to foreclose meaningful discovery. If there is any prejudice to Defendants at all, it is only the prejudice of having to go forward with suit and disclose fully the means by which they intend to execute Plaintiffs. That, however, is not a prejudice cognizable under the defense of laches.

Defendants suggest that undue delay in filing suit is proven by the need for stays of execution to continue the case. Defendants are confusing two very distinct concepts. Laches is a question related to the timing of the institution of suit, going to the question of whether inequity would result from permitting a delayed claim to be heard. In contrast, stays of execution present the question of whether equity justifies ***continuing*** a suit when a stay is needed to prevent mooting the claims. Stays can be justified – regardless of when suit is filed – by the balance of the relevant interests. Thus, although both analyses turn on equitable issues, the questions to be answered are distinct. *See Jones*, 2007 WL 1140416, at *7 (appreciating that the equitable considerations in a method of execution claim which involve an event which has yet to occur are considerations a court must weigh if it is asked to "stay a § 1983 plaintiff's scheduled execution"). In this case, there is no equitable justification for foreclosing suit based on the time

of filing. The question whether there was a sound basis for issuance of the stays and whether Defendants can carry their burden as movant to lift the stays is entirely separate from the question of delay, if any, in filing suit, and will be answered *infra* in Part III as part of Plaintiffs' response to Defendants Motion to Lift the Stays.

In sum, Defendants have failed to plead the affirmative defense of laches, prematurely sought relief on a claim that depends on facts outside the pleadings for resolution, wholly failed to explain how their posture in other cases (stating the claim is not ripe during the pendency of post-conviction review) supports a claim of delay, and utterly failed to show prejudice. For all of these reasons, Plaintiffs respectfully request the court to deny Defendants' request for judgment on the pleadings on the ground of inexcusable delay.

## II.    The Statute of Limitations Does Not Bar This Action

Defendants next suggest that Plaintiffs' claims must be barred by the six-year statute of limitations applied to lawsuits filed against the Federal government. Doc. 62, Memo., at 14. In support, Defendants again cite *Neville v. Johnson*,[3] and suggest that Plaintiffs' method of execution claims accrued at the end of direct review. For many of the same reasons discussed in response to Defendants' claim of laches, the Defendants are also wrong here.

### A.    Statutes of Limitations Do Not Apply to Method of Execution Claims

Statutes of limitations do not apply to suits seeking injunctive relief to bar a prospective violation of Plaintiffs' constitutional rights. "[A] method-of-execution lawsuit seeks injunctive relief for an allegedly unconstitutional act that has not yet occurred." *Jones*, 2007 WL 1140416, at *4. Because the event has yet to occur, none of the purposes served by applying limitations

---

[3] As with its laches argument, Defendants' reliance on *Neville* is misplaced. *Neville* comments that a method of execution challenge may be ripe after the end of direct review. It does not hold, and indeed, it would be nonsensical for it to do so, that simply because a claim is ripe, it has also necessarily accrued. *See Jones v. Allen*, __ F. Supp. 2d __, No. 06-cv-986, 2007 WL 1140416, at *7 (M.D. Ala. Apr. 20, 2007).

are served here. There is no need to protect Defendants from stale actions, or the risk of having to adjudicate a claim when evidence or witnesses may have been lost. Nor can Defendants credibly suggest that this is a case in which they acted in reliance on Plaintiffs' failure to bring suit after some date certain. "None of these policy reasons behind a statute of limitations applies to a case where the plaintiff's injury has yet to occur." *Id.* at *7; *see also Grayson v. Allen, et al.*, No. 06-cv-1032, 2007 WL 1491009, at *4-5 (M.D. Ala. May 21, 2007) (rejecting application of statute of limitations to method of execution challenges), *on appeal to*, No. 07-12364-P (11th Cir.).

For these reasons, courts have acknowledged in many contexts that there are "limitations" on limitations. "[S]tatutes of limitation go to matters of remedy, not to destruction of fundamental rights." *Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314 (1945). Where, as here, Plaintiffs seek only injunctive relief, courts have recognized that "statutes of limitation are not controlling measures." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946); *Nicholson v. Board of Comm'rs of the Alabama State Bar Ass'n*, 338 F. Supp. 48, 53 (M.D. Ala. 1972) (section 1983 action not barred by limitations because plaintiffs sought only injunctive and declaratory relief).

Similarly, courts have recognized that statutes of limitations, to the extent that they play a role at all, are continually renewed in the case where an unlawful practice continues into the future. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (recognizing the doctrine of continuing violations); *see also Heard v. Sheahan*, 253 F.3d 316, 320 (7th Cir. 2001) (collecting cases and agreeing that the "federal doctrine of continuing wrongs is . . . applicable to suits under 42 U.S.C. § 1983"); *Rehabilitation Ass'n of Virginia, Inc. v. Kozlowski*, 838 F. Supp. 243, 249 (E.D. Va. 1993) (where Plaintiffs challenge the "continuing application of an allegedly

15

unlawful policy" and the harm is of a "continuing nature," Plaintiffs' 1983 claim is not time barred). Thus, even if a statute of limitations were triggered at sentencing or upon the passage of regulations, as long as the violation complained of continues, as it does here (in that Plaintiffs continue to face an unconstitutional execution as a result of constitutionally offensive policies or practices), the cause of action continues to accrue. *See Page v. United States*, 729 F.2d 818, 822 & n.34 (D.C. Cir. 1984) (citing *Havens Realty*, 455 U.S. at 380-81 and recognizing continuing violation principle).

Were there a triggering point for limitations in the instant case, as Defendants incorrectly suggest there should be, the doctrine of continuing violations would be particularly relevant given the alleged violation of a constitutionally-protected right. In such cases, it is irrelevant how long the constitutional violation may have existed before a plaintiff sues, as long as the violation continues. *Heard*, 253 F.3d at 318 (prison's refusal to correct the unconstitutional condition, despite power to do so, creates a fresh violation each day).

Indeed, this must be so, because the rights of citizens to be free from unconstitutional conditions do not expire simply because the unconstitutional conduct has previously gone unchallenged. *Gonzales v. North Township of Lake County*, 800 F. Supp. 676, 684 (N.D. Ind. 1992) (section 1983 action for violation of First Amendment not time barred even though monument in issue had stood unchallenged for twenty years because each day monument stood represented a continuing violation of rights), *rev'd on other grounds*, 4 F.3d 1412 (7th Cir. 1993); *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997) ("[A]n ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within two years . . . ."). Like the plaintiffs in *Gonzales*, who waited some twenty years to challenge the constitutionality of a public

16

monument, Plaintiffs here have not lost the right to be free from torture and pain during execution simply because no challenge has been brought until now.  As is emblematic of a continuing wrong, the remedy Plaintiffs seek is still available.  Defendants have the power to remedy the situation and avoid all injury to Plaintiffs.  They simply choose not to do so.  *See Pitts v. City of Kankakee*, 267 F.3d 592, 595-96 (7th Cir. 2001) (continuing violation exists if it "still possible to implement a remedy that eradicates" the wrong).  Plaintiffs still face unconstitutional executions and it is plainly possible to implement a remedy eradicating that wrong.  Therefore, Plaintiffs have alleged a continuing violation and their claims are not barred by any statute of limitations.

### B.    Nothing on the Face of the Pleadings Shows that Plaintiffs' Claims are Barred by Limitations

Defendants cite no facts evident from the face of the pleadings, other than bare references to dates of sentencing, motions and passage of regulations, as potential triggering events for a limitations period.  Because Plaintiffs' lawsuit does not facially challenge the constitutionality of execution by lethal injection, there is nothing about those facts that put Plaintiffs on notice of the unconstitutional ***manner or means*** by which Defendants intend to carry out their executions.  *See* Doc. 8, ¶¶ 7, 24-29.  The question of when the Plaintiffs had information that should have put them on notice that their claims were ripe or accruing is a fact question.  Statutes of limitation claims that present fact questions cannot be resolved on a motion for judgment on the pleadings.  *See, e.g., Richards v. Mileski*, 662 F.2d 65, 73 n.13 (D.C. Cir. 1981) (noting "overwhelming line of authority" holds that plaintiffs' notice cannot be resolved on a motion to dismiss or similar motion which relying on the face of the pleadings); *Jones v. Rogers Memorial Hosp.*, 442 F.2d 773, 775 & n.2 (D.C. Cir. 1971) (holding fact question precludes motion to dismiss on limitations); *Cobell v. Babbitt*, 30 F. Supp. 2d 24, 44 (D.D.C. 1998) ("The question of

17

when the plaintiffs knew or should have known of their claim is a question of fact.  Given the factual nature of the inquiry, the Court declines to rule on the limitations issue at this juncture . . . .") (internal citations omitted); *Anderson, et al. v. Evans, et al.*, No. Civ-05-0825, 2006 WL 83093, at *2 (W.D. Okla. Jan. 11, 2006) ("On its face, the [method of execution] complaint does not show that the claim is time-barred.").

