UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES ROANE, JR., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 05-2337 (RWR/DAR) |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | ORAL ARGUMENT REQUESTED |
| ) | |
| Defendants. ) | |

**REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' AND INTERVENOR PLAINTIFFS' MOTION TO MODIFY THE PROTECTIVE ORDER**

Defendants' Opposition to Plaintiffs' And Intervenor Plaintiffs' Motion To Modify The Protective Order ("Def. Opp."), is premised on two assertions. *First*, they argue that plainitffs' request for "arrest record information" does not encompass "charge information." *Second*, they contend that because the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ article states only that the individual in question was "charged," and not that he was "arrested," plaintiffs have presented no persuasive reason" for the relief we seek because a "charge" is "not necessarily preceded by an arrest." Def. Opp. at 2-3. Defendants' argument fails for two reasons.[1] The distinction they draw between "arrest record information" and "charge information"—while typical of the hairsplitting and verbal gymnastics defendants have engaged in throughout this case in order to

---

[1] Two subsidiary points raised by defendants are easily laid to rest. *First*, their claim that plaintiffs seek to "reopen discovery" is incorrect. Plaintiffs do not seek additional discovery from defendants, who have proven to be an unreliable source. Plaintiffs seek to conduct their own investigation. Plaintiffs normally would be free to do so, and are prevented in this case only by the Protective Order, which, as we describe above, is premised on defendants' false assurances. *Second*, defendants argue that plaintiffs could have, and should have, asked the Relevant Individuals about their criminal histories in depositions. However, that avenue was foreclosed when defendants (falsely) led plaintiffs to believe those individuals had no criminal histories.

avoid meaningful discovery—is, at bottom, invalid. More importantly, however, as defendants surely must know—or at least would know had they undertaken their obligations under both the Federal Rules of Civil Procedure and the Protective Order in good faith—the individual in question *does* have an "arrest record."

1. **Defendants' Response To Plaintiffs' Discovery Request Was False.**

   Whether or not the distinction defendants draw—between an "arrest record" and records of "charges" filed—is valid, *see* § 2, *infra*, defendants' argument fails for a more fundamental reason. ▮▮▮ was, in fact, *arrested* by the ▮▮▮ Police Department and held at the ▮▮▮ Sheriff's Department Detention Facility on ▮▮▮, on charges of ▮▮▮. *See* Declaration of Paul F. Enzinna [Exh. A hereto]. Thus, plaintiffs' motion is not, as defendants suggest, "based on a false premise"—▮▮▮ does have an arrest record, and if ▮▮▮ is Protected Person No. 4, defendants have, in fact, "reneged on the[] promises" that underlie the Protective Order. For that reason alone, plaintiffs' Motion to Modify the Protective Order should be granted.

2. **Even If Defendants' Response Were Not Premised On A Falsehood, Their Interpretation Of Plaintiffs' Discovery Request Was Improper.**

   Discovery requests "should not be read or interpreted in an artificially restrictive or hypertechnical manner to avoid disclosure of information fairly covered by the discovery request, and to do so is subject to appropriate sanctions under [Rule 37(a)]." Fed. R. Civ. P. 37(a) Advisory Committee Note, 146 F.R.D. 401, 690 (1993). Courts have been quick to enforce this rule. For example, in *Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002), the plaintiffs in toxic tort litigation sought a new trial when they discovered that the defendants had failed to produce certain discovery materials. In discovery and at trial, the defendant had "conceal[ed]"

the existence of a report by means of "hypertechnical interpretations of the questions posed."[2] *Id.* at 295. The court found misconduct on the defendant's part because "any fair response" would have revealed the existence of the report. *Id.*

Similarly, in *Pepsico, Inc. v. Central Investment Corp., Inc.*, 2002 WL 32122596 (S.D. Ohio Feb. 4, 2002) [Exh. B hereto], an independent bottler asserting that Pepsico was "scheming to drive independent bottlers . . . out of business and take over their territories for itself" made a request for any documents related to such a scheme. In response, Pepsico withheld a "strategic business plan" that indicated that independent bottlers were "failing to keep pace" with company-owned bottling operations, and which described a plan to "aggressively pursue alignment and consolidation" of bottlers. *Id.* at *2. The court dismissed Pepsico's characterization of the document as unresponsive because it was "only a plan to establish large anchor bottlers, and not reduce independent bottlers" as "a hypertechnical distinction because it is readily apparent that large anchor bottlers means fewer independent bottlers." *Id.* at *5.

