UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAMES ROANE, JR.,** et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2337 (RWR/DAR) |
| | ) | |
| **ALBERTO GONZALES,** *et al.,* | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' AND INTERVENOR PLAINTIFFS' SURREPLY REGARDING
DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS
AND RENEWED MOTION TO LIFT THE STAY OF PLAINTIFFS' EXECUTIONS**

The Defendants seek to preclude this Court from ruling on the constitutionality of the procedures by which they plan to execute Plaintiffs.  On May 16, Defendants renewed their *Motion for Judgment on the Pleadings,* seeking a ruling that Plaintiffs cannot prevail no matter what the facts are and asking this Court to lift the stays of execution to which they had originally agreed.  The Defendants contend that the Supreme Court's decision in *Baze v. Rees,* 128 S. Ct. 1520 (2008), which found Kentucky's execution protocol constitutional, moots litigation over their own procedures, and reassert other purported barriers to this Court's review.  In late July, the Defendants, responding to Plaintiffs' opposition to these motions, appended to their Reply Brief a new Bureau of Prisons ("BOP") execution protocol, not previously seen by Plaintiffs or their experts.  Nearly two years after Plaintiffs initially sought discovery of the execution process,[1] as well as the qualifications of their execution personnel, the Defendants have produced

---

[1] Defendants have shown again and again that they are willing to go to great lengths to avoid fulfilling their discovery obligations.  Throughout this litigation, Defendants have continually resisted providing Plaintiffs with

a newly-minted document and assert that it alone forecloses any claim of an Eighth Amendment violation.

Defendants' premise -- that all this Court need do is compare this new written protocol to the one at issue in the Kentucky case -- is a gross misreading of *Baze*. *Baze* holds that a substantial risk of the maladministration of the protocol in a manner that creates a substantial danger of inadequate anesthesia renders the procedure unconstitutional. *See, e.g., Baze*, 128 S. Ct. at 1526, 1530-31, 1533. Whether the Defendants' procedures create a substantial risk of maladministration depends not only on their written protocol but also on the personnel's ability to implement the protocol as intended. Defendants seek to avoid judicial scrutiny of their ability to constitutionally implement execution procedures by altering their written protocol. But not only does Defendants' newly-revised protocol differ from the protocol approved in , Defendants' personnel are incompetent and unfit and therefore are no more likely to properly implement the new protocol than they were the previous one. Cosmetic changes to the written protocol cannot mitigate the substantial risk created by Defendants' pervasive incompetence and lack of fitness.

This surreply addresses the Defendants' erroneous characterization of *Baze v. Rees*. It demonstrates that Plaintiffs' complaint adequately alleges a substantial risk of maladministration of the execution protocol such that the resulting risk to the condemned prisoners states a claim under the Eighth Amendment and *Baze*. In addition:

---

clearly discoverable information touching upon the qualifications and fitness of federal executioners, facts that go to the heart of this case. Absent Plaintiffs' persistence -- culminating in ultimately successful motions 1) compelling a second entry upon land for Plaintiffs' lighting expert and 2) compelling executioners to answer deposition questions concerning their qualifications and experience -- Defendants undoubtedly would have continued unabashedly to resist legitimate discovery requests. Currently, Plaintiffs' Motion to Modify the Protective Order based upon their belief that Defendants have provided them with false or misleading responses to discovery requests related to the qualifications of one of their executioners is still pending before the Court. *See* Plaintiffs' and Intervenor Plaintiffs' Motion to Modify the Protective Order (February 20, 2007 and March 19, 2008). Plaintiffs initiated their attempts to resolve this current discovery dispute in January of this year when they first learned ▊▊▊▊▊▊ ▊▊▊▊▊▊▊▊▊▊▊▊ that had never been revealed to Plaintiffs. Defendants have now succeeded in stonewalling this discovery effort for almost seven months.

- Defendants' eleventh-hour production of the newly released protocol requires additional discovery;

- Expert discovery, halted pending *Baze,* should recommence;

- Defendants' new protocol is not "substantially similar" to Kentucky's;

- *Baze* has no impact on Plaintiffs' claims made pursuant to the Administrative Procedures Act; and

- Defendants' reassertion of purported procedural obstacles must fail.

Given the seriousness of the relief Defendants seek, Plaintiffs respectfully request an opportunity to present oral argument in order to further demonstrate that this Court should find that judgment on the pleadings is not appropriate; that the stays of execution should not be lifted at this time; and that this Court must, after affording full discovery, resolve all claims on their merits.

## I.    LEGAL STANDARD OF REVIEW FOR A JUDGMENT ON THE PLEADINGS

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) may be granted only if "the moving party demonstrates that 'no material fact is in dispute and that it is entitled to judgment as a matter of law.'" *See Covad Commc'ns Co. v. Revonet, Inc.*, 250 F.R.D. 14, 18 (D.D.C. 2008) (quoting *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992)). The evaluating court "must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Id.* A plaintiff need not allege "[s]pecific facts"; rather, Federal Rule of Civil Procedure 8(a)(2) requires only that the Complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 127 S.

Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007)); *see* Fed. R. Civ. P. 8(a)(2). *Twombly* does not require "heightened fact pleading of specifics."[2]

When a motion for judgment on the pleadings is addressed to the substantive merits, the motion should be granted only when it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (granting judgment on the pleadings only if the moving party demonstrates that "no material fact is in dispute and that it is entitled to judgment as a matter of law."). To the extent that Defendants' motion for judgment on the pleadings rests on the introduction of extrinsic facts by Defendants -- and the New Protocol is certainly an extrinsic fact that requires Plaintiffs to introduce extrinsic facts in response, Plaintiffs reiterate their objection to the motion as premature and as an attempt to yet again circumvent the filing of dispositive motions after the completion of discovery. Defendants have the burden of proof on their motions and they cannot meet that burden simply by attaching their New Protocol.

## II.    DEFENDANTS MISCHARACTERIZE THE SUPREME COURT'S HOLDING IN *BAZE*

Defendants ask this Court to find that the Supreme Court's decision in *Baze v. Rees*, which was based on the record before it and upheld the State of Kentucky's system of execution, also disposes of the *Roane* litigation. Their argument rests on three flawed premises. *First*, Defendants contend that "[l]egal questions over the constitutionality of the three substance drug formula were expressly resolved by the Supreme Court" in *Baze*. Def. Reply at 21. *Second*, Defendants suggest throughout their reply that *Baze* forecloses any consideration of the factual

---

[2] Defendants insinuate that the Supreme Court's decision in *Twombly* raised the pleading standard. Defs. Original Motion at 8-9. It did not. *Twombly* simply reaffirmed the pleading standard long employed in the D.C. Circuit that a complaint cannot rest on a wholly conclusory restatement of the legal standard, but must rather contain allegations raising a plausible inference that the plaintiff would be entitled to relief. 127 S. Ct. at 1968-69; *Erickson*, 127 S. Ct. at 2200 (construing *Twombly*).

basis of Plaintiffs' claim of "substantial risk of wanton and unnecessary infliction of pain" by holding that executioner incompetence and implementation failures are always irrelevant. Def. Reply at 24-26. *Third*, Defendants make no secret of the fact that their August 1, 2008 protocol is an attempt to make their execution procedures facially "substantially similar" to those approved in *Baze*. *See* Def. Reply at 16. None of these arguments accurately portrays the Supreme Court's holding in *Baze*.

