*Seymour L. Halleck, M.D.*
*549 Cedar Club Circle*
*Chapel Hill, N.C. 27517*

*Forensic Psychiatry*              *Phone: (919) 929-8574*
                                   *Fax: (919) 929-0709*

June 6, 2006

Mr. Sean D. O'Brien
305 East 63rd Street
Kansas City, Missouri 64113

Dear Mr. O'Brien:

    This is a report of my findings regarding the mental status of Jeffery William Paul throughout various stages of his life. It is based, in part, on four interviews I had with Mr. Paul while he was on death row at the Terra Haute Federal Penitentiary. The first interview, on November 20, 2002, was conducted at the prison and it lasted for approximately four and one-half hours. The second interview, by telephone on January 7, 2004, lasted for approximately one hour. The third interview, on August 17, 2004, was by telephone and lasted approximately one and one-half hours. The fourth interview, on February 28, of 2006, was conducted at the prison and lasted for approximately four hours. My report is also based on a review of collateral information which included the following:

1. Three volumes of records from the Terra Haute Penitentiary which cover Mr. Paul's psychological, medical and disciplinary problems while incarcerated..
2. Two volumes of medical notes from the Rivendell Psychiatric Center covering two hospitalizations in 1992 and 1993.
3. Jeff Paul's birth records.
4. Dennis Paul's (Jeff's father) military records.
5. Records from the Federal Correctional Institution at Butner, NC.
6. A forensic report from Butner FCI, dated February, 1997..
7. School records of Jeff Paul.
8. Treatment of Jeff Paul at the Ouachita Memorial Hospital for knife wounds on November 11, 1983.
9. School records of Jeff, Jason and Zachary Paul.

July 7, 2010
Exhibit 1

10. Arkansas State Prison records, 1994.
11. Garland County Detention Center records.
12. Records and reports of Dr. Anthony Semone.
13. Report of Dr. Kuo dated May 14, 1997..
14. Records of interviews with Paula Paul on September 23, 1996 and March 12, 1997.
15. Mitigation documents:
    a. Paul family history
    b. Mental health history of Jeff Paul
    c. Jeff Paul's life history
    d. Interviews done by Tena S. Francis, Hubert Massey and other family members
16. FBI reports of Special Agent Lavoie.
17. Records from the community counseling service concerning Jeff Paul.
18. The report of the Arkansas Child Study Center dated July, 1991.
19. A summary of the case (undated and unsigned).
20. Records of testimony before either a grand jury or a trial of the following individuals:
    a. Special Agent Lavoie
    b. Jason Paul
    c. Paula Paul
    d. Jonah Jones (Ingle trial)
    e. Darrell Bell (Ingle trial)
    f. Susie Arbuckle
    g. Rebecca Pringle
    h. Cindy Williams
    i. Chris Rogers
    j. Kris Lapaglia
    k. Daniel Coughlin

21. Declarations
    a. Sean O'Brien
    b. Tena Francis
    c. Dr. Seymour Halleck
    d. Trinity Ingle
    e. Richard McCaslin
    f. Heather Miller
    g. Hubert Massey
    h. James Massey
    i. Martha Massey
    j. Paula Paul
    k. Michael Roberson
    l. Dr. Anthony Semone
    m. Cyrila Teague
    n. Sara Bankhead
    o. Lynn Williams

**Past History:**

There is a history of serious mental illness among members of both sides of Jeffery Paul's family. Jeff's grandfather, Hubert Massey, has noted in his declaration that he had tried to kill himself with a shotgun when he was younger. He did this because he could not tolerate his alcoholic father beating him. Mr. Massey also reported that his brother's son had substance abuse problems and hung himself in jail. A niece of his could not go beyond second grade in school. His wife's sister had tried to slit her wrists and was committed to a mental hospital. His wife's uncle had killed himself. He was a substance abuser. His wife's father was severely depressed and one of Jeff's uncles on the maternal side had been diagnosed as having schizophrenia.

In her declaration, Mrs. Paula Paul reports that on her husband's side his mother, father, sisters and brother were all alcoholics. Dennis' uncle, (Jeff's father's uncle) had killed his mother while drunk and one of Dennis' cousins had tried to kill himself. I will provide more information about the serious mental difficulties of Jeff's father, Dennis Paul, in the next section.

**Early History:**

Most of Jeff Paul's early difficulties in life were related to the strange and often anti-social behavior of his father, Dennis Paul. Dennis came from a dysfunctional family with an alcoholic mother and alcoholic father. He felt he never fit in. He has referred to himself as "the kid everyone liked to beat up". He apparently responded to his difficulties by developing a fantasy life involving ideas that he had made unusual accomplishments as a soldier and martial arts expert. He created identities for himself which he presented to other people and his fantastic claims were often believed by others, including Jeff and his brothers. In reality, he was a failure at almost every job he had and was a completely unreliable provider for the Paul family. He would often unexpectedly disappear for long periods of time and then return home acting as though nothing had happened. In the meantime, the Paul family was, at times, left without food or electricity. Most of the deficits for the family's resources were filled in by Paula's father, Mr. Massey. Jeff and each of his brothers went through periods of disillusion as they grew older and began to discover their father's stories were not true.

Between 1972 and 1976 Dennis Paul managed to enlist in three different military services; the Navy, the Army, and the Marines. He lasted for two years in the Navy from 1972 to 1974 and was described as having poor performance and being unsuitable for duty. He was given a hardship discharge in 1974. In 1976, after six months in the U.S. Army Reserves, he was discharged for reasons that were not clearly stated in the records. He did have difficulties while with the Army Reserves. Earlier in 1976 he also had a brief tour of duty with the U.S. Marines. He was dismissed for unsuitability. There is a notation in his Marine records on January 10, 1976 indicating that he had one episode, in

which he was found to be disoriented and confused. He was combative and had to be put in restraints. No reason for these behaviors is provided.

