**Affidavit of Sean D. O'Brien**

Comes now Sean D. O'Brien, first being duly sworn, states as follows:

I am an attorney licensed to practice in Missouri and admitted to practice before the 8th Circuit Court of Appeals. Since approximately 1985 the majority of my practice has consisted of the defense of indigent persons in capital cases. I am writing this affidavit to explain the circumstances under which the attached, unsigned declaration was prepared.

In late 1999, Robert McGlasson contacted me for assistance in the representation of Jeffrey Paul, a young man sentenced to death in the Western District of Arkansas. I gave Mr. McGlasson minor assistance with Jeff's appeal, and in the spring of 2002, I authorized Mr. McGlasson to advise the district court that I would accept an appointment as co-counsel on Jeff's habeas corpus petition. Mr. McGlasson's motions to appoint co-counsel were initially denied, but finally granted when he fell ill for several months in mid-2003. I was appointed as co-counsel in Jeff's case on September 15, 2003.

In the entire time that I have represented Jeff, we have had only one rational conversation about the merits of his case. That occurred on October 1, 2003. In November, 2003, when Mr. McGlasson and I were in Hot Springs, Arkansas, attempting to interview witnesses and preparing for a November 21, 2003, oral argument on discovery and other issues, my office called to advise that Mr. Paul apparently had attempted suicide and was locked down in an observation cell. Details were unavailable at that time.

In response to this development, Mr. McGlasson and I attempted to set up a visit with Mr. Paul by Dr. Seymour Halleck and Dr. Karen Froming. We were informed by that the Bureau of Prisons had only recently adopted a rule requiring a court order to allow outside mental health experts to see prisoners on death row. We therefore on November 20, 2003, wrote an ex parte motion asking the court to enter such an order, and we filed it on November 21, 2003, prior to appearing for the scheduled oral argument. Since Mr. McGlasson and I were both in Arkansas, the court granted leave to proceed ex parte, and agreed to hear us on our motion for access that day. On December 2, the Court entered an order granting our request. However, shortly thereafter Judge Hendren received a letter from our client asking to dismiss his appeal, and the judge withdrew his order authorizing the mental evaluation. We attempted several times, without success, to persuade the district court to reinstate the order.

Judge Hendren scheduled a hearing on August 6, 2004, to determine whether Mr. Paul would be allowed to dismiss his habeas corpus petition and submit to execution. Based on our research and observations of Jeff, Mr. McGlasson and I strongly felt that a mental evaluation was necessary on several substantive issues in the case in addition to the question of whether he was competent to proceed and whether his attempts to dismiss his appeal were knowing, voluntary and intelligent.

One of the troubling issues confronting us was the extent to which we could share with the judge, in an open hearing in the presence of the prosecution, attorney-client communications which in our view clearly had a bearing on the competency issue. Our dilemma arose from the fact that we felt bound by the attorney-client privilege, yet disclosure of such information would be probative of whether Mr. Paul at the time was competent to proceed. Mr. McGlasson and I have both represented mentally impaired prisoners, and we were (and are) convinced that Jeff's impairments are significant.

July 7, 2010
Exhibit 5

Because of concerns about the attorney-client privilege, I decided that it would be appropriate to seek leave to proceed ex parte, and to file that attached declaration with the court in the event that such leave was granted. This declaration was drafted on August 9, 2004, and was based on my observations and recollections of my contacts with Mr. Paul and his family since October 1 of 2003. I also relied on contemporaneous notes and memos that I had made of such contacts. It was my intention to present this declaration to the court after obtaining leave to proceed ex parte. Of course, the issue of whether Jeff was still attempting to waive his appeal was also a significant factor in the decision to disclose this declaration. The case for disclosure of my declaration diminished on August 17, 2004 when I visited with Jeff in person and he once again signed a written repudiation of his request to be executed. On January 31, 2005, Judge Hendren denied our motion to proceed *ex parte* on the same day that he also denied Mr. Paul's 2255 motion.

When this Court granted Mr. Paul's motion to allow Dr. Halleck's evaluation to move forward, I provided the attached declaration to Dr. Halleck so that he would have the benefit of this information in arriving at a conclusion. Dr. Halleck referred to the declaration in his report finding that Jeff was not competent to proceed in the district court. Given the importance of this information to the issues before the court, Dr. Halleck's conclusion that Mr. Paul is not competent, and the possibility that Mr. Paul would be irretrievably prejudiced by the non-disclosure of this information, I am filing the declaration at the present time.