If anything, the face of the pleadings shows that this action is not barred by limitations. Defendants responded to Plaintiffs' amended complaint in two ways.  First, they filed a motion to dismiss claiming that the statute of limitations barred Plaintiffs' count four – a claim that the Administrative Procedure Act was violated by the promulgations of execution regulations.  *See* Doc. 13, at 20.  Next, Defendants filed an answer in which they asserted that "Plaintiffs' claims are barred, *in part*, by statute of limitations."  Doc. 14, at 15 (emphasis added).  On the face of the pleadings, Defendants asserted only part of Plaintiffs' case, count IV, was barred by limitations.  Thus the pleadings indicate that some part of Plaintiffs' case must survive a dismissal on limitations grounds.  Defendants' failure to assert by motion to dismiss or by answer that *all* of Plaintiffs' claims are barred by limitations constitutes a waiver of that claim. *See, e.g., Kroot v. District of Columbia*, 800 F. Supp. 976, 980 (D.D.C. 1992) ("Affirmative defenses such as the statute of limitations and laches generally must be raised in the answer or they are waived.").  For these reasons, Defendants' motion for judgment on the pleadings based on limitations should be denied.

### C.    Plaintiffs' Claims Could Not Accrue until They Had Actual Notice of The Unconstitutional Manner in Which Their Executions Would be Conducted

Without waiver of the objection that this claim cannot be adjudicated on the pleadings or prior to the completion of discovery, the facts known at this time show that Plaintiffs' claims are timely or that there are genuine issues of material fact that preclude judgment on the pleadings.

"Section 1983 claims accrue, for the purpose of the statute of limitations, when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Johnson v. Johnson County Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991) (internal quotation omitted). Here, the facts show that Plaintiffs have only recently (and well within any relevant limitations period) become aware of the manner and means by which Defendants intend to execute them and that they face an unconstitutional risk of harm.

Defendants claim that Plaintiffs' sentences of death and the Federal regulations about lethal injection should have put Plaintiffs on notice of any and all claims they might raise regarding execution by lethal injection. Doc. 62, Memo., at 16. But Plaintiffs do not complain about the fact of execution by lethal injection. Doc. 8, ¶ 7. Instead, they challenge the manner and means by which their executions by lethal injection will be carried out. As explained in the Amended Complaint, nothing in the Federal regulations provides notice of any of the details of execution – because the regulations prescribe no specific drugs, dosages, drug combinations, manner of intravenous line access, or certifications, training, or licensure for those who participate in executions. Doc. 8, ¶¶ 24-29. Importantly, the regulations do not say that the Federal government intends to use the dangerous multi-drug synergism of thiopental, pancuronium bromide, and potassium chloride.

The Federal government has assiduously guarded its recipe for death. It was not until the McVeigh execution in June of 2001 that any person could know that the Federal government was carrying out executions with the multi-drug synergism of thiopental, pancuronium bromide, and potassium chloride. *See, e.g.*, *U.S. Executes McVeigh*, 2001 WLNR 10642743, CHICAGO TRIBUNE, at page 1 (June 11, 2001). But, even if a lay person could have appreciated that the drugs were dangerous, because these drugs can be constitutionally administered, there is nothing

19

about the fact of their use that puts one on notice of unconstitutional conduct. Plaintiffs could not have known that the Federal government, which touted its method of execution publicly as humane, would fail to employ the appropriate standards of care. *Cf. Cristwell v. Veneman*, 224 F. Supp. 2d 54, 58 (D.D.C. 2002) (noting equitable estoppel prevents a limitations defense where defendants have taken active steps to prevent plaintiff from litigating his claim).

Indeed, there was no specific information indicating any problem with the Federal government's method of execution until November 2003, when documents produced in the *LeCroy* litigation indicated the government was administering as little as 1 gram of thiopental. *See* Heath Decl., pp. 4, 16 & Decl. Ex. O. But even then, nothing could have alerted Plaintiffs to the present state of affairs – the use of femoral vein access and the employment of persons who are responsible for horrifically botched executions. That information became available *for the first time* when Defendants produced a new Addendum to their protocol on June 26, 2007.[4]

Other courts have agreed that, to the extent that limitations apply at all, a method of execution claim does not accrue on notice that lethal injection will be employed as the method of execution. *See Anderson*, 2006 WL 83093 at *2 (rejecting argument on a motion to dismiss that, because Oklahoma has used lethal injection as the means of execution since 1977, limitations period began when defendants were sentenced to death and holding that action accrued arguably when specific protocol information became public); *cf. Evans v. Saar*, 412 F. Supp. 2d 519, 527 (D. Md. 2006) (rejecting the argument that plaintiff waived right to challenge the method of lethal injection by not making a challenge in 1994 when Maryland adopted lethal injection as a method of execution). Additionally, because the Defendants have argued elsewhere that a method of execution claim is not ripe during post-conviction review (discussed *supra*), there can

---

[4] The suspect nature of the persons employed by the Federal government and the risks of femoral vein intravenous access are discussed in full, *infra* in Part III.

be no real question that this claim has been accruing since the end of direct review. For all Plaintiffs, post-conviction review ended well within the limitations period asserted by the Defendants. Thus, to the extent that statutes of limitations are applicable (which Plaintiffs do not accept) no factual trigger occurred until well within any possible limitations period. For these, and all of the foregoing reasons, Defendants' motion for judgment on the pleadings based on limitations should be denied.

## III.    The Stays of Execution Agreed to by the Federal Government Should Continue until This Lawsuit Has Been Resolved on the Merits

### A.    Defendants Fail to Meet Their Burden to Justify a Change in Status-quo

The Defendants have moved to lift the stays of execution of Plaintiffs. Doc. 62, Memo., at 17 & n.6. In support, Defendants state that Plaintiffs cannot meet their burden to justify stays of execution. *See, e.g., id.* at 18 ("Plaintiffs have little likelihood of success on the merits.").

As an initial matter, Defendants are wrong to imply that the burden rests with Plaintiffs. Defendants are the movants in this motion. They are the parties seeking to change the status quo and it is their burden to justify their request. *See, e.g., Atlanta Journal & Const. v. City of Atlanta Dep't of Aviation*, 6 F. Supp. 2d 1359, 1364 (N.D. Ga. 1998) ("On a motion to dissolve a preliminary injunction, the movant has the burden of proof."); *Reynolds v. Guiliani*, 118 F. Supp. 2d 352, 364 (S.D.N.Y. 2000) (burden is on defendants to establish changed circumstances justifying dissolution of an injunction). However, Defendants make no attempt to explain how continuation of Initial Plaintiffs' stays would harm them or the public interest, except to say that the public has an interest in finality of sentencing and that Initial Plaintiffs were sentenced many years ago. Doc. 62, Memo., at 21. Defendants' explanation of how the public interest would be served by lifting stays of execution falls flat, especially when it apparently served both Defendants' and the public's interests to agree to the injunctions sixteen months ago.

**B.    Defendants Should be Estopped from Changing the Conditions Under Which Intervenors Entered the Case**

Defendants also fail to meet their burden with respect to the Intervenors. They offer no reason for their abrupt change in position on the Intervenors' stays and should be estopped from seeking a change in status quo for the Intervenors.