Defendants have taken a similarly hypertechnical approach here. While it is, technically, true that one may be charged and convicted of a crime without being physically restrained by law enforcement officers, the term "arrest" is not so limited. An "arrest" is defined to include the:

> keeping of a person in custody by legal authority, esp. in response to a criminal charge; specif., the apprehension of someone for the purpose of securing the administration of the law, esp. of *bringing that person before a court.*"

Black's Law Dictionary (8th ed. 1999) at 116 (emphasis added). While an individual may plead to charges without being forcibly seized by police officers, that person's appearance before the

---

[2] As an example, the court noted that although the defendants' negative response to the question whether he had performed a test was technically true, it was misleading because the defendant had "caused a test to be made by someone else." 292 F.3d at 295.

court for the purpose of pleading is compelled by legal authority and is, therefore, an "arrest" in the precise meaning of that term.

And the term "arrest record," at least in the popular vernacular—and clearly in the context of plaintiffs' discovery request—encompasses all information concerning an individual's past criminal history.[3] The central issue in this case is the training and qualifications of execution personnel. To define "arrest record" to include only charges and convictions that involved physical restraint by police (*i.e.*, handcuffs and a ride in a squad car) is too clever by half, especially where the individuals involved are themselves law enforcement workers, and therefore likely to receive a "break" from other law enforcement authorities, in the form of an agreement for self-surrender.

This point is made even clearer by the fact that the crimes to which ▓▓▓▓ pled guilty—"two felonies plea-bargained down to misdemeanors for ▓▓▓▓ and ▓▓▓▓▓▓▓▓ ▓▓▓▓" involving ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[4]—evidence significant emotional or behavioral problems that raise serious questions about ▓▓▓▓▓▓ fitness to serve on the federal execution team. ▓▓▓▓▓▓▓▓ criminal history is "fairly covered" by plaintiffs' request for arrest records, even if he *had been* afforded the accommodation of self-surrender, and a good

---

[3] Notably, defendants state that "[i]n addition to providing arrest record information" in response to plaintiffs' discovery requests, they also "ran [NCIC] checks." Def. Opp. at 3. The information contained in a NCIC report includes criminal history information beyond mere arrest record, http://www.fas.org/irp/agency/doj/fbi/is/ncic.htm, and there would have been no reason for defendants—who claim to have obtained "arrest record information" elsewhere, Def. Opp. at 3—to have conducted NCIC checks had they, in fact, read plaintiffs' request to be as limited as they now claim.

[4] According to the report, one of the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

faith response to plaintiffs' request would have included this information. Defendants' response—even if it had not been based on a falsehood—was a "hypertechnical" reading of the discovery request, designed to avoid disclosing information that is clearly relevant and discoverable.

Of course, this kind of "how many angels can dance on the head of a pin" parsing is beside the point given that ▓▓▓▓▓ does, in fact, have an "arrest record," however that term is defined, and given that defendants have concealed that fact from plaintiffs despite our explicit request for this information. However, this is not the first time the defendants have stepped outside the lines of fair discovery practice in an effort to avoid providing plaintiffs with information that is clearly relevant and discoverable, and the Court has previously sanctioned the defendants for similar behavior. It is patently clear that the premise for the Protective Order's prohibition on plaintiffs' investigation—the defendants' promise to provide the requested information—is inoperative, and plaintiffs respectfully submit that the requested relief is not only necessary to permit us to obtain necessary and permissible discovery, but also is an appropriate sanction under Federal Rule of Civil Procedure 37.