*Baze* establishes that the constitutionality of a lethal injection protocol depends on the facts: the procedures that are used, the evidence of what has happened at previous executions, and the competence of both former and current executioners.

In *Baze*, a three-Justice Plurality held that in order to prevail on a claim that a state's method of execution violates rights protected by the Eighth Amendment a prisoner must demonstrate that the challenged protocol would subject the prisoner to a "substantial risk of serious harm." *Baze*, 128 S. Ct. at 1532. The Plurality recognized that such a risk exists where an inadequately anesthetized inmate is given pancuronium and potassium. *Id.* at 1533 (holding that in the absence of "a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."). The Plurality further held that a method of execution is unconstitutional where it imposes a substantial risk of serious harm, and there is a feasible and readily available alternative to the State that significantly reduces the risk. *Id.* at 1532.

Taken together, these principles conclusively establish that risk -- assessed objectively -- is the touchstone of the Eighth Amendment inquiry. But while *Baze*'s objective risk framework governs this case, *Baze*'s *application* of that standard to Kentucky's protocol is not determinative

here. Assessment of objective risk is inherently a factual inquiry because different facts create or reveal different risks. *Baze* makes clear that a reviewing court must examine all aspects of a State's procedures to determine whether a plaintiff has shown a substantial risk of "maladministration." *Id.* at 1537-38. Indeed, the Plurality's repeated acknowledgement that the maladministration of the written protocol could lead to a "substantial and unconstitutional risk" of pain, *id.* at 1533-34, presupposes that some plaintiffs will be able to demonstrate just such a danger. While the *Baze* Court found that the Kentucky plaintiffs had not marshaled facts sufficient to demonstrate that risk, its ruling by no means precludes other litigants relying from prevailing on different facts.

*First*, and most obviously, *Baze* necessarily could pass upon only the particular execution procedures that were before it. To the extent that another jurisdiction's procedures differ from Kentucky's, *Baze* does not (and could not) address whether they pose a substantial risk. As Plaintiffs will address later in this surreply, Kentucky's procedures differ in important ways from those of the federal government.

*Second*, because the Supreme Court does not find facts in the first instance, but merely reviews trial court fact-findings for clear error, the Supreme Court was limited to considering the testimony -- both opinion and expert -- actually presented in *Baze* about the risks associated with Kentucky's procedures. Thus, for example, although the Plurality found that there was no reason to think that Kentucky's personnel would not be able to carry out their tasks properly it did so based upon a record with little factual development. Reply Brief of Petitioner at 16, *Baze v. Rees*, 128 S. Ct. 1520 (2008) (No. 05-7439), *available at* http://www.law.berkeley.edu/clinics/dpclinic/LethalInjection/LI/briefs.html. Had the record in *Baze* revealed confusion and inconsistent practice by execution personnel -- as is the case here --

such facts would have been considered in determining whether Kentucky's procedures created a substantial risk.

*Third*, the *Baze* record lacked any evidence on the efficacy of alternative methods of carrying out lethal injection. The Plurality noted that Baze's primary proposed alternative -- administration of a single massive dose of thiopental -- "was not proposed to the state courts below," and thus could not be passed upon by the Supreme Court. 128 S. Ct. at 1534. Consequently, *Baze* did not conclusively pass upon the viability of any particular alternative to Kentucky's procedures, let alone the federal government's.

The evidentiary limitations in the Kentucky record should put to rest any contention by Defendants that *Baze* pre-approved all three-drug protocols in general, or the federal government's practices in particular. As the remainder of this surreply discusses, the facts that Plaintiffs are prepared to prove at trial in this case show that Defendants' practices and record present a substantial risk of serious harm (and, contrary to Defendants' arguments are not substantially similar to Kentucky's). Defendants' New Protocol provides little information about implementation, leaving many unanswered questions about how and by whom the many discretionary decisions it provides for will be performed. At trial, Plaintiffs will present evidence regarding past hiring, training, and implementation practices demonstrating that there is every reason to be concerned about how that discretion will be exercised. Defendants' practices create substantial and remediable risks of serious harm. Plaintiffs both pled such substantial risks in their complaint and will present sufficient facts to prevail at trial.

III. **PLAINTIFFS' COMPLAINT INCLUDES DETAILED ALLEGATIONS THAT DEFENDANTS' PROCEDURES AND PERSONNEL SUBJECT THEM TO A SUBSTANTIAL RISK THAT COULD BE EASILY ALLEVIATED.**

In an effort to avoid judicial scrutiny of Plaintiffs allegations in the case, Defendants have moved for Judgment on the Pleadings. At this stage, therefore, Plaintiffs allegations must be taken as true, and the only question before this Court is whether Defendants' New Protocol actually negates all of Plaintiffs' allegations that Defendants' lethal injection procedures are permeated by incompetence and substantial risk of maladministration.

A.   UNDER *BAZE*, DEFENDANTS' FAILURE TO EMPLOY COMPETENT EXECUTION PERSONNEL, THEIR HAPHAZARD DRUG ADMINISTRATION PROCEDURES AND THE ABSENCE OF SUFFICIENT SAFEGUARDS CREATE A SUBSTANTIAL LIKELIHOOD OF MALADMINISTRATION AND INHUMANE EXECUTIONS.

*Baze* did not, and could not, hold that as long as the government employs facially qualified personnel and a protocol similar to Kentucky's, it does not matter how systemically flawed and dangerous the government's actual practices and personnel are. Evidence of this sort was not before the *Baze* Court, but it is at the core of the Plaintiffs' allegations here. Plaintiffs' allegations regarding the dangers posed by unqualified personnel, faulty procedures and inadequate safeguards clearly constitute allegations of the requisite risk of serious harm. *See Baze*, 127 S.Ct. at 1562 (Thomas, J., concurring in the judgment) (stating that under the Plurality's opinion, the lower courts are now tasked with the obligation to determine what evidence is sufficient to demonstrate substantial risk).

Errors and deviations from the protocol, resulting in inadequate anesthesia are a foreseeable inevitability so long as the BOP employs personnel who are unable or unwilling to perform their execution responsibilities properly, and, relies upon a non-specific protocol, that tolerates and exacerbates the shortcomings of such personnel. *See Harbison v. Little*, 511 F. Supp. 2d 872, 891 (M.D. Tenn. 2007) (employing the substantial risk standard used in *Farmer v.*

8

*Brennan*, 511 U.S. 825 (1993), and subsequently in *Baze,* in finding that the "failure to utilize adequately trained executioners" contributed to substantial risk of excruciating pain); *see also Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Cal. 2006) (finding that pervasive incompetence and lack of training created "undue" and "intolerable" risk).