There is considerable evidence that Dennis Paul lost his temper with very little provocation and when he did, was abusive to his children, particularly to Jeff. This was noted by Jeff during interviews and by his mother, Paula during her testimony. It is also noted in the declarations of Zach Dryden, Heather Miller, Hubert Massey, James Massey (Jeff's uncle) Martha Massey, his grandmother, Michael Roberson who lived with the family for a while, Cyrila Sue Teague and Sara Bankhead. Most of the above listed individuals believe that Jeff was the one child in the family that was singled out for the greatest abuse. It is reported that at times Jeff's father would pick him up by his ears and whirl him in the air until Jeff became very upset and cried and screamed for help. Sometimes Dennis would throw Jeff against walls. Some who wrote declarations noted that Jeff often had bruises.

When Jeff was seven years old he was struck in his face with a knife his father had thrown. The wound, a deep one which went from the skin of his cheek to the inside of his mouth, required one hundred and two stitches to repair. (Records of Ouachita Memorial Hospital.) Jeff had some facial disfigurement from this scar as a child which gradually improved as he grew older.

Dennis' role modeling as a father was also harmful to Jeffery. He urged Jeff to be tough and to cultivate a reputation as a tough person. According to Jeff (and this is partially supported by his older brother Jason) by the time Jeff was eleven years old, he was stealing things, including guns and giving them to his father who sold them to obtain money to support the family. Jeff always believed that his father was involved in criminal activities. He was amazed his father was almost never arrested and certainly never convicted of serious crimes. Much of Jeff's anti-sociality was not only learned from peers but was actually initiated by his learning experiences at home. Dennis' behavior has been much more subdued in his older years and he is now employed as a police officer.

Jeff's mother, Paula Paul, seemed to have been a more loving person in Jeff's life. She remained with Dennis, always took him back after his prolonged absences and even stayed with him after he had an affair with another woman. She worked when she could and was often the chief provider for the family. Eventually her parents, Mr. & Mrs. Massey, moved much closer to Paula and were helpful in supporting her family. It appears that Paula was overprotective of Jeff and would regularly make excuses for him when he behaved badly. She rarely disciplined him.

It is interesting to note that Jeff regularly slept in the same bed with his mother until he was seventeen years old. Jeff explains this by arguing that he needed to be there to protect his mother. Apparently neither Jeff, nor his mother, nor his father, thought this was unusual. In later years a younger brother, Zach, would also sleep with Paula Paul.

Two of Jeff's family members, his mother and his maternal uncle, James Massey, describe him as having some type of hallucinatory experiences as a young child. Mr. Massey reports that Jeff saw people in his room and insisted that they were real and that they were talking to him. Jeff's mother, Paula, stated that Jeff would report seeing people who everybody knew were not there. She also notes that he always felt that his life was being controlled by some negative force. He had a constant sense of pessimism that bad things were going to happen to him.

In the various declarations listed above, several people noted that Jeffery was a very loving child. He is often described as sweet. He was particularly concerned about taking care of wounded animals and could not stand seeing animals hurt. Unfortunately, Jeff had to cope with his father having broken one of Jeff's dog's legs while in a fit of rage. (Declaration of Heather Miller.) Jeff was upset when he saw people who were poorer than him and sometimes asked his parents if he could give them money. The positive aspects of Jeff's personality are emphasized in the declarations of Richard McCaslin, Heather Miller, Hubert Massey Jeff's grandfather, James Massey Jeff's uncle, Martha Massey his grandmother, Paula Paul his mother, Suzie Teague, and Ms. Bankhead.

By age six Jeff had developed a compulsion about biting his knuckles. Later on throughout childhood and up through adulthood, he developed a habit of picking on his face and frequently developed sores. This problem apparently increased during adolescence when he had acne. Jeff compulsively picked on sores throughout much of his early adulthood.

Jeff was apparently involved in the "accidental" setting of a brush fire when he was a small boy and later felt that he may have accidentally burned down a house with another friend when they were smoking. His first documented difficulty with the law, however, occurred when he was eight or nine years old when he and some other children were accused of taunting an elderly man. Jeff was the only one of these children who was convicted of harassing the man and was placed on probation. The courts found him to be a "delinquent child".

Jeff did reasonably well in school until he was about nine or ten years old. At that time he was attending an elementary school in Hot Springs where most of the other students were more affluent than Jeff was. Jeff was often teased and humiliated because he wore clothes that did not fit him. Apparently some stealing, particularly of clothes, began at this time. Jeffery also developed a powerful sense of humiliation over his poverty and began to view stealing as a justifiable way of alleviating this problem. Jeff began smoking marijuana at age ten. He began drinking shortly afterwards. By age fifteen he was using LSD on a regular basis. Later on he began using Methamphetamines and other forms of stimulating drugs which he considered to be his favorites.

By 1991 Jeff's schoolwork was deteriorating. He was getting into more difficulty with the law, was oppositional and defiant at home and was brought to the Arkansas Children's Hospital in Little Rock for evaluation. He, he was diagnosed as having an attention deficient hyper-activity disorder along with an oppositional defiant disorder. He

was put on Ritalin at this time. About this time Jeff's self concept had also deteriorated and he often referred to himself as a bad person who would never amount to anything.

By his early teens it was also apparent that Jeff had a tendency to try to impress others with his "badness". He developed a reputation as a fighter. He tried to sustain his reputation by exaggerating the extent of his delinquency. This was noted by one of Jeff's friends, Richard McCaslin, who said that Jeff actually made up a story about shooting somebody else at the mall. It was also noted in the declaration of Michael Roberson, who spent some time living with the Paul family. Mr. Roberson states that Jeff's father, Dennis, actually tried to train Jeff to be an "intimidator". Jeff always exaggerated his "badness". Since early adolescence, Jeff appeared to have developed a consistent tendency to reject the self-concept of being a sick person and wanted others to view him as a "bad person". He was always ambivalent about accepting counseling services. He was extremely unhappy later on when he was hospitalized on two occasions at the Rivendell Psychiatric Hospital. On one occasion in the course of these hospitalizations he was reported to have stated quite emphatically "I am not a mental patient, I am a criminal".