I affirm that the information set forth herein and in the attached declaration is true and correct.

Sean D. O'Brien

STATE OF MISSOURI          )
                           ) ss.
COUNTY OF JACKSON          )

Subscribed and sworn to before me, a notary public, this 12th day of June, 2006.

ETHEL M. GURKE
Notary Public - Notary Seal
State of Missouri - County of Clay
My Commission Expires Mar. 10, 2009
Commission #05448921

NOTARY PUBLIC

My commission expires:

A02328

### Declaration of Sean D. O'Brien

I am an attorney admitted to practice law in the State of Missouri, the U.S. District Court for the Western District of Missouri, the Eighth and Tenth Circuit Courts of Appeals, and the United States Supreme Court. On September 15, 2003, I was appointed to represent Jeffrey William Paul in proceedings pursuant to 28 U.S.C. sec. 2255 challenging his conviction for the murder of Sherman Williams and sentence of death.

Since being appointed to represent Jeff, we have had only one substantive conversation about his conviction and sentence and the underlying facts of the case. That occurred on October 1, 2003, during my first visit with Jeff at the U.S. Penitentiary in Terre Haute, Indiana. I had met with my co-counsel, Robert McGlasson, in Atlanta, Georgia, the previous day (September 30) to review parts of the file and discuss the case. I noted that the mitigation investigation by Tena Francis had been terminated prematurely, and that the investigation had just begun to uncover family mental health issues. I also noted that Dr. Tony Semone had been consulted by defense counsel, and he had expressed concern that Mr. Paul's mental condition would deteriorate under the stress of a trial. From the description of Mr. Paul's behavior as trial progressed, Dr. Semone's prediction was quite accurate. It quickly became apparent that competent representation of Mr. Paul would require completion of Ms. Francis' aborted investigation and a thorough mental health evaluation.

Mr. McGlasson and I traveled together to Terre Haute to visit our client. During our visit, which lasted several hours, Mr. Paul was friendly and cooperative, and motivated to assist us in preparing and presenting his case. He asserted his innocence of killing Mr. Williams, and presented a plausible scenario of events consistent with that assertion. I noted that Jeff tended to give tangential, rambling responses to questions. He also said that when he was first arrested on this charge he would have committed suicide if the means to do so had been available, and he said that he said to the arresting officer, "Shoot me, motherfucker." After he was handcuffed and leaned against the hood of a car, he urged the officer, "Give the gun to me; I'll blow my brains out." Jeff later called me and expressed concern that during our meeting he had said something to offend me or cause me to dislike him. I assured him that was not at all the case, and that I was optimistic that I could help him.

After my first visit with Jeff, I began reading the file and planned an investigative trip to Arkansas with Mr. McGlasson. We met in Little Rock on November 17, 2003, and drove to Hot Springs to visit various scenes connected with the case and talk to trial counsel and other witnesses. We spoke to several close friends of Jeff who described him as sensitive and caring, and not likely on his own volition to commit a violent crime, particularly one against an elderly victim. The people I spoke with were very supportive of Jeff and would gladly have come to testify in his defense. These include Barbara Baker, Richard McCaslin and his wife, Melissa. Richard and Melissa have two children with whom Jeff was very close and protective. They were very willing to help us locate additional witnesses.

On Wednesday, November 19, I received a phone call from my office. Danny Lee, federal death row inmate being represented by my law partner, Kent Gipson, called Kent and told him that Jeff had attempted to kill himself and was taken to the infirmary. Details were very sketchy. Mr. McGlasson and I called Brian Stewart, Mr. Paul's counselor in the U.S. Penitentiary at Terre Haute, who told us only that a corrections officer on November 18, 2003, saw Mr. Paul in the midst of an attempt to hang himself in his cell, and intervened, successfully preventing him from committing suicide. Mr. McGlasson and I later received more details from Officer Perdue, who was working

A02329

the front desk during our visit with Mr. Paul on August 6, 2004. Officer Perdue said that Mr. Paul had put a towel over the window of his cell door when Perdue was making his rounds. He moved the towel aside and saw Mr. Paul hanging by his neck from a strip of cloth he had tied to the bars on his window. Mr. Paul's feet were not touching the floor; his face was discolored; he was not moving and did not appear to be breathing. Perdue said that he and three or four other officers working that evening fumbled for their keys to Paul's cell, and upon finally getting the door open Perdue lifted Paul, taking the weight off the ligature around his neck, while another officer cut him down. Paul was not breathing. Officers used what Perdue said was a "Heimlich-like" procedure to open and airway and restart Paul's breathing. It involved hitting him very hard in the back; on the third blow Paul began gasping for breath.