The doctrine of equitable estoppel precludes Defendants from "changing their minds" about the preliminary injunctive relief to which they consented because the Intervenors reasonably, and detrimentally, relied upon their written representations filed on the record with regard to their support for the preliminary injunction. For the equitable estoppel doctrine to apply, Intervenors must show that: "(1) there was a 'definite' representation to the party claiming estoppel; (2) the party relied on its adversary's conduct to his detriment; and (3) the reliance on the representation was 'reasonable.'" *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 83 (D.D.C. 2003) (quoting *Graham v. SEC*, 222 F.3d 994, 1007 (D.C. Cir. 2000)); *see also Thoubboron v. Ford Motor Co.*, 809 A.2d 1204, 1212 (D.C. 2002) (party with full knowledge of facts who accepts benefits of a transaction or contract may not subsequently take an inconsistent position to avoid the corresponding obligations or effects) (citing *First Am. Disc. Corp. v. Commodity Futures Trading Comm.*, 222 F.3d 1008, 1016 (D.C. Cir. 2000)); *Currier v. Radio Free Europe*, 159 F.3d 1363, 1368 (D.C. Cir. 1998) (declining to dismiss equitable estoppel claim based upon statements suggesting that employment status will continue). When invoking equitable estoppel against the Government, the Intervenors also must show an injustice and a lack of undue damage to the public interest. *United States v. Philip Morris*, 300 F. Supp. 2d 61, 70 (D.D.C. 2004) (rejecting claim of estoppel on unrelated other grounds) (*citing ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988)); *Hertzberg*, 273 F. Supp. 2d at 83 (rejecting claim of estoppel on unrelated other grounds); *Grumman Ohio Corp. v. Dole*, 776 F.2d 338, 347 (D.C.

Cir. 1985) (doctrine intended to withhold judicial reward of conduct that will cause an "'egregiously unfair result'") (quoting *General Accounting Office v. General Accounting Office Personnel Appeals Bd.*, 698 F.2d 516, 526 n.57 (D.C. Cir. 1983)); *see also Heckler v. Community Health Servs.*, 467 U.S. 51, 61 (1984) (preserving availability of equitable estoppel against the Government because of interest in ensuring citizens a "minimum standard of decency, honor, and reliability in their dealings with their Government"); *Office of Personnel Management v. Richmond*, 496 U.S. 414, 421-23 (1990) (continuing to preserve availability of equitable estoppel against the Government); *ATC Petroleum*, 860 F.2d at 1111 (same, noting that courts must rigidly apply the doctrine against the Government).  Each of the elements of the equitable estoppel doctrine are satisfied here and, as a result, equity estops Defendants from doing what they described at the June 8, 2007, hearing as "changing their minds" regarding their position on Intervenors' preliminary injunctions, which they have sought to do by way of their motion a mere 72 hours after the motions to intervene of Battle and Hall were granted.[5]

First, Defendants made a definite representation.  *Hertzberg*, 273 F. Supp. at 83.  With respect to Battle and Hall, Defendants represented by written agreement on the record in the April 27, 2007 Joint Stipulation (the "Joint Stipulation") that they did not oppose the interventions or preliminary injunctions staying the setting of their execution dates. Doc. 39 at 1-2.  This representation continued unaltered on the record through the time when the Court granted the preliminary injunctions for Battle and Hall on June 11, 2007, Docs. 67, 68. The Defendants also made the same representation to Webster that is memorialized in a Notice filed by Defendants on February 5, 2007 (the "Notice").  *See* Doc. 24, at 1.

---

[5] *See also Pegram v. Herdrich*, 530 U.S. 211, 228 n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase"); *New Hampshire v. Maine*, 532 U.S. 745, 749-50 (2001) (court has discretion to invoke judicial estoppel doctrine in order "to protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment[.]").

Second, Intervenors have forgone rights in reliance upon that representation. *Hertzberg*, 273 F. Supp. at 83. First, Intervenors explicitly agreed not to pursue different or additional claims (leading Hall and Battle not to pursue the *Bivens* claim based upon an extension of existing law and to agree to a stipulation under which an amended complaint would be filed that does not include such a claim). *See* Ex. 5 (email string evidencing that counsel for Battle and Hall revised their clients' complaints to clarify that they were not bringing an APA challenge to the lethal injection regulations themselves and, in response, counsel for Defendants agreed to execute the Joint Stipulation). Second, Intervenors agreed not to seek to alter the discovery schedule or the scope of discovery (which for Battle and Hall effectively has meant foregoing an initial inspection of the Terre Haute facility and foregoing a request to extend the date for commencement of discovery in order to have as much time as Plaintiffs have had to prepare for discovery, not to mention requesting deposition of additional witnesses such as personnel involved in dealings with and responding to the United Nations Committee Against Torture on U.S. lethal injection protocols). Third, Intervenors agreed to waive the requirement that Defendants answer their complaint, and thereby accept the existing answer of Defendants, filed in November 2006. *See* Doc. 14.

Finally, Intervenors' reliance was reasonable as there was no indication, at the time of reliance, that Defendants would or could change their minds regarding the preliminary injunctions. *Hertzberg*, 273 F. Supp. at 83; *see Heckler*, 467 U.S. at 59 ("reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading"). Intervenors reasonably understood they had reached a fair and transparent bargain with the Defendants for how the case would proceed and what each side would be compromising to achieve that end: unopposed intervention, based on a

complaint that does not raise *Bivens* claims and supports unopposed preliminary injunctive relief, in a case proceeding rapidly toward discovery and merits review. This bargain is plain in both the Notice and Joint Stipulation. *See* Doc. 24 at 1; Doc. 39 at 1-2.

Up until the moment of the filing of Defendants' most recent dispositive motion – which appears to have been some time in the drafting – there was no indication to Intervenors that Defendants secretly opposed preliminary injunctive relief and intended to spring that opposition upon the Intervenors immediately upon their intervention. The Intervenors reliance in forgoing the various litigation advantages and claims described was therefore reasonable.

The Intervenors also meet the additional standards for invoking equitable estoppel against Defendants. First, a grave injustice would be worked if Intervenors are subject to execution by lethal injection under the Federal protocol during the pendency of the serious constitutional challenge to that method of execution. Second, for the same reason the public interest was served by granting their unopposed motions injunctive relief, Docs. 27, 67 and 68, the public interest is served by upholding the original intended purpose that the injunctions remain in effect during the pendency of this case.

Defendants have implied there is no injustice in moving to lift the Intervenors' stays, contending that, as a result of Defendants' changed tactics, Intervenors can just "withdraw from this case and file their claims in the districts where their criminal cases were tried or in the district where they are incarcerated." Doc. 77, at 8. Defendants thus recognize that Intervenors would be entitled to take significant steps to remedy the injustice that would occur if Defendants were permitted to abandon the agreement to preliminary injunctive relief set forth in the Notice and Joint Stipulation. Nonetheless, Defendants completely ignore the fact that the Intervenors have spent months of time and resources to intervene in this case rather than pursuing another

case, in reliance on the agreement of Defendants set forth in the Notice and Joint Stipulation. Defendants' suggestion that the Intervenors file new cases elsewhere is particularly disingenuous. Given that Defendants suddenly claim (after consenting only weeks before to the intervention of Battle and Hall) that the Intervenors' Complaints were filed "'too late in the day,'" Doc. 62, Memo at 9 (quoting *Hill*, 126 S. Ct. at 2014), the notion that it would be fair to expect the Intervenors to refile a new case months after moving to intervene cannot be taken seriously.

With respect to the second factor – lack of undue damage to the public interest – Defendants already consented to injunctive relief in the Notice and Joint Stipulation, indicating they did not believe there was any threat to the public interest. Further, not only would the public interest not be harmed by estopping Defendants, but it would be served, for the reasons stated in Intervenors' unopposed motions for a preliminary injunction. *See* Doc. 26, Memo., at 4-5; Doc. 63, Memo., at 4-5; Doc. 65, Memo., at 6-9. The public interest factor also is satisfied for the other reasons fully developed elsewhere in this Memorandum, *infra*.

Because Defendants have not credibly met their burden to lift the existing stays, Defendants' motion must fail.