Respectfully submitted,


/s/ Paul F. Enzinna

PAUL F. ENZINNA (D.C. Bar No. 421819)
JEREMY I. LEVIN
RACHEL McKENZIE
EMMA KUNTZ
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004-2400
(202) 639-7752

*Counsel for Plaintiff James H. Roane, Jr.*


/s/ Charles A. Zdebski
CHARLES A. ZDEBSKI  (D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004-2134
(202) 274-2909

STEPHEN A. NORTHUP (D.C. Bar. No. 54587)
Troutman Sanders LLP
1001 Haxall Point
P.O. Box 1122
Richmond, VA 23218-1122
(804) 697-1240

FREDERICK R. GERSON
Robinson & Gerson, P.C.
7102 Three Chopt Road
Richmond, VA 23226

*Counsel for Plaintiff Richard Tipton*


/s/ Charles A. Zdebski
CHARLES A. ZDEBSKI  (D.C. Bar No. 451075)
Troutman Sanders LLP
401 9th Street, NW
Suite 1000
Washington, D.C. 20004-2134

(202) 274-2909


BARBARA HARTUNG
700 E. Main Street
Suite 1600
Richmond, VA 23219

EDWARD E. SCHER
Thorsen & Scher, LLP
3810 Augusta Avenue
Richmond, VA 23230

*Counsel for Plaintiff Cory Johnson*


/s/ William E. Lawler III
WILLIAM E. LAWLER III (D.C. Bar No.398951)
GRAHAM E. EDDY (D.C. Bar No. 495794)
Vinson & Elkins LLP
1455 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004-1008
(202) 639-6676

*Counsel for Plaintiff Bruce Webster*


/s/ Joshua C. Toll
JOSHUA C. TOLL (D.C. Bar No. 463073)
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500

*Counsel for Plaintiff Anthony Battle*


/s/ Owen Bonheimer
MARK J. HULKOWER (D.C. Bar No. 400463)
OWEN BONHEIMER (D.C. Bar No. 484984)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

- 8 -

ROBERT C. OWEN
Texas Bar No. 15371950
Owen & Rountree, LLP
P.O. Box 40428
Austin, TX 78704
(512) 804-2661

MARCIA A. WIDDER
Louisiana Bar No. 23367
636 Baronne Street
New Orleans, LA 70113
(504) 558-9867

*Counsel for Plaintiff Orlando Hall*

Dated: April 17, 2008

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES ROANE, JR., *et al.*,

    Plaintiffs,

v.

MICHAEL B. MUKASEY, *et al.*,

    Defendants.

Civil Action No. 05-2337 (RWR/DAR)

### DECLARATION OF PAUL F. ENZINNA

1. I am a member of the District of Columbia Bar and a partner in the law firm of Baker Botts, LLP. I represent James H. Roane, Jr., in this matter.

2. On April 14, 2008, I telephoned the ▮▮▮ Sheriff's Department Detention Facility, where I spoke with Deputy Sheriff ▮▮▮ and Jail Administrator ▮▮▮. Both confirmed to me that ▮▮▮ was arrested by ▮▮▮ Police on ▮▮▮ and detained at the detention facility for several hours, on warrants issued in connection with a charge of ▮▮▮, which was reported in ▮▮▮.

3. At ▮▮▮ suggestion, I then called the ▮▮▮ Police Department, and spoke with Dispatcher ▮▮▮, who confirmed ▮▮▮ arrest for ▮▮▮ and ▮▮▮ occurring on ▮▮▮. Ms. ▮▮▮ told me that the number assigned to ▮▮▮'s case was ▮▮▮.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 15, 2008.

                                                                          _/s/ Paul F. Enzinna_
                                                                          Paul F. Enzinna

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32122596 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 32122596)

Page 1

►PepsiCo, Inc. v. Central Inv. Corp., Inc.
S.D.Ohio,2002.
Only the Westlaw citation is currently available.
United States District Court,S.D. Ohio, Western Division.
PEPSICO, INC., Plaintiff,
v.
CENTRAL INVESTMENT CORPORATION, INC., et al., Defendants.
No. C-1-98-389.

Feb. 4, 2002.

*ORDER*

BECKWITH, J.

*1 This matter is before the Court on Defendant Central Investment Corporation's ("CIC") motion for sanctions (Doc. No. 231), Magistrate Judge Hogan's order of August 6, 2001 (Doc. No. 260) finding that Plaintiff PepsiCo, Inc. ("PepsiCo") should be sanctioned, PepsiCo's objections to Magistrate Judge Hogan's order (Doc. No. 268), CIC's submission of legal fees and expenses relating to the sanctions order (Doc. No. 277), and PepsiCo's objections to CIC's submission of legal fees and expenses (Doc. No. 285).