Contrary to the Defendants' assertions, *Baze* contemplates that lower courts will consider a number of areas critical to the execution process. <u>The *Roane* Defendants prove lacking in each of them.</u>

### 1. Executioner Incompetence.

The *Baze* Plurality was careful to note that Kentucky's execution personnel, with EMT-level training, were "trained and experienced," and that it had found no evidence that they were not competent to perform their execution responsibilities. 128 S. Ct. at 1533-34, 1537; *Baze v. Rees*, Oral Arg. Tr. 27:22-24 (Jan. 7, 2008) ("literally the best qualified human being in the Commonwealth of Kentucky … place[s] the IV line"). In fact, as Justice Ginsburg noted, Kentucky uses a phlebotomist with *8 years'* experience and an EMT with *20 years'* experience. *Id*. at 1569 (Ginsburg, J., dissenting).

Defendants' New Protocol, on the other hand, offers no such assurances. It provides that lethal substances shall be administered by "qualified personnel," ¶ A, which is partially defined to "*include[]* currently licensed physicians, nurses, EMTs, Paramedics, Phlebotomists, [and] other medically trained personnel, including those trained in the United States Military having at least one year professional experience." ¶ D (emphasis added). However, the New Protocol further defines "qualified personnel" to include "other personnel with *necessary* training and experience in a specific execution related function" and "[n]on medically licensed or certified" persons who have participated in "a minimum of ten (10) execution rehearsals a year and . . . at

least two (2) execution rehearsals prior to participating in an actual execution." *Id.* (emphasis added). In other words, under Defendants' New Protocol, execution personnel need not have *any* medical training or certification, so long as they (1) have what the Defendants view -- but do not define -- as "necessary training and experience;" and (2) have participated in as few as two execution rehearsals, the content of which is undefined and unknown. Therefore, on its face, the New Protocol does not require the same level of qualification as the Kentucky protocol approved in *Baze*. Contrary to Defendants' argument, then, even if the only relevant analysis under *Baze* was whether the New Protocol was "substantially similar" to Kentucky's protocol, the New Protocol is materially inferior to Kentucky's with regard to what the *Baze* Court found to be the "most important" safeguard against unconstitutional executions.[3]

And in any event, Plaintiffs have alleged, and the evidence substantiates, that Defendants employ incompetent execution personnel who -- whatever their on-paper qualifications -- are unprepared to implement the procedures properly. In this case, far more is known about the execution team's actual qualifications (or lack thereof) and performance than was known in *Baze*. Plaintiffs are prepared to show that Defendants have a history of hiring unqualified and incompetent medical personnel and, by their own admission, place total faith in, and rely implicitly on, the advice their medical personnel provide them in the execution context. The selection of, and reliance on, incompetent and unfit execution team members causes great concern that the lethal injection procedures will be implemented in an unconstitutional manner.

---

[3]Defendants assert that they have "no knowledge of any person who would be on the federal execution protocol team for the executions of the Plaintiffs that provide execution related services to Florida," Def. Reply at 24, but do not deny (a) that such persons may be selected to participate in future federal executions; (b) that such persons have been involved in past federal executions; or (c) that such persons have been involved in drawing up federal execution procedures, including the New Protocol. Defendants have used and continue to use the Protective Order in this case to prevent Plaintiffs from obtaining important information regarding the qualifications of their executioners. Defendants' failure to reveal ██████████████████████████ only one example of this stonewalling tactic.

*See Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Cal. 2006) (finding California's execution protocol constitutionally defective based upon a record replete with evidence that in actual practice, California's execution protocol does not function as intended; one "critical deficienc[y]" the court identified was "inconsistent and unreliable screening of execution team members.").



---

[4]It was precisely this course of conduct that led to the botched execution of Florida inmate Angel Diaz, and that a state-appointed commission later found demonstrated the personnel's "inadequate training." *See* The Governor's Comm'n on Administration of Lethal Injection, *Final Report with Findings and Recommendations*, at 9 (Mar. 1, 2007), *available at* http://www.law.berkeley.edu/clinics/dpclinic/LethalInjection/LI/documents/commission/fl/lethalinjectionfinalreport.pdf.

[5]_____ Although thiopental is called an ultra-short acting drug because it takes effect quickly, it is not instantaneous. The drug needs time to move through the IV tubing, into the condemned, through the condemned's venous system (from vein to heart to lung to heart) and then to the brain. That movement takes time. An execution that is begun and concluded within 2 minutes has not allowed sufficient time for the condemned to be non-responsive to noxious stimuli. *See Expert Report of Thomas Henthorn*, attached to Plaintiffs' Opposition to Defendants' Renewed Motion for Judgment on the Pleadings as Ex. 24, ¶¶ 20, 22, 24.



More generally, the Kentucky protocol approved in *Baze* requires that IV personnel participate in 10 execution rehearsals -- which "encompass a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers" -- per year. 127 S.Ct. at 1534. While Defendants' New Protocol *makes reference* to similar qualifications, it does not *require* that federal execution personnel take part in similar training in order to be qualified for the team. Further, there is no requirement in the New Protocol that the medically trained

---

Defendants have in the past, and apparently intend in the future since they have made no specific provisions to the contrary in their New Protocol, to execute persons without allowing enough time for the anesthetic drugs to take full effect. Such conduct is unconscionable and certainly creates a substantial risk of serious harm to Plaintiffs.

executioners undertake any training with the BOP executioners, which apparently continues Defendants' prior practice.[7]

The deficiencies in the qualifications and practices of Defendants' execution personnel, which are exacerbated by the New Protocol's failure to require adequate training, create a substantial and remediable risk that federal executions will be improperly performed.[8] *See, e.g., Harbison*, 511 F. Supp. 2d at 891 ("failure to utilize adequately trained executioners" contributed to substantial risk of excruciating pain). There is ample evidence that Defendants' executioners, whatever their on-paper qualifications, *have* performed incompetently in previous executions. Their incompetence demonstrates that Defendants' practices, regardless of the language in the New Protocol, have created a substantial risk that Plaintiffs will be inadequately anesthetized and will suffer serious harm.

Further, there is no guarantee that Defendants will not recruit similarly incompetent and/or unfit personnel to complete its execution team. There is also no guarantee that Defendants will not, as they have in the past, fail to adequately train and support these personnel in their performance of the New Protocol. These failures are particularly likely to lead to maladministration of the execution procedure because the New Protocol leaves to the discretion of the execution team the manner in which many of the crucial steps, such as whether to use peripheral or femoral IV access, will be accomplished. Where Defendants employ personnel who are unable or unwilling to perform their execution responsibilities properly, errors and

---

[7]Neither of the two physician executioners ever practiced with the BOP executioners prior to the first three federal executions. The nurse executioner attended only one training, just prior to the McVeigh execution.

[8]While the Plurality affirmed the trial court's findings that there was *no evidence* that Kentucky's personnel were not "trained and experienced," it did *not* hold – contrary to what Defendants would have this Court find -- that evidence that personnel are untrained, incompetent or unfit would be irrelevant to a lethal injection challenge. Indeed, because all that was known about Kentucky's personnel was their on-paper qualifications, the Court did not have before it any evidence that individual execution personnel, while perhaps facially qualified, were in fact unable or unwilling to perform executions properly.

deviations that result in inadequate anesthesia are foreseeable inevitabilities.  Other courts have

recognized the close connection between incompetence, official disregard, and a substantial risk

of inhumane executions.  For instance, in applying the "substantial risk" standard to Tennessee's

protocol, the court in *Harbison v. Little* concluded that evidence that the execution personnel did

not understand and were unable to perform their responsibilities under the protocol created a

substantial risk of maladministration and inadequate anesthesia.  511 F.Supp.2d, 872, 891 (M.D.