By his teenage years Jeffery had adopted some of his father Dennis' tendencies to be careless with the truth. As Jeff described this to me he stated that his father was a "pathological liar" but that he, Jeff, tended to simply "spin things". Some of the things that Jeffery reports about himself during adolescence, particularly with regard to his anti-social activities, cannot be accepted without skepticism. One example of this is that when at the Rivendell institution, he reported to a counselor that he had killed somebody. This never happened. There is also reason to question his frequent descriptions of his "gang activity". He told me and he has told others that he was a member of the Crypts gang during adolescence. This is a black gang which generally does not accept white members. His brother Jason apparently belonged to the same gang and does accept Jeff's stories about gang activities. However, other friends of Jeff's at this time, including Zach Dryden and Richard McCaslin, insist that Jeff's "gang" was a loosely organized group of friends who were not particularly committed to anti-social activities.

At age sixteen Jeff stole a car with another boy and drove it to Memphis. He went to court and was put on probation. At about this time he was sent for help to the local Community Counseling Service. Here he received counseling from two social workers; Miss Sharon Allen and Mr. Joseph Fedor. Apparently he was cooperative with these counselors and appeared to benefit from his relationship with them. Miss Allen referred Jeffery to a doctor who diagnosed him as having an attention deficit hyperactivity disorder and oppositional defiant behavior and recommended that he be put back on Ritalin which his parents had stopped because of financial difficulties.

Also at the age of 16, Jeffery had obtained a gun and was playing with it in a car when he accidentally shot a friend. He was charged with possession of handgun. He spent some time at a detention center the Ouachita Childrens' Center. Plans were made to hospitalize him at the Rivendell Mental Institution. Sometime before entering Rivendell, in August 1992, he had apparently been talking to his mother about suicidal

thoughts. On one occasion he did slit his wrists enough to bleed. Jeffery spent about a month at Rivendell during his first hospitalization. He was diagnosed as having a conduct disorder and a depressive disorder. The staff at Rivendell saw Jeffery as a boy with serious emotional disturbances but also as a young man who was involved in a great deal of anti-social behavior. While at Rivendell for the first hospitalization, Jeff was treated with psychotherapy and Sinequan (a strong anti-depressant). At the time of the second hospitalization at Rivendell, at least one staff member felt that he had no problem other than wishing to avoid responsibility for his actions and that he was headed for prison. Between hospitalizations at Rivendell (the second one was from January 27, 1993 through March 2, 1993), Jeff managed to get thrown out of school and was kept at home for home schooling. He continued to receive therapy from Miss Allen and Mr. Fedor. He also was charged with burglary of a friend's house, became terrified of going to a training school or prison and talked about killing himself if this were to happen. The burglary charges appear to have been a factor in his second commitment to Rivendell. Prior to the second admission he was threatening suicide while he was continued on Sinequan.

Even with treatment (psychotherapy and anti-depressants), and even with home schooling restrictions placed upon him by his probation officer, Jeffery continued to get into trouble. On October 8, 993 he was arrested for theft of under $200 and criminal mischief. On November 13th of the same year he was accused of committing a terroristic act. Apparently Jeff and his friends were having an argument with some individuals in another car. As the two cars passed, Jeff fired a shot at the people in the other car. In December 1993 Jeffery was arrested for this shooting and was placed in custody at the Garland County Detention Center. There he was involved in one fight and made one escape attempt.

On April 27, 1993 Jeff pled guilty to the terroristic act and was given a six year sentence with adult probation. Jeff was soon in trouble again however for theft of property and in August 1994 he pled guilty to the terroristic act and violation of probation. He was committed to the Arkansas Department of Correction for a term of five years. Jeff talked about suicide at this time but did not make overt threats. He remained in prison until March 12, 1995 when he was released on parole. Jeff told me that it was very difficult for him to be in the Arkansas prison and while there he was physically assaulted. He was described as something of a "loner" while there. He appears to have survived eight months of incarceration without getting into serious trouble. On release from prison Jeff held jobs for a while at Wendy's Restaurant and at a local resort. He did not do well at either job. He began spending much more time with Trinity Ingle and they both would use methamphetamines on a regular basis. They also continued to engage in joint criminal ventures up until June 22, 1995, the day on which the victim in this case, Sherman Williams, was murdered.

It is difficult to know what kind of head injuries Jeff Paul has experienced. He reports many injuries related to fights and one from jumping off a roof when he was a small boy trying to experience the fantasy that he could fly. He also has been in automobile accidents. It's impossible to authenticate whether there was any loss of

consciousness in any of these events. He seems to have lost consciousness when beaten up in prison but this is not verified in the records.

**The Crime and Arrest**

Jeff's version of what happened on the day of the crime is that he intended to steal a car and he believed that Mr. Ingle had the same intention. He states, "we were into stealing, not robbing". He acknowledges that both he and Ingle had used "speed" before the crime and that they had taken "acid" the night before. He also believes that he had not had alcohol for twelve hours preceding the crime. Mr. Ingles spotted the victim and suggested they rob him. Ingle took his money and then duct taped his arms and legs. Jeff said they were walking away from the victim when Ingle told him that he was concerned that the victim would report them. He had seen their faces. Jeff said at this point he was in denial and did not believe that anybody was going to be killed. Jeff states that he asked Ingle to stop. Ingle turned the gun on Jeff and said that if he didn't cooperate, he would kill Jeff as well. Ingle then killed the victim. Jeff states that after the crime, and for many, many days, he was angry at himself and thought constantly about the victim saying he had children and grandchildren. Jeff states, "I felt some compassion. I was trying not to give a shit. But, yea, I had nightmares."