We were advised by Mr. Stewart that Mr. Paul was transferred to an observation cell and was seen by prison mental health staff, who reportedly intended to order that he receive medication. Mr. Paul later told us he was prescribed Alonzopine, commonly used for the treatment of schizophrenia, though we have not been allowed access to records that would confirm what medication, if any, was prescribed.

Prison staff arranged a call from Mr. Paul to Mr. McGlasson on November 19, 2003. During that call, Mr. Paul expressed bizarre and irrational thoughts and beliefs; in fact he was completely incoherent throughout the telephone conversation. Mr. Paul was still expressing suicidal wishes and tendencies, and was unable to respond rationally to attempts to communicate with him. Mr. McGlasson and I prepared an *ex parte* motion for access to Mr. Paul by mental health professionals, Seymour Halleck, M.D., and Karen Froming, Ph.D., who had seen Mr. Paul previously. A court order was necessary to obtain access because the prison had recently adopted a new policy requiring a court order to allow mental health professionals into the penitentiary. On November 21, 2003, Judge Hendren granted our written request for leave to proceed ex parte on a motion for access to Mr. Paul.

On November 25, 2003, around 4:00 p.m., I called from Paula Paul, Jeff's mother. She was very worried and upset about phone calls she and her husband received over the weekend. On Saturday, Randy White, the Unit Supervisor at Terre Haute, called and spoke with Jeff's father, Dennis Paul. White advised that Jeff had put his foot through a glass window, cutting himself, which required stitches. On Sunday, Jeff called and said some very strange things that she knew indicated that he was "just not right mentally." A lot of Jeff's statements were bizarre ramblings, so she could not clearly remember everything he told her. She does clearly recall him insisting that he was married and had a wife, but he couldn't remember her name, and was very frustrated that Paula kept telling him that he had never been married. She said it was reminiscent of her brother Butch's (James Massey) disorder. He has been diagnosed with schizophrenia. Jeff told Paula Sunday that he did not want to have any further contact with her, which hurt her deeply, but she understands that Jeff is not in his right mind. She said that she was going to go ahead and put money on Jeff's books like she does every week.

Paula is sure that the diagnosis "schizophrenia" appears in Jeff's psychiatric treatment records from Rivendell and his other placement, and was surprised that it never got brought up in Jeff's trial. While the recent episode is more extreme than any of Jeff's previous episodes that she has witnessed, she does recall times when he became paranoid and seemed to lose a grip on reality. He commonly thought that people were out to get him when Paula knew that it absolutely was not true. She

2

A02330

wondered if those episodes were precursors of the more recent events.

On November 26, 2003, I received a call from Robert McGlasson who said he had received updated information of yet another very recent suicide attempt by Jeff Paul. Apparently he put his fist through a safety glass window in his cell and used the shards to saw at his wrist in another attempt to kill himself. In addition, he told Robert that he had mailed a letter to the district court asking to drop his appeals so he can be executed. I placed a phone call to Jeff. The following paragraph is a synopsis of that call.