### C.    Defendants Apply an Incorrect Standard to Requests for Preliminary Injunctive Relief

Even if the court were to entertain Defendants' proposition that Plaintiffs bear the burden of justifying a continuance of the stays, the Defendants have erred in their expression of the relevant standard for preliminary injunctive relief, implying that the court should weigh all four elements of the standard equally. *See, e.g.,* Doc. 62, Memo., at 17-19. Even if the court were to do so, Plaintiffs would prevail. However, the standard for issuance of preliminary injunctive relief comprises a more complex calculus. "A court considering a plaintiff's request for a

26

preliminary injunction must examine whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998). Importantly, "[t]hese factors interrelate on a sliding scale and must be balanced against each other. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* at 1318 (internal quotations omitted). Under these principles, it is "enough that the Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Ramirez v. United States Custom & Border Protection*, 477 F. Supp. 2d 150, 155 (D.D.C. 2007) (internal quotations omitted); *see also Al-Marri v. Bush*, No. Civ. A 04-2035, 2005 WL 774843 (D.D.C. Apr. 4, 2005) (same).

Additionally, the court applies a relaxed evidentiary standard when weighing evidence in a request for preliminary injunction. *See Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) ("A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits . . . ."); *Insight Tech. Inc. v. Surefire, LLC*, 447 F. Supp. 2d 120, 131 n.9 (D.N.H. 2006) (noting that courts apply a "relaxed evidentiary standard" in "preliminary injunction hearings"); *see generally* 11A CHARLES ALLEN WRIGHT, ARTHUR MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2949 n.21 (collecting cases) & n.22 (collecting cases) (2d ed. 1983 and Supp. 2007).

D.    **The Balance of Relevant Factors Weighs Strongly in Favor of Continuing the Stays of Execution**

The gist of Defendants' motion to lift the stays is that Plaintiffs cannot show Defendants' policies and practices violate the Eighth Amendment's contemporary standard of decency and therefore cannot succeed on the merits of their claims. Before discussing those propositions, it is important to understand the mechanics of death by lethal injection.

Defendants purport to kill condemned inmates by intravenous injection of a multi-drug synergism involving the serial administration of three drugs (separated by flushes of saline solution). The drugs in question are: thiopental,[6] pancuronium bromide, and potassium chloride. The drugs are quite distinct. Thiopental is an anesthetic drug, intended to put the condemned inmate to sleep. Pancuronium bromide is a neuromuscular blocking agent, intended to paralyze all voluntary muscles, including those which allow for respiration. Potassium chloride is a cardioplegic agent which stops the heart. The Defendants refer to all these drugs as "lethal substances." *See, e.g.,* BOP Execution Protocol (2004), at 10, attached hereto as Ex. 6. The implication of referring to all the drugs as "lethal" is that each drug is capable of independently causing death in an execution. But that is not correct. Death in an execution by lethal injection is, in almost all cases, caused by the administration of potassium chloride. *See* Heath Decl., p. 11-12. That means the condemned is alive throughout the process of execution until the last drug is administered. If conscious, the condemned is capable of experiencing everything that occurs during the execution – the administration of all of the drugs, and death.

Within this suite of drugs, only one is capable of creating a humane execution. Thiopental (if administered in a sufficient dose which successfully enters the condemned's venous system and then reaches his brain) will cause a deep and protracted anesthetic state that

---

[6] Thiopental is also known as Sodium Pentothal, Sodium Thiopental or Thiopentone. It will be referred to throughout this brief as thiopental.

will render the condemned insensate to any further proceedings. *See* Heath Decl., p. 16-17. The other two drugs, pancuronium bromide and potassium chloride, each would cause enormous pain or suffering to a conscious person. Pancuronium bromide paralyzes all voluntary muscles, including those which allow respiration and, if allowed sufficient time to act, will cause asphyxiation. *Id.* p. 12-14. Potassium chloride, when administered in the concentrations used in Federal executions, causes extreme pain. *Id.* p. 11

It is incumbent on the Defendants to ensure that the condemned has been adequately anesthetized so that he is non-responsive to the noxious stimulus of potassium chloride injection or the suffering of conscious asphyxiation. Indeed, there is no real dispute on this point – an inmate must be deeply asleep before drugs which will, with absolute certainty, cause pain or suffering, are administered. *See Taylor*, 2006 WL 1779035, at *3 ("There was no dispute that if an inmate is not sufficiently anesthetized when the potassium chloride is administered, it will cause excruciating pain as it is administered through the inmate's veins."); *Morales v. Hickman*, 415 F. Supp. 2d 1037, 1040 (N.D. Cal. 2006) (same) [hereinafter "*Morales I*"]. The Defendants have admitted as much in their answer to Request for Admission 29 ("To the extent the Request . . . is limited to whether the administration of potassium chloride in the amounts and concentration given to conduct an execution by lethal injection to an unanesthetized person, this portion of the request [admit that the inmate must be non-responsive to noxious stimuli] is admitted.").

Instead of accepting the consequences of using these drugs, and designing a protocol that will minimize the foreseeable and inevitable risks, Defendants have gone another way. They have selected a manner and means of drug administration, protocols, procedures, and personnel, that cannot reliably assure that any condemned inmate will be "asleep" in the way he needs to be

– that is, in a surgical plane of anesthesia and non-responsive to noxious stimuli at the time of administration of drugs known to cause excruciating pain or suffering.

### 1.    The Contemporary Standard of Decency Requires Assurance of Anesthetic Depth

Defendants' assert that, because lethal injection has been touted as the most "humane method of execution," Plaintiffs will not be able to show that the manner and means by which Defendants carry out executions violates the contemporary standard of decency required by the Eighth Amendment. Doc. 62, Memo., at 20-21. Defendants' assertion is without merit.

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). Specifically, it forbids the infliction of unnecessary pain in the execution of a sentence of death. *In re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . . ."). A punishment is particularly offensive if it involves the foreseeable infliction of suffering. *See Farmer v. Brennan*, 511 U.S. 825, 842, 847 (1994) (Eighth Amendment is violated by prison officials when they know of a risk of serious harm and proceed without taking reasonable measures to abate the risk).

An execution that risks inflicting several minutes or more of intense conscious suffering, as alleged here, violates the Eighth Amendment. *See Taylor*, 2007 WL 1583874, *6 (citing *Hill*, 126 S. Ct. at 2101 and concluding that a foreseeable risk of gratuitous pain states an Eighth Amendment claim); *see also Furman v. Georgia*, 408 U.S. 238, 430 (1972) ("[N]o court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives.") (Powell, J., dissenting, joined by Burger, C.J., Blackmun, J., and Rehnquist, J.); *LaGrand v. Stewart*, 173 F.3d 1144, 1148-49 (9th Cir. 1999) (conscious suffering during an execution that lasts between 15 seconds and one minute and possibly persists for several additional minutes violates the Constitution).

30

The Eighth Amendment requires the court to evaluate Plaintiffs' claims in the context of an evolving and contemporary standard of decency. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (holding the Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity" and must be analyzed in the context of "the evolving standards of decency that mark the progress of a maturing society") (internal quotations omitted). Defendants assume that, because lethal injection is capable of achieving a humane death, all methods of lethal injection meet the contemporary standard of decency. Defendants are wrong.

The contemporary standard of decency recognizes that, for an execution by lethal injection to be reliably humane, there must be assurance from an appropriately qualified person that the condemned has reached a deep aesthetic state. *See, e.g.*, *Taylor*, 2007 WL 1583874, at *10 (finding that a new protocol which requires a doctor, nurse, or EMT to physically assess anesthetic depth using standard clinical techniques prior to the administration of pancuronium bromide and potassium chloride complies with the Eighth Amendment's contemporary standard of decency); Doc. 35 (Order), at 5-6, *Brown v. Beck, et al.*, No. 5:06-CT-3018-H (E.D.N.C. Apr. 17, 2006) (State's proposed method for assessing anesthetic depth prior to administration of pancuronium bromide and potassium chloride using a physician or nurse to interpret signals from a bispectral index brain monitor was constitutionally compliant); *Morales I*, 415 F. Supp. 2d at 1047 (concluding that, as long as the State uses a three-drug protocol including pancuronium bromide and potassium chloride, the State must provide an assessment of anesthetic depth by a qualified person with formal training and experience in general anesthesia prior to the administration of pancuronium bromide and potassium chloride).