I. *Background*

The above referenced series of pleadings and orders relates to CIC's search for proof positive that PepsiCo instituted these legal proceedings, not because CIC was a disloyal franchisee, as PepsiCo claimed in its amended complaint, but rather because PepsiCo was scheming to drive independent bottlers like CIC out of business and take over their territories for itself. Toward that end, CIC propounded to PepsiCo a number of discovery interrogatories designed to ferret out information confirming its suspicions. In particular, CIC asked PepsiCo to provide:

Any and all documents that refer or relate to [PepsiCo CEO] Roger Enrico's statement reported in the October 15, 1998 issue of *Wall Street Journal* to the effect that PepsiCo's goal was to create a "handful" of strong bottlers.

Any and all documents that refer or relate to Roger Enrico's statement reported in the October 15, 1998 issue of *Wall Street Journal* concerning consolidation in PepsiCo's U.S. bottling network that "The tree has been shaken and the apples have started to fall."

Any and all documents that relate to PepsiCo's desire or plan to reduce the number of independent Pepsi-Cola bottlers.

All documents relating or referencing Whitman's potential acquisition of the rights to manufacture, sell, and/or distribute Pepsi beverage products to customers located within CIC's exclusive territories.

All documents relating to or referencing PBG's potential acquisition of the rights to manufacture, sell, and/or distribute Pepsi beverage products to customers located within CIC's exclusive territories.

All documents that relate to PepsiCo's plans to consolidate bottling operations in the United States to the extent those plans impact or involve independent bottlers.

*See* PepsiCo's Response to CIC's Second Request for Production of Documents (Doc. No. 231), Ex. 5, Requests 68-70; PepsiCo's Response to CIC's Fourth Request for Production of Documents (Doc. No. 231), Ex. 7, Requests 163-64; PepsiCo's Response to CIC's Sixth Request for Production of Documents (Doc. No. 231), Ex. 8, Request 185. With respect to the first two document requests, PepsiCo objected on the grounds that the requests were vague, ambiguous, unduly burdensome, and not reasonably likely to lead to the discovery of admissible evidence, but stated that it would produce any documents in its possession. PepsiCo objected to the third document request on the grounds that it was vague, ambiguous, and not likely to lead to the discovery of admissible evidence. PepsiCo objected to the fourth and fifth document requests on the grounds that any such documents were created in conjunction with a settlement proposal and by agreement could not be used for any purpose in this litigation. Finally, with respect to the last document request, PepsiCo

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32122596 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 32122596)

Page 2

objected on the grounds that it was not likely to lead to admissible evidence but stated that it had produced any documents relating to this request. *See id.*

*2 By order of October 20, 1999, Magistrate Judge Hogan established November 18, 2000 as the discovery cutoff deadline. *See* Doc. No. 56. On April 20, 2000, CIC moved to compel production of, *inter alia*, documents responsive to document request 70, which requested documents relating to PepsiCo's desire or plan to reduce the number of independent bottlers. *See* Doc. No. 67. On November 15, 2000, Magistrate Judge Hogan issued an order (Doc. No. 164) which, in pertinent part, directed PepsiCo to produce any such documents notwithstanding PepsiCo's objection that the request was vague and not likely to lead to the discovery of admissible evidence. In fact, Judge Hogan found that this document request was directly relevant to the theory of CIC's counterclaim, calling such information the "smoking gun." Judge Hogan further opined that severe sanctions might be warranted for failure to disclose information responsive to the request. *See* Doc. No. 164, at 3.

In total, in his November 15, 2000 order, Judge Hogan made rulings in CIC's favor on approximately 130 document requests propounded to PepsiCo. During the week of December 18, 2000, in two separate lots, PepsiCo delivered to counsel for CIC 35 boxes of documents consisting of 80,000 pages of documents. Morgan Aff. (Doc. No. 231, Ex. 15) ¶ 2. The cover letter accompanying the final delivery of documents stated that the documents were responsive to requests 6, 25, 26, 34, 62, 144-146, and 211-214. *See* Doc. No. 231, Ex. 9. Included in the 35th box of documents however, was a 46 page document entitled "Project Broncos." *See* Morgan Aff. ¶ 3.