Tenn. 2007); *see also Morales v. Tilton*, 465 F.Supp.2d 972, 979 (N.D. Cal. 2006) (finding that

pervasive incompetence and lack of training created "undue" and "intolerable" risk).

        **2.**        **Drug Administration Deficiencies.**

The lack of competence on the part of execution personnel described above makes drug

delivery failures, and therefore inadequate anesthesia, more likely.  The execution team's ability

to insert and maintain reliable IVs is crucial to ensuring successful administration of the drugs.[9]

In *Baze*, the Plurality noted that there was no evidence of any IV problem in Kentucky's single

execution, 128 S. Ct. at 1528, and therefore there was no showing of a substantial risk that such

problems would occur in the future, *id.* at 1537-38.  In contrast, several foreseeable drug delivery

problems have occurred in previous federal executions, and they are not likely to be corrected by

the New Protocol.

For instance, an obvious and substantial risk of harm unique to Defendants' procedures is

the practice, ███████████████████████ of administering the pancuronium

and the potassium within a minute of the thiopental.  Thiopental takes more than a minute to

bring the inmate to a sufficiently deep level of unconsciousness -- a state known as "burst

suppression" -- where he will be unable to feel the pain caused by the second two chemicals.  It

---

[9]Infiltration, catheter migration, and other IV problems can result in the delivery of insufficient thiopental to fully anesthetize, but sufficient pancuronium and potassium to paralyze and cause pain and death.

is highly unlikely that a prisoner will achieve burst suppression within 15 to 20 seconds after receiving a dose of thiopental.

*Baze* considered only the inmates' claim of risk that the chemicals would not be administered in their intended doses, and thus had no occasion to confront the risks that are created by injecting the intended doses in too quick a sequence. But what little evidence there is in *Baze* on this point suggests that Kentucky pauses after administering the thiopental to allow for a consciousness check. 128 S. Ct. at 1534.[10]

Defendants' New Protocol retains procedures that differ in other critical respects from the Kentucky protocol approved in *Baze*. For example, the *Baze* Court relied heavily on the fact that the Kentucky protocol required execution personnel "to establish both primary and backup lines and to prepare two sets of the lethal injection drugs before the execution commences. 128 S. Ct. at 1534. As the *Baze* Court held, "[t]hese redundant measures ensure that if an insufficient dose of sodium thiopental is initially administered through the primary line, an additional dose can be given through the backup line before the last two drugs are injected." *Id.*

Defendants' New Protocol requires a backup line if the lethal drugs are delivered peripherally, but provides that the BOP Director or his designee may choose the means of IV access (femoral or peripheral) on-site. Although the New Protocol deletes the prior version's statement that femoral access is "preferred," it does not restrict in any way the ability of the Director or designee to opt for this method, in which case there will be no backup line.[11]

---

[10]It is ostensibly for this reason that Arkansas and Missouri have amended their protocols to require a three-minute pause after administering the thiopental. *Taylor v. Crawford*, 487 F.3d 1072, 1083 (8th Cir. 2007); *Nooner v. Norris*, Case No. 5:06-cv-00110-SWW (ED AR, August 5, 2008). Defendants' New Protocol does not have this safeguard.

[11]Moreover, femoral access—*i.e.*, the insertion of a catheter into the femoral vein (located in the groin and buried anywhere from about half an inch to several inches below the skin)—is an invasive procedure that can be expected to cause significant pain even with the use of local anesthesia, and physicians generally use femoral lines only where peripheral access is impossible, and then, only after providing intravenous sedation through a peripheral line. And in addition to the pain it can be *expected* to cause, femoral access can result in numerous excruciating

Without further discovery into the question of when, under the New Protocol, femoral access will be used, there is no basis on which to determine whether Defendants' execution procedures will continue to use femoral catheterization, a procedure that creates needless and substantial risk of pain and suffering, as its default.

In addition to lacking the safeguards upon which the *Baze* Court expressly relied, Defendants' protocol also raises a number of issues not even considered in *Baze*. For example, the New Protocol calls for the preparation of 40 syringes of four different substances, and although it specifies the order in which those syringes are to be administered (because, were they administered out of order, the execution would be unconstitutional), it provides no labeling or handling instructions meant to ensure that they are administered in proper order.

### 3.    Lack of Safeguards.

The *Baze* Court based its approval of the Kentucky system on the "safeguards" Kentucky had put in place "to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner." *Id.* Defendants' New Protocol lacks the critical safeguards upon which the *Baze* Court relied in finding that the Kentucky protocol does not violate the Eighth Amendment.

*First*, unlike in Kentucky, Defendants' execution personnel have little to no ability to observe the prisoner during the execution.[12] The New Protocol does not require any executioner or BOP official to remain in the execution chamber during the entire execution process. The

---

complications, including hematomas. The defendants' execution facility does not contain the equipment and supplies necessary to address these complications. The use of femoral IV access, particularly when such an invasive procedure is not medically indicated, was not considered by the *Baze* Court.

[12]Although one Senior BOP official is designated to be on site, the Protocol does not require that he or she be in the execution chamber with the prisoner. This BOP official is not tasked with the responsibility for observing the inmate or any part of the drug administration process. Nor does the New Protocol require that any executioner, with medical training and experience, be present in the execution room with the prisoner through the course of the execution.

lighting in the execution facility, as verified by Plaintiffs' lighting expert, is poor. The line of vision from the chemical room to the execution gurney and the prisoner is obstructed. It is impossible to observe the entire length of the IV lines from inside the chemical room. And, even if the New Protocol required an executioner to be present in the execution chamber through the course of the execution, which it does not, that person's ability to observe the last portion of the IV lines as well as the IV site(s) would be obstructed by a sheet that covers the prisoner's body. As the *Baze* Plurality recognized, effective observation is crucial in detecting IV failures and signs of consciousness. 128 S. Ct. at 1534; J.A. 119, 293.

The *Baze* Court also relied heavily on the presence of the warden and deputy warden in the execution room "to watch for signs of IV problems, including infiltration." *Baze*, 128 S. Ct. at 1534. The New Protocol does not require anyone to remain in the execution room for any specified period. And although it does provide for inspection of the IV site, it states merely that "the IV site will be physically examined, *to the extent practicable*," following the injection of sodium thiopental. ¶ I (emphasis added). Without further discovery, it is impossible to know how execution personnel will interpret "to the extent practicable" (or how or if they have been told to interpret it in rehearsals). Moreover, the New Protocol does not alter the Defendants' practice of covering the inmate from head to toe with a sheet, so it is unclear to what extent inspection of the IV site will be "practicable" in view of this covering.

Additionally, Defendants' New Protocol gives the BOP Director or "his/her designee" authority to modify *any* part of the procedure "as necessary to (1) comply with specific judicial orders; (2) based on the recommendation of on-site medical personnel utilizing their clinical judgment; or (3) *as may be required by other circumstances*" (emphasis added). The New Protocol does not specify any criteria to be used in evaluating the need for any such

17

modifications.[13]    Thus, it is clear that the procedures described in the New Protocol are not necessarily the procedures that will be used to execute the Plaintiffs.   Given this all-purpose "escape hatch," the Court cannot conclude from the face of the New Protocol what procedures Defendants will use to execute the Plaintiffs and certainly not whether they would pass muster under *Baze*.[14]    At a minimum, further discovery and expert opinion are needed with regard to the many facets of unlimited discretion provided for in the protocol.