I do not know what statements Mr. Ingle made to the FBI or what claims he made at his trial. In his declaration of February 2005, however, Mr. Ingle stated that he tied the victim up with tape "then Jeff and I started back down the trail but when I looked back at him, the guy was looking right at me. I turned to go back but Jeff grabbed me by the arm and said let's just leave him and get out of here. Jeff kept arguing with me but I yanked free of him holding me. I still had the gun in my hand and when Jeff was looking at it as I held it in his direction. Even though Jeff didn't know what I was going back up the mountain for, I made sure that he knew if he put his hands on me again trying to stop me, I would have shot him too and there would have been two people left up on the mountain." Ingle goes on to state that he killed the victim. Jeff also notes that before the attack, he had premonitions that things were going to go wrong that day. He states, "I was predicting my own doom". He also told me there were many things he could not really remember about what had happened on the mountain.

After spending a couple of days in a hotel and talking with friends, Jeff left for Florida with his brother Jason. (Jason was implicated in so far as he had driven Mr. Ingle and Jeff to the site where the crime occurred.) They ended up in the Florida Keys and eventually Key West. Jeff remained free for almost fourteen months during which time he earned money selling T-shirts, had a relationship with a woman, Cindy Wallace, and also made friends with a Daniel Coughlin. He was apparently in contact with his father some of this time. At one point, he and Jeff moved briefly to Myrtle Beach and then back to Mississippi. Jeff was planning to go California when he was arrested in August 1996. He believes that his cousin informed the FBI as to his whereabouts. When apprehended, he asked the arresting officer to shoot him saying he would rather be dead than go to prison.

Shortly after his arrest, Jeff made a statement to Federal Bureau of Investigation Special Agent Lavoie stating that it was he who had duct taped the victim's arms and legs and that he had also kicked the victim. He did not acknowledge any further involvement in the victim's death. The prosecution developed its case however. It investigated four old friends of Jeff's, Kris Lapaglia, Cindy Wallace, Daniel Coughlin, and Chris Rogers who were persuaded to testify. Jeff had talked to each of them about his involvement in the death of the victim. There were some inconsistencies between the stories he told each friend. In one of the stories he told about kicking the man in the head so hard that his eye came out. This was obviously not true. Jeff's older brother Jason was also persuaded to testify for the prosecution.

As part of its pre-trial preparation, the defense requested that Jeff's competency be evaluated and he was sent to the Federal Correctional Institution in Butner, N.C. for evaluation by government doctors. While at Butner, Jeff apparently made an escape attempt. The report from Butner concluded that Jeff did not have a major mental illness but did have a substance abuse problem and an anti-social personality disorder. The report also indicated that Jeff was competent to stand trial and was responsible for his crime.

After being appointed by the trial court to assist the defense in the capital murder case of Jeffery Paul by evaluating and assessing his mental health, Dr. Anthony Semone, interviewed Jeff and administered a series of tests in May 1997. Dr. Semone was concerned about Jeff's mental competency. In a letter addressed to Jeffrey's attorneys he stated that he had serious concern about Jeff's present competency to stand trial. The doubts were based upon several flagrant and emotional outbursts thrown by Jeffrey during the interviews with him and his attorneys. The attorneys had told Dr. Semone that they were concerned the he would react to trial in the same manner. They also told him that they did not know whether his resistance and his explosiveness were feigned or if, in fact, they represented underlying serious psychological problems. In his letter to the attorneys Dr. Semone made it clear the Jeffery Paul was suffering from an underlying severe mental disease and that the behaviors the attorneys were concerned about were a direct product of that disease and were not feigned behaviors. He also told the attorneys that his initial testing had demonstrated the presence of psychotic panic or an acutely psychotic decompensation. He predicted this condition would worsen under stress. Dr. Semone noted that Jeff's paranoid projections and delusional ideas might be masked by behavior in which he would appear hostile, demanding, perplexed and possibly disoriented. He indicated that the stress of the trial could increase the degree of his incompetency. In effect, Dr. Semone predicted that Jeff was in danger of having a serious psychological decompensation in the course of the trial. As I will note shortly, his prediction was accurate.

Dr. Semone was also concerned that Jeff could avoid some of the stresses of the trial if he were properly medicated. In response to Dr. Semone's report, Jeff's attorneys hired Dr. Irving Kuo to evaluate Jeff. Dr. Kuo diagnosed Jeff Paul as having an anti-social personality disorder. He did not believe he needed medication and declared him competent "at this point".

In the meantime, the mitigation specialist hired by the defense, Tena F. Francis was having major problems in preparing mitigation evidence. In her declaration of July 23, 2004, she describes how the judge was unwilling to authorize payment for the many hours she was having to put in as well as problems she was having with the short time schedule available to her. She felt that the defense attorney, Linn Williams, was unable to persuade the judge that more hours were needed. For a while Ms. Francis did pro bono work. She also notes in her declaration that this was time in her life where she could not afford to be performing pro bono work indefinitely and, eventually, she could not complete the kind of mitigation report which would have met her professional standards. It was only until the case was appealed some time after Jeff was sentenced to death, that mitigation information began to be compiled in detail.

Before his trial, which began on June 21, 1997, Jeff felt a certain degree of confidence that he might be acquitted. This began to erode in the early days before trial as he became acquainted with his attorneys. He had two attorneys, Steve Oliver, who handled the guilt phase of the trial and Linn Williams who handled the sentencing phase. He liked Mr. Oliver but he eventually grew to despise Mr. Williams. They argued constantly. Jeff felt that Mr. Williams did not listen to him and by the time the trial ended, he was almost convinced that Mr. Williams was working for the prosecution.