Jeff was concerned that he might need medication, primarily because he is "too aware" of things that go on around him. He told me he has always been acutely aware of subtle cues and signs that people give off that other people don't notice, but which tell him a lot about motives of people and things that are going on around him. He said that has been happening a lot lately, and that "I'm thinking some very weird shit." He said that in his sleep, somebody discards a bunch of his old memories and he wakes up with a whole new set of memories that are very detailed and very complicated that he can't quite work out. He's been given a new identity, and he told me to "ask me my name." I asked his name, and he said, "I am Brian J. Lieberman." That name was given to him by someone he does not know, but it comes from real estate papers that were brought to him by a friend, whom he does not recall. He could not recall whether he saw these real estate papers before or after being sent to prison. He said that he has been told a lot of things by a lot of people, and now people are denying having told him stuff. Lately people have been telling him that he is being very weird and that his ideas are insane, but that has stopped within the last couple of days because he just doesn't talk about it anymore, and he tells people that he's feeling okay. However, there is a "huge foundation" that is "talking to me about weird, narcissistic shit." He is worried because he signed something to allow people to chemically castrate him, which doesn't bother him that much, because there aren't any women around, but he is afraid that he signed something authorizing that he be permanently committed. That's why he wrote the court to drop his appeal, although he knows he can't drop his appeal because people related to Mr. Williams want to do something to him, so it is in their interest to keep him alive. That's why they have given him a huge amount of money to deter him from dropping his appeals. He asked me if he was wealthy, and I told him that to my knowledge he had no money and that's why the court appointed me on the case. He said he wasn't sure, but he thinks he has lots and lots of money. His thoughts are coming very fast, and he has a hard time sorting them out, but he has figured out that "this place is the delusion, and these thoughts are what's real."

I asked specifically what he had written to the court, and he said that he told Judge Hendren he wants to drop his appeals, and he also told the judge that he is "culpable to the extent of being an accessory after the fact." He wants everything to be over, and thinks execution is one way to end it. He says that the prison is "color nothing," and he wants color in his life. He asked me to send him color magazines, and he wants to go back to his cell to paint. He asked me to tell Randy White, a unit supervisor at the prison, that he is sorry that he broke his promise not to break anything else, and that he would like to go back to his original cell and have coffee and cigarettes. He wants to leave all of this other stuff in God's hands. He wants magazine subscriptions, because he wants to know what's going on in the world, but he doesn't want news because that's depressing. I told him I'd try to figure something out. I spoke with Randy White, the unit supervisor, who said that Jeff needs to sign a release, after which he will call me and fill me in on what has happened.

3

A02331

Judge Hendren on December 2, 2003, entered an order granting our request to allow Dr. Halleck and Dr. Froming to enter the U.S. Penitentiary to evaluate Mr. Paul. However, that order was vacated by the court when Mr. Paul wrote a pro se letter to the judge asking to dismiss his appeals. We visited Mr. Paul on December 8, 2003, and he signed a document withdrawing that request. That document was filed with the court, along with a request to reinstate the order granting access. That order has never been reinstated.

Robert and I visited Jeff on December 8, 2003, in Terre Haute, arriving in the prison around 11:20 a.m. Jeff was initially happy to see us, and showed us the cuts on his knuckles caused by his breaking the safety glass, and the cuts on his wrist from his attempt to cut them. Although there were numerous scratches on his left wrist, the safety glass shards were not sharp enough to cut deeply.

We spent a good deal of the day discussing the letter he had sent to Judge Hendren. Jeff was very ambivalent. On that subject, he said over and over, "I'm tired." He badly wants his appeal to be over, and he is not afraid to die. He thinks he will come back, but did not profess a religious belief in reincarnation. He also continued to express thoughts of a delusional nature, and when asked said that he has been experiencing these thoughts since the night of his first attempt at suicide by hanging. He exhibited confusion about the nature of the thoughts he is experiencing, which seem real to him. He'd say, "They're not real. But then they are." For example, he knows Robert and I are not Satan. But "they" are telling him that we are. He repeatedly apologized to us for saying that we are Satan. Jeff said he is taking Alonzopine and Busbar. His mood changed rapidly from fear to laughter.

As the afternoon wore on, he became fatigued, and just prior to our departure, he became frightened when I failed to remember that on my prior visit he had introduced me to Officer Dougherty, and made a comment about our common Irish heritage. That incident may have happened, I don't recall, but my failure to recall had a profoundly disturbing effect on him. He had insisted that I had been there to visit him twice before; I am certain it has been only once. He thinks that my failure to recall that minor incident means that one of his visitors was an imposter.