Indeed, states now reviewing their lethal injection protocols have accepted that contemporary standards of decency require assessment of anesthetic depth. For example,

31

California's San Quentin Operational Procedure No. 0-770, Execution by Lethal Injection (May 15, 2007), at 46, requires that "[o]ne Intravenous Team Member will remain in the execution room to continuously monitor the intravenous lines and assess the consciousness of the condemned inmate throughout the execution."[7]    Similarly, Florida's new protocol requires a physical assessment of anesthetic depth.    Florida Dep't of Corrections, Execution by Lethal Injection Procedures, at 8 (eff. May 9, 2007) ("[A] member of the execution team will assess whether the inmate is unconscious."), attached hereto as Ex. 7, ¶ 3.[8]

There are additional standard of care requirements that are nationally accepted as concomitant obligations of safely and competently producing the required level of anesthetic depth.    These include: (i) ensuring reliable intravenous (IV) access; (ii) ensuring IV catheters remain in place and patent[9] throughout the duration of the execution; (iii) using a method of intravenous access that is humane and reasonable under the circumstances; (iv) administering drug amounts that will induce the appropriate depth and duration of narcosis; (v) planning for reasonably foreseeable contingencies like IV line failure and emergencies like venous or arterial puncture; (vi) allowing for adequate visualization during the administration of drugs and for adequate visualization of the condemned throughout the process of execution; and (vii) having an appropriate level of training and supervision of execution personnel.    Many states have been found to be deficient in one or all of these areas.

For example, in *Morales v. Tilton*, the court noted a variety of flaws in the execution process that impinged on achieving the requisite level of anesthetic depth such as a "lack of meaningful training, supervision and oversight of the execution team," "[i]nconsistent and

---

[7] *Available at* Doc. 318, at 47 (filed May 15, 2007), *Morales v. Tilton*, 06-cv-219 (N.D. Cal.).
[8] Plaintiffs do not suggest that all departments of correction currently meet the contemporary standard of decency by having an ***appropriately qualified person*** assess anesthetic depth.    But the foregoing cases make completely clear that, at a minimum, a "physical" assessment of anesthetic depth is required.
[9] A patent IV line is one that is unblocked, open, and flowing.

unreliable record-keeping" of the execution drugs used, "[i]nadequate lighting," and other flaws related to a pervasive lack of professionalism and skill in the implementation of executions. *Morales v. Tilton*, 465 F. Supp. 2d 972, 979-981 (N.D. Cal. 2006) [hereinafter *"Morales II"*]. Similarly, in *Taylor*, Judge Gaitan ordered Missouri to develop a protocol addressing preparation and delivery of drugs and specifically required that the State eliminate any mandatory or default use of femoral vein intravenous access. *Taylor*, 2006 WL 1779035, at *8. Judge Gaitan further ruled specifically that a person – ████████████████████████████████ – who Judge Gaitan considered to be inadequately qualified must be removed from the execution process. *Id.* at *7-8 (raising concerns about the qualifications of "John Doe 1"), and Doc. 213 (Order), at 2, *Taylor v. Crawford*, No. 05-4173-CV (W.D. Mo. Sept. 12, 2006) ("John Doe 1 shall not participate in any manner, at any level, in the State of Missouri's lethal injection process.").[10]

Defendants' assertion that, because lethal injection is considered capable of producing a humane death, every lethal injection protocol necessarily comports with the contemporary standard of decency, is clearly wrong. As the foregoing cases illustrate, contemporary standards accept that a constitutional protocol must, at a minimum, assure that the condemned will reliably reach an appropriate level of anesthetic depth and that all steps that are part of that process (from equipment to the presence of adequately trained and professional personnel) must be addressed to eliminate the foreseeable and unnecessary risk of conscious awareness during execution.

---

[10] Although the State of Missouri initially appealed this part of the district court's order, ultimately the State withdrew any objection to the use of John Doe I and conceded that the State of Missouri would not use him for future executions. *See* April 17, 2007, Letter from Michael Pritchett, Assistant Attorney General for the State of Missouri to Michael Gans, Clerk for the United States Court of Appeals for the Eighth Circuit, attached hereto as Exhibit 8.

2.    **Success on the Merits Is Proof that Compels Defendants to Correct Unconstitutional Protocols and Procedures**

Defendants also suggest that Plaintiffs will not be able to show a likelihood of success on the merits because the Supreme Court has never invalidated a method of execution and "courts have rejected challenges to lethal injection protocols using the same three-chemicals used by the Federal government." Doc. 62, Memo., at 20, 19. This contention is flatly wrong. Plaintiffs do not ask this court to invalidate lethal injection as a method of execution. Rather, Plaintiffs in this proceeding (and Plaintiffs in other similar proceedings) specifically recognize that executions by lethal injection can be performed without placing Plaintiffs at an unnecessary risk of unconstitutional suffering. Consequently, no court in the country has been called upon to rule that lethal injection should be invalidated as a method of execution. Instead, courts have been asked to compel departments of correction to improve the care with which they carry out executions. Success on the merits in a lethal injection challenge is thus an order "requiring the [government] to modify its lethal injection protocol to correct the flaws Plaintiff has alleged." *Morales I*, 415 F. Supp. 2d at 1046. Viewed under this standard, many litigants have succeeded in compelling governmental actors to modify their protocols to approach constitutional compliance. The many cases cited above which reflect the contemporary standard of decency are also cases which show that governments can be and have been compelled to change their lethal injection protocols.

In California, after a trial on the merits, the court found "Defendants' actions and failures to act have resulted in an undue and unnecessary risk of an Eighth Amendment violation" that is "intolerable." *Morales II*, 465 F. Supp. 2d at 981. California undertook a review of its lethal injection protocol to correct the errors observed by the court and subsequently produced a revised protocol which, among other things, included construction of a new execution facility.

*See* State of California San Quentin Operational Procedure No. 0-770, Execution by Lethal Injection (May 15, 2007).[11]

In Missouri, after a trial on the merits, the court found that condemned inmates were subjected to "an unnecessary risk that they will be subject to unconstitutional pain and suffering when the lethal injection drugs are administered." *Taylor*, 2006 WL 1779035, at *8. The court then ordered Missouri to develop an execution protocol that addressed questions of, among other things, personnel (who shall prepare the drugs and create IV access), an assurance that pancuronium bromide and potassium chloride will not be administered until a sufficient anesthetic depth has been reached, an assessment of anesthetic depth by a qualified person, and selection of the site of intravenous access without default use of femoral vein access. *Id*. Missouri subsequently submitted a protocol providing, among other things for assessment of anesthetic depth: "a physician, nurse, or EMT is required to examine the prisoner physically using standard clinical techniques to determine that he is unconscious before the second and third chemicals are administered." *Taylor*, 2007 WL 1583874, at *10.[12]

In North Carolina, the department of corrections was ordered to change its protocol so that a qualified person could assess anesthetic depth prior to the administration of pancuronium bromide and potassium chloride. *See* Doc. 32 (Order), at 14, *Brown v. Beck, et al*., No. 5:06-CT-3018-H (E.D.N.C. Apr. 7, 2006) (order conditionally denying motion for preliminary injunction and requiring the presence of "execution personnel with sufficient medical training to ensure the

---

[11] *Available at* Doc. 318, at 47 (filed May 15, 2007), *Morales v. Tilton*, 06-cv-219 (N.D. Cal.). The constitutionality of California's new protocol is contested by Mr. Morales in a third amended complaint. *See* Doc. 323 (July 2, 2007), *Morales v. Tilton*, No. 06-cv-00219 (N.D. Cal.).

[12] The District Court's final order in *Taylor*, which rejected the State of Missouri's revised protocol, was appealed to the United States Court of Appeals for the Eighth Circuit. Although the Eighth Circuit ultimately rejected the District Court's conclusion that the revised protocol was not constitutionally sound, the Eighth Circuit impliedly affirmed the District Court's original findings that a revision of protocol was required. *See Taylor v. Crawford*, __ F.3d __, No. 06-3651, 2007 WL 1583874 (8th Cir. June 4, 2007).