By any objective standard, the Project Broncos document is a strategic business plan. *See* Doc. No. 231, Ex. 1. The document outlines problems or perceived problems with PepsiCo's distribution system, specifically how FOBO's (franchise owned bottling operations, e.g., CIC) were failing to keep pace with COBO's (company owned bottling operations). Thus, the Project Broncos document described a plan to restructure PepsiCo's bottling system in order to meet its growth objectives. One of the "guiding principles" of the plan was to "aggressively pursue alignment and consolidation of U.S. bottling network." *See id.* at 8. Identified as a potential acquisition candidate for PepsiCo during the year 2001 was CIC. *See id.* at 36, 40.

On February 16, 2001, CIC moved for discovery sanctions against PepsiCo for its alleged willful failure to produce the Project Broncos document during the discovery period. In its motion, CIC claimed that PepsiCo purposely withheld relevant information by making frivolous objections to its production, and then, when ordered to produce the information by Magistrate Judge Hogan, buried the document in the last box of 80,000 pages of other documents produced during the holidays. CIC contended that PepsiCo was certainly aware of the Project Broncos document's existence because it had earlier produced it to Coca-Cola Company in the New York anti-trust suit. CIC also pointed out that during discovery depositions, no senior PepsiCo executives mentioned the existence of Project Broncos despite questioning about bottler consolidation strategies. CIC claimed prejudice from the late production of the Project Broncos document because it no longer had the opportunity question witnesses about any relationship between this lawsuit and Project Broncos. Therefore, CIC sought an evidentiary-based sanction which would have precluded PepsiCo from introducing any evidence of the alleged "ambush" meeting between CIC chief Bud Koons and PepsiCo CEO Roger Enrico-the watershed event upon which PepsiCo based its bid to terminate CIC's franchise rights.

*3 On March 14, 2001, PepsiCo responded that Project Broncos had nothing to do with CIC and it really only dealt with its strategy to create an anchor bottling network. PepsiCo argued that CIC had not been prejudiced by the late production of the Project Broncos document because it had been able to question extensively PepsiCo witnesses about PepsiCo's anchor bottling strategy. *See generally* Doc. No. 234.

Contemporaneous with the filing of its memorandum in opposition to CIC's motion for discovery sanctions, PepsiCo served on CIC approximately an additional 1,500 pages of documents responsive to Judge Hogan's November 15, 2000 order. Included in these documents were two other versions of Project Broncos, both of which listed CIC as an "Acquisition," rather than as a "Potential

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3
Not Reported in F.Supp.2d, 2002 WL 32122596 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 32122596)

Acquisition." *See* Doc. No. 234, Ex. 18, at P235466; Ex. 19, at P235503.

On August 6, 2001, Judge Hogan issued an order (Doc. No. 260) finding that sanctions against PepsiCo were appropriate for failing to produce the Project Broncos documents. In his order, Judge Hogan found that PepsiCo should not be punished for making *legitimate*[FN1] objections to CIC's discovery requests since he later ruled on the legitimacy of those discovery requests. Judge Hogan also found that PepsiCo's production of the Project Broncos documents after the discovery deadline was not per se sanctionable since he did not rule on the motion to compel until just before the close of discovery. Judge Hogan did, however, find that this document was directly responsive to request number 70 and not to requests 25, 26, and 62, as the cover letter indicated. Judge Hogan concluded that PepsiCo's general objection to the discovery request on the grounds of vagueness and ambiguity, coupled with the late production of the Project Broncos documents and the fact that it was contained in the 35th of 35 boxes produced at the last hour indicated an intent on the part of PepsiCo to deceive CIC.

> FN1. Judge Hogan emphasized the word "legitimate" in his original order. In its pleadings, PepsiCo argues that Judge Hogan found that its objections to CIC's document requests were well-founded, if not well-taken. The Court is not sure that it agrees with PepsiCo's interpretation of the order since Judge Hogan categorically overruled almost every one of PepsiCo's objections. The statement may simply be a general observation that legitimate objections to discovery requests should not be sanctioned.