In short, Defendants' claim that their lethal injection procedures are "substantially similar" to the procedures approved in *Baze* is both wrong and irrelevant.[15]    In reality, Defendants' system is unique in its deficiencies, and the assurances on which the *Baze* Plurality relied are entirely absent here.   Furthermore, even if this Court were to accept Defendants' argument that the New Protocol is facially substantially similar to Kentucky's, the crucial question is whether the New Protocol can be implemented properly, an inquiry contemplated under *Baze*.   Plaintiffs are entitled to explore Defendants' assumption/assertion of proper implementation.   Plaintiffs' allegations – as well as the evidence amassed to date – require

---

[13]The New Protocol also provides that when any "member of the execution team becomes aware of a situation not contemplated in this procedure" that person should notify the supervisory BOP team member who is required to "advise" the Director's on-site designee who, in turn, must consult with the United States Marshal about how to proceed. The New Protocol does not specify any criteria for identifying situations "not contemplated."

[14] ████████ participating in past executions—who has participated in each of the three executions defendants have carried out to date—testified that he has never seen a written procedure during his performance of past executions. ████████████████

[15] In addition, the New Protocol lacks any assurance that qualified personnel, adequate equipment, or appropriate medications are on hand in the event of a need for resuscitation, an eventuality that the New Protocol contemplates. See para. L. As seen in the Kentucky protocol under review in Baze, see Baze v. Rees, No. 07-5439, Joint Appendix Vol. IV at 985, medical personnel and medical equipment can be made available for such purpose. This issue is relevant, in light of the heightened risk of maladministration of anesthesia under the New Protocol. As indicated in Plaintiffs' Opposition to Defendants' Renewed Motion to Dismiss, p. 9 n. 8, ██████████████████████ ████████████████████ and take all necessary steps to prevent constitutional violations resulting from the administration of pancuronium bromide to him through the protocol in the event of a need for his resuscitation. Should ████ not obtain the administrative relief requested, he is prepared to bring the relevant evidence to the attention of the court at the appropriate time. Meanwhile, counsel for ████ will shortly file a notice with this court further detailing the status of that proceeding, and plan to keep the court informed of any new developments as this administrative process proceeds.

judicial scrutiny and therefore cannot be resolved by a Judgment on the Pleadings. Additionally, now that Defendants have suddenly changed the protocol in material respects in mid-stream, further discovery is needed to determine whether personnel can implement this protocol.

**B.    THERE ARE READILY AVAILABLE ALTERNATIVES THAT WOULD SUBSTANTIALLY REDUCE THE RISKS OF MALADMINISTRATION AND INHUMANE EXECUTIONS.[16]**

There are "feasible [and] readily implemented" alternative procedures available to Defendants that will "significantly reduce the risk[s]" described above. *Baze*, 127 S.Ct. at 1532. The available alternatives are not just feasible, they are obvious. At a minimum, Defendants should not inject the pancuronium and potassium until at least three minutes have elapsed since the injection of the thiopental. And Defendants should not give supplemental doses of pancuronium and potassium without first giving a supplemental dose of thiopental. Execution personnel should be present in the execution chamber to be able to closely monitor the execution procedure. The record reveals no impediment to these reforms -- not only has the federal government never articulated a justification for either aspect of its current practice, but other States have implemented precisely these changes -- and they would represent a substantial improvement in Defendants' practices.

But while such overdue reforms would be welcome, they are not sufficient to remedy entirely the substantial risks in Defendants' practices. The feasibility of an "anesthetic-only" protocol was not definitively addressed in *Baze* because that "alternative was not proposed to the state courts below." *Baze*, 128 S. Ct. at 1534. Having no findings to review on the efficacy of

---

[16] In *Baze*, the Court found that a prisoner challenging a lethal injection procedure must show that the challenged protocol gives rise to a "substantial risk of serious harm," *and* that the governmental entity involved has refused, "without a legitimate penological justification" to implement an alternative that is "feasible, readily implemented, and [which] in fact significantly reduce[s] a substantial risk of severe pain." 128 S. Ct. at 1532. Prior to *Baze*, no controlling authority required Plaintiffs to prove that such an alternative existed, and Plaintiffs' expert witnesses have offered no opinion in this regard. They are prepared to do so with leave of this Court.

that reform, the Supreme Court could not have concluded in the first instance whether it was feasible or readily implementable. This Court, however, has the opportunity to hear and consider evidence concerning the efficacy of such a protocol. There is no dispute among the parties that a sufficiently large dose of a barbiturate would be lethal and painless; the only remaining question is whether some legitimate, countervailing consideration makes the use of a single drug infeasible. Defendants' expert, Dr. Mark Dershwitz, advised Tennessee in April 2007 to switch from its three-drug protocol to "a one-drug protocol which provided for the administration of 5 grams of sodium thiopental, ... and a waiting period of five minutes before the physician came in and confirmed death." *Harbison*, 511 F. Supp. 2d at 876. In any case, given the factual nature of the question, additional discovery is certainly warranted.[17]

### C.    WHETHER DEFENDANTS' NEW PROTOCOL IS CONSTITUTIONAL EVEN UNDER *BAZE* CANNOT BE ANSWERED WITHOUT FURTHER DISCOVERY.

The New Protocol has not previously been disclosed to Plaintiffs and has never been the subject of discovery or consideration by Plaintiffs' experts in this case. Before this Court can determine whether the New Protocol protects against a substantial risk of serious harm and can be constitutionally implemented without substantial risk of maladministration, the New Protocol must be subject to testing by Plaintiffs through discovery and expert opinions. Defendants cannot unilaterally change the facts, and then seek to dispose of this litigation in their favor based on their own interpretation of those new facts, without affording Plaintiffs any opportunity for discovery with respect to those new facts. Accordingly, Plaintiffs are entitled to take discovery in order to determine whether Defendants are capable of carrying out their new lethal

---

[17]Further factual development is particularly appropriate here because *Baze* changed the legal rule regarding the presentation of alternative methods. In *Hill v. McDonough*, 547 U.S. 573, 582 (2006), the Supreme Court held that a method of execution challenge need not allege specific alternatives to the challenged practice. In *Baze*, the Plurality changed course and held that a plaintiff must show that a feasible alternative is available. It is appropriate then to allow both parties to present evidence regarding the feasibility of an anesthetic-only alternative.

injection protocol in a manner that does not create a substantial risk of serious harm to the prisoners.

Discovery is necessary to allow Plaintiffs to learn of any plans Defendants have to change or recruit new personnel prior to resuming executions.[18]  Discovery would also allow Plaintiffs to learn when and through what means Defendants intend to be ready to perform the New Protocol, whether personnel know anything about or have even read the New Protocol, and, if they have read the New Protocol, whether they have concerns about the new procedures.  Also relevant would be Defendants' plans to train personnel on the New Protocol, including the number of trainings the BOP plans to undertake before Defendants determine their executioners will be ready to perform executions under the new procedures.