Throughout much of the trial Jeffery was convinced that even if he were found guilty, his father would somehow or other rescue him from confinement. He believes his father encouraged him in this belief and thought that either during the trial or after he was found guilty, if that happened, his father would get him out. As the trial progressed, however, and he realized that they would not be able to suppress his FBI statement and that his friends were testifying against him, he thought increasingly of escaping. He felt more and more paranoid. Jeff told me, "Everyone I cared about hurt me. I couldn't believe it was happening. It was like there was a great conspiracy against me. I couldn't stop myself. I felt great anger. At one point I felt that when they found me guilty, they were going to shoot me immediately." At other times Jeff felt he would be executed on the first set date set for his death which was only three months after the trial. At times he felt he was about to hyperventilate. He felt like his head was going to explode. He believes that throughout much of the guilt phase of the trial he was near a state of panic. He was angry and looked angry. "I tried to hold onto a positive picture that I was going home but I was not thinking clearly."

Jeff became increasingly furious at Linn Williams. Jeff felt he was working for the prosecution. Jeff states, "I couldn't figure him out. He got me to say things that were untrue just to appease him. I reacted to him. I did what I thought he wanted. I feared he would sabotage me otherwise. We would fight. He would call me a liar and a piece of shit." Jeff states that by the time he was found guilty "my mind was gone". He told me he had no memory of the death penalty phase except "my mind was gone".

At one point Jeff was convinced that the marshal knew that he was about to try to escape from the court and the marshal grabbed his shoulders. On June 23, 1997, Jeff

called the prosecuting attorney a "bitch" possibly within hearing distance of the jury. On the 24th he arrived in court without having showered, combed his hair or changed his clothes.

Although Jeff's recollection of what was happening to him was vague, there were others present at the trial who were able to provide a more objective picture of what was happening. Dr. Anthony Semone attended much of the sentencing phase of the trial and observed Jeff's his demeanor and actions with his attorneys and occasionally spoke with Jeff. Dr. Semone saw the kind of deterioration he had predicted would happen. He states, "I saw how Mr. Paul's appearance changed dramatically. His demeanor became more dazed, he had stopped grooming himself and had been coming to court in his jail outfit rather than the street clothes he had been provided. Mr. Paul also began having difficulty controlling his emotions as he engaged in more frequent outbursts and blatant gesturing. The trial judge appeared to treat these behaviors as hostile reactions to him and the proceedings rather than as the overt symptoms of an underlying mental disease." Dr. Semone was convinced by his observations that the stress of the trial proceedings had caused such a severe deterioration of Jeff's mental capacity that he became incompetent while the trial was ongoing.

In his declaration of February 11, 2005, Jeff's uncle, James Massey, reports that he attended the entire trial. He states in this document, "At first Jeff seemed okay to me. I saw his face, the way he was interacting with his attorneys, how he would glance at me and smile. As the process continued, however, all of this changed. He stopped talking to his lawyers, he withdraw into himself. His face had a dazed and blank stare on it most of the time but, at the end, Jeff looked so confused and bewildered it looked to me like he really didn't know where he was. I'm no expert or anything but I know Jeff very well and I could tell that by the time that trial was over he was not really there. He was disconnected, completely out of it and aloof." He later states, "Something very awful happened to Jeff in that courtroom and it seemed to me like no one was paying any attention to it except when Jeff's emotions would bubble up and he would have an outburst".

In his declaration of February 2005, one of Jeff's oldest friends, Richard McCaslin, stated, "As the trial approached Jeff's wheels in his brain starting breaking. He got more emotional, he started asking about my kids. He told me he hated his lawyers because they were working against him. He really believed they were part of the government or something. Jeff said they were questioning and messing with his memory and they didn't try to dig deep into the case. He called me every night during the trial and started saying strange things. He said they were controlling him but he didn't say who or how. He would also say things like "They hate me. I'm a piece of shit. I'm nothing in their eyes. They are denying me my rights. Nothing I say amounts to a hill of beans. My lawyers told me I am lying." Jeff was desperate and wanted me to help but I didn't know what I could do. He would cry and ask me, "Why do people hate me? Why do they treat me like I'm shit?" He was also very paranoid and rambling and not making any sense. I couldn't calm him down. A lot of what he said made no sense whatsoever. I was very worried about his mental condition but I didn't know what to do." It appeared the Jeff's

emotional deterioration was conducive to producing behavioral outbursts in court which made him get into more trouble with the judge and jury. His attorney, Linn Williams, called only one mitigation witness, Jeff's mother, feeling that any continuation of the trial would only result in Jeff damaging himself further. He terminated the defense.

**Jeff Paul's Mental State While on Death Row**

Some of the material in this section is based upon my review of the medical records of the Terra Haute Institution. It is clear from this review that different observers repeatedly came up with somewhat different views of what was wrong with Jeff and the seriousness of his condition. I will say more about these differences in my conclusions, but it might help in going through this section to record a quote taken from the part of Dr. Semone's report having to deal with the MMPI. This quote is, "It should be noted that he obtained a very high score on the control scale (See N). This anticipates an unusual ability to disguise or conceal psychopathology in interviews. A presentation "as well put together" or "as having aggression under control" should clearly not be taken at face value.

One of the first notes in the Terra Haute death row records is from a Dr. Campbell who is a psychiatrist and it is dated May 31, 2000. Dr. Campbell states, "He comes in on a referral from the Department of Psychology. They state that he has been having an increase in anxiety, not able to concentrate. He says he has thoughts that go round and round about a certain person or he remembers things from the past. He is having difficulty with his short-term memory, however." Dr. Campbell goes on, "He seems somewhat anxious today. He was quite suspicious of taking medications. He seemed to think there was a plot to control people, however, he appeared dysphoric and showed inappropriate affect and was anxious." Dr. Campbell made the diagnosis of brief psychotic episode, rule out obsessive compulsive disorder. In his later notes he made he diagnosis of schizophreniform disorder. Other prison doctors who have seen Jeff over the years have made the diagnosis of schizophrenia but did not provide data to justify the diagnosis. There are occasional psychiatric notes which indicate a diagnosis of a psychotic process, either schizophrenia, schizophreniform disorder or brief psychosis which appear between Dr. Campbell's first notes until May 23, 2004 when Dr. Wilson described Jeffery as "hearing voices". It appears that after May 2004, depression was the only psychiatric diagnosis made.