His delusional material expressed today included a belief that his girlfriend Carrie is a hermaphrodite, that his name is really James Glazer or James Edward Lieberman, that he is Jewish, that he is in a movie or TV Game Show first called the "Crying Game," now called "The Dying Game." He thinks he is the brother of Jesus Christ, and that his brother is the anti-Christ. He says he is not religious, but is puzzled that all these religious ideas creep into his head. He said that when he broke the glass with his hand, it felt as if someone else had control of his body and was forcing his hand into the glass. He feels as if someone is putting his finger into the back of his head, and controlling his thoughts and movements. He doesn't hear voices, but he spontaneously gets new memories of conversations that intrude into his head.

Robert and I asked Jeff if he understood the implications of writing the judge about dropping his appeals. Jeff said he wished he had not done that, but that he "couldn't help it." He said that there is no color in his world, and that he couldn't live without color. He apologized to us for writing to the judge, and signed a document we had prepared repudiating his pro se letter to the court. We attached that document to a letter to the court requesting reinstatement of his December 2 order granting access to Mr. Paul by mental health experts.

I had a few phone conversations with Jeff in the following months, but unfortunately my time

A02332

527

was consumed with a number of pressing cases. These included *State of Missouri v. Theodore White, Jr.*, Jackson County, Missouri case no. CR1998-02401, which was set for trial by jury beginning March 29, 2004, but commenced on May 6, 2004 and ran through June 2, 2004; *State of Arizona v. Ramon Martinez-Villareal*, Santa Cruz County No. 4641-A, charging two counts of first degree murder, in which I was in Nogales, Arizona for a competency to proceed hearing on June 9-12, 2004; and *In re Steven W. Parkus*, Washington County, Missouri, case no. CV1000-325CC, a death penalty post conviction case, in a competency to be executed hearing went forward the week of July 12, 2004. I did not do a very good job documenting my contacts with Jeff over that time because of the pressing nature of those cases and other matters, but I can say definitively that Jeff's thought processes did not improve over that period of time. In fact, between the White trial and the Parkus competency hearing, I set up a visit with Jeff at the first opportunity, which presented itself on June 30, 2004. It was my intention at that time to attempt to accomplish some substantive work on his case, and get a lay-person's assessment of his mental condition.

My June 30 visit with Jeff was very frustrating. I spent the days prior to the visit going through the file and getting a list of questions and information in the hopes that I could further our investigation with this visit. I struck out completely in my attempts to get Jeff to talk about any aspect of his case. He continued to be very paranoid and tangential. I went through the file inventory and tried to get information about various medical procedures and other factors in this case. There's one medical record that referred to treatment for a sprained back, and he started to tell me about an incident in which he was thrown across a bed by a large, black prisoner in the Arkansas Department of Corrections. He then started to tell me about spending his 16th birthday in the county jail, and how devastating it was to him, but then he stopped and said, "That doesn't matter, you could read my mind and get the information so why do you have to ask. It's not fair that you can read my mind but I can't read yours." When I tried to bring him back around to his 16th birthday, then he said, "well it probably didn't happen anyway. I was probably wrong about that."

Jeff said he got the order from the judge denying discovery, but he hasn't been able to read it. He says he can't focus well enough to read at all. He is not getting any kind of medication. The prison wants him to take Paxil, but he has refused the medication. He said, "I don't want medication, I want an explanation." He kept talking about trying to get to the truth and saying that he is innocent of Mr. Sherman's death, but he is going to take responsibility for it. I tried to discuss the concept of accessory liability with him, but he couldn't articulate what that meant. He seems to be under the impression that not stopping the murder in and of itself was sufficient to make him morally and legally guilty of its commission. He also mentioned *Ring v. Arizona* and said there might be an argument in his case based on that, but those were the only substantive issues that he mentioned. In the same breath, he would say that he deserved the death penalty, but that he deserved to go free because he is not a threat.

The main theme of our nearly five-hour discussion was Jeff's weariness of being incarcerated. He says he just can't stand it any longer. He is very fearful of going to the new facility across the street when it opens in March of 2005. I asked why, but he refused to tell me. He again expressed the belief that I have the power to release him from prison, but I won't because I don't want to. He said, "I know you're controlling this, and I want you to know I think it's a pretty shitty idea." He also said several times that, "I'm still myself, but then I'm not myself." He rambled about heaven and hell, but none of that discussion made sense. I kept trying to turn the conversation back

5

A02333

to Jeff's teenage years and some of the people he associated with, but he wouldn't respond to any inquiry in concrete terms. Instead he said, "I didn't create any of this. It was already here. But I'm the one who's paying the price for all of it." Several times he said, "I don't want to be here" and "I don't belong in society, and society doesn't want me." He said he had no fear of death, but that was clearly not true.