Plaintiff is in all respects unconscious <u>prior to</u> and <u>at the time of</u> the administration of any pancuronium bromide or potassium chloride").[13]

This case already stands as an additional example of at least partial success on the merits. Defendants produced an Addendum to their lethal injection protocols on June 26, 2007, with an effective date of July 1, 2007, for the sole purpose of remedying clear and egregious flaws in their protocols and procedures. *See* Heath Decl. Ex. R.  Moreover, as the following discussion will show, there is yet much that Defendants must do to achieve a constitutionally compliant execution process.

> **3.     Plaintiffs Will Be Able to Compel Defendants to Change Their Protocol and Thus Can Show a Likelihood of Success on the Merits**

Although it is impossible to capture all the flaws in the Federal execution process in one brief, and further discovery and a full hearing on the merits will be required to elucidate all of the issues, Plaintiffs can demonstrate they will be able to compel the Defendants to modify their execution processes and, thus, succeed on the merits.    In summary, the Defendants' unconstitutional conduct includes, but is not limited to, the following:

- use of personnel unqualified to participate in executions;

- use of a multi-drug synergism acknowledged by their own consultant as unnecessarily creating avoidable risks;

- use of a form of intravenous access that is highly invasive, painful, and unnecessary, and which has been rejected by other courts;

- failure to adequately monitor and track the controlled substances used in execution leading to unnecessary risks of diversion and underdosage of anesthetic;

- failure to provide adequate visualization of the site(s) of intravenous access;

---

[13] North Carolina offered to have a licensed registered nurse and licensed physician interpret signals from a Bispectral Index Monitor to gauge anesthetic depth before the administration of pancuronium bromide or potassium chloride so that "additional quantities of sodium pentothal" could be administered if needed. Doc. 35, at 5-6, *Brown v. Beck, et al.*, No. 5:06-CT-3018H (E.D.N.C. Apr. 17, 2006). The court accepted this change as adequately addressing court's concerns for the condemned's safety. *Id.*

- failure to provide a protocol which comprehensibly explains the anesthetic drug amounts to be administered which ensures that the drugs will be prepared to reliably deliver a consistent dose to the condemned;

- failure to administer drugs at a rate which allows the condemned to reach an adequate depth of anesthesia; and

- failure to require an assessment of anesthetic depth by a qualified person.

### a.    The Defendants Have Consulted With and Relied Upon the Persons Responsible for the Botched Diaz Execution

Even if one devises a robust protocol for execution by lethal injection (and Defendants have not), the persons who carry out that protocol must be qualified to undertake the complex tasks they will perform, particularly the medical tasks. Accurately preparing and mixing drugs accurately, establishing and maintaining IV access, and evaluating and responding to adverse medical events during execution are all critical tasks. Instead of retaining the services of qualified persons possible to undertake these tasks, Defendants employ the services of a medical person involved in one of the most heinous executions in modern times – that of Mr. Angel Diaz in Florida.

Mr. Diaz was executed by lethal injection by the State of Florida on Dec. 13, 2006. His execution took some 34 minutes and was unquestionably "botched." The state commission which reviewed the Diaz execution found that "venous access at the time of the execution was improperly maintained and administered," that execution personnel "failed to follow . . . [p]rotocols, which resulted in the administration of the lethal chemicals [thiopental] to inmate Diaz at least in part subcutaneously," and administered the chemicals in an order creating the opportunity for the "second chemical, pancuronium bromide, and the third chemical, potassium chloride, to take affect [sic] before the first drug, sodium pentothal, was able to fully take effect." The Governor's Commission on Administration of Lethal Injection, *Final Report with Findings and Recommendations*, at 8-9 (March 1, 2007), attached hereto as Ex. 9.

Some courts have concluded that reference to "mishaps" in other states, "which regrettable if true" are not "probative of risks" in their states. *Grayson v. Allen, et al.,* No. 06-cv-1032, 2007 WL 1491009, at *13 (M.D. Ala. May 21, 2007), *on appeal to*, No. 07-12364-P (11th Cir.). That complaint cannot be levied here because the key medical person involved in Mr. Diaz's execution testified that "I serve as a resource to five states, ***including the federal government***." Tr. Test. of "Medically Qualified [Execution Team] Member," at 91 (Feb. 19, 2007), The Governor's Commission on Administration of Lethal Injection (emphasis added), attached hereto as Ex. 10. The Defendants' reliance on a person so patently unqualified to participate in executions places the Plaintiffs in clear and imminent risk of harm.

        **b.**      **The Defendants Rely Upon the Services of the Only Person in the Country Who Has Been Barred from Participation in Executions**

The Defendants have revealed that the individual they call Protected Person Number 2 – the person responsible for "development of execution procedures," placing and monitoring intravenous lines, monitoring levels of consciousness, and making determinations of death for the Federal government – ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████



"'The problem with all these drugs is if you give the dose and you do not get the effect you need, you cannot simply add more drug to get the dose. You must repeat the entire dose.'" *Id.* at 27 ▮▮▮▮▮▮. As Dr. Heath explained, "[t]hat's completely false." *Id.* at 27. The depth and duration of thiopental narcosis is dose dependant. *Id.* at 27-28. You can, in fact, add more thiopental to get the effect you need.

▮▮▮▮▮▮ that thiopental "'was chosen because it doesn't cause cardiac vascular depression so it means you can give a lot of it and your heart will still beat fine.'" *Id.* at 28. Again, that is patently false: thiopental is a drug which causes cardiac vascular depression. *Id.* at 28-29. As Dr. Heath explained: "He's got it 100 percent backwards." *Id.* at 29.

▮▮▮▮▮▮ that it is necessary to give the execution drugs quickly. "John Doe One stated, I quote, 'You want a rapid onset of the drug, and these drugs are rapid onset drugs. If you give them slowly they just don't work.'" *Id.* at 29. However, "[t]hat statement is false." *Id.* at 30.

After hearing this, and other similar testimony, Judge Gaitan expressed deep concern over John Doe I's qualifications. *See Taylor,* 2006 WL 1779035, at *7. Subsequently, Judge Gaitan took the extraordinary step of ordering that John Doe I ▮▮▮▮▮▮ be barred from participating in executions in Missouri. *See* Doc. 213 (Order), at 2, *Taylor v. Crawford, et al.,*

No. 05-4173-CV (W.D. Mo. Sept. 12, 2006) ("John Doe 1 shall not participate in any manner, at any level, in the State of Missouri's lethal injection process.").[15]



Defendants have exercised their solemn duties to ensure that condemned inmates experience a humane execution. Indeed, the Defendants' ████████████████ as part of their execution team reveals the folly of Bureau of Prisons Director Lappin's statement to the Florida Commission, where he said, with respect to the IV teams, "I *assume* that I'm bringing in somebody who is proficient, who is skilled, that they don't need to practice." Feb. 24, 2007, Tr. of The Governor's Commission on Administration of Lethal Injection, at 49 (emphasis added), attached hereto as Ex. 15. Director Lappin did indeed assume – and assumed wrongly – when he allowed ████████ to participate in Federal executions by lethal injection.

####       c.       The Defendants' Own Expert Has Acknowledged That Their Multi-Drug Synergism Creates Avoidable Risks

Federal regulations authorizing execution by lethal injection require that the "sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death." 28 C.F.R. § 26.2(a)(2). Thus, Defendants are not obliged to use the drugs they have selected. They chose the lethal cocktail currently in use. But the Defendants have no medical justification for that lethal cocktail – which knowingly includes highly dangerous drugs with little tolerance for error. *See* Heath Decl., at pp. 11, 16. The "inventor" of the lethal injection drug synergism says "If I were doing it now, I would probably eliminate it [pancuronium bromide]." Elizabeth Cohen, *Lethal Injection Creator: Maybe It's Time to*

---

[15] *See supra* n.9.

*Change Formula*, CNN.com, attached hereto as Ex. 16.[16] Even the expert anesthesiologist consulted by the Federal government, Dr. Mark Dershwitz,[17] has acknowledged that the inclusion of a "paralytic drug is a disadvantage" of any multi-drug synergism. *See, e.g.*, Recordation of April 9, 2007 Conference, Review of TDOC Electrocution Process, Rachel Jackson Bldg., Conference Room 6 A, at 1, attached hereto as Ex. 18. Pancuronium bromide serves no medical purpose and adds the risk of conscious asphyxiation; its inclusion in the execution process creates an unnecessary risk of harm.