Citing Rule 37 of the Federal Rules of Civil Procedure, Judge Hogan held, however, that bad faith objections to discoverable documents are not sanctionable until a court order to produce the documents is violated. Thus, Judge Hogan, reasoned, the question became whether PepsiCo could have produced the Project Broncos document before the November 18, 2000 deadline. Judge Hogan found that PepsiCo could have produced the document before the deadline because it was produced in the Pepsi/Coke antitrust case and there was an identity of counsel in both cases. Furthermore, Judge Hogan was convinced that the prior disclosure of Project Broncos in the Coke case, coupled with the failure of any PepsiCo executive to mention Project Broncos in his or her deposition indicated that the document was not produced in a more timely fashion for strategic reasons. Judge Hogan found, however, that the evidentiary sanction requested by CIC was too drastic and, therefore, decided that a monetary sanction which did not affect the merits of the case was appropriate. Thus, Judge Hogan ordered PepsiCo to pay CIC's legal fees and expenses for preparation of the motion to compel and the motion for sanctions.

*4 Following the issuance of Judge Hogan's order on the motion for sanctions, CIC submitted a bill totaling $101,519.00 in legal fees and $1,537.98 in expenses. The bill represents approximately 157 hours of time spent briefing the motion to compel and approximately 270 hours of time spent briefing the motion for sanctions. PepsiCo objects not only to Judge Hogan's finding that PepsiCo engaged in sanctionable conduct but also to CIC's bill. With regard to the latter, PepsiCo claims that CIC failed to properly document the hours spent briefing these matters and that, in any event, the hours devoted to these issues were not reasonable.

II. *Analysis*

A magistrate judge's decision that sanctions are appropriate is a dispositive matter subject to de novo review by this Court pursuant to Rule 72(b) of the Federal Rules of Civil Procedure. *Massey v. City of Ferndale,* 7 F.3d 506, 509-10 (6th Cir.1993). In addition to the sanctioning powers granted to the Court under Rule 37(b), a district court may also impose sanctions pursuant to its inherent authority where it finds that a party or an attorney has acted in bad faith. *Ray A. Scharer & Co., Inc. v. Plabell Rubber Products, Inc.,* 858 F.2d 317, 321 (6th Cir.1988).

In its objections to Magistrate Judge Hogan's order, PepsiCo argues that it legitimately withheld producing the Project Broncos document because the project was not related to a systemic plan to eliminate independent bottlers, but rather was a plan to create large anchor bottlers in response to market demands for consolidation. Therefore, PepsiCo contends that its objection that the request was vague and ambiguous was proper because CIC mischaracterized

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 32122596 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 32122596)

the purpose and intent of the anchor bottling strategy. Furthermore, once faced with Judge Hogan's ruling on the motion to compel, PepsiCo says it worked diligently to review and produce the documents and that there was no intent to bury the Project Broncos document. PepsiCo also says that the fact that no PepsiCo executive mentioned Project Broncos by name in a deposition is irrelevant since they all testified about PepsiCo's anchor bottling strategy at length. PepsiCo also states that Judge Hogan's finding that the Project Broncos document was easily isolated because it was produced in the Coke case is unfounded because there is no evidence that Mr. Gerard Casey, Esq., PepsiCo's general counsel and the only attorney who has entered an appearance in both cases, was personally involved in reviewing documents or answering document requests.

At the outset, the Court notes that the case for sanctions against PepsiCo is circumstantial-there is no smoking gun pointing to a deliberate failure to produce the "smoking gun." Compounding the difficulty is the fact that the case also turns largely on the credibility of the parties and the Court is required to judge their credibility on a dry paper record. In addition, the Court is being asked to conclude that men and women who are officers of the court and who have sworn to act with the utmost honesty and candor in litigating cases before this Court have behaved dishonestly. Further complicating the task is the fact that there is no love lost between the parties and their attorneys. This case has been bitterly contested on every front and on every issue from its inception with a take no prisoners approach.[FN2] Thus, it is possible that in the passionate heat of battle, proper judgment has not been exercised. Therefore, the parties should be aware that the Court does not take lightly making any decision that sanctions are appropriate in this case. Having prefaced its findings as stated, the Court does find that an award of sanctions on behalf of CIC is warranted in this case.

> FN2. One suspects that neither side would shed a tear should the other come down with a crippling case of writer's cramp or an immobilizing onset of writer's block, although the Court itself would be grateful for the respite in the deluge in pleadings such events would produce.