Discovery would also allow Plaintiffs to uncover the manner in which Defendants developed the current protocol, the number of drafts considered, the identities of those involved in the drafting, whether doctors were consulted in the drafting process, and specifically whether ███████████████████████████████████████████[19] Such discovery will provide Plaintiffs with necessary information regarding Defendants' interpretation of the protocol -- which is written to give BOP personnel broad discretion in how they actually perform executions -- as well as Defendants' intentions regarding implementation of the protocol.

Discovery is also necessary to determine the manner in which Defendants and their executioners will exercise their broad discretion under the New Protocol to decide, for instance, who will decide whether femoral IV access is appropriate and what the criteria will be for that

---

[18]████████████████████████████████████████████████████████████

[19]Information about what information Defendants considered and whether other alternatives were considered and rejected are clearly relevant to determining whether there exists a substantial likelihood that Plaintiffs will suffer severe pain in the context of their executions.

determination, which executioner will conduct the IV patency checks required by the protocol and in what manner those IV checks will be undertaken.

To give but one example of how the BOP's discretionary implementation decisions can result in very different procedures, the consciousness check performed by a doctor with some anesthesia training would have a different probability of effectiveness from one performed by an EMT with no such training or experience -- or a person who has no medical training and has participated in two training sessions ████████████████████████████████ ████████████████ These implementation questions will largely determine the reliability of the procedures, but Defendants' plans regarding implementation are still largely undisclosed. Discovery regarding the development of the protocol is likely to lead to admissible evidence regarding Defendants' intentions with respect to implementation.

### D.    THE *BAZE* DECISION DOES NOT HAVE ANY IMPACT ON PLAINTIFFS' ADMINISTRATIVE PROCEDURES ACT CLAIMS

Plaintiffs have stated a claim under the Eighth Amendment and *Baze* that there is a substantial risk of maladministration of Defendants' execution protocol that will result in a substantial risk of inadequate anesthesia, i.e. serious harm, and thus an unconstitutional execution. Plaintiffs, after being afforded the opportunity to conduct discovery about the New Protocol, including supplementing their experts' opinions, will be prepared to prove substantial risk and less dangerous alternatives. Nevertheless, Defendants' request for a judgment on the pleadings and motions to lift the stays of execution do not address (or have any impact on) Plaintiffs' claims made under the Administrative Procedures Act (APA), specifically that Defendants did not provide adequate notice and a full and fair opportunity to comment on their Lethal Injection Protocol and the various amendments, including the administration of chemical

substances by unqualified personnel, prior to their promulgation.   Whatever actions this Court

may take on Defendants' motions, Plaintiffs' APA claims survive.

## IV. THE STAYS OF EXECUTION SHOULD REMAIN IN PLACE IN ORDER TO PERMIT FULL AND FAIR DISCOVERY AND A TRIAL ON THE ISSUES RAISED IN THIS ACTION.

Defendants' request that the Court dissolve the stays of execution, if granted, would

allow Defendants to moot this litigation by executing the Plaintiffs, and effectively render their

execution methods exempt from judicial review.   Defendants have not met the burden necessary

to justify such extreme relief.

Defendants' argument that the stays of execution should be lifted turns on their assertions

that in *Baze,* the Supreme Court "expressly held" that the procedure Defendants intend to use to

execute the Plaintiffs does not violate the Eighth Amendment.   Def. Reply at 21.   However, as

discussed above, even if it were assumed—and there is no factual basis for such an assumption—

that the Defendants' New Protocol will be implemented exactly as written, it is not "substantially

similar" to, much less identical to, the protocol approved in *Baze.*  Thus, even if it were proper to

consider facts unilaterally changed by Defendants, with no opportunity for Plaintiffs' discovery,

Defendants' motion to lift the stays must fail.

As an initial matter, Defendants err in contending that "Plaintiffs have never established

their entitlement to a preliminary injunction," and that it is Plaintiffs' burden to justify the

continuation of the injunction.   Def. Reply at 14-15.   This Court enjoined Plaintiffs' executions

on February 27, 2006, February 16, 2007 and June 11, 2007 only after considering the parties'

arguments regarding the balancing required by *Serono Laboratories, Inc., v.  Shalala*, 158 F.3d

1313, 1317-18 (1998) and *Washington Metropolitan Area Transit Commission, v. Holiday

Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).   *See* Plaintiffs' Motion For A Stay, And For A

Preliminary Injunction Barring Their Execution (Doc. Nos. 2, 26, 63, 65); Orders (February 27, 2006, February 16, 2007 and June 11, 2007) (Doc. Nos. 5, 27, 67). Now, it is the Defendants—the party seeking to *dissolve* the injunctions—who bear the burden to justify their request. [20] *See* Plaintiffs and Intervenor Plaintiffs/ Opposition To Defendants' Renewed Motion For Judgment On The Pleadings And Renewed Motion To Lift The Stay Of The Plaintiffs' Executions (May 30, 2008) (Doc. No. 163) at 21-22. They have not done so.

### A.    THE STANDARD

Defendants erect a straw man in stating that "Plaintiffs appear to argue that the analysis requires the granting of a preliminary injunction where there is a particularly strong showing in one element . . . although proof of the other elements is weak," and that *Ramirez v. United States Customs & Border Protection*, 477 F. Supp. 2d 150, 155 (D.D.C. 2007), "collapse[s] the four elements into a single one." Def. Reply at 19-20. The law on this issue is crystal clear, requiring the Court to engage in a multi-factor analysis, with no single factor being determinative. As the D. C. Circuit has held:

> A court considering a plaintiff's request for a preliminary injunction must examine whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction. These factors interrelate on a sliding scale and must be balanced against each other [and i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are *rather weak.*

*Serono Laboratories, Inc., v. Shalala*, 158 F.3d 1313, 1317-18 (1998) (citations omitted).

If anyone, it is Defendants, and not Plaintiffs, who wrongly seek to "collapse the four

---

[20]Defendants are simply wrong to continue to imply that the burden rests with Plaintiffs when they are the parties seeking to lift the stay. Defendants, as the parties seeking to change the status quo, have the burden to justify their request. *See, e.g., Atlanta Journal & Const. v. City of Atlanta Dep't of Aviation*, 6 F. Supp. 2d 1359, 1364 (N.D. Ga. 1998) ("On a motion to dissolve a preliminary injunction, the movant has the burden of proof."); *Reynolds*

elements into a single one," Def. Reply at 20, suggesting that the "likelihood of success" factor is somehow more important than the others. Def. Mem. In Support of Renewed Motion at 16. Defendants rely on language from this Court's decision in *Emily's List, v. Federal Election Commission,* 362 F. Supp. 2d 43, 51-52 (D.D.C. 2005), but in that decision, the Court made clear that "a very strong showing with respect to the other preliminary injunction factors" will support a preliminary injunction even where the party seeking the injunction "fails" to show "a substantial likelihood of success on the merits."