Dr. Campbell started Jeffery on Zyprexa in the spring of 2000 and this drug was continued until April 11, 2002. At this point there is note in the chart by a psychologist, Dr. Bigler, which states, "Dr. Campbell had placed him on anti-psychotic medication. In consultation with Dr. Webster, it was determined that continued treatments for self-reported anxiety and attentional problems should not be treated long term with Zyprexa or Seroquel. At no time prior to starting medication did Mr. Paul display any thought or mood disorder." (Mr. Paul had been briefly taken off of Zyprexa in 2001 and put briefly on Seroquel. He was taken off of Zyprexa because of having a complaint of weight gain. He did not like the Seroquel however and Zyprexa was quickly reinitiated.)

Apparently Zyprexa was started again in December 2003 after Mr. Paul had almost succeeded in hanging himself. For reasons which are not clear, this drug was discontinued again in April 2004. The records, with regard to anti-psychotic medication Jeff was taking, are somewhat confusing. There are orders for Zyprexa during the months between December 3, 2003 and April 2004 but it appears that some of the people involved with Jeff and perhaps Jeff himself did not know if he was taking it at that time or not.

The relatively frequent notes written by psychologists, with one exception, do not describe any serious mental disorder. Sometimes they routinely state that there is no evidence of serious psychological illness. At other times when Jeff would report symptoms suggestive of delusions or bizarre thinking, these were dismissed as being manipulative attempts to feign psychosis or efforts to get attention. One exception to this is a note written on Thursday, April 29, 2004 by chief psychologist, Bill Elliott, Ph.D. He states, "The inmate was seen privately in an SCU visiting room at the request of Unit Manager, R. White. According to Mr. White, various staff had reported that the subject was carrying on conservations with himself and making odd statements during interactions with others. (Interestingly Lt. Halloran had earlier informed me of a phone conversation between Paul and his father in which the former sounded confused and made little sense.) The subject presented as cordial and cooperative albeit confused, easily distracted and suspicious. He complained of intense, recurrent and unwanted interior monologues which were causing intolerable headaches. He professed to believe that staff and other inmates hated him and were often talking about him. Paul suggested that he was being punished for "something terrible" that he did as a child. He acknowledged that a subjective experience of distress has exacerbated since he had received an execution date."

"I informed the subject that he was depressed and anxious, not "crazy" and that I would ask Dr. Webster to prescribe appropriate medication."

The medical records reveal that Jeffery tried to hang himself by making a loop out of a bed sheet which he seemed to be trying to attach to the window on November 19, 2003. The officer stopped him from doing this however and there were no ill effects. He was put on closer watch at this time. Two days later, on November 21, 2003, he did succeed in hanging himself with a sheet. When he was discovered his feet were off the floor. His skin was discolored and he was unconscious. Evidence from the records and from personal conversations Sean O'Brien had with some of the officers indicate that he did not breathe for awhile until some kind of Heimlich maneuver was tried and he began to gasp for breath. A couple of hours after he was revived, he managed to break out the window in his cell door and cut his wrists with the glass shards. At this point he was put on strict suicidal observation. He was visited in his cell by chief psychologist, Bill Elliott. Jeff told the psychologist, "Look Elliott, you and I both know that I am competent and I'm not going to kill myself. I am going to beat this case and be out of here in two years. My lawyer is working on a psychological angle and I'm just trying to help out the cause. Just give him a call and he'll explain everything. We don't need to go through all of this bullshit." Dr. Elliott viewed this as a virtual admission of

malingering. He advised inmate Paul that he could not justify continued placement on suicide watch. Jeff was removed from suicide watch at this time. It appears that Mr. Paul was always believed by the psychologists when he would give any kind of indication that he may have been malingering and feigning mental illness. His sincerity was routinely questioned when he presented evidence of despair or distress. He was treated on a malingerer even when he had just, within the past twenty-four hours, narrowly escaped death by hanging.

Subsequent to his having broken the cell window and cutting himself with glass on November 21, 2003, there were two other incidents which were quite similar which occurred in June 2004 and June 2005. In each instance these were interpreted as manipulative attempts to gain attention and convince people that he was mentally ill. They were handled with a disciplinary response.

During his time at Terra Haute, Jeff has received disciplinary reports for insolence, for threatening bodily harm, for setting a fire with toilet paper, for breaking windows, for trying to hang himself, for self-mutilation, for refusing to obey an order, for interference with the count, for spitting on an officer, for possessing tobacco in an unauthorized area, and for assaulting without serious injury. Most of these disciplinary reports where made in the months following his efforts to hang himself. It was also a time during which he was showing increasing evidence of psychosis.

With regard to non-psychiatric medical issues, the records also indicate that Jeff was treated for a sebaceous cyst, for arthritic pain, for impacted wax in his ears, for upper respiratory infections, for self inflicted wounds, for pain in his feet, for pain in his back and extremities and for heartburn. He also received dental care and was provided with glasses.

Before discussing the findings from my examinations of Mr. Paul, it will be useful to briefly describe some of the observations of one his attorneys, Sean O'Brien, which are described in his declaration of 2004.

Mr. O'Brien first interviewed Jeff on October 1, 2003. This was the only interview he had with Mr. Paul in which he felt that there were no overt signs of serious mental illness. On November 19, 2003 Mr. O'Brien had a telephone conversation with Jeff and observed that Jeff was completely incoherent. On November 25, 2003 Mr. O'Brien called Jeff's mother who reported that he had recently been incoherent during her telephone conversation with him.