The other theme that ran through Jeff's ramblings was that, "everyone knows but me what's going on." He asked me several times what's happening, and I tried to respond with an update on his family and his case, and Jeff would say that's not what he meant. I took a few notes during the interview, but stopped when he moved his chair next to mine so he could read what I was writing. I didn't try to hide my notes from him, and I interpreted what some of them were and was honest with him about what I was writing down and why. He nevertheless seemed concerned that I was writing things down.

I tried to find out if there were any happy times in his life that he could tell me about. I did briefly get him to talk about playing little league baseball. He thought he was pretty good at the sport, and his dad would take him out for a snow cone after every single game, regardless of whether they won or lost. He clearly enjoyed that. Then he slipped back into his agitated mode and said that was, "a good thing tainted by knowledge that bad things are coming." He said that his life was not bad at all until he went to school, but he refused to elaborate on that or tell me what was bad about school.

Jeff blamed his mother for the fact that he is now incarcerated. I tried to get him to elaborate on that, and he refused to answer directly. Instead he said, "Mom and Dad are the people who raised me. I have a real mother and father." He also said, "Mom and Dad took a retarded redheaded kid and ruined him." I asked him who the retarded redheaded kid was, and he said he was referring to himself.

Jeff is not currently getting any visitors from the outside, and his mother is occasionally putting a little bit of money on his books. I asked if he wanted to see his parents, and I told him that Dennis indicated he was planning a trip to Terra Haute to visit him. Jeff seemed very surprised by that, and he didn't seem particularly happy about it, although he said he would see his father if he came. He said, "I've been beaten, hit, and my face was laid open." I tried to get him to talk more about those things, and he sidetracked the discussion back to his desire to be released. He said his mother wasn't present when his face was cut, and when I asked about his brother Jason, he clammed up.

This was an exhausting interview. I worked very hard to get very little information, and Jeff's demeanor was a somewhat toned down version of his presentation at his last meeting with me and Robert. The stitches in his hand were eight days old. His left hand had numerous scabs, and the largest cut is right at the base of his palm. The stitches were still in the wound, which was about a half an inch to 3/4 of an inch long, but fairly deep. He also had a couple of stitches on the outside portion of the back of his left hand. He kept picking at the upper portion of his right arm near the shoulder, and when he raised his short-sleeved tee-shirt I could see small open sores. He wouldn't talk about them.

Jeff was in isolation; there are no other inmates he can talk to, though I could not determine from him whether that was due to his unwillingness to talk to anyone, or his inability to talk to anyone. In this context, he mentioned David Paul Hammer, but then stopped himself and said, "I'm

6

A02334

not supposed to mention that name." Then he refused to explain that comment to me. Throughout this visit, Jeff's speech was very tangential and illogical, and he frequently stopped in mid-sentence and failed to complete his thoughts.

On July 21, 2004, I received a letter from the court dated July 19, 2004, referring to *pro se* letters from Mr. Paul postmarked July 12, 2004, and July 13, 2004. The first letter implied that Mr. Paul wanted to drop his appeals and be executed, and the second letter made that explicit request, although it also suggested other issues. For example, the July 15, 2004 letter refers to "supernatural amount of punishment" being administered to Mr. Paul at the penitentiary, and confesses an inability to achieve any "real definition of what is going on." The court denied my request for additional time to respond to its letter, but authorized my travel to Terra Haute and scheduled a hearing by video teleconference for 2 p.m. Friday, August 6, 2004.