> **d.    The Defendants Use a Form of Intravenous Access That Is Highly Invasive, Painful, Unnecessary, and Which has been Rejected by Courts**

In *Nelson v. Campbell*, 541 U.S. 637 (2004), the Supreme Court determined that a section 1983 plaintiff stated a valid cause of action when he claimed that using a "cut-down"[18] to achieve IV access in an execution was unconstitutional. The ruling supports the proposition that there are limits on the invasiveness and pain that can be inflicted to achieve venous access. While the pinprick associated with peripheral vein catheterization might be performed without violating the Constitution, more invasive and painful procedures performed without medical justification cannot. Defendants intend to use one of the condemned's femoral veins as their "preferred" IV site. *See* Heath Decl., p. 5, & Decl. Ex. R. Femoral vein catheterization, in which a nearly half-foot long catheter is inserted into the groin of the condemned, is highly invasive, painful, and medically unjustified without first ascertaining that peripheral venous access is not possible. *See* Expert Report of Stephen Johnson, attached hereto as Ex. 19, ¶¶ 5-20.

---

[16] Available at: http://www.cnn.com/2007/HEATH/05/07/lethal.injection/index.html (last visited May 7, 2007).

[17] Although the Defendants have not yet identified their experts, Dr. Dershwitz testified in the United States District Court for the Eastern District of Missouri that he had been consulted by the Federal government. *See* Tr. Test. Mark Dershwitz, at 52-53 (Jan. 30, 2006), *Taylor v. Crawford*, Civ. No. 05-4173 (W.D. Mo.), attached hereto as Exhibit 17.

[18] A cut-down involves the surgical incision and manual exposure of a vein to facilitate the insertion of a cannula or needle, as for the administration of intravenous medication.

As Dr. Johnson explains, femoral vein catheterization is risky and prone to complications. *See id.* & Report Ex. 3 (showing arterial puncture associated with ████████ attempt to introduce a femoral vein catheter during an execution in Missouri). It is unconscionable to expose anyone to the risks of femoral vein access without medical need. Yet that is exactly what Defendants intend to do. Using femoral vein access as the default form of IV access has been soundly rejected by the only court to consider the question and should be rejected here. *See Taylor*, 2006 WL 1779035, at *9 (Holding the "State in conjunction with the [doctor] will have discretion to determine the most appropriate location on the inmate's body to inject the drugs" and rejecting automatic use of the femoral vein as a site of injection.).

### e. The Defendants Fail to Provide Adequate Visualization of the Site(s) of Intravenous Access

The Defendants' procedures require that the execution team "make sure" they "put sheet around the inmate up to his shoulders and cover leads from C room." *See* BOP Protocol Lead Script, attached hereto as Ex. 20. When the sites of IV catheter placement and IV lines are covered, it is impossible to ascertain during execution whether the lines remain patent. As Dr. Heath explains in full, covering the IV sites creates an extreme and unnecessary risk that an adverse event like an infiltration will not be recognized and addressed. *See* Heath Decl. pp. 19, 25. The simple step of ensuring the IV sites can be observed throughout the execution is critical to a humane execution.

### f. The Defendants Fail to Provide Comprehensible Directions on Thiopental Preparation

As Dr. Heath has explained, thiopental is a drug whose depth and duration of narcosis is dose dependent. It is, therefore, critical to know the dosage the Defendants intend to give condemned inmates to ascertain whether that dose is sufficient to produce an adequate depth and duration of non-responsiveness to noxious stimuli. However, Defendants have not produced a

protocol which comprehensibly explains the dose they have given or will give condemned inmates.

For the prior Federal executions, Defendants have produced a document referred to as an "Execution Checklist – Inmate Secured to Table" which states at step 12, that "Four syringes filled with 1.25 grams each of Sodium Pentothal and sterile water." *See* Heath Decl., Decl. Ex. P. However, that document contradicts the numbers of syringes set out in the execution chamber where only one syringe of thiopental is present. *See* Heath Decl., Decl. Ex. G (showing one syringe of thiopental). The Checklist is also at odds with documents produced by the United States in another case which indicate that, although 5 grams of thiopental is prepared and placed into a 50 cc syringe, only 10 ccs (or 1 gram) of thiopental is given. *See* Heath Decl, Decl. Ex. O.[19] It is not possible to tell how much thiopental has been given in past executions, and without knowing the amount, it is impossible to know whether those executions were humane.

On June 26, 2007, Defendants produced an Addendum to their execution protocol (effective date of July 1, 2007) which describes Defendants' intention to mix 5 grams of thiopental in 10 ccs of diluent. *See* Heath Decl. p. 16-17 & Decl. Ex. R. Without medical need, Defendants intend to mix thiopental at a 50% concentration – ten times higher than the highest level recommended by the manufacturer – a concentration that is highly toxic to tissues and capable of causing great pain in the event of extravasation. *Id.* p. 22. The Addendum also describes an absurd process of using "blank" IV lines (evacuating into containers rather than the condemned inmate) and a procedure for mixing as many as 16 syringes of thiopental (in the event of peripheral delivery) compressed within the last 30 minutes before execution. *Id.* pp. 23,

---

[19] As the Defendants own expert has said, 1 gram of thiopental is too low a dose (even if properly and effectively given) to assure a humane execution. *See* Tr. Test. Mark Dershwitz, at 264 (June 13, 2006), *Taylor v. Crawford, et al.*, No. 05-4173 (W.D. Mo.) ("I would say that probably the minimum acceptable dose would be 1.5 grams . . . ."), attached hereto as Ex. 22.

22. These processes do nothing to ameliorate the risks – rather they exacerbate the risks of using thiopental.

Not only do Defendants lack a protocol which comprehensibly explains drug delivery, they also apparently lack any documents which reflect their custody and control over the thiopental (a controlled substance). Defendants' lack of control over thiopental used for executions is most surprising, given their strong opposition to appearing at depositions with the execution drugs that "are, or could be, dangerous." Doc. 47, at 7. Defendants' inability to affirm a chain of custody is a blatant failure and well below the standard of care used around the country. *See e.g.,* Controlled Substances Log, Georgia 2007 protocol, attached hereto as Ex. 21.[20]

It is incomprehensible that the Defendants, under the heightened scrutiny of this case and supervised by a Director who has attended the hearings on one of the worst execution botches of all time, have been unable to produce a protocol that comprehensibly describes or assures delivery of the only drug capable of making the execution humane. The Defendants' Addendum stands as a testament to the Defendants' (and those who advise Defendants) utter inability to grasp the complexities of execution by lethal injection.

On this record, the Defendants cannot substantiate the amount of thiopental they have prepared or given to any condemned inmate in the past or a reliable protocol for safe delivery of an adequate amount to Plaintiffs. Plaintiffs risk harm that must be remedied by construction of a clear protocol, with procedures and plans to monitor and control thiopental used for executions. *See Taylor,* 2006 WL 1779035, at *7 (noting absence of records reflecting thiopental delivery and requiring delivery of 5 grams of properly prepared thiopental); *Morales II,* 465 F. Supp. 2d

---

[20] This controlled substances log was filed as part of the State of Georgia's June 7, 2007 Execution Protocol filed as Doc. 22-2, *Alderman v. Donald, et al.,* No. 07-cv-00896 (N.D. Ga.).

at 979 & n.9 (noting absence of "contemporaneous records showing that all of the sodium thiopental in the syringes used for injections actually was injected").

> **g.**    **The Defendants Have Administered Thiopental So Quickly That They Have Failed to Allow Sufficient Time for the Condemned to Reach an Adequate Plane of Anesthesia**

The evidence shows that the execution of Louis Jones took two minutes from the start of the first injection to time of death.  *See* BOP Doc. 381, attached hereto as Ex. 23.  Although thiopental is called an ultrashort acting drug because it takes effect quickly, is not instantaneous. The drug needs time to move through the IV tubing, into the condemned, through the condemned's venous system (from vein to heart to lung to heart) and then to the brain.  That movement takes time.  An execution that is begun and concluded within 2 minutes has not allowed sufficient time for the condemned to be non-responsive to noxious stimuli.  *See* Expert Report of Thomas Henthorn, attached hereto as Ex. 24, ¶¶ 20, 22, 24.  Defendants have in the past, and apparently intend in the future, to execute persons without allowing enough time for the anesthetic drugs to take full effect.  Such conduct is unconscionable and the protocol must be modified to accommodate reasonable measures to assure the drugs have time to take effect, as intended.