*5 As an initial matter, the Court agrees with Judge Hogan's conclusion that the Project Broncos documents are directly responsive to CIC's document request 70. As indicated above, this request asked for "[a]ny and all documents that relate to PepsiCo's desire or plan to reduce the number of independent Pepsi-Cola bottlers." Clearly the Project Broncos documents, which discuss consolidation and identify independent bottlers for acquisition, falls directly within the category of PepsiCo's plan or desire to reduce independent bottlers. PepsiCo's characterization of Project Broncos as only a plan to establish large anchor bottlers, and not reduce independent bottlers, is a hypertechnical distinction since it is readily apparent that large anchor bottlers means fewer independent bottlers. Therefore, the Court finds that PepsiCo, at minimum, should have responded to the spirit of the document request, even if it did not agree with CIC's characterization of its motives.

Second, the Court disagrees with PepsiCo that CIC's ability to depose Pepsi-Co's executives on its anchor-bottling strategy alleviated any prejudice resulting from its failure to produce the Project Broncos documents. As Judge Hogan pointed out in his order, these documents would have been important cross-examination tools to probe PepsiCo's contention that the anchor bottling strategy did not pose a threat to CIC. Furthermore, it is suspicious that no PepsiCo executive referred to Project Broncos by name during their depositions. This clearly was a major initiative by PepsiCo and it appears that the these documents were circulated at the highest levels in PepsiCo. The Court can only regard the failure of Project Broncos to come up during any deposition as one of two things, connivance or a remarkable example of Jungian collective unconscious, and the Court is not an adherent to Jungian philosophy. Moreover, the Court finds no authority which permits a party to withhold documents if the same areas are covered by deposition testimony.

Third, while the Court can perhaps understand the fact that it took PepsiCo some time to collect these documents, it still has not adequately explained why PepsiCo misidentified what document requests the production was responsive to. Going further, the Court can perhaps accept PepsiCo's explanation that it just lumped these documents into general categories and that to further categorize all the requests into more specific categories would have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32122596 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 32122596)

Page 5

meant further delay. Further still, while the Court can understand that a 46 page document might get lost in the shuffle, PepsiCo has not explained why it did not produce almost 1,500 pages of Project Broncos-related documents until over four months after Judge Hogan granted CIC's motion to compel. It seems to this Court that overlooking this volume of documents is like overlooking the elephant sitting in the living room-it can't be done. Moreover, it is suspicious that PepsiCo produced the additional documents on the same day it filed its memorandum in opposition to the motion for sanctions. Though these events could just be coincidences, at a certain point one coincidence after another stops being bad luck and becomes suspect conduct. In any event, the delay in producing these additional documents obviously deprived CIC of ammunition it could have used in its opening brief for sanctions.

*6 Under the totality of the circumstances, and the Court reiterates that the case is circumstantial, the Court must reluctantly conclude that PepsiCo and its attorneys were hiding the ball from CIC. PepsiCo's interpretation of CIC's discovery requests was either disingenuously hypertechnical or purposefully obtuse and the collective failure to mention Project Broncos during depositions was too coincidental to be genuine. Furthermore, there has been no explanation for the failure to produce 1,500 pages of responsive documents until four months after being ordered to do so. Therefore, for all of those reasons, the Court concludes that PepsiCo acted in bad faith and that an award of sanctions is appropriate.

As noted, PepsiCo has objected to the bill submitted by CIC as to both the numbers of hours expended and to the alleged inadequacy of the documentation supporting the bill. In the order granting CIC's motion sanctions, Judge Hogan stated that he would hold a hearing in the event PepsiCo objected to CIC's submission of fees and expenses. Although the parties appear to have adequately briefed the issues, given the amount at stake, the Court believes that holding a hearing would be appropriate in order to give each side a full opportunity to present its case. However, rather than remand the matter to Judge Hogan, the Court will conduct the hearing itself since the matter is subject to de novo review in any event. This procedure will avoid the time and expense of a preparing a report and recommendation and then another full round of briefing on the inevitable objections to Judge Hogan's conclusions. Accordingly, the Court's case administrator is directed to set this matter for a hearing at the earliest practicable time for the Court and the parties.

IT IS SO ORDERED

S.D.Ohio,2002.
PepsiCo, Inc. v. Central Inv. Corp., Inc.
Not Reported in F.Supp.2d, 2002 WL 32122596 (S.D.Ohio)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.