Of course, in reaching that conclusion, the *Emily's List* Court merely followed the holding of the D.C. Circuit in *Washington Metropolitan Area Transit Commission, v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977) (emphasis added), that:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (*i e.,* the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation. One moving for a preliminary injunction assumes the burden of demonstrating *either* a combination of probable success and the possibility of irreparable injury or that *serious questions* are raised and the balance of hardships tips sharply in his favor.

*Accord Ramirez, v. U.S. Customs and Border Protection,* 477 F. Supp. 2d 150, 155 (D.D.C. 2007). In short, the applicable law is clear: this Court must balance all four of these factors, and the injunction should be continued not only upon a showing that Plaintiffs are certain, or even probable, to succeed on the merits, but also if the balance of hardships tips decidedly in their favor—as it does—and their claims raise "serious questions." Under this standard, the balancing test dictated by applicable precedent requires that the injunction be continued. As an initial matter, however, Defendants' attempt to introduce new facts—in the form of a newly revised

---

*v. Guiliani,* 118 F. Supp. 2d 352, 364 (S.D.N.Y. 2000) (burden is on defendants to establish changed circumstances justifying dissolution of an injunction).

protocol, about which Plaintiffs have had absolutely no opportunity for discovery—is both improper and insufficient to support their burden.

**B.    THE REQUIRED BALANCING ANALYSIS FAVORS THE INJUNCTION.**

Plaintiffs have previously shown that the required balancing analysis favors the stays. *See* Plaintiffs and Intervenor Plaintiffs' Opposition to Defendants' Renewed Motion for Judgment on the Pleadings and Renewed Motion to Lift the Stay of the Plaintiffs' Executions (May 30, 2008) (Doc. No. 163) at 27-49. However, Defendants' assertion that *Baze* renders Plaintiffs' ability to show a "substantial likelihood of success on the merits is virtually nil" merits response.

*First*, as discussed above, where the remaining factors tip decidedly in their favor, Plaintiffs need not show that success is certain or even probable, but only that they raise "serious issues." Defendants suggest that Plaintiffs cannot show irreparable injury because "the harm is not in the carrying out of their lawfully imposed death sentences, but that they might suffer unconstitutional pain and suffering in the process." Def. Reply at 16. Defendants' effort to trivialize Plaintiffs' injury ignores the fact that *there can be absolutely no remedy* for such pain and suffering after the executions have been carried out.

*Second*, Defendants' assertion regarding the likelihood that Plaintiffs will succeed is premised on their claim that in *Baze,* the Supreme Court "expressly held" that the procedure they intend to use to execute the Plaintiffs does not violate the Eighth Amendment. However, as discussed above, this is not the case. The New Protocol is not identical to, or even "substantially similar" to, the protocol approved in *Baze*, and Plaintiffs at least raise "serious questions" as to its constitutionality given the very real potential for maladministration. The purported changes in this New Protocol are nothing more than words if the execution team is incapable of

implementing them.[21]

## V.    DEFENDANTS' TIMELINESS CHALLENGES MUST FAIL

### A.    DEFENDANTS HAVE WAIVED THE DEFENSE OF LACHES.

Defendants concede that they did not plead the affirmative defense of laches, but argue that they have not waived it because (1) "[t]he timeliness of a death sentenced inmate's constitutional litigation challenging methods of execution (and requests for stays of execution) is not measured by the traditional standards of laches, but by specialized equitable principles;" Def. Reply at 3; and (2) Defendants were entitled to raise the affirmative defense in an answer to Plaintiffs' amended complaint, or by motion, but were precluded from doing so by Plaintiffs' failure to file an amended complaint.

### 1.    Defendants Are Not Rescued By "Specialized Equitable Principles."

Defendants improperly raise their "specialized equitable principles" argument *for the first time* in their Reply. But even if such a doctrine of specialized equitable principles exists (and were timely raised), the Defendants do not show—or even argue—that such a doctrine would make the showing they must make any easier. Defendants cite two Eleventh Circuit district court opinions, *Grayson v. Allen*, 499 F. Supp 2d 1228, 1235 (2007), and *Arthur v. Allen,* 2007 WL 2320069 at 5 (S.D. Ala. 2007), neither of which, upon close review, support a legal theory of "specialized equitable principles."

---

[21]Defendants rely on, among other cases, *Emmett v. Johnson*, ___ F.3d ___, 2008 WL 2736034 2008 WL 2736034 (4th Cir. July 10, 2008) and *Clemons v. Crawford*, Case No. 07-4129-CV-C-FJG (W.D. Mo. July 15, 2008) as support for their position that other jurisdictions, post-*Baze*, are upholding the constitutionality of their lethal injection protocols. Def. Reply at 21, 23-25, 28. Such cases, however, are readily distinguished. The Fourth Circuit's decision in *Emmett* actually endorses, at least implicitly, Plaintiffs' reading of *Baze* because the court considered the evidence of Virginia's actual practices and implementation problems in previous executions. Under the Defendants' reading of *Baze*, these types of facts would have been irrelevant and the court need not have addressed them. In *Clemons*, the State of Missouri revealed well after the pleading stage that it would use an anesthesiologist in all future executions, which is the remedy that the district court ordered in the *Taylor* case. This change in the Missouri protocol renders the Missouri execution system significantly safer than any other

The *Grayson* court stated that "the defendant must show that the plaintiff delayed in asserting his claim, the delay was inexcusable, and the delay caused undue prejudice to the defendant," and discussed each of these elements in turn, *see id.* at 1236-1242, but made no mention of any alternative to the laches doctrine. Indeed, the Eleventh Circuit, in reviewing the trial court's opinion, stated that "the district court determined that *Grayson* was not entitled to injunctive relief and dismissed Grayson's claim under the doctrine of laches." *Grayson v. Allen*, 491 F.3d 1318, 1321 (11th Cir. 2007).

While the district court in *Arthur v. Allen* did state that "the equitable timeliness of the plaintiff's complaint is not measured by traditional laches principles but by the specialized 'equitable principles at issue when inmates facing imminent execution delay in raising their § 1983 method of execution challenges'" 2007 WL 2320069 at 5 (S.D. Ala. 2007) quoting *Grayson*, 491 F.3d at 1321, the district court relied upon the Eleventh Circuit opinion in *Grayson*, which, as already discussed, never described an alternative "specialized equitable principles" doctrine. *Arthur* is the only authority Defendants cite for the proposition that a doctrine of specialized equitable principles exists and should be applied to the case at issue, *see* Def. Reply at 3-4, and *Arthur*—a slip opinion at the district court level and unpublished at the Circuit court level—is an outlier, whose fleeting mention of an alternate doctrine to laches is attributed to a misreading of *Grayson*.