On November 26, 2003 Mr. Paul apparently wrote a letter to the court requesting to drop his appeals. He was seen afterward by Mr. O'Brien and his other attorney, Mr. McGlasson, at which time Jeff declared that "that weird things are happening to me". He stated that people were playing with his memory, that he had been changed into a new identity and that he was being chemically castrated. In a telephone conversation with Mr. O'Brien on December 8, 2003, Jeff reiterated a number of statements which could only have been based on delusional beliefs. Mr. O'Brien interviewed Jeff again on June 30,

2004 at which time Jeff rambled incoherently and continued to show delusional thinking including delusions of paranoia concerning his attorneys. On July 6, 2004 there was hearing involving Jeff at which Mr. O'Brien was present. This was videotaped and Jeff seemed to hold together reasonably well during the videotaped portion. Afterwards, when he went to his cell with Mr. O'Brien, he once again became completely incoherent and his thinking was disorganized. He urged Mr. O'Brien not to tell the judge about his mental illness for fear that this would interfere with his efforts to be executed.

### My Observations of the Mental Status of Jeffery Paul Based On Face-to-Face or Telephone Interviews

My first interview with Jeffery Paul took place on November 20, 2002 at a time when he felt he was doing much better. He talked about how disturbed he had been in the past, particularly at the time of the trial. He believed he had remained disturbed up to the point where he was finally given Zyprexa in 2000. He stated, "This repositioned me and allowed me to focus. I found my mind." Mr. Paul was able to talk about having obsessive, repetitive thoughts run through his mind which were very disturbing. He stated that he often developed elaborate fantasies and had false beliefs that people he knew worked for the Mafia. He would see people eating lunch and he would at times assume they were Mafia. He talked about always having had a vivid imagination and having jumped off a 30 foot roof when he was a child to prove he could fly. He talked about having always been socially anxious and feeling that people would talk about him. Some of his statements during the interview included, "The world is blurry. I always feel disconnected. It feels like there are cotton balls in my head, but sometimes there is lucidity."

Mr. Paul also talked about his tendency to "spin the truth", particularly when he wanted to impress people with his toughness. He acknowledged that he would frequently make up stories to convince people he was a serious criminal and not mentally ill. In addition to continuing to complain about obsessional thoughts (that is, repeatedly thinking about things he did not want to think about), Mr. Paul also described compulsions. (Irrational but acts he had to perform in order to avoid anxiety.) He describes his constant picking at his face as an especially troubling compulsion. He feels he has to touch a clock and a television set before he can go to bed. At home he had to step on cigarette burns on the carpet before he could go to the bathroom. He further states "I feel compelled to use bad language inappropriately. Once I insulted my teacher's dog and got kicked out of class." He also has the obsessive thought that he might kill himself while driving. He considers himself a bad driver insofar as he gets urges to swerve into another car or swerve off the side of the road into a tree. He did not elaborate but he said he sometimes has swerved his car off the road.

Mr. Paul reported that he has endured symptoms of depression for most of his life. He is particularly troubled by chronic sleep disturbances. Sometimes he gets as little as three to four hours sleep a night. On rare occasions he sleeps too much. When he is depressed he has trouble concentrating, he is sad and his energy and appetite are diminished. He states that he occasionally has "high" moods but describes these as "brief

and rare". He talked about suicidal fantasies and for the first time mentioned that out of frustration he might drop all of his appeals. He also has fantasies of setting himself on fire.

At the time of this first interview he was not having auditory hallucinations. He did endorse visual hallucinations in the past which he related to the effects of the drugs he was taking. Mr. Paul also complained of panic attacks. His heart beats so hard when he has these attacks that he fears he will hemorrhage into his brain. He becomes short of breath, weak and tremulous. He states "it's like a fight or flight response, I am notorious for my panics". He said "I had many fights in prison which were really related to panic. I am like a rabbit in a trap who will bite". During this first interview I briefly tested Mr. Paul's cognitive functions. He was fully oriented. He seemed to have a rather wide fund of knowledge, a good ability to concentrate and good recent memory. He would do fairly well with some mathematical problems but surprisingly was incapable of multiplying even small numbers. His ability to deal with abstractions as manifested by finding similarities and interpreting proverbs was fair.

My second interview with Mr. Paul was by telephone on January 7, 2004. A summary of this interview was presented to his attorneys in my declaration of February 2005 and I will quote from it directly. Mr. Paul expressed some very bizarre and disjointed ideas and beliefs. He made the following statements:

1. "I see things outside of my mind and body."
2. "My attorney may be involved in letting me become a fall guy." Note, he was preoccupied with Sean O'Brien's eyes being green like his.
3. "Everything I see on TV I saw before. TV is directed at me. Everything that happens to me, happened before."
4. "During my last phone call the words I spoke with were not my own. Words were put in my mouth."
5. "My girlfriend Carrie is not a woman, she a hermaphrodite. She's in love with a black inmate."
6. "People are calling me things like a "maggot pedophile". They want me to kill myself. I am being programmed."
7. "I have conversations with voices only I can hear." Note, at the point where I asked him if others could hear his thoughts, his response was affirmative.
8. "Everything I have seen, I have seen before."
9. "I have been programmed not to kill."
10. "My memories are different. I am not in control. I am being programmed."

During my conversation with him Jeff told me that he was experiencing racing thoughts and expressed concerns that his thoughts were being broadcast so that others could here them. He reported hearing continuous voices.

My third interview with Mr. Paul was on August 19, 2004 and was by telephone. At that particular time he was under many restrictions because of disciplinary events. He was under constant camera watch, was not allowed cigarettes and couldn't control the

temperature in this room. He told me about his suicide attempts. He insisted that he was being deliberately tortured. His captors were always looking for soft spots and trying to find ways to hurt him more. "Pretty soon they will stop feeding me, or letting me have clean clothes, stamps or hygiene products." He complained that his headaches were extreme describing his breaking windows as a way of helping his headaches. He believed that sonic waves were causing his headaches and that someone was pushing him into despair. He believed his green eyes were turning brown. He said that people seemed to be getting taller and shorter and everything seemed "weird".