I arrived in Terra Haute on the afternoon of August 4, but upon speaking with Mr. McGlasson chose to spend the rest of the day and the next morning researching legal issues and writing pleadings, and to visit with Mr. Paul on the 5th and 6th of August, prior to the hearing. On August 5th, Robert and I visited Jeff and attempted to discuss his letters to the court. Jeff said that he was determined to be executed, and begged us to step aside so that he could get it done. Robert and I tried to explain to him that he had some winning legal issues in his case and that we believed we could obtain his freedom. Jeff's response was that the entire thing was beyond our control, and that his fate had been predetermined. He said that his mother knew when he was a child that he would end up on death in Terra Haute. He made it clear that she was not expressing a general belief, as some people might, that Jeff would grow up to be a criminal. He believed that his mother had predicted when he was a child that he would end up in this specific time and place. He felt that his parents deliberately conspired to raise him to be wrongly convicted and put on death row. He kept talking about how his parents had raised a "retarded kid" with "orange hair" who could never be anything but a death row inmate. He talked about his destiny being controlled, but did not know who was doing the controlling. This was not a religious or philosophical statement; he was expressing a belief that an unseen malevolent entity had pre-ordained his future. At one point he suggested it was his mother, but he thought it might be his father or even me and Robert trying to manipulate his destiny. He said there was nothing that he could do to change anything because what was supposed to happen was already predetermined. He referred to being born into an "Orwellian nightmare," and that he couldn't stand being our "pet prisoner."

Jeff also expressed an awareness that his mental problems might be an obstacle to his execution, so he directed us not to discuss those with the judge and demanded that we obey his wishes. I was very frank with him about my perception of my role and my duty to call his mental condition to the court's attention, and I told him that I would resist his chosen course of action because of my belief in his lack of mental competence to make this decision, and my belief that his decision was being made without an understanding of the alternatives.

Robert and I tried to make Jeff understand that his case was not hopeless, but Jeff turned the discussion to what might happen to him after his release. He said that he just wanted to be left alone, but that society wouldn't let that happen. He said "society doesn't want me," that he would never be successful at anything, and there were forces at work preventing him from having any of the things that normal people have. He talked about his girlfriends, all of whom are married to other people and have children and families, and how that could never be for him because there's someone

A02335

or something controlling him and preventing him from having those things. That is his predestined station in life.

At the end of that very frustrating day I called Jeff's father, Dennis Paul, who confirmed that Jeff continues to "have a problem distinguishing between what really happened and false memories." He said that Jeff questions his mother about whether or not she is his real mother, or whether she is even real. Her conversations with Jeff are very unnerving to her, and she frequently ends them in tears. The last time Dennis and Paula visited Jeff was in March, and Paula was wearing a suit jacket that upset Jeff very much. She couldn't understand why, but she and Dennis found it very disturbing. During this visit and telephone conversations over the last 8 or 9 months, Jeff has expressed a lot of very odd ideas about his parents, about events that happened as he was growing up, and about a woman he has been involved with named Carrie, whom he described as an FBI agent who is trying to set him up.

Dennis said that what is occurring with Jeff is very reminiscent of his maternal uncle, James Massey, who has been diagnosed with schizophrenia. James always has a lot of strange ideas about UFO's, and frequently becomes involved with undesirable street people who move in and start manipulating and taking advantage of him. James frequently has things stolen from him and gets beaten up because of all of the "scuzzy people" he invites into his home. Dennis thinks that Jeff, like James, is easily manipulated in this way.

The next day, I asked Jeff about his mother's jacket, and he talked about the color red and how it was symbolic of blood, and Satan, and people who were trying to control him, and that it confirmed his beliefs about his mother's role in his life.

I will not review in detail the events at the hearing because it was captured on video tape. What is important, however, is what occurred after the tape was turned off and the guards led us back to the visitation room. Jeff quickly became incoherent and emotional, and began shedding tears and rambling and raging about the people controlling his life, about how he didn't have any choices, and repeating a good deal of the transparently delusional material that we have been observing in him since last November. Jeff is clearly in pain, beyond that inherent in his incarceration. I am absolutely convinced that he does not have a rational understanding of his circumstances, and that he is out of touch with reality. He is able to hold himself together for short periods of time to accomplish what he wants, i.e. suicide, but he could not hold it together through any kind of probing questioning about the facts or circumstances of his case or his sentence. He thinks that his case is doomed because of supernatural forces manipulating his life, and he is unable to weigh the evidence, the facts and circumstances of his case, or the legal issues and their possible outcomes in the equation of whether he wants to live or die.

8

A02336

I swear under the penalty of perjury under the laws of the State of Missouri and the United States of America that the foregoing declaration is true and correct.

Dated this _____ day of _____, 2004.

_____

Sean D. O'Brien

9

A02337