> **h.**    **Defendants Do Not Have a Qualified Person Monitor Anesthetic Depth**

Defendants purport to wait to begin the administration of pancuronium bromide until the "inmate is sleepy" or appears "unconscious."  *See* Heath Decl., p. 6 & Decl. Exs. S & R.  There are no directions as to how the "sleepy" assessment should be performed or who will perform the check.  Certainly, there is no requirement that a medically trained person assess anesthetic depth and assure that appearing "sleepy" means non-responsive to noxious stimuli.  In fact, the Defendants admit that the condemned is observed personally only by the personnel in the

45

chamber – who are not medically trained. The only opportunity for medically trained persons to assess anesthetic depth is from the drug room via a window or closed circuit television screen.

As Dr. Heath explains, an assessment of anesthetic depth made to ascertain whether an individual is non-responsive to noxious stimuli is not a simple matter of checking to see if the inmate looks sleepy. Heath Decl., p. 24-25. Such an assessment must be performed by one qualified and skilled in intravenous anesthetic techniques at the bedside using multiple clinical modalities. *Id.* It is not an assessment a lay person can make, nor is it an assessment that a qualified person can make remotely. But those are exactly the conditions under which the Defendants purport to assess consciousness. Only lay persons are at the bedside, and the only doctors on hand (in the remote chemical room) are not qualified to assess anesthetic depth. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

Society does not allow for the euthanization of our household pets by potassium chloride until it has first been ascertained by a qualified person that the pet is deeply anesthetized:

> It is of utmost importance that ***personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously***. Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.

*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218 (5) J. AM. VET. MED. ASS'N 669, 681 (2001) (emphasis added); *see also* Expert Report of Dr. Concannon, at ¶ 11, attached hereto as Ex. 25 (meeting the AVMA standards for potassium chloride euthanasia requires a hands-on assessment of anesthesia). There is no person involved in the Federal executions who is qualified to assess anesthetic depth and no provision for the means to make a reliable assessment of anesthetic depth. The failure to make any meaningful effort to assess anesthetic depth is flatly contrary to the contemporary standard of decency and demands correction.

It should go without saying that all of the above mentioned flaws are exactly the flaws that courts have recognized and addressed with revised and modified protocols. *See, e.g.*, *Taylor*, 2006 WL 1779035, at *7-9 (identifying serious problems as including: absence of written protocol identifying amount of thiopental to be used; default use of femoral vein access; inadequate visualization of condemned due to sheet and inadequate line of sight from the drug or chemical preparation room; absence of assessment of anesthetic depth by a qualified person; and use of unqualified personnel); *Morales II*, 465 F. Supp. 2d at 978-982 (identifying serious problems as including: inadequate visualization of the condemned; poor control over the controlled substances, pervasive lack of professionalism in personnel; and absence of monitoring of anesthetic depth).

Plaintiffs believe the evidence presented herein, and the evidence which they will present in full at trial, will persuade this court that an injunction ordering the Defendants to modify their execution protocols is appropriate and necessary.

**D.    Public Interest Is Served by the Continuation of the Injunction and Defendants Would Not be Injured by a Continuation of Stays**

The final prongs of the preliminary injunctive relief analysis require the court to consider whether the Defendants or the public interest would be harmed by the continuation of an injunction.  Defendants suggest only that the public interest is generally served by finality in sentencing.  Even if true, that statement does not explain how the Defendants or the public are harmed by continuing injunctions that were agreed to and which have been in place for sixteen months.  Moreover, when serious claims have been raised about the propriety of Defendants' procedures and policies, the public interest is served by an adequate investigation into those claims.

Given the blatant flaws in Defendants' procedures for execution by lethal injection and the clear evidence that Defendants will be required to modify their execution procedures, the balance of interests weigh heavily in favor of continuing the existing injunctions and allowing this case to proceed.

## CONCLUSION

By agreeing to sixteen months of stays and avoiding discovery and access to governmental actors, Defendants' conduct shows clearly that Plaintiffs did not file this action so late that the time of filing caused disruption, delay, or injustice to Defendants.  Nor have Plaintiffs brought this action, concerning an event which has yet to occur, outside any applicable statute of limitations.  Defendants raise the claims of equity and limitations, as well as a motion to lift the existing stays of execution now, not out of any real concern on those issues, rather, because they wish to avoid depositions which are certain to further expose the unconstitutional conduct of Federal governmental actors.  For these, and all of the foregoing reasons, Plaintiffs

respectfully request the court find that Defendants have not met their burden to justify judgment on the pleadings or an order lifting the stays of execution.

Counsel believe the issues in this opposition would be elucidated by the presentation of oral argument; therefore, Plaintiffs respectfully request oral argument of the pending motions.

Respectfully submitted this 10th day of July, 2007,

*Paul Enzinna /per*

PAUL F. ENZINNA (D.C. Bar No. 421819)
JEREMY I. LEVIN
TIMOTHY LOPER
RACHEL McKENZIE
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 639-7752

*Counsel for Plaintiff James H. Roane, Jr.*

*Charles Zdebski /per*

CHARLES A. ZDEBSKI (D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004-2134
(202) 274-2909

STEPHEN A. NORTHUP (D.C. Bar No. 54587)
Troutman Sanders LLP
1001 Haxall Point, P.O. Box 1122
Richmond, VA 23218-1122
(804) 697-1240

FREDERICK R. GERSON
Robinson & Gerson, P.C.
7102 Three Chopt Road
Richmond, VA 23226

*Counsel for Plaintiff Richard Tipton*

*Owen Bonheimer /per*

MARK J. HULKOWER (D.C. Bar No. 400463)
OWEN BONHEIMER (D.C. Bar No. 484984)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

ROBERT C. OWEN (Texas Bar No. 15371950)
Owen & Rountree, LLP
P.O. Box 40428
Austin, TX 78704
(512) 804-2661

MARCIA A. WIDDER (La. Bar No. 23367)
636 Baronne Street
New Orleans, LA 70113
(504) 558-9867

*Counsel for Plaintiff Orlando Hall*

49

*Charles Zdebski /gh*

CHARLES A. ZDEBSKI (D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, NW, Suite 1000
Washington, D.C. 20004-2134
(202) 274-2909

BARBARA HARTUNG
700 E. Main Street
Suite 1600
Richmond, VA 23219

EDWARD E. SCHER
Thorsen & Scher, LLP
3810 Augusta Avenue
Richmond, VA 23230

*Counsel for Plaintiff Cory Johnson*

JOSHUA C. TOLL (D.C. Bar No. 463073)
ABIGAIL BORTNICK
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500

MARGARET O'DONNELL
McNally & O'Donnell, P.S.C.
P.O. Box 1243
513 Capitol Avenue
Frankfort, KY 40602
(502) 227-2142
(502) 227-4669 (fax)

WILLIAM E. HOFFMANN, JR.
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
(404) 572-3383
(404) 572-5136 (fax)

*Counsel for Plaintiff Anthony Battle*

*William E. Lawler III /gh*

WILLIAM E. LAWLER III (D.C. Bar No.398951)
GRAHAM E. EDDY (D.C. Bar No. 495794)
Vinson & Elkins LLP
1455 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004-1008
(202) 639-6676

*Counsel for Plaintiff Bruce Webster*

50

## CERTIFICATE OF SERVICE

I hereby certify that true and correct paper copies of the foregoing Plaintiffs' Opposition to Defendants' Motion for Judgment on the Pleadings (filed under seal) along with two volumes of exhibits (filed under seal) have been served by hand in a sealed envelope on the following this 10th day of July, 2007:

Peter S. Smith, Esq.
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

Counsel for Defendants

Joshua C. Toll
Counsel for Plaintiff-Intervenor Anthony Battle