### 2. The Fact That Plaintiffs Did Not File An Amended Complaint Does Not Excuse Defendants' Waiver Of The Defense.

In their Reply, Defendants also argue that laches can be raised by motion and by an amended pleading, and thus because Plaintiffs Roane, Johnson, Tipton and Webster have not yet

---

jurisdiction's. This would be a change Defendants could make to their protocol which Plaintiffs submit would be a significant step toward an adequate remedy.

filed an amended complaint (as, Defendants assert, Plaintiffs agreed to do in a stipulation governing intervention by Plaintiffs Hall and Battle), Defendants' ability to raise laches *by pleading* has not arisen. Def. Reply at 3.[22] However, this Court has held that a defense available at the time of the initial pleading cannot be asserted when the initial pleading is amended. *Lederman v. United States*, 131 F. Supp. 2d 46, 59 (D.D.C. 2001) (citing *Weber v. Turner*, 1982 WL 26999, 3 (D.D.C. Oct. 2, 1980). Thus, because the facts on which Defendants base their laches defense were known to them, and the defense was available to them, at the time of the initial complaint, they could not in any event have raised the defense in response to an amended complaint.[23] The rationale for this rule is particularly strong here, where the stipulation on which Defendants base their argument forbade Plaintiffs from raising any new claims, and called for the Plaintiffs to *move* for permission to file an amended complaint "[i]n order to clean up pleadings in this case" following the interventions. (Doc. No. 39).[24]

### B.   DEFENDANTS' OWN FILING DEMONSTRATES THAT PLAINTIFFS' CLAIMS ARE NOT BARRED BY LACHES OR THE STATUTE OF LIMITATIONS.

Defendants' own recent filing demonstrates that Plaintiffs' claims are not barred by the statute of limitations, and that they would not be barred by laches even if Defendants had not waived that defense. Defendants argue that Plaintiffs could have filed their complaint years earlier than they did, because they knew that Defendants intended to execute them by lethal

---

[22]By definition, Defendants' arguments cannot apply to Intervenor Plaintiffs Battle and Hall as their complaints are not subject to the stipulated amendment.

[23]Nor may Defendants raise the defense in a dispositive motion, since laches must be pled affirmatively by responsive pleading. *Riley v. Titus*, 190 F.2d 653 (D.C. Cir. 1951); see also *Harris*, 126 F.3d at 345 (Rule 8(c) requires a party "first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion").

[24]The proposed amendments were administrative, not substantive, in nature. Additionally, Plaintiffs have made it clear since their 2007 opposition to judgment on the pleadings that they are not pursing any claims against Defendants in their individual capacities and clarified that they do not challenge the promulgation of 28 C.F.R. § 26.3. The fact that the amendments have not been made should not be the basis to thwart consideration of otherwise meritorious claims, especially when taking into consideration Defendants' dilatory tactics over the course of the past two years concerning discovery obligations.

injection, and "there had been publicized concerns with lethal injections carried out by states between 1988 and 2000." Def. Reply at 6.

However, even assuming that Plaintiffs knew that Defendants intended to execute them by lethal injection, and that lethal injection carried risks, there is no dispute that "lethal injection" may be carried out in a variety of ways, and that at least *some* of those procedures would result in a constitutional execution.  Therefore, the pertinent question has always been, precisely what procedures would the Defendants use to execute the Plaintiffs?  As Defendants' latest revision of their protocol makes manifest, the answer to this question has been, and seems to remain, a moving target.   Defendants cannot arrogate to themselves the right to change the facts unilaterally, while simultaneously asserting that Plaintiffs knew, or should have known, those facts before they were changed.   Their statute of limitations and laches arguments must, therefore, fail.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' Renewed Motions For Judgment On the Pleadings And To Lift The Stay Of The Plaintiffs' Executions should be denied.  Plaintiffs should be afforded limited additional discovery into the New Protocol only recently produced by Defendants.  Further, Defendants should be ordered to comply with longstanding previous discovery obligations pertaining to the qualifications of executioners, which obligations Defendants have, to date, refused to fulfill.  Only then should a trial on the merits be scheduled to allow the Court to consider all the evidence amassed over the course of this litigation in order to permit it to decide whether Defendants' new execution procedures are constitutional. Alternatively, Plaintiffs request this Court to schedule oral argument on all motions still pending before this Court, including Plaintiffs' Motion to Modify the Protective Order based upon their

belief that defendants have provided them with false or misleading responses to discovery requests related to the qualifications of one of their executioners.

Dated:  August 15, 2008

Respectfully submitted,

_Paul Enzinna / GE_

PAUL F. ENZINNA (D.C. Bar No. 421819)
EMMA KUNTZ
Baker Botts L.L.P
1299 Pennsylvania Avenue, NW
Washington, DC  20004-2400
(202) 639-7752

*Counsel for Plaintiff James H. Roane, Jr.*

_Charles Zdebski / GE_

CHARLES A. ZDEBSKI  (D.C. Bar No. 451075)
Troutman Sanders L.L.P
401 9th Street, NW
Suite 1000
Washington, DC 20004-2134
(202) 274-2909

STEPHEN A. NORTHUP (D.C. Bar. No. 54587)
Troutman Sanders L.L.P
1001 Haxall Point
P.O. Box 1122
Richmond, VA 23218-1122
(804) 697-1240

FREDERICK R. GERSON
Robinson & Gerson, P.C.
7102 Three Chopt Road
Richmond, VA 23226

*Counsel for Plaintiff Richard Tipton*

CHARLES A. ZDEBSKI  (D.C. Bar No. 451075)
Troutman Sanders L.L.P
401 9th Street, NW
Suite 1000
Washington, D.C. 20004-2134
(202) 274-2909

BARBARA HARTUNG
700 E. Main Street
Suite 1600
Richmond, VA 23219

EDWARD E. SCHER
Thorsen & Scher, L.L.P
3810 Augusta Avenue
Richmond, VA 23230

*Counsel for Plaintiff Cory Johnson*

WILLIAM E. LAWLER III (D.C. Bar No.398951)
GRAHAM E. EDDY (D.C. Bar No. 495794)
Vinson & Elkins L.L.P
1455 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004-1008
(202) 639-6676

*Counsel for Plaintiff Bruce Webster*

JOSHUA C. TOLL (D.C. Bar No. 463073)
King & Spalding L.L.P
1700 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 737-0500

*Counsel for Plaintiff Anthony Battle*

MATTHEW HERRINGTON (D.C. Bar No. 452364)
OWEN BONHEIMER (D.C. Bar No. 484984)
Steptoe & Johnson L.L.P
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

ROBERT C. OWEN
Texas Bar No. 15371950
Owen & Rountree, L.L.P
P.O. Box 40428
Austin, TX 78704
(512) 804-2661

MARCIA A. WIDDER
Louisiana Bar No. 23367
636 Baronne Street
New Orleans, LA 70113
(504) 558-9867

*Counsel for Plaintiff Orlando Hall*

## CERTIFICATE OF SERVICE

I hereby certify that true and correct paper copies of the foregoing Plaintiffs' and Intervenor Plaintiffs' Surreply Regarding Defendants' Renewed Motion for Judgment on the Pleadings and Renewed Motion to Lift the Stay of Plaintiffs' Executions (filed under seal), have been served on the following by hand in a sealed envelope this 15th day of August 2008:

Peter S. Smith
Kenneth Adebonojo
UNITED STATES ATTORNEY'S OFFICE
Appellate Division
555 4th Street, NW
Eight Floor
Washington, DC 20530

Robert J. Erickson
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Room 1515
Washington, DC 20530

Beverly Maria Russell
John F. Henault, Jr.
Madelyn E. Johnson
U.S. ATTORNEY'S OFFICE FOR D.C.
501 Third Street, N.W.
4th Floor
Washington, DC 20530

_____
Graham E. Eddy