He talked about the efforts to break him down as being deliberate and synchronized. He again complained that his thoughts were being broadcast and "people can't hear my voice sometimes but they think I can read their minds". He wanted to waive his appeals again and to end it all. He again talked about being trapped, that everyone just pretending and that he was in a strange world. He then said that "if I tell you what is unbearable for me and you let them know, they will use it to make things worse". He also made a reference to being in a situation similar to that of the victim in a film "The Truman Show" where the rest of the world was watching him on television and that the world he lived in was not the real one. He made the same reference in my last interview with him.

My final interview with Jeffery Paul was on February 28, 2006. It took place at the Terra Haute Institution. At the time the only psychotropic drug Jeffery was taking was Paxil. He believed the Zyprexa had been stopped because he was experiencing liver damage. He believed that the voices for some reason had stopped on exactly December 10th of the previous year, ten weeks earlier. He talked about how severe they had been up to then. There were dialogues in which the voices were threatening to cut his head off. He also talked about hearing voices from unplugged headphones and light sockets. Sometimes he was afraid to eat the food the institution gave him and at one time tried to invent some kind to vest to wear that would afford him protection from persecutors. He referred to the voices as coming from out of his head and used the word "disembodied" to describe them. Jeff also talked about how the voices were usually preceded by headaches and he described these headaches as being extremely severe. He said it was so bad that "you start thinking of giving yourself a lobotomy so the voices will go away". It is not entirely clear that the voices have disappeared. Sometimes he talked about his symptoms as though they were still happening. It is not uncommon for people with schizophrenia to report evidence of past delusions and hallucinations when they are still having them in the present.

In this interview, Mr. Paul once again reiterated his problems with panic, obsessions, compulsions and depression. More troubling, however, was that at times he lost his train of thought and went off on tangents. He acknowledged that his concentration has been bad since he attempted to hang himself, that he has trouble processing a conversation, that he talks less and that he loses his train of thought. He states, "It's like I was under water and then revived." He thinks his brain is less sharp than it used to be. Although he denied that he had attention deficit disorder as a child, he thinks he may have it now. He feels that all the time he has spent on death row and all the things that have happened to him, have put his mind in a situation where he has difficulty focusing on things relating

to people. When I did a brief test of his cognitive functions on this occasion, he did somewhat worse than he had done back in 2002. He did not know the date, had difficulty with multiplication, had trouble memorizing and his recent memory was not as good. His ability to find similarities between things or to interpret proverbs was limited.

Mr. Paul's mental status during this most recent interview was certainly better than it was during my two previous telephone conversations. There was, however, considerable evidence of recent severe psychosis as well as some residuals of psychosis insofar as his cognitive functions were concerned.

**Diagnostic Issues**

Jeff Paul has a history of having experienced obsessions, compulsions, depression and panic at various times throughout his life since he was a young child. At some point as he reached adulthood, all of these symptoms evolved into a psychotic disorder related to his genetics and to the stresses of trial and incarceration. His psychotic disorder most closely resembles a schizophrenic disorder but a bipolar disorder must not be ruled out. The only certainty is that his psychosis is characterized by delusions, hallucinations and cognitive impairment. It is also quite possible that after he attempted to hang himself he was probably anoxic for a period of time. There may have been brain damage which is now complicating the clinical picture. His psychosis is also characterized by periods of apparent remission.

Certainly during much of his life, Jeff's bad behavior would qualify him for the diagnosis of anti-social personality disorder using DSM IV criteria. It is my opinion, however, that much of his anti-social behavior was fueled by his mental illness.

It is important to appreciate that Jeff has exceptional abilities to conceal his psychosis when he wants to. When he is "covering up" his psychosis cannot be detected unless he is interviewed in some detail. It is possible that his psychosis can go undetected for relatively long periods of time.

The psychiatric symptoms observed by myself, Dr. Semone, Mr. O'Brien and some of the psychiatrists at Terra Haute are typical of those seen in other psychotic patients. It is unlikely that Mr. Paul could have fabricated these symptoms so consistently for so long. Please note that Dr. Semone's evaluation included tests which indicated that Mr. Paul was not malingering.

I am still puzzled as to why the psychologists who were working with Jeff were so committed to viewing him as malingering. For a year beginning in July 1954, I was in charge of the Acute Admissions Unit for mentally disordered offenders who were sent to the Medical Center for Federal Prisoners in Springfield, Missouri. I found that it was not uncommon for prisoners who had been overtly psychotic to claim that they had been malingering once they had been treated and had a remission from their psychosis. My observations prompted me to publish a paper on this issue which was published in 1960 in Psychiatry The Journal of Interpersonal Processes in which I argued that for many

individuals, particularly those want to maintain a reputation as being tough or who want to survive in a prison environment, it is much better to be viewed as "bad" rather than "mad". Because of this, I would have strongly questioned statements Jeff gave to this psychologist that he was malingering. I have also seen (admittedly rarely) some individuals who, sensing that they were beginning to experience psychotic symptomatology, began to try to bring it on themselves by simulating it. I suspect they did this in order to gain some control over the symptomatolgy which they felt might otherwise engulf them. Eventually, some of these people became obviously psychotic.

**The Issue of Competency**

At the time of his capital murder trial, Jeff Paul may not have had a total understanding of the nature and severity of the charges against him. As the trial progressed to the penalty phase, he could not communicate rationally with his attorneys. He did not have sufficient concentration and memory to understand the events of the trial. He did not have sufficient impulse control to exercise appropriate courtroom demeanor. In my opinion, he never should have been allowed to go to trial without medication. He was certainly incapable of proceeding through the penalty phase.

I also believe that since his hanging attempt in November 2003, his mental condition has deteriorated to such an extent that he is unable to assist his attorneys in proceeding relevant to his appeal. He does not seem to comprehend the benefits of a successful appeal. He has difficulty in communicating rationally with his attorneys. His paranoid delusions, which sometimes include his attorneys, complicates communication further. Furthermore, his suicidal impulses related to his illness may cause him to irrationally seek an unfavorable outcome of his appeal.

Respectfully submitted,

Seymour L. Halleck, M.D.